# EXHIBIT 1

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use NUEDEXTA safely and effectively. See full prescribing information for NUEDEXTA.**

**NUEDEXTA (dextromethorphan hydrobromide and quinidine sulfate) capsules, for oral use**
**Initial U.S. Approval: 2010**

------------------------**INDICATIONS AND USAGE**------------------------

NUEDEXTA is a combination product containing dextromethorphan hydrobromide (an uncompetitive NMDA receptor antagonist and sigma-1 agonist) and quinidine sulfate (a CYP450 2D6 inhibitor) indicated for the treatment of pseudobulbar affect (PBA). (1)

--------------------**DOSAGE AND ADMINISTRATION**--------------------

- Starting dose: one capsule daily by mouth for 7 days. (2.1)
- Maintenance dose: After 7 days, 1 capsule every 12 hours. (2.1)

--------------------**DOSAGE FORMS AND STRENGTHS**--------------------

Capsules: Dextromethorphan hydrobromide 20 mg/quinidine sulfate 10 mg. (3)

------------------------------**CONTRAINDICATIONS**------------------------------

- Concomitant use with quinidine, quinine, or mefloquine. (4.1)
- Patients with a history of quinidine, quinine or mefloquine-induced thrombocytopenia, hepatitis, or other hypersensitivity reactions. (4.2)
- Patients with known hypersensitivity to dextromethorphan. (4.2)
- Use with an MAOI or within 14 days of stopping an MAOI. Allow 14 days after stopping NUEDEXTA before starting an MAOI. (4.3)
- Prolonged QT interval, congenital long QT syndrome, history suggestive of torsades de pointes, or heart failure. (4.4)
- Complete atrioventricular (AV) block without implanted pacemaker, or patients at high risk of complete AV block. (4.4)
- Concomitant use with drugs that both prolong QT interval and are metabolized by CYP2D6 (e.g., thioridazine or pimozide). (4.4)

------------------------**WARNINGS AND PRECAUTIONS**------------------------

- Thrombocytopenia or other hypersensitivity reactions: Discontinue if occurs. (5.1)
- Hepatitis: Discontinue if occurs. (5.2)

- QT Prolongation: Monitor ECG if concomitant use of drugs that prolong QT interval cannot be avoided or if concomitant CYP3A4 inhibitors used. (5.3)
- Left ventricular hypertrophy (LVH) or left ventricular dysfunction (LVD): Monitor ECG in patients with LVH or LVD. (5.3)
- CYP2D6 substrate: Nuedexta inhibits CYP2D6. Accumulation of parent drug and/or failure of metabolite formation may decrease safety and/or efficacy of concomitant CYP2D6 metabolized drugs. Adjust dose of CYP2D6 substrate or use alternative treatment when clinically indicated. (5.4, 12.4)
- Dizziness: Take precautions to reduce falls. (5.5)
- Serotonin syndrome: Use of NUEDEXTA with selective serotonin reuptake inhibitor (SSRIs) or tricyclic antidepressants increases the risk. Discontinue if occurs. (5.6, 7.4)
- Anticholinergic effects of quinidine: Monitor for worsening in myasthenia gravis and other sensitive conditions. (5.7)

------------------------------**ADVERSE REACTIONS**------------------------------

The most common adverse reactions (incidence of ≥3% and two-fold greater than placebo) in patients taking NUEDEXTA are diarrhea, dizziness, cough, vomiting, asthenia, peripheral edema, urinary tract infection, influenza, increased gamma-glutamyltransferase, and flatulence. (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Otsuka America Pharmaceutical, Inc. at 1-800-438-9927 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------**DRUG INTERACTIONS**------------------------------

- Desipramine: Exposure increases 8-fold. Reduce desipramine dose and adjust based on clinical response. (7.5, 12.4)
- Paroxetine: Exposure increases 2-fold. Reduce paroxetine dose and adjust based on clinical response. (7.5, 12.4)
- Digoxin: Increased digoxin substrate plasma concentration may occur. (7.6)

------------------------**USE IN SPECIFIC POPULATIONS**------------------------

- Pregnancy: Based on animal data, may cause fetal harm. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 12/2022**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***
**WARNING: TITLE OF WARNING**

**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
   **2.1**   Recommended Dose
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
   **4.1**   Quinidine and Related Drugs
   **4.2**   Hypersensitivity
   **4.3**   MAOIs
   **4.4**   Cardiovascular
**5   WARNINGS AND PRECAUTIONS**
   **5.1**   Thrombocytopenia and Other Hypersensitivity Reactions
   **5.2**   Hepatotoxicity
   **5.3**   Cardiac Effects
   **5.4**   Concomitant use of CYP2D6 Substrates
   **5.5**   Dizziness
   **5.6**   Serotonin Syndrome
   **5.7**   Anticholinergic Effects of Quinidine
   **5.8**   CYP2D6 Poor Metabolizers
**6   ADVERSE REACTIONS**
   **6.1**   Clinical Trials Experience
   **6.2**   Long-Term Exposure with NUEDEXTA
   **6.3**   Safety Experience of Individual Components
**7   DRUG INTERACTIONS**
   **7.1**   MAOIs
   **7.2**   Drugs that Prolong QT and are Metabolized by CYP2D6
   **7.3**   Drugs that Prolong QT and Concomitant CYP3A4 inhibitors
   **7.4**   SSRIs and Tricyclic Antidepressants
   **7.5**   CYP2D6 Substrate
   **7.6**   Digoxin
   **7.7**   Alcohol
**8   USE IN SPECIFIC POPULATIONS**
   **8.1**   Pregnancy
   **8.2**   Lactation
   **8.4**   Pediatric Use
   **8.5**   Geriatric Use
   **8.6**   Renal Impairment
   **8.7**   Hepatic Impairment
**9   DRUG ABUSE AND DEPENDENCE**
**10   OVERDOSAGE**
   **10.1** Treatment of Overdose
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
   **12.1** Mechanism of Action
   **12.2** Pharmacodynamics
   **12.3** Pharmacokinetics
   **12.4** Drug-Drug Interactions
   **12.5** Pharmacogenomics
**13   NONCLINICAL TOXICOLOGY**
   **13.1** Carcinogenesis, Mutagenesis, Impairment of Fertility
**14   CLINICAL STUDIES**
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**
* Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

# 1    INDICATIONS AND USAGE

NUEDEXTA is indicated for the treatment of pseudobulbar affect (PBA).

PBA occurs secondary to a variety of otherwise unrelated neurologic conditions, and is characterized by involuntary, sudden, and frequent episodes of laughing and/or crying. PBA episodes typically occur out of proportion or incongruent to the underlying emotional state. PBA is a specific condition, distinct from other types of emotional lability that may occur in patients with neurological disease or injury.

# 2    DOSAGE AND ADMINISTRATION

## 2.1    Recommended Dose

The recommended starting dose of NUEDEXTA is one capsule daily by mouth for the initial seven days of therapy. On the eighth day of therapy and thereafter, the daily dose should be a total of two capsules a day, given as one capsule every 12 hours.

The need for continued treatment should be reassessed periodically, as spontaneous improvement of PBA occurs in some patients.

# 3    DOSAGE FORMS AND STRENGTHS

NUEDEXTA capsules contain 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate in a brick red gelatin capsule with "DMQ 20-10" printed in white ink on the capsule.

# 4    CONTRAINDICATIONS

## 4.1    Quinidine and Related Drugs

NUEDEXTA contains quinidine and should not be used concomitantly with other drugs containing quinidine, quinine, or mefloquine.

## 4.2    Hypersensitivity

NUEDEXTA is contraindicated in patients with a history of NUEDEXTA, quinine, mefloquine or quinidine-induced thrombocytopenia, hepatitis, bone marrow depression or lupus-like syndrome. NUEDEXTA is also contraindicated in patients with a known hypersensitivity to dextromethorphan (e.g., rash, hives) *[see Warnings and Precautions (5.1)]*.

## 4.3    MAOIs

NUEDEXTA is contraindicated in patients taking monoamine oxidase inhibitors (MAOIs) or in patients who have taken MAOIs within the preceding 14 days, due to the risk of serious and possibly fatal drug interactions, including serotonin syndrome. Allow at least 14 days after stopping NUEDEXTA before starting an MAOI *[see Drug Interactions (7.1)]*.

## 4.4    Cardiovascular

NUEDEXTA is contraindicated in patients with a prolonged QT interval, congenital long QT syndrome or a history suggestive of torsades de pointes, and in patients with heart failure *[see Warnings and Precautions (5.3)]*.

NUEDEXTA is contraindicated in patients receiving drugs that both prolong QT interval and are metabolized by CYP2D6 (e.g., thioridazine and pimozide), as effects on QT interval may be increased *[see Drug Interactions (7.2)]*.

NUEDEXTA is contraindicated in patients with complete atrioventricular (AV) block without implanted pacemakers, or in patients who are at high risk of complete AV block.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Thrombocytopenia and Other Hypersensitivity Reactions

Quinidine can cause immune-mediated thrombocytopenia that can be severe or fatal. Non-specific symptoms, such as lightheadedness, chills, fever, nausea, and vomiting, can precede or occur with thrombocytopenia. NUEDEXTA should be discontinued immediately if thrombocytopenia occurs, unless the thrombocytopenia is clearly not drug-related, as continued use increases the risk for fatal hemorrhage. Likewise, NUEDEXTA should not be restarted in sensitized patients, because more rapid and more severe thrombocytopenia than the original episode can occur. NUEDEXTA should not be used if immune-mediated thrombocytopenia from structurally related drugs, including quinine and mefloquine is suspected, as cross-sensitivity can occur. Quinidine-associated thrombocytopenia usually, but not always, resolves within a few days of discontinuation of the sensitizing drug.

Quinidine has also been associated with a lupus-like syndrome involving polyarthritis, sometimes with a positive antinuclear antibody test. Other associations include rash, bronchospasm, lymphadenopathy, hemolytic anemia, vasculitis, uveitis, angioedema, agranulocytosis, the sicca syndrome, myalgia, elevation in serum levels of skeletal-muscle enzymes, and pneumonitis.

### 5.2    Hepatotoxicity

Hepatitis, including granulomatous hepatitis, has been reported in patients receiving quinidine, generally during the first few weeks of therapy. Fever may be a presenting symptom, and thrombocytopenia or other signs of hypersensitivity may also occur. Most cases remit when quinidine is withdrawn.

### 5.3    Cardiac Effects

NUEDEXTA causes dose-dependent QTc prolongation *[see Clinical Pharmacology (12.2)]*. QT prolongation can cause torsades de pointes-type ventricular tachycardia, with the risk increasing as the degree of prolongation increases. When initiating NUEDEXTA in patients at risk of QT prolongation and torsades de pointes, electrocardiographic (ECG) evaluation of QT interval should be conducted at baseline and 3 to 4 hours after the first dose. This includes patients concomitantly taking/initiating drugs that prolong the QT interval or that are strong or moderate CYP3A4 inhibitors, and patients with left ventricular hypertrophy (LVH) or left ventricular dysfunction (LVD). LVH and LVD are more likely to be present in patients with chronic hypertension, known coronary artery disease, or history of stroke. LVH and LVD can be diagnosed utilizing echocardiography or another suitable cardiac imaging modality.

Strong and moderate CYP3A inhibitors include, but are not limited to, atazanavir, clarithromycin, indinavir, itraconazole, ketoconazole, nefazodone, nelfinavir, ritonavir, saquinavir, telithromycin, amprenavir, aprepitant, diltiazem, erythromycin, fluconazole, fosamprenavir, grapefruit juice, and verapamil.

Reevaluate ECG if risk factors for arrhythmia change during the course of treatment with NUEDEXTA. Risk factors include concomitant use of drugs associated with QT prolongation, electrolyte abnormality (hypokalemia, hypomagnesemia), bradycardia, and family history of QT abnormality. Hypokalemia and hypomagnesemia should be corrected prior to initiation of therapy with NUEDEXTA, and should be monitored during treatment.

If patients taking NUEDEXTA experience symptoms that could indicate the occurrence of cardiac arrhythmias, e.g., syncope or palpitations, NUEDEXTA should be discontinued and the patient further evaluated.

### 5.4    Concomitant use of CYP2D6 Substrates

The quinidine in NUEDEXTA inhibits CYP2D6 in patients in whom CYP2D6 is not otherwise genetically absent or its activity otherwise pharmacologically inhibited *[see Warnings and*

*Precautions (5.8) and Clinical Pharmacology (12.3, 12.5)]*. Because of this effect on CYP2D6, accumulation of parent drug and/or failure of active metabolite formation may decrease the safety and/or the efficacy of drugs used concomitantly with NUEDEXTA that are metabolized by CYP2D6 *[see Drug Interactions (7.5)]*.

### 5.5    Dizziness
NUEDEXTA may cause dizziness *[see Adverse Reactions (6.1)]*. Precautions to reduce the risk of falls should be taken, particularly for patients with motor impairment affecting gait or a history of falls. In a controlled trial of NUEDEXTA, 10% of patients on NUEDEXTA and 5% on placebo experienced dizziness.

### 5.6    Serotonin Syndrome
When used with SSRIs (such as fluoxetine) or tricyclic antidepressants (such as clomipramine and imipramine), NUEDEXTA may cause "serotonin syndrome", with changes including altered mental status, hypertension, restlessness, myoclonus, hyperthermia, hyperreflexia, diaphoresis, shivering, and tremor *[see Drug Interactions (7.4), Overdosage (10)]*.

### 5.7    Anticholinergic Effects of Quinidine
Monitor for worsening clinical condition in myasthenia gravis and other conditions that may be adversely affected by anticholinergic effects.

### 5.8    CYP2D6 Poor Metabolizers
The quinidine component of NUEDEXTA is intended to inhibit CYP2D6 so that higher exposure to dextromethorphan can be achieved compared to when dextromethorphan is given alone *[see Warnings and Precautions (5.4) and Clinical Pharmacology (12.3, 12.5)]*. Approximately 7 to 10% of Caucasians and 3 to 8% of African Americans lack the capacity to metabolize CYP2D6 substrates and are classified as poor metabolizers (PMs). The quinidine component of NUEDEXTA is not expected to contribute to the effectiveness of NUEDEXTA in PMs, but adverse events of the quinidine are still possible. In those patients who may be at risk of significant toxicity due to quinidine, genotyping to determine if they are PMs should be considered prior to making the decision to treat with NUEDEXTA.

## 6    ADVERSE REACTIONS

A total of 946 patients participated in four Phase 3 controlled and uncontrolled PBA studies and received at least one dose of the combination product of dextromethorphan/quinidine in various strengths at the recommended or higher than the recommended dose. Of those patients, 393 patients were exposed for at least 180 days and 294 patients were exposed for at least one year. Median exposure was 168 days.

Controlled trials enrolled only patients with either ALS or MS. Uncontrolled studies enrolled 136 patients with PBA secondary to a wide variety of underlying neurological conditions including stroke (45 patients) and traumatic brain injury (23 patients). Consequently, patients with other underlying neurologic diseases may experience other adverse reactions not described below.

### 6.1    Clinical Trials Experience
A 12-week, placebo-controlled study evaluated NUEDEXTA (dextromethorphan 20 mg/quinidine 10 mg) (N=107) and a 30 mg dextromethorphan/10 mg quinidine combination (N=110) compared to placebo (N=109). Approximately 60% of patients had ALS and 40% had MS. Patients were 25 to 80 years of age, with a mean age of approximately 51 years. Three (3) ALS patients in each drug treatment arm and 1 ALS patient in the placebo arm died during the 12-week placebo-control period. All deaths were consistent with the natural progression of ALS.

<u>Adverse Reactions Leading to Discontinuation</u>

The most commonly reported adverse reactions (incidence ≥2% and greater than placebo) that led to discontinuation with the 20 mg dextromethorphan/10 mg quinidine twice daily dose were

muscle spasticity (3%), respiratory failure (1%), abdominal pain (2%), asthenia (2%), dizziness (2%), fall (1%), and muscle spasms (2%).

<u>Most Common Adverse Reactions</u>

Adverse drug reactions that occurred in ≥3% of patients receiving the 20 mg dextromethorphan/10 mg quinidine twice daily dose, and at an incidence of ≥2 times placebo in short-term clinical trials in ALS and MS are provided in Table 1. Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to the rates in the clinical trials of another drug and may not reflect the rates observed in clinical practice.

**Table 1: Adverse Drug Reactions with an Incidence of ≥3% of Patients and ≥2x Placebo in NUEDEXTA-treated Patients by System-Organ Class and Preferred Term**

|  | NUEDEXTA N=107 % | Placebo N=109 % |
|---|---|---|
| Diarrhea | 13 | 6 |
| Dizziness | 10 | 5 |
| Cough | 5 | 2 |
| Vomiting | 5 | 1 |
| Asthenia | 5 | 2 |
| Peripheral edema | 5 | 1 |
| Urinary tract infection | 4 | 1 |
| Influenza | 4 | 1 |
| Increased gamma-glutamyltransferase | 3 | 0 |
| Flatulence | 3 | 1 |

## 6.2   Long-Term Exposure with NUEDEXTA

The experience in open-label clinical trials is consistent with the safety profile observed in the placebo-controlled clinical trials.

## 6.3   Safety Experience of Individual Components

The following adverse reactions have been reported with the use of the individual components of NUEDEXTA, dextromethorphan and quinidine, from post-marketing experience. Because these reactions are reported voluntarily from a population of unknown size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

<u>Dextromethorphan</u>

Drowsiness, dizziness, nervousness or restlessness, nausea, vomiting, and stomach pain.

<u>Quinidine</u>

Cinchonism is most often a sign of chronic quinidine toxicity, but it may appear in sensitive patients after a single moderate dose of several hundred milligrams. Cinchonism is characterized by nausea, vomiting, diarrhea, headache tinnitus, hearing loss, vertigo, blurred vision, diplopia, photophobia, confusion, and delirium.

Convulsions, apprehension, and ataxia have been reported with quinidine therapy, but it is not clear that these were not simply the results of hypotension and consequent cerebral hypoperfusion in patients being treated for cardiovascular indications. Acute psychotic reactions have been reported to follow the first dose of quinidine, but these reactions appear to be extremely rare. Other adverse reactions occasionally reported with quinidine therapy include

depression, mydriasis, disturbed color perception, night blindness, scotomata, optic neuritis, visual field loss, photosensitivity, keratopathy, and abnormalities of skin pigmentation.

## 7    DRUG INTERACTIONS

### 7.1    MAOIs

Do not use NUEDEXTA with monoamine oxidase inhibitors (MAOIs) or in patients who have taken MAOIs within the preceding 14 days *[see Contraindications (4.3)]*.

### 7.2    Drugs that Prolong QT and are Metabolized by CYP2D6

Do not use with drugs that both prolong QT interval and are metabolized by CYP2D6 (e.g., thioridazine or pimozide) *[see Contraindications (4.4)]*.

### 7.3    Drugs that Prolong QT and Concomitant CYP3A4 Inhibitors

Recommend ECG in patients taking drugs with NUEDEXTA that prolong the QT interval and in patients taking concomitant moderate or strong CYP3A4 inhibitors *[see Warnings and Precautions (5.3)]*.

### 7.4    SSRIs and Tricyclic Antidepressants

Use of NUEDEXTA with SSRIs or tricyclic antidepressants increases the risk of 'serotonin syndrome' *[see Warnings and Precautions (5.6)]*.

### 7.5    CYP2D6 Substrate

The co-administration of NUEDEXTA with drugs that undergo extensive CYP2D6 metabolism may result in altered drug effects, due to accumulation of parent drug and/or failure of metabolite formation *[see Warnings and Precautions (5.4)]*. Therapy with medications that are primarily metabolized by CYP2D6 and that have a relatively narrow therapeutic index should be initiated at a low dose if a patient is receiving NUEDEXTA concurrently. If NUEDEXTA is added to the treatment regimen of a patient already receiving a drug primarily metabolized by CYP2D6, the need for a dose modification of the original medication should be considered. The extent to which CYP2D6 interactions may pose clinical problems will depend on the pharmacokinetics of the substrate involved.

In cases of prodrugs whose actions are mediated by the CYP2D6-produced metabolites (for example, codeine and hydrocodone, whose analgesic and antitussive effects appear to be mediated by morphine and hydromorphone, respectively), it may not be possible to achieve the desired clinical benefits in the presence of NUEDEXTA due to quinidine-mediated inhibition of CYP2D6. Consider use of alternative treatment with NUEDEXTA when clinically indicated.

Drug interactions with desipramine and paroxetine have been studied in controlled clinical trials with a higher dose combination of dextromethorphan/quinidine (dextromethorphan 30 mg/quinidine 30 mg) than NUEDEXTA; study results are described below. No other drug interactions with CYP2D6 substrates have been systematically investigated, although concomitant use of such drugs was allowed in clinical trials with NUEDEXTA and in clinical trials with higher dose formulations of dextromethorphan/quinidine.

Desipramine (CYP2D6 substrate):
The tricyclic antidepressant desipramine is metabolized primarily by CYP2D6. A drug interaction study was conducted between a higher combination dose of dextromethorphan (dextromethorphan 30 mg/quinidine 30 mg) and desipramine 25 mg. The combination dose of dextromethorphan/quinidine increased steady state desipramine levels approximately 8-fold. If NUEDEXTA and desipramine are prescribed concomitantly, the initial dose of desipramine should be markedly reduced. The dose of desipramine can then be adjusted based on clinical response; however, a dose above 40 mg/day is not recommended.

Paroxetine (CYP2D6 inhibitor and substrate):
When the combination dose of dextromethorphan 30 mg/quinidine 30 mg was added to paroxetine at steady state, paroxetine exposure ($AUC_{0-24}$) increased by 1.7 fold and $C_{max}$ increased by 1.5 fold. Consideration should be given to initiating treatment with a lower dose of paroxetine if given with NUEDEXTA. The dose of paroxetine can then be adjusted based on clinical response; however, dosage above 35 mg/day is not recommended.

## 7.6   Digoxin

Quinidine is an inhibitor of P-glycoprotein. Concomitant administration of quinidine with digoxin, a P-glycoprotein substrate, results in serum digoxin levels that may be as much as doubled. Plasma digoxin concentrations should be closely monitored in patients taking NUEDEXTA concomitantly, and the digoxin dose reduced, as necessary.

## 7.7   Alcohol

As with any other CNS drug, caution should be used when NUEDEXTA is taken in combination with other centrally acting drugs and alcohol.

# 8   USE IN SPECIFIC POPULATIONS

## 8.1   Pregnancy

Risk Summary
There are no adequate data on the developmental risk associated with the use of NUEDEXTA in pregnant women. In oral studies conducted in rats and rabbits, a combination of dextromethorphan/quinidine demonstrated developmental toxicity, including teratogenicity (rabbits) and embryo lethality, when given to pregnant animals *(see Data)*. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2-4% and 15-20%, respectively. The estimated background risk of major birth defects and miscarriage for the indicated population is unknown.

Data
*Animal Data*
When dextromethorphan/quinidine was administered orally (0/0, 5/100, 15/100, and 50/100 mg/kg/day) to pregnant rats during the period of organogenesis, embryo-fetal deaths were observed at the highest dose tested and reduced skeletal ossification was observed at all doses. The lowest dose tested (5/100 mg/kg/day) is approximately 1/50 times the recommended human dose (RHD) of 40/20 mg/day on a mg/m$^2$ basis. Oral administration to pregnant rabbits during organogenesis in two separate studies (0/0, 5/60, 15/60, and 30/60 mg/kg/day; 0/0, 5/100, 15/100, and 50/100 mg/kg/day) resulted in an increased incidence of fetal malformations at all but the lowest dose tested. The no-effect dose (5/100 mg/kg/day) is approximately 2/100 times the RHD on a mg/m$^2$ basis.

When dextromethorphan/quinidine was orally administered  to female rats during pregnancy and lactation in two separate studies (0/0, 5/100, 15/100, and 30/100 mg/kg/day; 0/0, 5/100, 15/100, and 50/100 mg/kg/day), pup survival and pup weight were decreased at all doses, and developmental delay was observed in offspring at the mid and high doses. A no-effect dose for adverse developmental effects was not identified. The lowest dose tested (5/100 mg/kg/day) is approximately 1/50 times the RHD on a mg/m$^2$ basis.

When dextromethorphan/quinidine was orally administered (0/0, 5/50, 15/50, 25/50 mg/kg) to male and female rats on Postnatal Day 7, the highest dose resulted in neuronal death in brain (thalamus and medulla oblongata). Postnatal Day 7 in rat corresponds to the third trimester of the gestation through the first several months of life but may extend to approximately three years of age in humans.

## 8.2    Lactation

Risk Summary

Quinidine is excreted in human milk. It is not known whether dextromethorphan is excreted in human milk. There are no data on the effects of quinidine or dextromethorphan on the breastfed infant or the effects on milk production. The development and health benefits of breastfeeding should be considered along with the mother's clinical need for NUEDEXTA and any potential adverse effects on the breastfed infant from NUEDEXTA or from the underlying material condition.

## 8.4    Pediatric Use

The safety and effectiveness in pediatric patients below the age of 18 have not been established.

## 8.5    Geriatric Use

Of the total number of patients with PBA in clinical studies of NUEDEXTA, 14% were 65 years old and over, while 2% were 75 and over. Clinical studies of NUEDEXTA did not include sufficient number of patients aged 65 and over to determine whether they respond differently than younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy.

## 8.6    Renal Impairment

Dose adjustment of NUEDEXTA is not required in patients with mild to moderate renal impairment *[see Clinical Pharmacology (12.3)]*. The pharmacokinetics of NUEDEXTA have not been evaluated in patients with severe renal impairment; however, increases in dextromethorphan and/or quinidine levels are likely to be observed.

## 8.7    Hepatic Impairment

Dose adjustment of NUEDEXTA is not required in patients with mild to moderate hepatic impairment. The pharmacokinetics of NUEDEXTA have not been evaluated in patients with severe hepatic impairment; however, increases in dextromethorphan and/or quinidine levels are likely to be observed.

# 9    DRUG ABUSE AND DEPENDENCE

NUEDEXTA is a low-affinity uncompetitive NMDA antagonist and sigma-1 receptor agonist that has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. However, NUEDEXTA is a combination product containing dextromethorphan and quinidine, and cases of dextromethorphan abuse have been reported, predominantly in adolescents.

While clinical trials did not reveal drug-seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this experience the extent to which NUEDEXTA will be misused, diverted, and/or abused once marketed. Therefore, patients with a history of drug abuse should be observed closely for signs of NUEDEXTA misuse or abuse (e.g., development of tolerance, increases in dose, drug-seeking behavior).

# 10    OVERDOSAGE

Evaluation and treatment of NUEDEXTA overdose is based on experience with the individual components, dextromethorphan and quinidine. Metabolism of the dextromethorphan component of NUEDEXTA is inhibited by the quinidine component, such that adverse effects of overdose due to NUEDEXTA might be more severe or more persistent compared to overdose of dextromethorphan alone.

During development of NUEDEXTA, dose combinations of dextromethorphan/quinidine containing up to 6-times higher dextromethorphan dose and 12-times higher quinidine dose were studied. The most common adverse events were mild to moderate nausea, dizziness, and headache.

The most important adverse effects of acute quinidine overdose are ventricular arrhythmias and hypotension. Other signs and symptoms of overdose may include vomiting, diarrhea, tinnitus, high-frequency hearing loss, vertigo, blurred vision, diplopia, photophobia, headache, confusion, and delirium.

While therapeutic doses of quinidine for treatment of cardiac arrhythmia or malaria are generally 10-fold, or more, higher than the dose of quinidine in NUEDEXTA, potentially fatal cardiac arrhythmia, including torsades de pointes, can occur at quinidine exposures that are possible from NUEDEXTA overdose.

Adverse effects of dextromethorphan overdose include nausea, vomiting, stupor, coma, respiratory depression, seizures, tachycardia, hyperexcitability, and toxic psychosis. Other adverse effects include ataxia, nystagmus, dystonia, blurred vision, and changes in muscle reflexes. Dextromethorphan may cause serotonin syndrome, and this risk is increased by overdose, particularly if taken with other serotonergic agents, SSRIs or tricyclic antidepressants.

## 10.1   Treatment of Overdose

While serum quinidine levels can be measured, electrocardiographic monitoring of the QTc interval is a better predictor of quinidine-induced arrhythmia. Treatment of hemodynamically unstable polymorphic ventricular tachycardia (including torsades de pointes) is either immediate cardioversion or, if a cardiac pacemaker is in place or immediately available, immediate overdrive pacing. After pacing or cardioversion, further management must be guided by the length of the QTc interval. Factors contributing to QTc prolongation (especially hypokalemia and hypomagnesemia) should be sought out and (if possible) aggressively corrected. Prevention of recurrent torsades de pointes may require sustained overdrive pacing or the cautious administration of isoproterenol (30 to 150 ng/kg/min).

Because of the theoretical possibility of QT-prolonging effects that might be additive to those of quinidine, other antiarrhythmics with Class I (procainamide) or Class III activities should (if possible) be avoided.

If the post-cardioversion QTc interval is prolonged, then the pre-cardioversion polymorphic ventricular tachyarrhythmia was (by definition) torsades de pointes. In this case, class Ib antiarrhythmics like lidocaine are unlikely to be of value, and other Class I and Class III antiarrhythmics are likely to exacerbate the situation.

Quinidine-induced hypotension that is not due to an arrhythmia is likely to be a consequence of quinidine-related α-blockade and vasorelaxation. Treatment of hypotension should be directed at symptomatic and supportive measures. Repletion of central volume (Trendelenburg positioning, saline infusion) may be sufficient therapy; other interventions reported to have been beneficial in this setting are those that increase peripheral vascular resistance, including α-agonist catecholamines (norepinephrine).

Quinidine:

Adequate studies of orally administered activated charcoal in human overdoses of quinidine have not been reported, but there are animal data showing significant enhancement of systemic elimination following this intervention, and there is at least one human case report in which the elimination half-life of quinidine in the serum was apparently shortened by repeated gastric lavage. Activated charcoal should be avoided if an ileus is present; the conventional dose is 1 g/kg, administered every 2 to 6 hours as a slurry with 8 mL/kg of tap water. Although renal elimination of quinidine might theoretically be accelerated by maneuvers to acidify the urine,

such maneuvers are potentially hazardous and of no demonstrated benefit. Quinidine is not usefully removed from the circulation by dialysis. Following quinidine overdose, drugs that delay elimination of quinidine (cimetidine, carbonic anhydrase inhibitors, thiazide diuretics) should be withdrawn unless absolutely required.

Dextromethorphan:
Treatment of dextromethorphan overdosage should be directed at symptomatic and supportive measures.

## 11   DESCRIPTION

NUEDEXTA is an oral formulation of dextromethorphan hydrobromide USP and quinidine sulfate USP in a fixed dose combination.

Dextromethorphan hydrobromide is the pharmacologically active ingredient of NUEDEXTA that acts on the central nervous system (CNS). The chemical name is dextromethorphan hydrobromide: morphinan, 3-methoxy-17-methyl-, (9α, 13α, 14α), hydrobromide monohydrate. Dextromethorphan hydrobromide has the empirical formula $C_{18}H_{25}NO \cdot HBr \cdot H_2O$ with a molecular weight of 370.33. The structural formula is:



Quinidine sulfate is a specific inhibitor of CYP2D6-dependent oxidative metabolism used in NUEDEXTA to increase the systemic bioavailability of dextromethorphan. The chemical name is quinidine sulfate: cinchonan-9-o1, 6'-methoxy-, (9S) sulfate (2:1), (salt), dihydrate. Quinidine sulfate dihydrate has the empirical formula of $(C_{20}H_{24}N_2O_2)_2 \cdot H_2SO_4 \cdot 2H_2O$ with a molecular weight of 782.96. The structural formula is:



The combination product, NUEDEXTA, is a white to off-white powder. NUEDEXTA is available for oral use as NUEDEXTA which contains 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate. The active ingredients are dextromethorphan hydrobromide monohydrate USP and quinidine sulfate dihydrate USP. Inactive ingredients in the capsule are croscarmellose sodium NF, microcrystalline cellulose NF, colloidal silicon dioxide NF, lactose monohydrate NF, and magnesium stearate NF.

## 12    CLINICAL PHARMACOLOGY

### 12.1    Mechanism of Action

Dextromethorphan (DM) is a sigma-1 receptor agonist and an uncompetitive NMDA receptor antagonist. Quinidine increases plasma levels of dextromethorphan by competitively inhibiting cytochrome P450 2D6, which catalyzes a major biotransformation pathway for dextromethorphan. The mechanism by which dextromethorphan exerts therapeutic effects in patients with pseudobulbar affect is unknown.

### 12.2    Pharmacodynamics

Cardiac Electrophysiology

The effect of dextromethorphan 30 mg/quinidine 10 mg (for 7 doses) on QTc prolongation was evaluated in a randomized, double-blind (except for moxifloxacin), placebo- and positive-controlled (400 mg moxifloxacin) crossover thorough QT study in 50 fasted normal healthy men and women with CYP2D6 extensive metabolizer (EM) genotype. Mean changes in QTcF were 6.8 ms for dextromethorphan 30 mg/quinidine 10 mg and 9.1 ms for the reference positive control (moxifloxacin). The maximum mean (95% upper confidence bound) difference from placebo after baseline correction was 10.2 (12.6) ms. This test dose is adequate to represent the steady state exposure in patients with CYP2D6 extensive metabolizer phenotype.

The effects of supratherapeutic doses of dextromethorphan/quinidine (30 mg/30 mg and 60 mg/60 mg, for 7 doses) on QTc prolongation was evaluated in a randomized, placebo-controlled, double-blind, crossover design with an additional open-label positive control (400 mg moxifloxacin) arm in 36 healthy volunteers. The maximum mean (95% upper confidence bound) differences from placebo after baseline-correction were 10.2 (14.6) and 18.4 (22.7) ms following dextromethorphan/quinidine doses of 30 mg/30 mg and 60 mg/60 mg, respectively. The supratherapeutic doses are adequate to represent exposure increases due to drug-drug interactions and organ dysfunctions.

### 12.3    Pharmacokinetics

NUEDEXTA contains dextromethorphan and quinidine, both of which are metabolized primarily by liver enzymes. Quinidine's primary pharmacological action in NUEDEXTA is to competitively inhibit the metabolism of dextromethorphan catalyzed by CYP2D6 in order to increase and prolong plasma concentrations of dextromethorphan *[see Warnings and Precautions (5.4, 5.8), and Clinical Pharmacology (12.5)]*. Studies were conducted with the individual components of NUEDEXTA in healthy subjects to determine single-dose and multiple-dose kinetics of orally administered dextromethorphan in combination with quinidine. The increase in dextromethorphan levels appeared approximately dose proportional when the dextromethorphan dose was increased from 20 mg to 30 mg in the presence of 10 mg of quinidine.

Absorption

Following single and repeated combination doses of dextromethorphan 30 mg/quinidine 10 mg, dextromethorphan/quinidine-treated subjects had an approximately 20-fold increase in dextromethorphan exposure compared to dextromethorphan given without quinidine.

Following repeated doses of dextromethorphan 30 mg/quinidine 10 mg and dextromethorphan 20 mg/quinidine 10 mg (NUEDEXTA), maximal plasma concentrations ($C_{max}$) of dextromethorphan are reached approximately 3 to 4 hours after dosing and maximal plasma concentrations of quinidine are reached approximately 1 to 2 hours after dosing.

In extensive metabolizers, mean $C_{max}$ and $AUC_{0-12}$ values of dextromethorphan and dextrorphan increased as doses of dextromethorphan increased from 20 to 30 mg; mean $C_{max}$ and $AUC_{0-12}$ values of quinidine appeared similar.

The mean plasma $C_{max}$ of quinidine following twice daily co-administration of dextromethorphan 30 mg/quinidine 10 mg in patients with PBA was within 1 to 3% of the concentrations required for antiarrhythmic efficacy (2 to 5 mcg/mL).

NUEDEXTA may be taken without regard to meals as food does not affect the exposure of dextromethorphan and quinidine significantly.

<u>Distribution</u>
After NUEDEXTA administration, protein binding remains essentially the same as that after administration of the individual components; dextromethorphan is approximately 60 to 70% protein bound and quinidine is approximately 80 to 89% protein bound.

<u>Metabolism and Excretion</u>
NUEDEXTA is a combination product containing dextromethorphan and quinidine. Dextromethorphan is metabolized by CYP2D6 and quinidine is metabolized by CYP3A4. After dextromethorphan 30 mg/quinidine 30 mg administration in extensive metabolizers, the elimination half-life of dextromethorphan was approximately 13 hours and the elimination half-life of quinidine was approximately 7 hours.

There are several hydroxylated metabolites of quinidine. The major metabolite of quinidine is 3-hydroxyquinidine. The 3-hydroxymetabolite is considered to be at least half as pharmacologically active as quinidine with respect to cardiac effects such as QT prolongation.

When the urine pH is less than 7, about 20% of administered quinidine appears unchanged in the urine, but this fraction drops to as little as 5% when the urine is more alkaline. Renal clearance involves both glomerular filtration and active tubular secretion, moderated by (pH-dependent) tubular reabsorption.

<u>Specific Populations</u>
*Geriatric Use*
The pharmacokinetics of dextromethorphan/quinidine have not been investigated systematically in elderly subjects (aged >65 years), although such subjects were included in the clinical program. A population pharmacokinetic analysis of 170 subjects (148 subjects <65 years old and 22 subjects ≥65 years old) administered dextromethorphan 30 mg/quinidine 30 mg revealed similar pharmacokinetics in subjects <65 years and those ≥65 years of age.

*Pediatric Use*
The pharmacokinetics of NUEDEXTA in pediatric patients have not been studied.

*Gender*
A population pharmacokinetic analysis based on data from 109 subjects (75 male; 34 female) showed no apparent gender differences in the pharmacokinetics of NUEDEXTA.

*Race*
A population pharmacokinetic analysis of race with 109 subjects (20 Caucasian; 71 Hispanic; 18 Black) revealed no apparent racial differences in the pharmacokinetics of NUEDEXTA.

*Renal Impairment*

In a study of a combination dose of dextromethorphan 30 mg/quinidine 30 mg TWICE DAILY in 12 subjects with mild (CLCR 50 to 80 mL/min) or moderate (CLCR 30 to 50 mL/min) renal impairment (6 each) compared to 9 healthy subjects (matched in gender, age, and weight range to impaired subjects), subjects showed little difference in quinidine or dextromethorphan pharmacokinetics compared to healthy subjects. Dose adjustment is, therefore, not required in mild or moderate renal impairment. NUEDEXTA has not been studied in patients with severe renal impairment.

*Hepatic Impairment*

In a study of a combination dose of dextromethorphan 30 mg/quinidine 30 mg TWICE DAILY in 12 subjects with mild or moderate hepatic impairment (as indicated by the Child-Pugh method; 6 each) compared to 9 healthy subjects (matched in gender, age, and weight range to impaired subjects), subjects with moderate hepatic impairment showed similar dextromethorphan AUC and $C_{max}$ and clearance compared to healthy subjects. Mild to moderate hepatic impairment had little effect on quinidine pharmacokinetics. Patients with moderate impairment showed an increased frequency of adverse events. Therefore, dosage adjustment is not required in patients with mild and moderate hepatic impairment, although additional monitoring for adverse reactions should be considered. Quinidine clearance is unaffected by hepatic cirrhosis, although there is an increased volume of distribution that leads to an increase in the elimination half-life. Neither dextromethorphan alone nor NUEDEXTA has been evaluated in patients with severe hepatic impairment.

## 12.4   Drug-Drug Interactions

The potential for dextromethorphan and quinidine to inhibit or induce cytochrome P450 *in vitro* were evaluated in human microsomes. Dextromethorphan did not inhibit (<20% inhibition) any of the tested isoenzymes: CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2D6, CYP2E1, or CYP3A4 in human liver microsomes at concentrations up to 5 microM. Quinidine did not inhibit (<30% inhibition) CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2E1, or CYP3A4 in human microsomes at concentrations up to 5 microM. Quinidine inhibited CYP2D6 with a half maximal inhibitory concentration ($IC_{50}$) of less than 0.05 microM. Neither dextromethorphan nor quinidine induced CYP1A2, CYP2B6 or CYP3A4 in human hepatocytes at concentrations up to 4.8 microM.

Desipramine (CYP2D6 substrate)

Co-administration of dextromethorphan 30 mg/quinidine 30 mg with the tricyclic antidepressant desipramine, a CYP2D6 substrate, when desipramine was given at a dose of 25 mg once daily in 13 healthy volunteers resulted in an approximately 8-fold increase in steady state desipramine exposure ($C_{min}$) compared to desipramine given alone. Therefore, concomitant administration of NUEDEXTA and drugs undergoing CYP2D6 metabolism should be evaluated for appropriate dose adjustment or alternative medication if the concomitant medication depends primarily on CYP2D6 metabolism and has a narrow therapeutic index, or if it relies on CYP2D6 for conversion to an active species *[see Warnings and Precautions (5.4)]*.

Paroxetine (CYP2D6 inhibitor and substrate)

Co-administration of the selective serotonin reuptake inhibitor paroxetine and a higher combination dose of dextromethorphan/quinidine (dextromethorphan 30 mg/quinidine 30 mg) was studied in 27 healthy volunteers. Group 1 (N = 14) received paroxetine 20 mg once daily for 12 days followed by the addition of dextromethorphan 30 mg/quinidine 30 mg twice daily for 8 days. Group 2 (N = 13) received dextromethorphan 30 mg/quinidine 30 mg twice daily for 8 days followed by the addition of paroxetine 20 mg once daily for 12 days. Dextromethorphan exposure ($AUC_{0-12}$) and $C_{max}$ increased by 1.5 fold and 1.4 fold, respectively, and quinidine exposure ($AUC_{0-12}$) and $C_{max}$ increased by 1.4 fold and 1.3 fold, respectively, and dextrorphan exposure ($AUC_{0-12}$) and $C_{max}$ decreased by 14% and 18%, respectively, and paroxetine

exposure ($AUC_{0-24}$) and $C_{max}$ increased by 2.3 fold and 2.0 fold, respectively, when paroxetine was added to the combination dose of dextromethorphan/quinidine at steady state (Group 2).

When the combination dose of dextromethorphan/quinidine was added to paroxetine at steady state (Group 1), paroxetine exposure ($AUC_{0-24}$) and $C_{max}$ increased by 1.7 fold and 1.5 fold, respectively, while dextromethorphan and quinidine exposure did not change significantly and dextrorphan exposure ($AUC_{0-12}$) and $C_{max}$ decreased by 34% and 33%, respectively.

Based on these results, when NUEDEXTA is prescribed with drugs such as paroxetine that inhibit or are extensively metabolized by CYP2D6, consideration should be given to initiating treatment with a lower dose. The dose of paroxetine can then be adjusted based on clinical response; however, dosage above 35 mg/day is not recommended *[see Warnings and Precautions (5.4)]*.

NMDA receptor antagonists (memantine)
A drug interaction study was conducted between a higher combination dose of dextromethorphan/quinidine (dextromethorphan 30 mg/quinidine 30 mg) and memantine 20 mg/day to investigate the pharmacokinetic and pharmacodynamic interactions in 52 healthy subjects. Both dextromethorphan and memantine are antagonists of the *N*-methyl-D-aspartate (NMDA) receptor, which could theoretically result in an additive effect at NMDA receptors and potentially an increased incidence of adverse events. There was no significant difference in the plasma concentrations of dextromethorphan and dextrorphan before and after the administration of memantine. Plasma concentrations of quinidine increased 20 to 30% when memantine was added to dextromethorphan 30 mg/quinidine 30 mg.

## 12.5  Pharmacogenomics

The quinidine component of NUEDEXTA is intended to inhibit CYP2D6 so that higher exposure to dextromethorphan can be achieved compared to when dextromethorphan is given alone. Approximately 7 to 10% of Caucasians and 3 to 8% of African Americans generally lack the capacity to metabolize CYP2D6 substrates and are classified as PMs. The quinidine component of NUEDEXTA is not expected to contribute to the effectiveness of NUEDEXTA in PMs, but adverse events of the quinidine are still possible. In those patients who may be at risk of significant toxicity due to quinidine, genotyping to determine if they are PMs should be considered prior to making the decision to treat with NUEDEXTA *[see Warnings and Precautions (5.4, 5.8), and Clinical Pharmacology (12.3)]*.

## 13  NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis
In a 26-week carcinogenicity study in the Tg.rasH2 transgenic mouse, dextromethorphan and quinidine, alone and in combination, at oral doses up to 100/100 mg/kg/day did not show any evidence of carcinogenic potential.

In a two-year carcinogenicity study in rats, dextromethorphan/quinidine were administered at oral doses of 0/0, 5/100, 20/100, 50/100, 50/0, 0/100 mg/kg/day. No biologically significant tumor findings were observed. The highest dose tested (50/100 mg/kg/day) is approximately 12/50 times the maximum recommended human dose (MRHD) of 40/20 mg/day on a mg/m$^2$ basis.

Mutagenesis
Dextromethorphan/quinidine was negative in an *in vitro* chromosomal aberration assay in human lymphocytes.

Dextromethorphan was negative in *in vitro* (bacterial reverse mutation, chromosomal aberration in human lymphocytes) and *in vivo* (mouse micronucleus) assays.

Quinidine was negative in an *in vitro* bacterial reverse mutation assay and in an *in vivo* mouse micronucleus assay. Quinidine induced chromosomal aberrations in an *in vitro* chromosomal aberration assay in the presence of metabolic activation.

Impairment of fertility
When dextromethorphan/quinidine was administered orally (0/0, 5/100, 15/100, and 50/100 mg/kg/day) to male and female rats prior to and during mating, and continuing to Day 7 of gestation in females, no effect on fertility was observed up to the highest dose tested, which is approximately 12/50 times the MRHD on a mg/m$^2$ basis.

## 14    CLINICAL STUDIES

The efficacy of NUEDEXTA was demonstrated in one trial in patients with pseudobulbar affect (PBA). These patients had underlying amyotrophic lateral sclerosis (ALS) or multiple sclerosis (MS). Other trials at higher doses (dextromethorphan 30 mg/quinidine 30 mg) provided supportive evidence.

In the NUEDEXTA trial, patients with PBA were randomized to receive NUEDEXTA dextromethorphan 20 mg/quinidine 10 mg, (N=107), dextromethorphan 30 mg/quinidine 10 mg (N=110), or placebo (N=109) for 12 weeks.

The primary outcome measure, laughing and crying episodes (Figure 1), was statistically significantly lower in each dextromethorphan/quinidine arm compared to placebo, based on an analysis of the sums of the episode counts over the double-blind phase. The secondary endpoint was the Center for Neurologic Studies Lability Scale (CNS-LS), a seven-item self-report questionnaire with 3 items assessing crying and 4 assessing laughter. CNS-LS was analyzed based on the difference between the mean scores on Day 84 and baseline, and was also statistically significantly lower in each dextromethorphan/quinidine arm compared to placebo (Figure 2). There were no clinically important differences between NUEDEXTA and the dextromethorphan 30 mg/quinidine 10 mg arm.

**Figure 1: Mean PBA Episode Rates by Visit**



*Statistically significant at $p < 0.05$

**Figure 2: Least Square Mean CNS-LS Scores by Visit**



*Statistically significant at $p < 0.05$

Two additional studies conducted using a higher dose combination of dextromethorphan/quinidine (dextromethorphan 30 mg/quinidine 30 mg) provided supportive evidence of NUEDEXTA efficacy. The first was a 4-week study in PBA patients with underlying ALS, and the second was a 12-week study in patients with underlying MS. In both studies, the primary outcome measure, CNS-LS, and the secondary outcome measure, laughing and crying episodes, were statistically significantly decreased by the dextromethorphan/quinidine combination.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

NUEDEXTA is supplied as brick red gelatin capsules imprinted with "DMQ 20-10". NUEDEXTA is supplied in the following package configuration:

| Package Configuration | Capsule Strength (mg) | NDC Code |
|---|---|---|
| Bottles of 60 (30 day supply) | dextromethorphan 20 mg/quinidine 10 mg | 59148-053-16 |

Storage

Store NUEDEXTA capsules at controlled room temperature, 25°C (77°F); excursions permitted to 15°C to 30°C (59°F to 86°F) [see USP Controlled Room Temperature].

## 17    PATIENT COUNSELING INFORMATION

Hypersensitivity

Patients should be advised a hypersensitivity reaction to NUEDEXTA could occur. Patients should be instructed to seek medical attention immediately if they experience symptoms indicative of hypersensitivity after taking NUEDEXTA *[see Contraindications (4.2), Warnings and Precautions (5.1)]*.

Cardiac effects

Patients should be advised to consult their healthcare provider immediately if they feel faint or lose consciousness. Patients should be counseled to inform their healthcare provider if they have any personal or family history of QTc prolongation *[see Contraindications (4.4), Warnings and Precautions (5.3), Drug Interactions (7)]*.

Dizziness

Patients should be advised that NUEDEXTA may cause dizziness. Precautions to reduce the risk of falls should be taken, particularly for patients with motor impairment affecting gait or a history of falls *[see Warnings and Precautions (5.5), Adverse Reactions (6.1)]*.

Drug Interactions

Inform patients that NUEDEXTA increases the risk of adverse drug interactions. Instruct patients to inform their healthcare provider about all the medications that they are taking before taking NUEDEXTA. Before taking any new medications, patients should tell their healthcare provider that they are taking NUEDEXTA *[see Drug Interactions (7)]*.

Dosing Instructions

Instruct patients to take NUEDEXTA exactly as prescribed. Instruct patients not to take more than 2 capsules in a 24-hour period and to make sure that there is an approximate 12-hour interval between doses, and not to take a double dose after they miss a dose *[see Dosage and Administration (2.1)]*.

General

Patients should not share or give NUEDEXTA to others, even if they have the same symptoms, because it may harm them.

Advise patients to contact their healthcare provider if their PBA symptoms persist or worsen.

Advise patients to keep this and all medications out of reach of children and pets.

Distributed and Marketed by Otsuka America Pharmaceutical, Inc., Rockville, MD 20850 USA

NUEDEXTA is a registered trademark of Avanir Pharmaceuticals, Inc. used under license by Otsuka America Pharmaceutical, Inc.

18US22IBR0002

# EXHIBIT 2

US007659282B2

(12) **United States Patent**
Yakatan et al.

(10) Patent No.: **US 7,659,282 B2**
(45) Date of Patent: **Feb. 9, 2010**

(54) **PHARMACEUTICAL COMPOSITIONS COMPRISING DEXTROMETHORPHAN AND QUINIDINE FOR THE TREATMENT OF NEUROLOGICAL DISORDERS**

(75) Inventors: **Gerald Yakatan**, Del Mar, CA (US); **James Berg**, San Diego, CA (US); **Laura E. Pope**, Carlsbad, CA (US); **Richard A. Smith**, La Jolla, CA (US)

(73) Assignee: **Avanir Pharmaceuticals, Inc.**, Aliso Viejo, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 847 days.

(21) Appl. No.: **11/035,213**

(22) Filed: **Jan. 12, 2005**

(65) **Prior Publication Data**

US 2005/0203125 A1    Sep. 15, 2005

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US03/22303, filed on Jul. 17, 2003.

(60) Provisional application No. 60/396,661, filed on Jul. 17, 2002.

(51) **Int. Cl.**
*A01N 43/90* (2006.01)
*A01N 43/42* (2006.01)
*A61K 31/44* (2006.01)

(52) **U.S. Cl.** ...................................... 514/289; 514/305

(58) **Field of Classification Search** ................. 514/305, 514/289
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,536,809 | A | 10/1970 | Appelzweig |
| 3,598,123 | A | 8/1971 | Zaffaroni |
| 3,845,770 | A | 11/1974 | Theeuwes et al. |
| 3,916,899 | A | 11/1975 | Theeuwes et al. |
| 4,008,719 | A | 2/1977 | Theeuwes et al. |
| 4,316,888 | A | 2/1982 | Nelson |
| 4,806,543 | A | 2/1989 | Choi |
| 5,034,400 | A | 7/1991 | Olney |
| 5,166,207 | A | 11/1992 | Smith |
| 5,206,248 | A | 4/1993 | Smith |
| 5,321,012 | A | 6/1994 | Mayer et al. |
| 5,350,756 | A | 9/1994 | Smith |
| 5,352,683 | A | 10/1994 | Mayer et al. |
| 5,366,980 | A | 11/1994 | Smith |
| 5,502,058 | A | 3/1996 | Mayer et al. |
| 5,556,838 | A | 9/1996 | Mayer et al. |
| 5,863,927 | A | 1/1999 | Smith et al. |
| 6,207,674 | B1 | 3/2001 | Smith |
| 2002/0068718 | A1 | 6/2002 | Pierce |

2004/0087479 A1    5/2004 Sosnowski et al.

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 96 09044 | 3/1996 |
| WO | WO 00/17366 A2 | 3/2000 |
| WO | WO 00/59486 A2 | 10/2000 |

OTHER PUBLICATIONS

Gould. 1986, Salt selection for basic drugs. International Journal of Pharmaceutics, vol. 33, pp. 201-217.*

Ben Abraham, et al., "Dextromethorphan for phantom pain attenuation in cancer amputees: a double-blind crossover trial involving three patients", *Clin J Pain*, (2002) 18: 282-285.

Bensimon, et al., "A controlled trial of Riluzole in amyotrophic lateral sclerosis", *N Eng J Med*. (1994) 330:585-91.

Broly, et al., CA 111: 89742z, 1989.

Broly, et al. "Effect of quinidine on the dextromethorphan O-demethylase activity of microsomal fractions from human liver", *Br J Clin Pharmacol*. (1989) 28(1): 29-36.

Broly, et al., CA 112: 210493v, 1990.

Broly, et al., "Inhibitory studies of mexiletine and dextromethorphan oxidation in human liver microsomes", *Biochem Pharmacol*. (1990) 39:1045-1053.

Brooks, "Personality change after severe head injury" *Acta Neurochirurgica* Suppl. (1988) 44: 59-64.

Chase, et al., "Antiparkinsonian and antidyskinetic activity of drugs targeting central glutamatergic mechanisms", *J Neurol*. (2000) 247 Suppl 2:II36-II42.

Cottrell, et al., J. Neurol. Psychopathol., 1926; 7:1-30.

Craviso, et al., "High-affinity dextromethorphan binding sites in guinea pig brain. I. Initial characterization", *Mol Pharmacol*., (1983) 23(3):619-628.

Craviso, et al., "High-affinity dextromethorphan binding sites in guinea pig brain. II. Competition experiments", *Mol Pharmacol*. (1983) 23(3):629-40.

Dayer, et al. "Dextromethorphan O-demethylation in liver microsomes as a prototype creation to monitor cytochrome P-450 db1 activity", *Clin Pharmacol Ther*., (1989) 45(1):34-40.

(Continued)

*Primary Examiner*—Sreeni Padmanabhan
*Assistant Examiner*—Kara R McMillian

(74) *Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

(57) **ABSTRACT**

Pharmaceutical compositions and methods for treating neurological disorders by administering same are provided. The compositions comprise dextromethorphan in combination with quinidine.

**12 Claims, 5 Drawing Sheets**

US 7,659,282 B2

Page 2

## OTHER PUBLICATIONS

Desmeules, et al., "Contribution of cytochrome P-4502D6 phenotype to the neuromodulatory effects of dextromethorphan", *J Pharmacol Exp Ther*., (1999) 288(2): 607-612.

Dickenson, et al., "Evidence for a role of the NMDA receptor in the frequency dependent potentiation of deep rat dorsal horn nociceptive neurons following C fibre stimulation", *Neuropharmacology* (1987) 26(8): 1235-1238.

Dickenson, et al., "Dextromethorphan and levorphanol on dorsal horn nociceptive neurones in the rat", *Neuropharmacology* (1991)30: 1303-1308.

Doble, "The pharmacology and mechanism of action of riluzole", *Neurology* (1996) 47(6 Suppl 4):S233-41.

Droll, et al., "Comparison of three CYP2D6 probe substrates and genotype in Ghanaians, Chinese and Caucasions", *Pharmacogenetics* (1998) 8(4): 325-333.

Due Nielsen, et al., CA 112: 171691m, 1990.

France, et al., "Analgesic effects of phencyclidine-like drugs in rhesus monkeys," *J Pharmacol Exp Ther*., (1989) 250(1): 197-201.

Grass, et al., "N-methyl-D-aspartate receptor antagonists potentiate morphine's antinociceptive effect in the rat", *Acta Physiol Scand*. (1996) 158(3): 269-73.

Heiskanen, et al., "Analgesic effects of dextromethorphan and morphine in patients with chronic pain", *Pain* (2002) 96(3): 261-267.

Hoffmann, et al., "Dextromethorphan potentiates morphine antinociception, but does not reverse tolerance in rats", *Neuroreport* (1996) 7(3): 838-40.

Inaba, T., et al, "Quinidine: Potent inhibition of sparteine and debrisoquin oxidation in vivo," Br. J. Clin. Pharmacol. 22: 199-200, 1986.

Jerusalem, et al., "ALS", *Neurology* (1996) 47(6 Suppl 4):218S-220S.

Kalin, et al., CA 108: 124860y, 1988.

Kalin, et al, "Opiate modulation of separation-induced distress in non-human primates," Brain Research 440: 285-292, 1988.

Kauppila, et al., "Dextromethorphan potentiates the effect of morphine in rats with peripheral neuropathy," *Neuroreport* (1998) 9(6): 1071-4.

Klein, et al., "The effect of prototypic sigma ligands on the binding of [3H] dextromethorphan to guinea pig brain", *Neurosci Lett*., (1989) 97(1):175-80.

Koyuncuoglu, et al, "The treatment of heroin addicts with dextromethorphan: a double-blind comparison of dextromethorphan with chlorpromazine", *Int J Clin Pharmacol Ther Toxicol*. (1990) 28(4): 147-52.

Kronbach, et al., "High-performance liquid chromatographic assays for bufuralol 1'-hydroxylase, debrisoquine 4-hydroxylase, and dextromethorphan O-demethylase in microsomes and purified cytochrome P-450 isozymes of human liver", Anal Biochem. (1987) 162(1):24-32.

Küpfer, A., et al "Dextromethorphan as a safe probe for debrisoquine hydroxylation polymorphism", *Lancet* (1984) 2:517-518,.

Kwiecinski, "Symptomatic treatment and palliative care of ALS", *Neurol Neurochir Pol*. (2001) 35:51-9, abstract only.

Largent, et al., "Structural determinants of sigma receptor affinity", *Mol Pharmacol*. (1987) 32(6):772-84.

Manning, et al, "Continuous co-administration of dextromethorphan or MK-801 with morphine: attenuation of morphine dependence and naloxone-reversible attenuation of morphine tolerance," *Pain* (1996) 67: 79-88.

Mao, et al, "Oral administration of dextromethorphan prevents the development of morphine tolerance and dependence in rats," *Pain* (1996) 67: 361-8.

Musacchio, et al., "Dextromethorphan binding sites in the guinea pig brain", *Cell Mol Neurobiol*., (1988) 8(2):149-56.

Musacchio, et al., "High affinity dextromethorphan binding sites in guinea pig brain: further characterization and allosteric interactions", *J Pharmacol Exp Ther*., (1988) 247(2):424-31.

Otton, et al., "In vitro evidence against the oxidation of quinidine by the sparteine/debrisoquine monooxygenase of human liver", *Drug Metab Dispos*. (1988) 16(1):15-7.

Otton, et al., "Use of quinidine inhibition to define the role of the sparteine/debrisoquine cytochrome P450 in metoprolol oxidation by human liver microsomes", *J Pharmacol Exp Ther*., (1988) 247(1):242-7.

Parvizi, et al., "Pathological laughter and crying—A link to the cerebellum", *Brain*, 2001;124:1708-19.

Physician's Desk Reference, 44th Edition, 1990, pp. 670-671 (Medical Economics Company, 1990).

Plesan, et al, "Comparison of ketamine and dextromethorphan in potentiating the antinociceptive effect of morphine in rats," *Anesth Analg*. (1998) 86(4): 825-9,.

Ramachander, et al, "Determination of dextrorphan in plasma and evaluation of bioavailability of dextromethorphan hydrobromide in humans", *J Pharm Sci*. (1977) 66(7):1047-8.

Ross, et al., "Pathological display of affect in patients with depression and right frontal brain damage. An alternative mechanism", *J Nerv Ment Dis*. (1987) 175(3):165-72.

Sang, "NMDA-receptor antagonists in neuropathic pain: experimental methods to clinical trials", *Pain Symptom Manage*. (2000) 19(1 Suppl): S21-25.

Shaw et al., Brain Sciences in Psychiatry, London: Butterworth, 1982 (Contents pages only) 3 pages.

Smith, et al., "The treatment of affective lability with dextromethorphan", *Neurology*, (1995) 45:604P.

Vinik, "Diabetic neuropathy: pathogenesis and therapy", *Am J Med*., (1999) 107: 17S-26S.

von Moltke et al., "Multiple human cytochromes contribute to biotransformation of dextromethorphan in-vitro: role of CYP2C9, CYP2C19, CYP2D6, and CYP3A", *J Pharm Pharmacol*., (1998) 50(9): 997-1004.

Weinbroum, et al., "The role of dextromethorphan in pain control", *Can J Anaesth*., 2000: 47: 585-596.

Dere, et al., "NMDA-recptor antagonism via dextromethorphan and ifenprodil modulates graded anxiety test performance of C57BL/6 mice", *Behav. Pharmacol*. (2004) 14(3)245-249; Abstract 1 page.

Liu et al., "Dextromethorphan protects dopaminergic neurons against inflammation-mediated degeneration through inhibition of microglial activation", *J Pharmacol Exp Ther*. (2003) 305(1):212-218.

Pope, et al., "Pharmacokinetics of dextromethorphan after single or multiple dosing in combination with quinidine in extensive and poor metabolizers", *J Clin Pharmacol*. (2004) 44(10):1132-1142.

Albers, G. W., et al, "Safety and tolerance of oral dextromethorphan in patients at risk for brain ischemia," Stroke 22: 1075-1077, 1991.

Andersen et al., *Pathoanatomic Correlation Between Poststroke Pathological Crying and Damage to Brain Areas Involved in Serotonergic Nerurotranmission*, Stroke, 1994; 25:1050-2.

Applebaum, J. S., et al, "Dextromethorphan in the treatment of ALS: A pilot study," Abstract No. 960S (p. 393) in Neurology 41 (Suppl. 1), Mar. 1991.

Askmark et al., J. Neurol. Neurosurg. Psychiatry, 1993; 56:197-200.

Bisaga, A., et al, "Opiate withdrawal with dextromethorphan [letter]," Amer. J. Psychiatry 154: 584 (1997).

Blin et al., Clin. Neuropharmacol., 1996; 19: 189-192.

Brinn, R., et al, "Sparteine oxidation is practically abolished in quinidine-treated patients," Br. J. Clin. Pharmacol. 22: 194-197, 1986.

Brosen, K., et al, "Extensive metabolizers of debrisoquin become poor metabolizers during quinidine treatment," Pharmacol. Toxicol. 60: 312-314, 1987.

Carpenter et al., Brain Res., Jan. 26, 1988 439(1-2):372-5.

Choi, et al. *Dextrorphan and Levorphanol Selectivity Block N-Methyl-d-Aspartate Receptor-Mediated Neurotoxity on Cortical Neurons*, The Journal of Pharmacology and Experimental Therapeutics, vol. 242, No. 2, (1987) pp. 713-720.

Dark et al., *Pathology Laughing and Crying*, Austr. N. Zeal. J. Psychiatry, 1996; 30:472-9.

Debonnel et al., *Modulation of NMDA and Dopaminergic Neurotransmissions by Sigman Ligands: Possible Implications for the Treatment of Psychiatric Disorders*, Life Sci., 1996; 58:721-34.

Dickenson, A.H., "A cure for wind up: NMDA receptor antagonists as potential analgesics," Trends in Pharm. Sci. 11: 307-309, 1990.

**US 7,659,282 B2**

Page 3

Feinstein et al., *Prevalence and Neurobehavorial Correlates of Pathological Laughing and Crying in Multiple Sclerosis*, Arch. Neurol., 1997; 54:1116-21.

Funck-Brentano et al., *Genetically-determined interaction between propafenone and low dose quinidine: Role of active metabolites in Modulating net Drug Effect*, Br. J. Clin. Pharmacol., Apr. 1989, 27(4):435-44.

Funck-Brentano et al., *Effect of Low Dose Quinidine on Encainide Pharmacokinetics and Pharmacodynamics, Influence of Genetic Polymorphism*, J. Pharmacol. Exp. Ther., Apr. 1989, 249(1):134-42.

Gallagher, J.P., *Pathological Laughter and Crying in ALS: a Search for their Origin*, Acta Neurol. Scand. 1989; 80:114-7.

Gredal et al., *A Clinical Trial of Dextromethorphan in Amyotrophic Lateral Sclerosis*, Acta Neurol. Scand. 1997; 96: 8-13.

Guttendorf, R. J., et al, "Simplified phenotyping with dextromethorphan by thin-layer chromatography," Ther. Drug. Monit. 10: 490-498, 1988.

Hildebrand et al., *Determination of Dextromethorphan Metabolizer Phenotype in Healthy Volunteers*, Eur. J. Clin. Pharmacol., 1989; 36:315-318.

Hollander et al., *High-dose Dextromethorphan in Amyotrophic Lateral Sclerosis: Phase I Safety and Pharmacokinetic Studies*, Ann. Neurol., 1994; 36:920-4.

House et al., *Emotionalism After Stroke*, BMJ, 1989; 298:991-4.

Iannoccone et al., *Pharmacologic Treatment of Emotional Lability*, Clin. Neuropharm., 1996; 19:532-5.

Jackson et al. *Amyotrophic Lateral Sclerosis*, Semin. Neurol. 1998; 18:27-39.

Kim et al., *Metabolism to Dextrorphan is not essential for Dextromethorphan's Anticonvulsant Activity Against Kainate in Mice*, Life Sci., 2003; 72: 769-783.

Koppel, C., et al, "Urinary metabolism of dextromethorphan in man," Arzneim.-Forsch./Drug Research 37: 1304-1306, 1987.

Mao, J., et al, "Intrathecal treatment with dextrorphan or ketamine potently reduces pain-related behaviors in a rat model of peripheral mononeuropathy," Brain Research 605: 164-168, 1993.

Maurice et al., *The Interaction between Neuroactive Steroids and the o1 receptor function: Behavioral Consequences and Therapeutic opportunities*, Brain Res. Brain Res. Rev., 2001; 37:116-32.

McCarthy, J.P., "Some less familiar drugs of abuse," Med. J. Australia 1971 (2): 1078-1081.

McQuay, H.J., et al, "Dextromethorphan for the treatment of neuraphatic pain: a double-blind randomised controlled crossover trial with integral n-of-1 design," Pain 59: 127-133, 1994.

Miller et al., *Practice Parameter: The Care of the Patient with Amyotrophic Lateral Sclerosis (An Evidence-based Review)* Neurol., 1999; 52:1311-23.

Netzer et al., *Dextromethorphan Blocks N-Methyl-D-aspartate-induced Currents and voltage-operated inward currents in cultured cortical Neurons*, Eur. J. Pharmacol., 1993; 238: 209-216.

Nielsen, M. D., et al, "A dose-effect study of the in vivo inhibitory effect of quinidine on sparteine oxidation in man," Br. J. Clin. Pharmacol. 29: 299-304, 1990.

Palmer GC, *Neroprotections by NMDA Receptor Anatagonists in a Variety of Neropathologies*, Curr. Drug Targets, 2001; 2:241-271.

Poeck, K., Pathophysiology of emotional disorders associated with brain damage. In: P.J. Vinken, G.W. Bruyn, editors. Handbook of Clinical Neurology. Amsterdam: North-Holland Publishing Company 1969; pp. 343-367.

Sang et al., *Dextromethorphan and Memantine In Painful Diabetic Neuropathy and Postherpetic Neuralgia*, Anesthesiology, 2002; 96: 1053-1061.

Schadel et al., *Pharmacokinetics of Dextromethorphan and Metabolites i Humans: Influence of the CYP2D^Phenotype and Quinidine Inhibition*, J. Clin. Psychopharmacol., 1995; 15:263-9.

Schiffer et al., *Treatment of Pathologic Laughing and Weeping with Mithriptyline*, N. Engl. J. Med. 1985, 312: 1480-1482.

Schmid et al., *Polymorphic Dextromethorphan Metabolism: Co-Segregation of Oxicative O-Demethylation with Debrisoquin Hydroxylation*, Clin. Pharmacol. Ther., 1985; 38: 618-624.

Starkstein et al., *Prevalence and Clinical Correlates of Pathological affective display in Alzheimer's disease*, J. Neurol. Neurosurg. Psychiatry, 1995; 59:55-64.

Tortella, F.C., et al, "Dextromethorphan and neuromodulation: old drug coughs up new activities," Trends in Pharm. Sci. 10: 501-507, 1989.

Udaka et al., *Pathologic Laughing and Crying Treated with Levodopa*, Arch. Neurol. 1984, 41: 1095-1096.

Vetticaden et al., *Phenotypic Differences in Dextromethorphan Metabolism*, Pharm. Res., Jan. 1989, 6(1):13-9.

Walker, E. O., and Hunt, V. P., "An open label trial of dextromethorphan in Huntington's Disease," Clin. Neuropharmacol. 12: 322-330 (1989).

Wilson, S.A. Kinner, *Some Problems in Neurology*, J. Neurol. Psychopathol., 1924; IV:299-333.

Wolf et al., *Treatment of "emotional Incontinence" with Levodopa* Neurol., 1979; 29:1435-6.

Zhang et al. "Dextromethorphan: Enhancing its Systemic Availablity by Way of Low-dose QWuinidine-mediated Inhibition of Cytochrome P4502D6," Clin. Pharm. ? Ther., 51(6) :647-655, 1992.

PCT Search Report in equivalent PCT International Application No. PCT/US2003/022303.

International Preliminary Examination Report in equivalent PCT International Application No. PCT/US2003/022303.

Abdel-Rahman et al. Drug Metab Dispos. Jul. 1999;27(7):770-5.

Abdul et al. Br J Clin Pharmacol. Sep. 1999;48(3):382-7.

Andersen et al. Lancet. 342 (1993) 837-9.

Beck et al. J Clin Psychol. 40 (1984) 1365-7.

Bertelsen et al. Drug Metab Dispos. Mar. 2003;31(3):289-93.

Capon et al. Clin Pharmacol Ther. Sep. 1996;60(3):295-307.

Choi D. Brain Res. 403 (1987) 333-6.

Fernandes et al. J Clin Psychopharmacol. Jun. 2002;22(3):326-9.

Frison et al. Stat. Med. 11 (1992) 1685-704.

Gorski et al. Biochem Pharmacol. Jul. 5, 1994;48(1):173-82.

Granvil et al. J Pharmacol Exp Ther. Jun. 2002;301(3):1025-32.

Güzey et al. Ther Drug Monit. Jun. 2002;24(3):436-7.

Holford et al. Br. J. Clin. Pharmacol. 11 (1981) 187-95.

Hou et al. Clin Pharmacol Ther. Apr. 1996;59(4):411-7.

House et al. Br. Med. J. 298 (1989) 991-4.

Jurima-Romet et al. Toxicol In Vitro. Jun. 2000;14(3):253-63.

Kaufer et al. J Neuropsychiatry Clin Neurosci 12 (2000) 233-9.

Kerry et al. Br J Clin Pharmacol. Sep. 1994;38(3):243-8.

McDonald et al. Ann. Neurol. 50 (2001) 121-7.

Metman et al. Neurol. 51 (1998) 203-6.

Moghadamnia et al. Br J Clin Pharmacol. Jul. 2003;56(1):57-67.

Moore et al. J. Neurol. Neurosurg. and Psychiatry. 63 (1997) 89-93.

Müller et al. Brain Injury. 77 (1996) 1309-11.

Musacchio et al. Mol. Pharmacol. 35 (1989) 1-5.

Pope et al. J. Clin. Pharmacol. 39 (1999) 984.

Robinson, B. Journal of Gerontology 38 (1983) 344-8.

Schmider et al. Biopharm Drug Dispos. Apr. 1997;18(3):227-40.

Shin et al. Drug Metab Dispos. Sep. 1999;27(9):1078-84.

Steinberg et al. J Neurosurg. 84 (1996) 860-6.

Tyndale et al. Drug Metab Dispos. Aug. 1999;27(8):924-30.

Voirol et al. Brain Res. Feb. 14, 2000;855(2):235-43.

Wienkers et al. Drug Metab Dispos. Dec. 2002;30(12):1372-7.

Yamamoto et al. Drug Metab Dispos. Jan. 2003;31(1):60-6.

* cited by examiner



**FIG. 1**

U.S. Patent          Feb. 9, 2010        Sheet 2 of 5          US 7,659,282 B2



*FIG. 2*



FIG. 3

U.S. Patent          Feb. 9, 2010          Sheet 4 of 5          US 7,659,282 B2



**FIG. 4**



**FIG. 5**

U.S. Patent          Feb. 9, 2010          Sheet 5 of 5          US 7,659,282 B2



*FIG. 6*



*FIG. 7*

US 7,659,282 B2

**1**

# PHARMACEUTICAL COMPOSITIONS COMPRISING DEXTROMETHORPHAN AND QUINIDINE FOR THE TREATMENT OF NEUROLOGICAL DISORDERS

## RELATED APPLICATION

This application is a continuation, under 35 U.S.C. § 120, of International Patent Application No. PCT/US2003/022303, filed on Jul. 17, 2003 under the Patent Cooperation Treaty (PCT), which was published by the International Bureau in English on Jan. 22, 2004, which designates the United States and claims the benefit of U.S. Provisional Application No. 60/396,661, filed Jul. 17, 2002.

## FIELD OF THE INVENTION

Pharmaceutical compositions and methods for treating neurological disorders are provided. The compositions comprise dextromethorphan in combination with quinidine.

## BACKGROUND OF THE INVENTION

Patients suffering from neurodegenerative diseases or brain damage such as is caused by stroke or head injury often are afflicted with emotional problems associated with the disease or injury. The terms emotional lability and pseudobulbar affect are used by psychiatrists and neurologists to refer to a set of symptoms that are often observed in patients who have suffered a brain insult such as a head injury, stroke, brain tumor, or encephalitis, or who are suffering from a progressive neurodegenerative disease such as Amyotrophic Lateral Sclerosis (ALS, also called motor neuron disease or Lou Gehrig's disease), Parkinson's disease, Alzheimer's disease, or multiple sclerosis. In the great majority of such cases, emotional lability occurs in patients who have bilateral damage (damage which affects both hemispheres of the brain) involving subcortical forebrain structures.

Emotional lability, which is distinct from clinical forms of reactive or endogenous depression, is characterized by intermittent spasmodic outbursts of emotion (usually manifested as intense or even explosive crying or laughing) at inappropriate times or in the absence of any particular provocation. Emotional lability or pseudobulbar affect is also referred to by the terms emotionalism, emotional incontinence, emotional discontrol, excessive emotionalism, and pathological laughing and crying. The feelings that accompany emotional lability are often described in words such as "disconnectedness," since patients are fully aware that an outburst is not appropriate in a particular situation, but they do not have control over their emotional displays.

Emotional lability or pseudobulbar affect becomes a clinical problem when the inability to control emotional outbursts interferes in a substantial way with the ability to engage in family, personal, or business affairs. For example, a businessman suffering from early-stage ALS or Parkinson's disease might become unable to sit through business meetings, or a patient might become unable to go out in public, such as to a restaurant or movie, due to transient but intense inability to keep from crying or laughing at inappropriate times in front of other people. These symptoms can occur even though the patient still has more than enough energy and stamina to do the physical tasks necessary to interact with other people. Such outbursts, along with the feelings of annoyance, inadequacy, and confusion that they usually generate and the visible effects they have on other people, can severely aggravate the other symptoms of the disease; they lead to feelings

**2**

of ostracism, alienation, and isolation, and they can render it very difficult for friends and family members to provide tolerant and caring emotional support for the patient.

## SUMMARY OF THE INVENTION

There remains a need for additional or improved forms of treatment for emotional lability and other chronic disorders, such as chronic pain. Such a treatment preferably provides at least some degree of improvement compared to other known drugs, in at least some patients. A method for treating emotional lability in at least some patients suffering from neurologic impairment, such as a progressive neurologic disease, is desirable.

A method of treating emotional lability, pseudobulbar affect, and other chronic conditions in human patients who are in need of such treatment, without oversedation or otherwise significantly interfering with consciousness or alertness is provided. The treatment involves administering dextromethorphan in combination with a minimum dosage of quinidine.

In a first embodiment, a method for treating pseudobulbar affect or emotional lability is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the first embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a second embodiment, a method for treating neuropathic pain is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In a third embodiment, a method for treating a neurodegenerative disease or condition is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the third embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a fourth embodiment, a method for treating a brain injury is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the fourth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

In aspects of the first through fourth embodiments, the dextromethorphan and the quinidine are administered as one combined dose per day.

In aspects of the first through fourth embodiments, the dextromethorphan and the quinidine are administered as at least two combined doses per day.

US 7,659,282 B2

3

4

In aspects of the first through fourth embodiments, the amount of quinidine administered includes from about 20 mg/day to about 45 mg/day.

In aspects of the first through fourth embodiments, the amount of dextromethorphan administered includes from about 20 mg/day to about 60 mg/day.

In aspects of the first through fourth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the first through fourth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the first through fourth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, and wherein an amount of quinidine sulfate administered includes from about 30 mg/day to 60 mg/day and wherein an amount of dextromethorphan hydrobromide administered includes from about 30 mg/day to about 60 mg/day.

In a fifth embodiment, a method for treating pseudobulbar affect or emotional lability is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the fifth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a sixth embodiment, a method for treating neuropathic pain is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In a seventh embodiment, a method for treating a neurodegenerative disease or condition is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the seventh embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In an eighth embodiment, a method for treating a brain injury is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the eighth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

In aspects of the fifth through eighth embodiments, the weight ratio of dextromethorphan to quinidine in the combined dose is about 1:0.75 or less.

In aspects of the fifth through eighth embodiments, the amount of quinidine administered includes from about 20 mg/day to about 45 mg/day, and wherein the amount of dextromethorphan administered includes from about 20 mg/day to about 60 mg/day.

In aspects of the fifth through eighth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the fifth through eighth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the fifth through eighth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, and wherein an amount of quinidine sulfate administered includes from about 30 mg/day to about 60 mg/day and wherein an amount of dextromethorphan hydrobromide administered includes from about 30 mg/day to about 60 mg/day.

In aspects of the fifth through eighth embodiments, one combined dose is administered per day.

In aspects of the fifth through eighth embodiments, two or more combined doses are administered per day.

In a ninth embodiment, a pharmaceutical composition suitable for use in treating pseudobulbar affect or emotional lability is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the ninth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a tenth embodiment, a pharmaceutical composition suitable for use in treating neuropathic pain is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an eleventh embodiment, a pharmaceutical composition suitable for use in treating a neurodegenerative disease or condition is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the eleventh embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a twelfth embodiment, a pharmaceutical composition suitable for use in a brain injury is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the twelfth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

US 7,659,282 B2

5

In aspects of the ninth through twelfth embodiments, the weight ratio of dextromethorphan to quinidine is about 1:0.75 or less.

In aspects of the ninth through twelfth embodiments, the quinidine is present in an amount of from about 20 mg to about 45 mg, and wherein the dextromethorphan is present in an amount of from about 20 mg to about 60 mg.

In aspects of the ninth through twelfth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the ninth through twelfth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the ninth through twelfth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, wherein the quinidine sulfate is present in an amount of from about 30 mg to about 60 mg, and wherein the dextromethorphan hydrobromide is present in an amount of from about 30 mg to about 60 mg.

In a thirteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating pseudobulbar affect or emotional lability is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the thirteenth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a fourteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating neuropathic pain is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In a fifteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating a neurodegenerative disease or condition is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the fifteenth embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a sixteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating a brain injury is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the sixteenth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

6

In aspects of the thirteenth through sixteenth embodiments, dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:0.75 or less.

In aspects of the thirteenth through sixteenth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the thirteenth through sixteenth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the thirteenth through sixteenth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, wherein the quinidine sulfate is present in an amount of from about 30 mg to about 60 mg, and wherein the dextromethorphan hydrobromide is present in an amount of from about 30 mg to about 60 mg.

In aspects of the thirteenth through sixteenth embodiments, the quinidine is present in an amount of from about 20 mg to about 45 mg, and wherein the dextromethorphan is present in an amount of from about 20 mg to about 60 mg.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 provides a box plot of CNS-LS scores for Clinical Study #4. The distributions of CNS-LS scores are symmetrical and contain only one outlier. These distributions support the use of ANCOVA for the analysis of the CNS-LS scores. As prospectively specified in the study protocol, the differences in mean improvement in CNS-LS cores, adjusted for center and baseline CNS-LS scores, were analyzed by using linear regression according to the ANCOVA method of Frison and Pocock. The results of this analysis are in Table 30. The results of the additional analyses without any adjustments or with an adjustment for baseline CNS-LS score alone are also in this table.

FIG. 2 provides a plot depicting adjusted mean reductions in CNS-LS scores for the three treatment groups from the primary efficacy analysis of the ITT population of Clinical Study #4. Reductions in CNS-LS scores below the horizontal lines are statistically significantly different from 30DM/30Q at the significance levels indicated.

FIG. 3 provides the disposition of subjects by MTD group participating in Clinical Study #5.

FIG. 4 depicts Mean Sleep Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. 5. Mean Present Pain Intensity Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. 6. Mean Activity Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. 7. Mean Pain Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The following description and examples illustrate a preferred embodiment of the present invention in detail. Those of skill in the art will recognize that there are numerous varia-

7

tions and modifications of this invention that are encompassed by its scope. Accordingly, the description of a preferred embodiment should not be deemed to limit the scope of the present invention.

Emotional lability or pseudobulbar affect is associated with a number of neurological diseases, such as stroke (House et al., BMJ, 1989; 298:991-4), multiple sclerosis (MS) (Cotrell et al., J. Neurol. Psychopathol., 1926; 7:1-30; Feinstein et al., Arch. Neurol., 1997; 54:1116-21), amyotrophic lateral sclerosis (ALS) (Miller et al., Neurol., 1999; 52:1311-23; Jackson et al., Semin. Neurol. 1998; 18:27-39; Poeck, K., Pathophysiology of emotional disorders associated with brain damage. In: P. J. Vinken, G. W. Bruyn, editors. Handbook of Clinical Neurology. Amsterdam: North-Holland Publishing Company 1969; pp. 343-67), Alzheimer's disease (Starkstein et al., J. Neurol. Neurosurg. Psychiatry, 1995; 59:55-64), and traumatic brain injury (Brooks, N., Acta Neurochirurgica Suppl., 44 1988; 59-64). Studies have suggested that pseudobulbar affect occurs in up to 50% of patients with ALS (Gallagher, J. P., Acta Neurol. Scand. 1989; 80:114-7).

Emotional lability or pseudobulbar affect in the context of neurological injury can be considered a disconnection syndrome resulting from loss of cortical communication with the brainstem or cerebellum Wilson S A K, J Neurol. Psychopathol., 1924; IV:299-333; Parvivzi et al., Brain, 2001; 124: 1708-19). At the neurotransmitter level, disruptions of ascending and descending serotonergic pathways arising in the brainstem, and dysregulation of dopaminergic projections to the striatum and cortex have been implicated (Andersen et al., Stroke, 1994; 25:1050-2; Ross et al., J. Nerv. Ment. Dis., 1987; 175:165-72; Shaw et al., Brain Sciences in Psychiatry, London: Butterworth, 1982; Udaka et al., Arch. Neurol. 1984; 41:1095-6).

A body of evidence suggests that pseudobulbar affect can be modulated through pharmacologic intervention. In 1979, Wolf reported that levodopa was effective in subjects with pathological laughing (Wolf et al., Neurol., 1979; 29:1435-6.). However, in a follow-up study, only 10 of 25 subjects responded satisfactorily to treatment (Udaka et al., Arch. Neurol., 1984; 41:1095-6). There have been reports of symptomatic benefit with other drugs, including amantadine, imipramine, desipramine, nortriptyline, amitriptyline, sertraline, fluoxetine, levodopa, methylphenidate, and thyrotropin-releasing hormone (Dark et al., Austr. N. Zeal. J. Psychiatry, 1996; 30:472-9; Iannoccone et al., Clin. Neuropharm., 1996; 19:532-5).

The best previously known therapies for treating emotional lability involve the drugs amitriptyline, amantadine, and levodopa. Although reports such as Udaka et al., Arch. Neurol. 1984, 41: 1095-1096, and Schiffer et al., N. Engl. J. Med. 1985, 312: 1480-1482 indicate that these compounds may be effective in helping reduce pathological displays of emotion in some patients, they make it clear that none of these prior art drugs are effective in all patients, and even in patients who receive some benefit, the effect usually stops far short of an effective cure. A common practice for many clinical neurologists is to prescribe amitriptyline and amantadine, one at a time, in the hope that one of them might be able to provide any level of improvement in the patient's condition. However, all both fall short of offering an effective cure. In addition, levodopa is not satisfactory, since it has other effects and is a relatively powerful drug.

ALS is a neurodegenerative disease produced by progressive loss of upper and lower motor neurons. Up to 50 percent of patients with ALS exhibit emotional lability, and it is very prevalent in those with the bulbar form of ALS (Gallagher J P, Acta Neurol. Scand., 1989; 80:114-7). Based on the notion

8

that excitotoxicity secondary to impaired recycling of glutamate may be a factor in the etiology of ALS, riluzole, a glutamate release inhibitor, has been used to treat ALS (Jerusalem et al., Neurology, 1996; 47:S218-20; Doble A., Neurology, 1996; 47:S233-41). Riluzole modestly extends life span but does not confer symptomatic benefit (Bensimon et al., N. Eng. J. Med., 1994; 330:585-91; Kwiecinski H, Neurol. Neurochir. Pol., 2001; 35:51-9).

Because of the possibility that an excitotoxic process involving glutamate is etiologically implicated in ALS, several investigators have attempted to modify or arrest the course of ALS by the administration of dextromethorphan (DM). DM is a noncompetitive antagonist of the N-methyl-D-aspartate-sensitive ionotropic glutamate receptor, and it acts by reducing the level of excitatory activity. However, DM is extensively metabolized to dextrorphan (DX) and a number of other metabolites. Cytochrome P450 2D6 (CYP2D6) is the key enzyme responsible for the formation of DX from DM. A subset of the population, 5 to 10% of Caucasians, has reduced activity of this enzyme (Hildebrand et al., Eur. J. Clin. Pharmacol., 1989; 36:315-318). Such individuals are referred to as "poor metabolizers" of DM in contrast to the majority of individuals who are referred to as "extensive metabolizers" of DM (Vetticaden et al., Pharm. Res., 1989; 6:13-9).

A number of in vitro studies have been undertaken to determine the types of drugs that inhibit CYP2D6 activity. Quinidine (Q) is one of the most potent of those that have been studied (Inaba et al., Br. J. Clin. Pharmacol., 1986; 22:199-200). These observations led to the hypothesis that concomitant dosing with Q could increase the concentration of DM in plasma.

A number of chronic disorders other than emotional lability also have symptoms which are known to be very difficult to treat, and often fail to respond to safe, non-addictive, and non-steroid medications. Disorders such as intractable coughing fail to respond to conventional medicines and are typically treated by such drugs as codeine, morphine, or the anti-inflammatory steroid prednisone. These drugs are unacceptable for long-term treatment due to dangerous side effects, long-term risks to the patient's health, or the danger of addiction. There has been no satisfactory treatment for the severe itching and rash associated with dermatitis. Drugs such as prednisone and even tricyclic antidepressants, as well as topical applications have been employed, but do not appear to offer substantial and consistent relief. Chronic pain due to conditions such as stroke, cancer, and trauma, as well as neuropathic pain resulting from conditions such as diabetes and shingles (herpes zoster), for example, is also a problem which resists treatment. Neuropathic pain includes, for example, diabetic neuropathy, postherpetic neuralgia, phantom limb pain, trigeminal neuralgia, and sciatica. Postherpetic neuralgia (PHN) is a complication of shingles and occurs in approximately ten percent of patients with herpes zoster. The incidence of PHN increases with age. Diabetic neuropathy is a common complication of diabetes which increases with the duration of the disease. The pain for these types of neuropathies has been described as a burning steady pain often punctuated with stabbing pains, pins and needles pain, and toothache-like pain. The skin can be sensitive with dysesthetic sensations to even light touch and clothing. The pain can be exacerbated by activity, temperature change, and emotional upset. The pain can be so severe as to preclude daily activities or result in sleep disturbance or anorexia. The mechanisms involved in producing pain of these types are not well understood, but may involve degeneration of myelinated nerve fibers. It is known that in diabetic neuropathy, both small and large nerve fibers deteriorate resulting in reduced

**9**

thresholds for tolerance of thermal sensitivity, pain, and vibration. Dysfunction of both large and small fiber functions is more severe in the lower limbs when pain develops. Most of the physiological measurements of nerves that can be routinely done in patients experiencing neuropathic pain demonstrate a slowing of nerve conduction over time. To date, treatment for neuropathic pain has been less than universally successful. Chronic pain is estimated to affect millions of people.

Dextromethorphan is widely used as a cough syrup, and it has been shown to be sufficiently safe in humans to allow its use as an over-the-counter medicine. It is well tolerated in oral dosage form, either alone or with quinidine, at up to 120 milligrams (mg) per day, and a beneficial effect may be observed when receiving a substantially smaller dose (e.g., 30 mg/day) (U.S. Pat. No. 5,206,248 to Smith).

The chemistry of dextromethorphan and its analogs is described in various references such as Rodd, E. H., Ed., Chemistry of Carbon Compounds, Elsevier Publ., N.Y., 1960; Goodman and Gilman's Pharmacological Basis of Therapeutics; Choi, Brain Res., 1987, 403: 333-336; and U.S. Pat. No. 4,806,543. Its chemical structure is as follows:



Dextromethorphan is the common name for (+)-3-methoxy-N-methylmorphinan. It is one of a class of molecules that are dextrorotatory analogs of morphine-like opioids. The term "opiate" refers to drugs that are derived from opium, such as morphine and codeine. The term "opioid" is broader. It includes opiates, as well as other drugs, natural or synthetic, which act as analgesics and sedatives in mammals.

Most of the addictive analgesic opiates, such as morphine, codeine, and heroin, are levorotatory stereoisomers (they rotate polarized light in the so-called left-handed direction). They have four molecular rings in a configuration known as a "morphinan" structure, which is depicted as follows:



In this depiction, the carbon atoms are conventionally numbered as shown, and the wedge-shaped bonds coupled to carbon atoms 9 and 13 indicate that those bonds rise out of the plane of the three other rings in the morphinan structure. Many analogs of this basic structure (including morphine) are pentacyclic compounds that have an additional ring formed by a bridging atom (such as oxygen) between the number 4 and 5 carbon atoms.

**10**

Many dextrorotatory analogs of morphine are much less addictive than the levorotatory compounds. Some of these dextrorotatory analogs, including dextromethorphan and dextrorphan, are enantiomers of the morphinan structure. In these enantiomers, the ring that extends out from carbon atoms 9 and 13 is oriented in the opposite direction from that depicted in the above structure.

While not wishing to be limited to any particular mechanism of action, dextromethorphan is known to have at least three distinct receptor activities which affect central nervous system (CNS) neurons. First, it acts as an antagonist at N-methyl-D-aspartate (NMDA) receptors. NMDA receptors are one of three major types of excitatory amino acid (EAA) receptors in CNS neurons. Since activation of NMDA receptors causes neurons to release excitatory neurotransmitter molecules (primarily glutamate, an amino acid), the blocking activity of dextromethorphan at these receptors reduces the level of excitatory activity in neurons having these receptors. Dextromethorphan is believed to act at the phencyclidine (PCP) binding site, which is part of the NMDA receptor complex. Dextromethorphan is relatively weak in its NMDA antagonist activity, particularly compared to drugs such as MK-801 (dizocilpine) and phencyclidine. Accordingly, when administered at approved dosages, dextromethorphan is not believed to cause the toxic side effects (discussed in U.S. Pat. No. 5,034,400 to Olney) that are caused by powerful NMDA antagonists such as MK-801 or PCP.

Dextromethorphan also functions as an agonist at certain types of inhibitory receptors; unlike EAA receptors, activation of inhibitory receptors suppresses the release of excitatory neurotransmitters by affected cells. Initially, these inhibitory receptors were called sigma opiate receptors. However, questions have been raised as to whether they are actually opiate receptors, so they are now generally referred to as sigma ($\sigma$) receptors. Subsequent experiments showed that dextromethorphan also binds to another class of inhibitory receptors that are closely related to, but distinct from, sigma receptors. The evidence, which indicates that non-sigma inhibitory receptors exist and are bound by dextromethorphan, is that certain molecules which bind to sigma receptors are not able to completely block the binding of dextromethorphan to certain types of neurons that are known to have inhibitory receptors (Musacchio et al., Cell Mol. Neurobiol., 1988 June, 8(2):149-56; Musacchio et al., J. Pharmacol. Exp. Ther., 1988 November, 247(2):424-31; Craviso et al., Mol. Pharmacol., 1983 May, 23(3):629-40; Craviso et al., Mol. Pharmacol., 1983 May, 23(3):619-28; and Klein et al., Neurosci. Lett., 1989 Feb. 13, 97(1-2):175-80). These receptors are generally called "high-affinity dextromethorphan receptors" or simply "DM receptors" in the scientific literature. As used herein, the phrase "dextromethorphan-binding inhibitory receptors" includes both sigma and non-sigma receptors which undergo affinity-binding reactions with dextromethorphan and which, when activated by dextromethorphan, suppress the release of excitatory neurotransmitters by the affected cells (Largent et al., Mol. Pharmacol., 1987 December, 32(6):772-84).

Dextromethorphan also decreases the uptake of calcium ions ($Ca^{++}$) by neurons. Calcium uptake, which occurs during transmission of nerve impulses, involves at least two different types of channels, known as N-channels and L-channels. Dextromethorphan suppressed calcium uptake fairly strongly in certain types of cultured neurons (synaptosomes) which contain N-channels; it also suppressed calcium uptake, although less strongly, in other cultured neurons (PC12 cells) which contain L-channels (Carpenter et al., Brain Res., 1988 Jan. 26, 439(1-2):372-5).

US 7,659,282 B2

11

An increasing body of evidence indicates dextromethorphan has therapeutic potential for treating several neuronal disorders (Zhang et al., Clin. Pharmacol. Ther. 1992; 51: 647-655; Palmer G C, Curr. Drug Targets, 2001; 2: 241-271; and Liu et al., J. Pharmacol. Exp. Ther. 2003; 21: 21; Kim et al., Life Sci., 2003; 72: 769-783). Pharmacological studies demonstrate that DM is a noncompetitive NMDA antagonist that has neuroprotective, anticonvulsant and antinociceptive activities in a number of experimental models (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). In addition to acting as an NMDA antagonist, both DM and its primary metabolite, dextrorphan, bind to sigma-1 sites, inhibit calcium flux channels and interact with high voltage-gated sodium channels (Dickenson et al., Neuropharmacology, 1987; 26: 1235-1238; Carpenter et al., Brain Res., 1988; 439: 372-375; Netzer et al., Eur. J. Pharmacol., 1993; 238: 209-216). Recent reports indicate that an additional neuroprotective mechanism of DM may include interference with the inflammatory responses associated with some neurodegenerative disorders that include Parkinson's disease and Alzheimer's disease (Liu et al., J. Pharmacol. Exp. Ther., 2003; 21: 21). The potential efficacy of DM as a neuroprotectant was explored in limited clinical trials in patients with amyotrophic lateral sclerosis (Gredal et al., Acta Neurol. Scand. 1997; 96: 8-13; Blin et al., Clin. Neuropharmacol., 1996; 19: 189-192) Huntington's disease (Walker et al., Clin. Neuropharmacol., 1989; 12: 322-330) and Parkinson's Disease (Chase et al., J. Neurol., 2000; 247 Suppl 2: 1136-42). DM was also examined in patients with various types of neuropathic pain (Mcquay et al., Pain, 1994; 59: 127-133; Vinik A I, Am. J. Med., 1999; 107: 17S-26S; Weinbroum et al., Can. J. Anaesth., 2000; 47: 585-596; Sang et al., Anesthesiology, 2002; 96: 1053-1061; Heiskanen et al., Pain, 2002; 96: 261-267; Ben Abraham et al., Clin. J. Pain, 2002; 18: 282-285; Sang C N, J. Pain Symptom Manage., 2000; 19: S21-25). Although the pharmacological profile of DM points to clinical efficacy, most clinical trials have been disappointing with equivocal efficacy for DM compared to placebo treatment.

Several investigators suggested that the limited benefit seen with DM in clinical trials is associated with rapid hepatic metabolism that limits systemic drug concentrations. In one trial in patients with Huntington's disease, plasma concentrations were undetectable in some patients after DM doses that were eight times the maximum antitussive dose (Walker et al., Clin. Neuropharmacol., 1989; 12: 322-330).

As discussed above, DM undergoes extensive hepatic O-demethylation to dextrorphan that is catalyzed by CYP2D6. This is the same enzyme that is responsible for polymorphic debrisoquine hydroxylation in humans (Schmid et al., Clin. Pharmacol. Ther., 1985; 38: 618-624). An alternate pathway is mediated primarily by CYP3A4 and N-demethylation to form 3-methoxymorphinan (Von Moltke et al., J. Pharm. Pharmacol., 1998; 50: 997-1004). Both DX and 3-methoxymorphinan can be further demethylated to 3-hydroxymorphinan that is then subject to glucuronidation. The metabolic pathway that converts DM to DX is dominant in the majority of the population and is the principle for using DM as a probe to phenotype individuals as CYP2D6 extensive and poor metabolizers (Kupfer et al., Lancet 1984; 2: 517-518; Guttendorf et al., Ther. Drug Monit., 1988; 10: 490-498). Approximately 7% of the Caucasian population shows the poor metabolizer phenotype, while the incidence of poor metabolizer phenotype in Chinese and Black African populations is lower (Droll et al., Pharmacogenetics, 1998; 8: 325-333). A study examining the ability of DM to increase pain threshold in extensive and poor metabolizers found antinociceptive effects of DM were significant in poor metabo-

12

lizers but not in extensive metabolizers (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). The results are consistent with direct effects of parent DM rather than the DX metabolite on neuromodulation.

One approach for increasing systemically available DM is to coadminister the CYP2D6 inhibitor, quinidine, to protect DM from metabolism (Zhang et al., Clin. Pharmacol. Ther. 1992; 51: 647-655). Quinidine administration can convert subjects with extensive metabolizer phenotype to poor metabolizer phenotype (Inaba et al., Br. J. Clin. Pharmacol., 1986; 22: 199-200). When this combination therapy was tried in amyotrophic lateral sclerosis patients it appeared to exert a palliative effect on symptoms of pseudobulbar affect (Smith et al., Neurol., 1995; 54: 604P). Combination treatment with DM and quinidine also appeared effective for patients with chronic pain that could not be adequately controlled with other medications. This observation is consistent with a report that showed DM was effective in increasing pain threshold in poor metabolizers and in extensive metabolizers given quinidine, but not in extensive metabolizers (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). To date, most studies have used quinidine doses ranging from 50 to 200 mg to inhibit CYP2D6 mediated drug metabolism, but no studies have identified a minimal dose of quinidine for enzyme inhibition.

The highly complex interactions between different types of neurons having varying populations of different receptors, and the cross-affinity of different receptor types for dextromethorphan as well as other types of molecules which can interact with some or all of those same types of receptors, render it very difficult to attribute the overall effects of dextromethorphan to binding activity at any particular receptor type. Nevertheless, it is believed that dextromethorphan suppresses neuronal activity by means of at least three molecular functions: it reduces activity at (excitatory) NMDA receptors; it inhibits neuronal activity by binding to certain types of inhibitory receptors; and it suppresses calcium uptake through N-channels and L-channels.

Unlike some analogs of morphine, dextromethorphan has little or no agonist or antagonist activity at various other opiate receptors, including the mu (μ) and kappa (κ) classes of opiate receptors. This is highly desirable, since agonist or antagonist activity at those opiate receptors can cause undesired side effects such as respiratory depression (which interferes with breathing) and blockade of analgesia (which reduces the effectiveness of pain-killers).

Accordingly, emotional lability or pseudobulbar affect can be treated in at least some patients by means of administering a drug which functions as an antagonist at NMDA receptors and as an agonist at dextromethorphan-binding inhibitory receptors, and wherein the drug is also characterized by a lack of agonist or antagonist activity at mu or kappa opiate receptors, namely, dextromethorphan.

It has long been known that in most people (estimated to include about 90% of the general population in the United States), dextromethorphan is rapidly metabolized and eliminated by the body (Ramachander et al., J. Pharm. Sci., 1977 July, 66(7):1047-8; and Vetticaden et al., Pharm. Res., 1989 July, 6(1):13-9). This elimination is largely due to an enzyme known as the P450 2D6 (or IID6) enzyme, which is one member of a class of oxidative enzymes that exist in high concentrations in the liver, known as cytochrome P450 enzymes (Kronbach et al., Anal. Biochem., 1987 April, 162 (1):24-32; and Dayer et al., Clin. Pharmacol. Ther., 1989 January, 45(1):34-40). In addition to metabolizing dextromethorphan, the P450 2D6 isozyme also oxidizes sparteine and debrisoquine. It is known that the P450 2D6

US 7,659,282 B2

13

14

enzyme can be inhibited by a number of drugs, particularly quinidine (Brinn et al., Br. J. Clin. Pharmacol., 1986 August, 22(2):194-7; Inaba et al., Br. J. Clin. Pharmacol., 1986 August, 22(2):199-200; Brosen et al., Pharmacol. Toxicol., 1987 April, 60(4):312-4; Otton et al., Drug Metab. Dispos., 1988 January-February, 16(1):15-7; Otton et al., J. Pharmacol. Exp. Ther., 1988 October, 247(1):242-7; Funck-Brentano et al., Br. J. Clin. Pharmacol., 1989 April, 27(4):435-44; Funck-Brentano et al., J. Pharmacol. Exp. Ther., 1989 April, 249(1):134-42; Nielsen et al., Br. J. Clin. Pharmacol., 1990 March, 29(3):299-304; Broly et al., Br. J. Clin. Pharmacol., 1989 July, 28(1):29-36).

Patients who lack the normal levels of P450 2D6 activity are classified in the medical literature as "poor metabolizers," and doctors are generally warned to be cautious about administering various drugs to such patients. "The diminished oxidative biotransformation of these compounds in the poor metabolizer (PM) population can lead to excessive drug accumulation, increased peak drug levels, or in some cases, decreased generation of active metabolites . . . Patients with the PM phenotype are at increased risk of potentially serious untoward effects . . . " (Guttendorf et al., Ther. Drug Monit., 1988, 10(4):490-8, page 490). Accordingly, doctors are cautious about administering quinidine to patients, and rather than using drugs such as quinidine to inhibit the rapid elimination of dextromethorphan, researchers working in this field have administered very large quantities (such as 750 mg/day) of dextromethorphan to their patients, even though this is known to introduce various problems (Walker et al., Clin Neuropharmacol., 1989 August, 12(4):322-30; and Albers et al., Stroke, 1991 August, 22(8):1075-7).

Dextromethorphan is a weak, noncompetitive NMDA receptor antagonist that binds with moderate-to-high affinity to the phencyclidine site of the receptor complex. However, DM has additional, unique pharmacological properties. Binding studies suggest it is a ligand at the high affinity sigma 1 site, where it initially was proposed to act as an antagonist (Tortella et al., TiPS, 1989; 10:501-7) but more recently as an agonist (Maurice et al., Brain Res. Brain Res. Rev., 2001; 37:116-32). Sigma ligands also modulate NMDA responses (Debonnel et al., Life Sci., 1996; 58:721-34). Due to its inhibitory actions on glutamate, a number of investigators have treated ALS patients with DM in the hope of modifying or arresting the disease (Askmark et al., J. Neurol. Neurosurg. Psychiatry, 1993; 56:197-200; Hollander et al., Ann. Neurol., 1994; 36:920-4; and Blin et al., Clin. Neuropharmacol., 1996; 19:189-92). These trials have failed to demonstrate any benefit, possibly due to the rapid and extensive metabolism of DM that occurs in approximately 90 percent of the Caucasian population (referred to as extensive metabolizers) (see Hildebrand et al., Eur. J. Clin. Pharmacol., 1989; 36:315-8).

DM metabolism is primarily mediated by CYP2D6 in extensive metabolizers. This can be circumvented by co-administration of quinidine, a selective CYP2D6 inhibitor, at Q doses 1 to 1.5 logs below those employed for the treatment of cardiac arrhythmias (Schadel et al., J. Clin. Psychopharmacol., 1995; 15:263-9). Blood levels of DM increase linearly with DM dose following co-administration with Q but are undetectable in most subjects given DM alone, even at high doses (Zhang et al., Clin. Pharmac. & Therap., 1992; 51:647-55). The observed plasma levels in these individuals thus mimic the plasma levels observed in individuals expressing the minority phenotype where polymorphisms in the gene result in reduced levels of P450 2D6 (poor metabolizers). Unexpectedly, during a study of DM and Q in ALS patients, patients reported that their emotional lability improved during treatment. Subsequently, in a placebo controlled cross-

over study (N=12) conducted to investigate this, the concomitant administration of DM and Q administered to ALS patients was found to suppress emotional lability (P<0.001 compared to placebo) (Smith et al., Neurology, 1995; 45:A330).

Rapid dextromethorphan elimination may be overcome by co-administration of quinidine along with dextromethorphan (U.S. Pat. No. 5,206,248 to Smith). The chemical structure of quinidine is as follows:



Quinidine co-administration has at least two distinct beneficial effects. First, it greatly increases the quantity of dextromethorphan circulating in the blood. In addition, it also yields more consistent and predictable dextromethorphan concentrations. Research involving dextromethorphan or co-administration of quinidine and dextromethorphan, and the effects of quinidine on blood plasma concentrations, are described in the patent literature (U.S. Pat. No. 5,166,207, U.S. Pat. No. 5,863,927, U.S. Pat. No. 5,366,980, U.S. Pat. No. 5,206,248, and U.S. Pat. No. 5,350,756 to Smith).

The discovery that dextromethorphan can reduce the internal feelings and external symptoms of emotional lability or pseudobulbar affect in some patients suffering from progressive neurological disease suggests that dextromethorphan is also likely to be useful for helping some patients suffering from emotional lability due to other causes, such as stroke or other ischemic (low blood flow) or hypoxic (low oxygen supply) events which led to neuronal death or damage in limited regions of the brain, or head injury or trauma as might occur during an automobile, motorcycle, or bicycling accident or due to a gunshot wound.

In addition, the results obtained to date also suggest that dextromethorphan is likely to be useful for treating some cases of emotional lability which are due to administration of other drugs. For example, various steroids, such as prednisone, are widely used to treat autoimmune diseases such as lupus. However, prednisone has adverse events on the emotional state of many patients, ranging from mild but noticeably increased levels of moodiness and depression, up to severely aggravated levels of emotional lability that can impair the business, family, or personal affairs of the patient.

In addition, dextromethorphan in combination with quinidine can reduce the external displays or the internal feelings that are caused by or which accompany various other problems such as "premenstrual syndrome" (PMS), Tourette's syndrome, and the outburst displays that occur in people suffering from certain types of mental illness. Although such problems may not be clinically regarded as emotional lability, they involve manifestations that appear to be sufficiently similar to emotional lability to suggest that dextromethorphan can offer an effective treatment for at least some patients suffering from such problems.

One of the significant characteristics of the treatments of preferred embodiments is that the treatments function to

**15**

reduce emotional lability without tranquilizing or otherwise significantly interfering with consciousness or alertness in the patient. As used herein, "significant interference" refers to adverse events that would be significant either on a clinical level (they would provoke a specific concern in a doctor or psychologist) or on a personal or social level (such as by causing drowsiness sufficiently severe that it would impair someone's ability to drive an automobile). In contrast, the types of very minor side effects that can be caused by an over-the-counter drug such as a dextromethorphan-containing cough syrup when used at recommended dosages are not regarded as significant interference.

The magnitude of a prophylactic or therapeutic dose of dextromethorphan in combination with quinidine in the acute or chronic management of emotional lability or other chronic conditions can vary with the particular cause of the condition, the severity of the condition, and the route of administration. The dose and/or the dose frequency can also vary according to the age, body weight, and response of the individual patient.

In general, it is preferred to administer the dextromethorphan and quinidine in a combined dose, or in separate doses administered substantially simultaneously. The preferred weight ratio of dextromethorphan to quinidine is about 1:1.5 or less, preferably about 1:1.45, 1:1.4, 1:1.35, or 1:1.3 or less, more preferably about 1:1.25, 1:1.2, 1:1.15, 1:1.1, 1:1.05, 1:1, 1:0.95, 1:0.9, 1:0.85, 1:0.8, 1:0.75, 1:0.7, 1:0.65, 1:0.6, 1:0.55 or 1:0.5 or less. In certain embodiments, however, dosages wherein the weight ratio of dextromethorphan to quinidine is greater than about 1:1.5 may be preferred, for example, dosages of about 1:1.6, 1:1.7, 1:1.8, 1:1.9, 1:2 or greater. Likewise, in certain embodiments, dosages wherein the ratio of dextromethorphan to quinidine is less than about 1:0.5 may be preferred, for example, about 1:0.45, 1:0.4, 1:0.35, 1:0.3, 1:0.25, 1:0.2, 1:0.15, or 1:0.1 or less. When dextromethorphan and quinidine are administered at the preferred ratio of 1:1.25 or less, it is generally preferred that less than 50 mg quinidine is administered at any one time, more preferably about 45, 40, or 35 mg or less, and most preferably about 30, 25, or 20 mg or less. It may also be preferred to administer the combined dose (or separate doses simultaneously administered) at the preferred ratio of 1:1.25 or less twice daily, three times daily, four times daily, or more frequently so as to provide the patient with a preferred dosage level per day, for example: 60 mg quinidine and 60 mg dextromethorphan per day provided in two doses, each dose containing 30 mg quinidine and 30 mg dextromethorphan; 50 mg quinidine and 50 mg dextromethorphan per day provided in two doses, each dose containing 25 mg quinidine and 25 mg dextromethorphan; 40 mg quinidine and 40 mg dextromethorphan per day provided in two doses, each dose containing 20 mg quinidine and 20 mg dextromethorphan; 30 mg quinidine and 30 mg dextromethorphan per day provided in two doses, each dose containing 15 mg quinidine and 15 mg dextromethorphan; or 20 mg quinidine and 20 mg dextromethorphan per day provided in two doses, each dose containing 10 mg quinidine and 10 mg dextromethorphan. The total amount of dextromethorphan and quinidine in a combined dose may be adjusted, depending upon the number of doses to be administered per day, so as to provide a suitable daily total dosage to the patient, while maintaining the preferred ratio of 1:1.25 or less. These ratios are particularly preferred for the treatment of emotional lability and neuropathic pain.

In general, the total daily dose for dextromethorphan in combination with quinidine, for the conditions described herein, is about 10 mg or less up to about 200 mg or more dextromethorphan in combination with about 1 mg or less up to about 150 mg or more quinidine; preferably from about 15

**16**

or 20 mg to about 65, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, 140, 150, 160, 170, 180, or 190 mg dextromethorphan in combination with from about 2.5, 5, 7.5, 10, 15, or 20 mg to about 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, or 140 mg quinidine; more preferably from about 25, 30, 35, or 40 mg to about 55 or 60 mg dextromethorphan in combination with from about 25, 30, or 35 mg to about 40, 45, or 50 mg quinidine. In particularly preferred embodiments, the daily dose of dextromethorphan (DM) to quinidine (Q) is: 20 mg DM to 20 mg Q; 20 mg DM to 30 mg Q; 20 mg DM to 40 mg Q; 20 mg DM to 50 mg Q; 20 mg DM to 60 mg Q; 30 mg DM to 20 mg Q; 30 mg DM to 30 mg Q; 30 mg DM to 40 mg Q; 30 mg DM to 50 mg Q; 30 mg DM to 60 mg Q; 40 mg DM to 20 mg Q; 40 mg DM to 30 mg Q; 40 mg DM to 40 mg Q; 40 mg DM to 50 mg Q; 40 mg DM to 60 mg Q; 50 mg DM to 20 mg Q; 50 mg DM to 30 mg Q; 50 mg DM to 40 mg Q; 50 mg DM to 50 mg Q; 50 mg DM to 60 mg Q; 60 mg DM to 20 mg Q; 60 mg DM to 30 mg Q; 60 mg DM to 40 mg Q; 60 mg DM to 50 mg Q; or 60 mg DM to 60 mg Q. A single dose per day or divided doses (two, three, four or more doses per day) can be administered.

Preferably, a daily dose for emotional lability is about 20 mg to about 60 mg dextromethorphan in combination with about 20 mg to about 60 mg quinidine, in single or divided doses. Particularly preferred daily dose for emotional lability is about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, or 50 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; or about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; in single or divided doses.

In general, the total daily dose for dextromethorphan in combination with quinidine, for chronic pain, such as neuropathic pain, intractable coughing, dermatitis, tinnitus, and sexual dysfunction is preferably about 10 mg or less up to about 200 mg or more dextromethorphan in combination with about 1 mg or less up to about 150 mg or more quinidine. Particularly preferred total daily dosages for chronic pain, such as neuropathic pain, intractable coughing, dermatitis, tinnitus, and sexual dysfunction are about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, or 50 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; or about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; in single or divided doses. Similar daily doses for other indications as mentioned herein are generally preferred.

In managing treatment, the therapy is preferably initiated at a lower daily dose, preferably about 20 or 30 mg dextromethorphan in combination with about 2.5 mg quinidine per day, and increased up to about 60 mg dextromethorphan in combination with about 75 mg quinidine, or higher, depending on the patient's global response. It is further preferred that infants, children, patients over 65 years, and those with impaired renal or hepatic function, initially receive low doses, and that they be titrated based on individual response(s) and

**17**

blood level(s). Generally, a daily dosage of 20 to 30 mg dextromethorphan and 20 to 30 mg quinidine is well-tolerated by most patients.

It can be preferred to administer dosages outside of these preferred ranges in some cases, as will be apparent to those skilled in the art. Further, it is noted that the ordinary skilled clinician or treating physician will know how and when to interrupt, adjust, or terminate therapy in consideration of individual patient response.

Any suitable route of administration can be employed for providing the patient with an effective dosage of dextromethorphan in combination with quinidine. For example, oral, rectal, transdermal, parenteral (subcutaneous, intramuscular, intravenous), intrathecal, topical, inhalable, and like forms of administration can be employed. Suitable dosage forms include tablets, troches, dispersions, suspensions, solutions, capsules, patches, and the like. Administration of medicaments prepared from the compounds described herein can be by any suitable method capable of introducing the compounds into the bloodstream. Formulations of preferred embodiments can contain a mixture of active compounds with pharmaceutically acceptable carriers or diluents as are known by those of skill in the art.

The present method of treatment of emotional lability can be enhanced by the use of dextromethorphan in combination with quinidine as an adjuvant to known therapeutic agents, such as fluoxetine hydrochloride, marketed as PROZAC® by Eli Lilly and Company, and the like. Preferred adjuvants include pharmaceutical compositions conventionally employed in the treatment of the disordered as discussed herein.

The pharmaceutical compositions of the present invention comprise dextromethorphan in combination with quinidine, or pharmaceutically acceptable salts of dextromethorphan and/or quinidine, as the active ingredient and can also contain a pharmaceutically acceptable carrier, and optionally, other therapeutic ingredients.

The terms "pharmaceutically acceptable salts" or "a pharmaceutically acceptable salt thereof" refer to salts prepared from pharmaceutically acceptable, non-toxic acids or bases. Suitable pharmaceutically acceptable salts include metallic salts, e.g., salts of aluminum, zinc, alkali metal salts such as lithium, sodium, and potassium salts, alkaline earth metal salts such as calcium and magnesium salts; organic salts, e.g., salts of lysine, N,N'-dibenzylethylenediamine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine (N-methylglucamine), procaine, and tris; salts of free acids and bases; inorganic salts, e.g., sulfate, hydrochloride, and hydrobromide; and other salts which are currently in widespread pharmaceutical use and are listed in sources well known to those of skill in the art, such as The Merck Index. Any suitable constituent can be selected to make a salt of an active drug discussed herein, provided that it is non-toxic and does not substantially interfere with the desired activity. In addition to salts, pharmaceutically acceptable precursors and derivatives of the compounds can be employed. Pharmaceutically acceptable amides, lower alkyl esters, and protected derivatives of dextromethorphan and/or quinidine can also be suitable for use in compositions and methods of preferred embodiments. In particularly preferred embodiments, the dextromethorphan is administered in the form of dextromethorphan hydrobromide, and the quinidine is administered in the form of quinidine sulfate. For example, a dose of 30 mg dextromethorphan hydrobromide (of molecular formula $C_{18}H_{25}NO.HBr.H_2O$) and 30 quinidine sulfate (of molecular formula $(C_{20}H_{24}N_2O_2)_2.H_2SO_4.2H_2O$) may be administered (corresponding to an effective dosage of

**18**

approximately 22 mg dextromethorphan and 25 mg quinidine). Other preferred dosages include, for example, 45 mg dextromethorphan hydrobromide and 30 quinidine sulfate (corresponding to an effective dosage of approximately 33 mg dextromethorphan and approximately 25 mg quinidine); 60 mg dextromethorphan hydrobromide and 30 quinidine sulfate (corresponding to an effective dosage of approximately 44 mg dextromethorphan and approximately 25 mg quinidine); 45 mg dextromethorphan hydrobromide and 45 quinidine sulfate (corresponding to an effective dosage of approximately 33 mg dextromethorphan and 37.5 mg quinidine); 60 mg dextromethorphan hydrobromide and 60 quinidine sulfate (corresponding to an effective dosage of approximately 44 mg dextromethorphan and 50 mg quinidine).

The compositions can be prepared in any desired form, for example, tables, powders, capsules, suspensions, solutions, elixirs, and aerosols. Carriers such as starches, sugars, microcrystalline cellulose, diluents, granulating agents, lubricants, binders, disintegrating agents, and the like can be used in oral solid preparations. Oral solid preparations (such as powders, capsules, and tablets) are generally preferred over oral liquid preparations. However, in certain embodiments oral liquid preparations can be preferred over oral solid preparations. The most preferred oral solid preparations are tablets. If desired, tablets can be coated by standard aqueous or non-aqueous techniques.

In addition to the common dosage forms set out above, the compounds can also be administered by sustained release, delayed release, or controlled release compositions and/or delivery devices, for example, such as those described in U.S. Pat. Nos. 3,845,770; 3,916,899; 3,536,809; 3,598,123; and 4,008,719.

Pharmaceutical compositions suitable for oral administration can be provided as discrete units such as capsules, cachets, tablets, and aerosol sprays, each containing predetermined amounts of the active ingredients, as powder or granules, or as a solution or a suspension in an aqueous liquid, a non-aqueous liquid, an oil-in-water emulsion, or a water-in-oil liquid emulsion. Such compositions can be prepared by any of the conventional methods of pharmacy, but the majority of the methods typically include the step of bringing into association the active ingredients with a carrier which constitutes one or more ingredients. In general, the compositions are prepared by uniformly and intimately admixing the active ingredients with liquid carriers, finely divided solid carriers, or both, and then, optionally, shaping the product into the desired presentation.

For example, a tablet can be prepared by compression or molding, optionally, with one or more additional ingredients. Compressed tablets can be prepared by compressing in a suitable machine the active ingredient in a free-flowing form such as powder or granules, optionally mixed with a binder, lubricant, inert diluent, surface active or dispersing agent. Molded tablets can be made by molding, in a suitable machine, a mixture of the powdered compound moistened with an inert liquid diluent.

Preferably, each tablet contains from about 30 mg to about 60 mg of dextromethorphan and from about 30 mg to about 45 mg quinidine, and each capsule contains from about 30 mg to about 60 mg of dextromethorphan and from about 30 mg to about 45 mg quinidine. Most preferably, tablets or capsules are provided in a range of dosages to permit divided dosages to be administered. For example, tablets, cachets or capsules can be provided that contain about 10 mg dextromethorphan and about 5, 10, or 15 mg quinidine; about 20 mg dextromethorphan and about 10, 20 or 30 mg quinidine; about 30 mg dextromethorphan and about 15, 30, or 45 mg quinidine;

US 7,659,282 B2

19 20

and the like. A dosage appropriate to the patient, the condition to be treated, and the number of doses to be administered daily can thus be conveniently selected. While it is generally preferred to incorporate both dextromethorphan and quinidine in a single tablet or other dosage form, in certain embodiments it can be desirable to provide the dextromethorphan and quinidine in separate dosage forms.

It has been unexpectedly discovered that patients suffering from emotional lability and other conditions as described herein can treated with dextromethorphan in combination with an amount of quinidine substantially lower than the minimum amount heretofore believed to be necessary to provide a significant therapeutic effect. As used herein, a "minimum effective therapeutic amount" is that amount which provides a satisfactory degree of inhibition of the rapid elimination of dextromethorphan from the body, while producing no adverse effect or only adverse events of an acceptable degree and nature. More specifically, a preferred effective therapeutic amount is within the range of from about 20, 25 or 30 mg to about 60 mg of dextromethorphan and less than about 50 mg of quinidine per day, preferably about 20 or 30 mg to about 60 mg of dextromethorphan and about 30 mg to about 45 mg of quinidine per day, the amount being preferably administered in a divided dose based on the plasma half-life of dextromethorphan. For example, in a preferred embodiment dextromethorphan and quinidine are administered in specified mg increments to achieve a target concentration of dextromethorphan of a specified level in µg/mL plasma, with a maximum preferred specified dosage of dextromethorphan and quinidine based on body weight. The target dose is then preferably administered every 12 hours. Since the level of quinidine is minimized, the side effects observed at high dosages for quinidine are minimized or eliminated, a significant benefit over compositions containing dextromethorphan in combination with higher levels of quinidine.

The combination of dextromethorphan and quinidine of preferred embodiments can also be extremely effective in formulations for the treatment for other chronic disorders which do not respond well to other treatments. Dextromethorphan in combination with quinidine can be used to effectively treat severe or intractable coughing, which has not responded adequately to non-addictive, non-steroid medications, with minimal side-effects. Intractable coughing is a consequence of respiratory infections, asthma, emphysema, and other conditions affecting the pulmonary system.

Dextromethorphan in combination with quinidine as in the preferred embodiments can also be used in pharmaceutical compositions for treating dermatitis. As used herein, "dermatitis" or "eczema" is a skin condition characterized by visible skin lesions and/or an itching or burning sensation on the skin. Dextromethorphan in combination with quinidine as in the preferred embodiments can also be used in pharmaceutical compositions for the treatment of chronic pain from conditions such as stroke, trauma, cancer, and pain due to neuropathies such as herpes zoster infections and diabetes. Other conditions that can be treated using dextromethorphan in combination with quinidine according to the preferred embodiments can include sexual dysfunctions, such as priapism or premature ejaculation, as well as tinnitus.

Clinical Study #1

Clinical testing was conducted to determine the lowest dose of quinidine which inhibits the conversion of dextromethorphan to dextrorphan; and to chronicle the occurrence of side effects during administration of dextromethorphan/quinidine.

Testing protocol specifications and a detailed time and events schedule were prepared to assure consistent execution of the protocol throughout the study conduct.

A phenotyping study directed to dextromethorphan was conducted. The study was an open-label single dose study. Subjects were screened to ensure they met the inclusion and exclusion criteria. Subjects received a single oral dose of dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of tap water. A total of fifty-eight subjects were screened and fifty subjects dosed. The study determined each subject's ability to metabolize dextromethorphan. Subjects who met the inclusion/exclusion criteria remained in house for dosing. Each subject was administered one 30 mg capsule (P.M.) of dextromethorphan. Urine was collected prepose through 12 hours postdose and analyzed for dextromethorphan and dextrorphan. A blood sample (5 mL) was collected for analysis of plasma dextromethorphan, dextrorphan, and quinidine predose and at 2, 4 and 8 hours postdose. Following a wash-out period of at least two days, forty-eight subjects determined to be extensive metabolizers of dextromethorphan were asked to participate in the quinidine dosing study. Forty-six of these subjects were determined to be extensive metabolizers of dextromethorphan. One adverse effect was reported during the study (a headache, classified as mild, that resolved without intervention).

Thereafter, a quinidine dose determination study was conducted. The study was an open-label, randomized, multiple dose study. Subjects identified as extensive metabolizers received an evening dose on Day 1, at 12-hour intervals for the next six days, with a final morning dose on Day 8. All subjects were instructed to dose themselves at home on eight occasions with medication dispensed to them. Subjects maintained a diary during the study to record adverse effects.

Subjects randomized to Treatment A received fourteen oral doses of dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment B received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 2.5 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment C received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 10 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment D received fourteen oral doses of dextromethorphan Hydrobromide 30 mg/quinidine 25 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment E received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 50 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment F received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 75 mg capsule taken with 240 mL of tap water.

All subjects enrolled in the study except for one satisfied the inclusion/exclusion criteria as listed in the protocol. Medical histories, clinical laboratory evaluations, and performed physical examinations were reviewed prior to subjects being enrolled in the study. The subjects were instructed not to consume any grapefruit products while participating in the study. Over-the-counter medications were prohibited three days prior to dosing and during the study, and prescription medications (with the exception of oral contraceptives) were prohibited fourteen days prior to dosing and during the study.

A total of forty-six subjects, twenty-two males and twenty-four females, were enrolled in the study and forty-five subjects, twenty-two males and twenty-three females, completed the study. The subjects were screened within twenty-one days prior to study enrollment. The screening procedure included medical history, physical examination (height, weight, frame

US 7,659,282 B2

21

size, vital signs, and ECG), and clinical laboratory tests (hematology, serum chemistry, urinalysis, HIV antibody screen, serum pregnancy, and a screen for THECA).

Subjects were dosed in the clinic on the following schedule: Day 1 (P.M.), Day 2 (A.M.), Day 3 (P.M.), Day 4 (A.M.) and Day 7 (P.M.). The subjects reported to the clinic on Day 8 for the A.M. dosing and remained in house for 8 hours postdose. Subjects self medicated at home on Day 2 (P.M.), Day 3 (A.M.), Day 4 (P.M.), Day 5 (A.M. and P.M.), Day 6 (A.M. and P.M.), and Day 7 (A.M.). Subjects were dosed twice daily except they received only a PM dose on Day 1 and an AM dose on Day 8.

A clinical laboratory evaluation (hematology, chemistries, urinalysis), vital signs, ECG, and a brief physical examination were performed at the completion of the study. Subjects were instructed to inform the study physician and/or safety nurses of any adverse events that occurred during the study.

Blood samples (5 mL) were collected on Day 8 prior to dosing and at 2, 4 and 8 hours postdose for analysis of dextromethorphan, dextrorphan, and quinidine. A total of eight blood samples (40 mL) were drawn during the study (including the dextromethorphan screen) for drug analysis. Plasma samples were separated by centrifugation and then frozen at −20° C. and kept frozen until assayed. Urine was collected predose through twelve hours post doses 1, 5, and 13. Urine samples were pooled for the entire collection interval. At the end of the interval, the total volume was recorded and two aliquots were frozen at −20° C. until assayed for dextromethorphan and dextrorphan.

A total of forty-six subjects were dosed and forty-five subjects completed the study. One subject was discontinued/withdrawn from the study as not tolerating adverse events experienced. The mean age of the subjects was 51 years (range of 20 through 86), the mean height of the subjects was 67.6 inches (range of 61.5 through 74.5), and the mean weight of the subjects was 162.9 pounds (range 101.0 through 229.0).

A total of eight subjects were enrolled in Treatment Groups B, D, and E. Seven subjects were enrolled in Treatment Groups A and C.

A total of 150 adverse events were experienced by thirty-four subjects (74%). Other than one serious adverse effect, all adverse events were classified as mild (96%) or moderate (4%). The most frequently reported adverse events included headache, loose stool, lightheadedness, dizziness, and nausea. The relationship to study drug was classified as possibly, probably, or almost certainly for 120 of the 150 adverse events (80%). There were no clear differences between dose groups in the type or frequency of adverse events observed. No clinically significant trends regarding vital signs, physical examinations or clinical laboratory tests were observed.

Clinical Study #2

The objectives of this study were to determine pharmacokinetic parameters of dextromethorphan upon single-dose and multiple-doses of a capsule formulation containing 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsules, to determine the differences in these pharmacokinetic parameters for extensive metabolizers and poor metabolizers, and to chronicle the occurrence of side effects during administration of the formulation. This study had an open-label, single, and multiple dose design.

Ten subjects were enrolled in the study. A total of nine subjects completed the study. Ten subjects were included in safety analyses, and nine were included in pharmacokinetic analyses. All subjects enrolled in this study were judged by the investigator to be normal, healthy volunteers.

22

The test formulation was 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsules. All subjects received one 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsule taken orally with 240 mL of water every 12 hours for a total of 15 doses.

The noncompartmental pharmacokinetic parameters $C_{max}$, $T_{max}$, and AUC (0-12) were calculated from the plasma concentration-time data for dextromethorphan, dextrorphan, and quinidine on Days 1, 4, and 8. In addition, the parameters Kel and T ½el were calculated for dextrorphan (Day 8), and quinidine (Days 1, 4, and 8).

The amount of dextromethorphan and dextrorphan excreted in the urine was calculated from the 12-hour urine collections on Day 1 (postdose 1), Day 8 (postdose 15), and Days 9-14. The molar metabolic ratio (dextromethorphan:dextrorphan) was calculated for each urine-collection day.

Subjects were evaluated by physical examination, vital signs, electrocardiogram (ECG), clinical laboratory (hematology, serum chemistry, and urinalysis), and adverse event assessment.

Descriptive statistics for each parameter, including mean, median, standard deviation, coefficient of variation, N, minimum, and maximum were calculated for all of the subjects by Day. In addition, descriptive statistics were presented by the subgroups: extensive metabolizer (EM) and poor metabolizer (PM).

A normal theory, general linear model (GLM) was applied to the log-transformed parameters $C_{max}$ and AUC (0-12), and untransformed Tmax (dextromethorphan and dextrorphan), and to untransformed parameters $C_{max}$, AUC (0-12), and Tmax (quinidine). The ANOVA model included the factors group (EM or PM), subject within group, day, and the interaction term day by group. The group effect was tested using the subject within group mean square, and all other main effects were tested using the residual error (error mean square). In addition, tests of the hypotheses Day 1=Day 4, Day 1=Day 8, and Day 4=Day 8 were performed.

Safety and tolerability were assessed via data listings and calculation of summary statistics as follows: hematology, serum chemistry, and urinalysis test results from predose and postdose were listed in by-subject data listings. Descriptive statistics were reported by time point of collection, and changes from predose to postdose were summarized and statistically tested using the paired t-test ($H_o$: change=0). Shift tables describing out-of-range shifts from predose to postdose were created. Out-of-normal range and clinically significant laboratory values were listed by subject.

Descriptive statistics (mean, standard deviation, minimum, maximum, and sample size) were reported by time point (screen and Day 8 postdose) for vital sign measurements: systolic and diastolic blood pressure, pulse rate, respiration and temperature. Summary statistics were presented by metabolizer type. Differences between screening and postdose measurements were presented and statistically tested using a paired t-test ($H_o$: difference=0). Individual vital signs results were listed in by-subject data listings. Changes in physical examination results that occurred from predose to postdose were also identified.

Twelve-lead ECGs were recorded prior to dosing. Descriptive statistics (mean, standard deviation, minimum, maximum, and sample size) were reported by time point (predose and Day 8 postdose) for ECG measurements: QRS, PR, QTc, and heart rate. Summary statistics were presented by metabolizer type. Differences between predose and Day 8 postdose measurements were presented and statistically testing using a paired t-test ($H_o$: difference=0). ECG results were listed in by-subject data listings.

US 7,659,282 B2

23

Adverse events were classified using the 5th Edition of the COSTART dictionary. Summary tables include number of subjects reporting the adverse event and as percent of number of subjects dosed by metabolizer type. Summary tables were also presented by adverse event frequency, severity, and relationship to study medication. Adverse events were listed by subject, including verbatim term, severity, frequency, and relationship to treatment in data listings.

Mean pharmacokinetic parameters for dextromethorphan, dextrorphan, and quinidine are summarized in Table 1 for extensive metabolizers of dextromethorphan (EMs), poor metabolizers of dextromethorphan (PMs), and all subjects.

24

nausea, vomiting, anxiety, depersonalization, insomnia, and somnolence. The majority of the adverse events were mild in severity and all were resolved without treatment. Prolonged QT intervals and decreased ventricular rates were observed for the extensive metabolizer group following dosing. No clinically significant trends regarding vital signs, physical examinations, or routine clinical laboratory tests were observed.

Over the course of this study, low dose quinidine inhibited the metabolism of dextromethorphan, resulting in increased systemic availability. This effect was most pronounced in extensive metabolizers. The mean urinary metabolic ratio

TABLE 1

| Compound | Pharmacokinetics Parameter | Day | Metabolizer Type | | | | | | | | |
| | | | EM | | | PM | | | All Subjects | | |
| | | | Mean | N | S.D. | Mean | N | S.D. | Mean | N | S.D. |
| Dextromethorphan | Cmax | 1 | 15.89 | 7 | 8.22 | 22.30 | 2 | 0.14 | 17.31 | 9 | 7.66 |
| | (ng/mL) | 4 | 76.69 | 7 | 15.28 | 105.70 | 2 | 9.48 | 83.13 | 9 | 18.71 |
| | | 8 | 95.50 | 7 | 19.92 | 136.20 | 2 | 3.25 | 104.54 | 9 | 24.92 |
| | Tmax (hr) | 1 | 6.85 | 7 | 2.78 | 8.00 | 2 | 0.00 | 7.11 | 9 | 2.46 |
| | | 4 | 5.42 | 7 | 1.90 | 6.00 | 2 | 2.82 | 5.55 | 9 | 1.94 |
| | | 8 | 5.99 | 7 | 2.58 | 4.99 | 2 | 1.41 | 5.77 | 9 | 2.33 |
| | AUC (0-12) | 1 | 133.27 | 7 | 59.86 | 198.33 | 2 | 6.97 | 147.73 | 9 | 59.30 |
| | (ng * hr/ml) | 4 | 841.68 | 7 | 151.7 | 1146.4 | 2 | 84.43 | 886.07 | 9 | 199.8 |
| | | 8 | 1049.0 | 7 | 243.3 | 1533.5 | 2 | 80.97 | 1156.7 | 9 | 301.4 |
| | T ½el (hr) | 8 | 13.13 | 6 | 3.41 | 41.96 | 2 | 4.47 | 20.33 | 8 | 13.76 |
| Dextrorphan | Cmax | 1 | 124.86 | 7 | 53.26 | 10.80 | 2 | 3.39 | 99.51 | 9 | 68.25 |
| | (ng/ml) | 4 | 79.33 | 7 | 18.63 | 37.05 | 2 | 0.21 | 69.93 | 9 | 24.65 |
| | | 8 | 123.51 | 7 | 17.07 | 51.45 | 2 | 4.17 | 107.50 | 9 | 35.08 |
| | Tmax (hr) | 1 | 4.00 | 7 | 0.00 | 3.00 | 2 | 1.42 | 3.78 | 9 | 0.67 |
| | | 4 | 2.21 | 7 | 1.40 | 2.00 | 2 | 0.00 | 2.17 | 9 | 1.22 |
| | | 8 | 41.18 | 7 | 11.57 | 2.99 | 2 | 1.41 | 32.70 | 9 | 19.61 |
| | AUC (0-12) | 1 | 933.83 | 7 | 324.8 | 90.95 | 2 | 19.08 | 748.52 | 9 | 466.2 |
| | (ng * hr/mL) | 4 | 849.22 | 7 | 181.9 | 365.27 | 2 | 30.37 | 741.68 | 9 | 265.4 |
| | | 8 | 1000.5 | 7 | 147.2 | 530.40 | 2 | 82.39 | 896.04 | 9 | 245.1 |
| Quinidine | Cmax | 1 | 0.09 | 7 | 0.02 | 0.08 | 2 | 0.01 | 0.09 | 9 | 0.02 |
| | (µg/ml) | 4 | 0.15 | 7 | 0.03 | 0.14 | 2 | 0.01 | 0.15 | 9 | 0.03 |
| | | 8 | 0.16 | 7 | 0.04 | 0.16 | 2 | 0.02 | 0.16 | 9 | 0.03 |
| | Tmax (hr) | 1 | 1.71 | 7 | 0.27 | 1.50 | 2 | 0.00 | 1.67 | 9 | 0.25 |
| | | 4 | 1.65 | 7 | 0.37 | 1.52 | 2 | 0.00 | 1.62 | 9 | 0.33 |
| | | 8 | 1.99 | 7 | 0.01 | 1.49 | 2 | 0.00 | 1.88 | 9 | 0.22 |
| | AUC (0-12) | 1 | 0.48 | 7 | 0.18 | 0.51 | 2 | 0.13 | 0.49 | 9 | 0.17 |
| | (µg * hr/ml) | 4 | 1.20 | 7 | 0.21 | 0.97 | 2 | 0.05 | 1.15 | 9 | 0.21 |
| | | 8 | 1.31 | 7 | 0.19 | 1.07 | 2 | 0.02 | 1.26 | 9 | 0.19 |
| | T ½el (hr) | 1 | 8.11 | 7 | 2.95 | 8.25 | 2 | 2.65 | 8.14 | 9 | 2.72 |
| | | 4 | 6.86 | 7 | 1.11 | 6.51 | 2 | 0.70 | 6.78 | 9 | 1.01 |
| | | 8 | 7.66 | 7 | 1.09 | 6.66 | 2 | 0.41 | 7.44 | 9 | 1.05 |

Mean urinary metabolic ratios (dextromethorphan:dextrorphan) are summarized in Table 2 for extensive metabolizers of dextromethorphan (EMs), poor metabolizers of dextromethorphan (PMs), and all subjects.

TABLE 2

| | Metabolizer Type | | | | | | | | |
| | EM | | | PM | | | All Subjects | | |
| DAY | Mean | N | S.D. | Mean | N | S.D. | Mean | N | S.D. |
| 1 | 0.268 | 7 | 0.227 | 1.790 | 2 | 0.493 | 0.608 | 9 | 0.721 |
| 8 | 0.804 | 7 | 0.366 | 1.859 | 2 | 0.507 | 1.039 | 9 | 0.591 |
| 9 | 0.445 | 6 | 0.170 | 1.398 | 2 | 0.597 | 0.683 | 8 | 0.516 |
| 10 | 0.198 | 7 | 0.152 | 2.538 | 2 | 1.593 | 0.718 | 9 | 1.183 |
| 11 | 0.145 | 7 | 0.125 | 2.200 | 2 | 1.136 | 0.601 | 9 | 0.997 |
| 12 | 0.091 | 7 | 0.086 | 3.333 | 2 | 0.090 | 0.812 | 9 | 1.432 |
| 13 | 0.037 | 7 | 0.064 | 2.250 | 2 | 0.554 | 0.529 | 9 | 0.997 |
| 14 | 0.027 | 5 | 0.061 | 2.061 | 2 | 0.115 | 0.608 | 7 | 0.995 |

No serious adverse events occurred during this study. Drug related adverse events included asthenia, diarrhea, anorexia,

(dextromethorphan:dextrorphan) increased at least 29-fold in extensive metabolizers by Day 8. The plasma dextrorphan AUC (0-12) increased approximately 8-fold between Day 1 and Day 8, whereas the mean plasma dextrorphan AUC (0-12) remained the same between Day 1 and Day 8.

The effect of quinidine on dextromethorphan metabolism in poor metabolizers was unclear. The urinary metabolic ratios did not appear to change with quinidine treatment. The excretion of both dextromethorphan and dextrorphan increased. However, dextrorphan excretion increased proportionally to dextromethorphan. This suggests that quinidine did not inhibit dextromethorphan metabolism to dextrorphan in poor metabolizers. However, there was 6.1-fold increase in dextromethorphan AUC (0-12) from Day 1 to Day 8, compared to a 4.8-fold increase in dextrorphan AUC (0-12), which is consistent with a small decrease in metabolic clearance.

US 7,659,282 B2

25

Quinidine pharmacokinetics were similar between extensive metabolizers and poor metabolizers. Mean quinidine elimination half-life values (6.78 to 8.14 hours) were similar to previously reported values.

Dextromethorphan hydrobromide and quinidine sulfate capsules administered as a single-dose or multiple-doses product appeared to be well tolerated in this healthy population.

Clinical Study #3

The objectives of this study were to determine the lowest dose of quinidine sulfate that effectively inhibits the conversion of 45 mg of dextromethorphan to dextrorphan and the lowest dose of quinidine that effectively inhibits the conversion of 60 mg of dextromethorphan to dextrorphan, and to chronicle the occurrence of side effects during administration of dextromethorphan in combination with quinidine.

This dose interaction study was a Phase 1, open-label, parallel group, multiple-dose, single-center, safety, and pharmacokinetic study. A total of sixty-four subjects were planned, and sixty-five subjects were enrolled in the study. A total of forty-seven subjects completed the study and were included in pharmacokinetic analyses. All subjects were included in safety analyses. Males and females between 18 and 60 years of age, identified as extensive metabolizers of dextromethorphan, were enrolled. All subjects were judged to be healthy volunteers. Enrolled subjects met inclusion and exclusion criteria.

The test formulation was dextromethorphan hydrobromide and quinidine sulfate capsules, administered orally with water. Subjects receiving Treatment A received an oral dose of one dextromethorphan hydrobromide of 60 mg/0 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment B received an oral dose of one dextromethorphan hydrobromide of 60 mg/30 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment C received an oral dose of one dextromethorphan hydrobromide of 60 mg/45 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment D received an oral dose of one dextromethorphan hydrobromide of 60 mg/60 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment E received an oral dose of one dextromethorphan hydrobromide of 45 mg/0 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment F received an oral dose of one dextromethorphan hydrobromide of 45 mg/30 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment G received an oral dose of one dextromethorphan hydrobromide of 45 mg/45 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment H received an oral dose of one dextromethorphan hydrobromide of 45 mg/60 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. For Treatments B, C, D, F, G, and H, subjects received a single dose of dextromethorphan hydrobromide (either 60 mg for Treatments B, C, and D or 45 mg for Treatments F, G, and H) without quinidine for the first dose and then 14 does of the designated capsule, i.e., all subjects received one dose of either Treatment A or E as a baseline.

The first dose of Treatments A and E was considered as reference. Dextromethorphan hydrobromide 30 mg capsules

26

were used for phenotyping. Subjects received a single oral dose of one dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of water.

The plasma pharmacokinetic parameters, Cmax, Tmax, AUC (0-5), and AUC (0-12) were calculated using noncompartmental analysis. Pharmacokinetic parameters were summarized and descriptive statistics for all groups were calculated. Changes in these parameters from baseline were calculated and summarized. Urine metabolic ratios (dextromethorphan/dextrorphan) were calculated. Descriptive statistics for all groups were calculated, and changes in metabolic ratio from baseline were calculated and summarized.

Adverse events assessments, monitoring of hematology, blood chemistry, and urine values, measurements of vital signs and electrocardiogram (ECG) as well as the performance of physical examinations were evaluated for safety.

The effect of quinidine on the pharmacokinetics of dextromethorphan was assessed by measuring serial plasma dextromethorphan and dextrorphan concentrations on Days 1 and 8, quinidine concentrations on Day 8, and the amount of dextromethorphan and dextrorphan excreted in the urine for 12-hour urine collections on Day, 1, Day 3, and Day 7, following a multiple dose administration of dextromethorphan and quinidine. The noncompartmental pharmacokinetic parameters Cmax, Tmax, AUC (0-5), and AUC (0-12) were calculated from the plasma concentration-time data for dextromethorphan and dextrorphan on Days 1 and 8, quinidine on Day 8. The amount of dextromethorphan and dextrorphan excreted in the urine was calculated from the 12-hour urine collections on Day 1, Day 3, and Day 7. The molar metabolic ratio (dextromethorphan: dextrorphan) was calculated for each urine-collection day. To assess the effect of quinidine on dextromethorphan, analysis of variance was performed using SAS PROC Mixed on the parameter AUC of dextromethorphan from the 4 dextromethorphan and quinidine treatments, respectively, for 60 mg and 45 mg dextromethorphan doses. Least square means of doses, the differences (pairwise comparisons) between doses, plus the P-values for the significance of the differences were presented. To assess the effect of dextromethorphan on quinidine, analysis of variance was performed using SAS PROC Mixed on the parameter AUC of quinidine. Least square means of doses, the differences (pairwise comparisons) between doses, plus the P-values for the significance of the differences were presented.

Safety and tolerability were assessed through calculation of summary statistics and were displayed in data listings of individual subjects. Adverse events were coded using the MedDRA Adverse Event Dictionary (Version 3.0, 2000). The frequency, type, severity, and relationship to study drug of treatment-emergent adverse events were displayed and compared across treatments.

For laboratory tests, the study screening and poststudy measurements, along with the change between these time points, were summarized by descriptive statistics (median, mean, standard deviation, minimum, maximum, and sample size) for serum chemistry and hematology tests. Shift tables from screening to poststudy for serum chemistry, hematology, and urinalysis laboratory tests were constructed. Out-of-range clinical laboratory results and their associated recheck values were listed.

US 7,659,282 B2

27

Descriptive statistics (median, mean, standard deviation, minimum, maximum, and sample size) were calculated for vital signs and 12-lead electrocardiogram (ECG) measurements for baseline and postdose, along with the change between these time points. The ECG shift table from baseline to postdose was also presented.

28

The arithmetic means of pharmacokinetic parameters of plasma dextromethorphan, dextrorphan, and quinidine following Treatments A, B, C, D, E, F, G, and H, and results of statistical comparisons between treatment groups are presented in the following tables. Table 3 provides a summary of the plasma DM pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 3

| Pharmacokinetic Parameters | Day* | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Mean | S.D. | Mean | S.D. |
| Cmax (ng/mL) | 1 | 3.7 | 3.70 | 2.1 | 2.82 | 3.5 | 3.19 | 4.8 | 4.74 |
| | 8 | 7.7 | 7.01 | 191.8 | 45.48 | 204.8 | 22.93 | 231.9 | 96.36 |
| | C | 4.0 | 4.75 | 189.7 | 43.90 | 201.3 | 22.19 | 227.1 | 97.52 |
| Tmax (hr) | 1 | 2.6 | 0.96 | 2.5 | 0.57 | 2.4 | 0.56 | 3.5 | 1.05 |
| | 8 | 2.1 | 0.38 | 3.5 | 1.73 | 3.7 | 1.17 | 5.2 | 1.94 |
| | C | −0.5 | 1.12 | 1.0 | 1.42 | 1.3 | 1.51 | 1.7 | 1.97 |
| AUC(0-t) (ng * hr/mL) | 1 | 23.0 | 23.64 | 12.1 | 16.04 | 20.7 | 17.39 | 32.0 | 34.66 |
| | 8 | 52.3 | 46.72 | 1963.0 | 608.50 | 2121.0 | 278.50 | 2252.0 | 689.30 |
| | C | 29.3 | 34.57 | 1951.0 | 600.30 | 2100.0 | 275.90 | 2220.0 | 697.70 |
| AUC (0-12) (ng * hr/mL) | 1 | 23.2 | 23.50 | 12.3 | 15.93 | 20.7 | 17.39 | 32.2 | 34.45 |
| | 8 | 52.3 | 46.72 | 1963.0 | 608.50 | 2121.0 | 278.50 | 2252.0 | 689.30 |
| | C | 29.2 | 34.79 | 1951.0 | 600.10 | 2100.0 | 275.90 | 2220.0 | 697.80 |
| 1n (Cmax) | 1 | 0.9 | 1.07 | 0.1 | 1.21 | 0.9 | 1.05 | 1.2 | 0.88 |
| | 8 | 1.6 | 1.03 | 5.2 | 0.24 | 5.3 | 0.11 | 5.4 | 0.40 |
| | C | 2.3 | 1.03 | 219.5 | 132.00 | 108.8 | 92.40 | 85.0 | 54.87 |
| In (AUC(0-12) | 1 | 2.7 | 1.07 | 2.0 | 1.08 | 2.8 | 0.95 | 3.1 | 0.98 |
| | 8 | 3.6 | 1.02 | 7.5 | 0.33 | 7.7 | 0.13 | 7.7 | 0.32 |
| | C | 2.6 | 1.22 | 324.9 | 185.30 | 170.9 | 130.30 | 141.0 | 114.80 |

*= Code C corresponds to the change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the In-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

29

Table 4 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

TABLE 4

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 35.11 | 2159.23 | 0.02 | 0.0001 |
| B vs. D | 1888.72 | 2159.23 | 0.87 | 0.7601 |
| C vs. D | 2108.96 | 2159.23 | 0.98 | 0.9608 |

Table 5 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

30

TABLE 5

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 35.11 | 2159.23 | 0.02 | 0.0001 |
| B vs. D | 1888.72 | 2159.23 | 0.87 | 0.7601 |
| C vs. D | 2108.96 | 2159.23 | 0.98 | 0.9608 |

Table 6 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

TABLE 6

| Pharmacokinetic Parameters | Day* | Treatment E Mean | S.D. | Treatment F Mean | S.D. | Treatment G Mean | S.D. | Treatment H Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 2.3 | 1.60 | 9.6 | 13.91 | 3.6 | 5.04 | 1.7 | 1.08 |
| | 8 | 4.2 | 3.01 | 141.5 | 74.68 | 138.9 | 25.97 | 136.1 | 50.59 |
| | C | 1.9 | 2.03 | 131.9 | 62.92 | 135.3 | 23.87 | 134.4 | 50.80 |
| Tmax (hr) | 1 | 3.5 | 0.93 | 2.9 | 0.37 | 3.4 | 1.40 | 3.0 | 1.0 |
| | 8 | 3.4 | 0.50 | 4.3 | 1.70 | 3.3 | 1.80 | 3.6 | 2.07 |
| | C | −0.1 | 1.16 | 1.4 | 1.51 | −0.1 | 1.21 | 0.6 | 2.20 |
| AUC(0-t) (ng * hr/mL) | 1 | 14.9 | 11.39 | 77.5 | 120.80 | 25.4 | 36.89 | 10.2 | 7.08 |
| | 8 | 31.3 | 23.85 | 1438.0 | 842.60 | 1403.0 | 283.10 | 1464.0 | 588.60 |
| | C | 16.3 | 17.0 | 1360.0 | 736.20 | 1378.0 | 259.50 | 1453.0 | 589.30 |
| AUC (0-12) (ng * hr/mL) | 1 | 15.0 | 11.36 | 77.5 | 120.80 | 25.5 | 36.79 | 10.3 | 6.98 |
| | 8 | 31.5 | 23.64 | 1488.0 | 842.60 | 1403.0 | 283.10 | 1464.0 | 588.50 |
| | C | 16.5 | 16.82 | 1360.0 | 736.20 | 1378.0 | 259.60 | 1453.0 | 589.50 |
| 1n (Cmax) | 1 | 0.5 | 0.95 | 1.2 | 1.56 | 0.5 | 1.33 | 0.4 | 0.55 |
| | 8 | 1.1 | 1.09 | 4.8 | 0.52 | 4.9 | 0.19 | 4.8 | 0.45 |
| | C | 1.9 | 0.93 | 62.6 | 54.58 | 138.3 | 107.10 | 100.3 | 59.37 |
| ln (AUC(0-t) | 1 | 2.2 | 1.45 | 3.2 | 1.64 | 2.3 | 1.45 | 2.1 | 0.65 |
| | 8 | 3.0 | 1.23 | 7.1 | 0.54 | 7.2 | 0.19 | 7.2 | 0.50 |
| | C | 2.6 | 1.60 | 89.6 | 78.74 | 241.2 | 206.30 | 188.5 | 112.20 |
| ln (AUC(0-12) | 1 | 2.3 | 1.34 | 3.2 | 1.64 | 2.4 | 1.39 | 2.2 | 0.62 |
| | 8 | 3.0 | 1.17 | 7.1 | 0.54 | 7.2 | 0.19 | 7.2 | 0.50 |
| | C | 2.5 | 1.38 | 89.6 | 78.74 | 218.9 | 177.50 | 185.4 | 113.80 |

*= Code C corresponds to the change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the ln-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

**31**

Table 7 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

TABLE 7

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 20.89 | 1342.73 | 0.02 | 0.0001 |
| F vs. H | 1266.94 | 1342.73 | 0.94 | 0.8945 |
| G vs. H | 1380.84 | 1342.73 | 1.03 | 0.9490 |

Table 8 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

**32**

TABLE 8

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 20.18 | 1342.73 | 0.02 | 0.0001 |
| F vs. H | 1266.94 | 1342.73 | 0.94 | 0.8980 |
| G vs. H | 1380.84 | 1342.73 | 1.03 | 0.9490 |

Table 9 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 9

| Pharmacokinetic Parameters | Day* | Treatment A Mean | S.D. | Treatment B Mean | S.D. | Treatment C Mean | S.D. | Treatment D Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 663.6 | 111.69 | 858.1 | 75.95 | 885.4 | 33.23 | 655.5 | 145.57 |
| | 8 | 709.6 | 88.82 | 176.7 | 41.40 | 90.1 | 24.55 | 110.8 | 27.68 |
| | C | 46.0 | 142.71 | −681.4 | 75.24 | −795.3 | 57.72 | −544.8 | 126.32 |
| Tmax (hr) | 1 | 2.2 | 0.37 | 2.0 | 0.01 | 2.0 | 0.03 | 2.0 | 0.01 |
| | 8 | 2.1 | 0.38 | 1.6 | 1.60 | 5.3 | 5.77 | 4.3 | 4.13 |
| | C | −0.0 | 0.58 | −0.4 | 1.59 | 3.3 | 5.78 | 2.3 | 4.13 |
| AUC(0-t) | 1 | 3240.0 | 494.10 | 3953.0 | 516.80 | 3669.0 | 468.10 | 3237.0 | 515.10 |
| (ng * hr/mL) | 8 | 3608.0 | 386.80 | 1830.0 | 443.10 | 958.0 | 248.80 | 1157.0 | 281.30 |
| | C | 367.9 | 581.60 | −2123.0 | 322.70 | −2711.0 | 467.40 | −2080.0 | 369.40 |
| AUC (0-12) | 1 | 3240.0 | 494.10 | 3953.0 | 516.80 | 3669.0 | 468.10 | 3237.0 | 515.10 |
| (ng * hr/mL) | 8 | 3608.0 | 386.80 | 1830.0 | 443.10 | 958.0 | 248.80 | 1157.0 | 281.30 |
| | C | 367.9 | 581.60 | −2123.0 | 322.70 | −2711.0 | 467.40 | −2080.0 | 369.40 |
| 1n (Cmax) | 1 | 6.5 | 0.16 | 6.8 | 0.09 | 6.8 | 0.04 | 6.5 | 0.23 |
| | 8 | 6.6 | 0.12 | 5.2 | 0.24 | 4.5 | 0.27 | 4.7 | 0.27 |
| | C | 1.1 | 0.22 | 0.2 | 0.05 | 0.1 | 0.03 | 0.2 | 0.04 |
| In (AUC(0-t) | 1 | 8.1 | 0.15 | 8.3 | 0.13 | 8.2 | 0.13 | 8.1 | 0.16 |
| | 8 | 8.2 | 0.11 | 7.5 | 0.26 | 6.8 | 0.25 | 7.0 | 0.27 |
| | C | 1.1 | 0.19 | 0.5 | 0.08 | 0.3 | 0.07 | 0.4 | 0.06 |
| In (AUC(0-12) | 1 | 8.1 | 0.15 | 8.3 | 0.13 | 8.2 | 0.13 | 8.1 | 0.16 |
| | 8 | 8.2 | 0.11 | 7.5 | 0.26 | 6.8 | 0.25 | 7.0 | 0.27 |
| | C | 1.1 | 0.19 | 0.5 | 0.08 | 0.3 | 0.07 | 0.4 | 0.06 |

*= Code C corresponds to the Change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the In-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

33

Table 10 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) as relates to the effect of quinidine doses on 60 mg of Dextromethorphan.

TABLE 10

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 3589.57 | 1125.35 | 3.19 | 0.0001 |
| B vs. D | 1786.16 | 1125.35 | 1.59 | 0.0046 |
| C vs. D | 937.28 | 1125.35 | 0.83 | 0.2521 |

Table 11 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) as relates to the effect of quinidine doses on 60 mg of Dextromethorphan.

34

TABLE 11

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 3589.57 | 1125.35 | 3.19 | 0.0001 |
| B vs. D | 1786.16 | 1125.35 | 1.59 | 0.0046 |
| C vs. D | 937.28 | 1125.35 | 0.83 | 0.2521 |

Table 12 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

TABLE 12

| Pharmacokinetic Parameters | Day* | Treatment E Mean | S.D. | Treatment F Mean | S.D. | Treatment G Mean | S.D. | Treatment H Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 587.4 | 172.23 | 446.6 | 216.16 | 554.0 | 209.23 | 607.3 | 125.85 |
| | 8 | 599.2 | 199.89 | 89.1 | 25.97 | 86.8 | 23.11 | 77.7 | 15.81 |
| | C | 11.9 | 94.36 | −357.5 | 215.39 | −467.2 | 188.06 | −529.6 | 126.09 |
| Tmax (hr) | 1 | 2.0 | 0.00 | 2.0 | 0.01 | 2.2 | .038 | 2.0 | 0.01 |
| | 8 | 2.0 | 0.01 | 2.3 | 1.38 | 1.0 | 1.12 | 1.3 | 1.20 |
| | C | 0.0 | 0.01 | 0.3 | 1.38 | −1.2 | 1.25 | 0.7 | 1.20 |
| AUC(0-t) | 1 | 2618.0 | 603.10 | 2260.0 | 751.50 | 2462.0 | 737.10 | 2860.0 | 580.40 |
| (ng * hr/mL) | 8 | 2898.0 | 900.50 | 920.7 | 275.90 | 874.1 | 283.80 | 782.6 | 129.9 |
| | C | 280.7 | 430.70 | −1340.0 | 751.40 | −1588.0 | 537.30 | −2078.0 | 535.00 |
| AUC (0−12) | 1 | 2618.0 | 603.10 | 2260.0 | 751.50 | 2481.0 | 732.00 | 2860.0 | 580.40 |
| (ng * hr/mL) | 8 | 2898.0 | 900.50 | 920.7 | 275.90 | 874.1 | 238.80 | 782.6 | 129.90 |
| | C | 280.7 | 430.70 | −1340.0 | 751.40 | −1607.0 | 536.50 | −2078.0 | 535.00 |
| 1n (Cmax) | 1 | 6.3 | 0.30 | 6.0 | 0.62 | 6.3 | 0.37 | 6.4 | 0.20 |
| | 8 | 6.3 | 0.35 | 4.5 | 0.29 | 4.4 | 0.27 | 4.3 | 0.20 |
| | C | 1.0 | 0.19 | 0.3 | 0.24 | 0.2 | 0.03 | 0.1 | 0.04 |
| In (AUC(0-t) | 1 | 7.8 | 0.22 | 7.7 | 0.39 | 7.8 | 0.27 | 7.9 | 0.21 |
| | 8 | 7.9 | 0.31 | 6.8 | 0.31 | 6.7 | 0.28 | 6.7 | 0.17 |
| | C | 1.1 | 0.17 | 0.5 | 0.24 | 0.4 | 0.05 | 0.3 | 0.06 |
| In (AUC(0-12) | 1 | 7.8 | 0.22 | 7.7 | 0.39 | 7.8 | 0.27 | 7.9 | 0.21 |
| | 8 | 7.9 | 0.31 | 6.8 | 0.31 | 6.7 | 0.28 | 6.7 | 0.17 |
| | C | 1.1 | 0.17 | 0.5 | 0.24 | 0.4 | 0.05 | 0.3 | 0.06 |

*= Code C corresponds to the Change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the In-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

35

Table 13 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan.

TABLE 13

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 2777.40 | 773.75 | 3.59 | 0.0001 |
| F vs. H | 884.33 | 773.75 | 1.14 | 0.4276 |
| G vs. H | 846.26 | 773.75 | 1.09 | 0.5933 |

Table 14 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan.

36

TABLE 14

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 277.40 | 773.75 | 3.59 | 0.0001 |
| F vs. H | 884.33 | 773.75 | 1.14 | 0.4276 |
| G vs. H | 846.26 | 773.75 | 1.09 | 0.5933 |

Table 15 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 15

| Pharmacokinetic Parameters | Day* | Treatment A Mean | S.D. | Treatment B Mean | S.D. | Treatment C Mean | S.D. | Treatment D Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (mcg/mL) | 8 | 0.0 | 0.00 | 0.1 | 0.05 | 0.3 | 0.02 | 0.3 | 0.15 |
| Tmax (mcr) | 8 | — | — | 2.3 | 1.26 | 1.3 | 0.58 | 1.8 | 0.40 |
| AUC(0-Tt) (mcg-hr/mL) | 8 | 0.0 | 0.00 | 0.9 | 0.40 | 1.9 | 0.10 | 2.4 | 1.29 |
| AUC(0-12) (mcg * hr/mL) | 8 | 0.0 | 0.00 | 1.0 | 0.34 | 1.9 | 0.10 | 2.5 | 1.22 |
| 1n(Cmax) | 8 | — | — | −2.0 | 0.33 | −1.3 | 0.07 | −1.1 | 0.43 |
| 1n[AUC(0-t)] | 8 | — | — | −0.2 | 0.40 | 0.6 | 0.05 | 0.8 | 0.58 |
| 1n[AUC(0-12)] | 8 | — | — | −0.1 | 0.33 | 0.6 | 0.05 | 0.8 | 0.51 |

*= For Quinidine, only Day 8 data were analyzed

Table 16 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

TABLE 16

| Pharmacokinetic Parameters | Day* | Treatment E Mean | S.D. | Treatment F Mean | S.D. | Treatment G Mean | S.D. | Treatment H Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (mcg/mL) | 8 | 0.0 | 0.00 | 0.2 | 0.11 | 0.3 | 0.13 | 0.3 | 0.06 |
| Tmax (mcr) | 8 | — | — | 1.6 | 0.79 | 1.2 | 0.57 | 1.8 | 1.3 |
| AUC(0-Tt) (mcg-hr/mL) | 8 | 0.0 | 0.00 | 1.0 | 0.77 | 2.0 | 0.91 | 2.3 | 0.71 |
| AUC(0-12) (mcg * hr/mL) | 8 | 0.0 | 0.00 | 1.1 | 0.74 | 2.0 | 0.88 | 2.3 | 0.64 |
| 1n(Cmax) | 8 | — | — | −1.8 | 0.58 | −1.3 | 0.44 | −1.1 | 0.19 |
| 1n[AUC(0-t)] | 8 | — | — | −0.2 | 0.66 | 0.6 | 0.48 | 0.8 | 0.33 |
| 1n[AUC(0-12)] | 8 | — | — | −0.1 | 0.61 | 0.6 | 0.44 | 0.8 | 0.28 |

*= For Quinidine, only Day 8 data were analyzed

US 7,659,282 B2

**37**

Table 17 provides a summary of statistical comparisons of plasma quinidine AUC (0-12) as relates to different dextromethorphan/quinidine dose combinations.

**38**

Table 18 provides a summary of statistical comparisons of plasma quinidine AUC (0-t) as relates to different dextromethorphan/quinidine dose combinations.

TABLE 18

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| F vs. B | 0.84 | 0.84 | 1.00 | 0.9987 |
| G vs. C | 1.84 | 1.89 | 0.97 | 0.9421 |
| H vs. D | 2.18 | 2.12 | 1.03 | 0.9294 |

TABLE 17

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| F vs. B | 0.94 | 0.94 | 1.00 | 0.9925 |
| G vs. C | 1.88 | 1.89 | 1.00 | 0.9930 |
| H vs. D | 2.24 | 2.23 | 1.01 | 0.9765 |

A summary of the metabolic ratios for urinary pharmacokinetic parameters following a 60 mg dose of dextromethorphan are provided in Table 19.

TABLE 19

| Period | Pharmacokinetic Parameters | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. |
| 0-12 hr | Ae | 0.0013 | 0.0023 | 0.0010 | 0.0015 | 0.0027 | 0.0048 | 0.0041 | 0.0070 |
| | CumAe | 0.0013 | 0.0023 | 0.0010 | 0.0015 | 0.0027 | 0.0048 | 0.0041 | 0.0070 |
| 12-24 hr | Ae | 0.0058 | 0.0055 | 0.0865 | 0.0496 | 0.2748 | 0.2228 | 0.2934 | 0.2046 |
| | CumAe | 0.0031 | 0.0039 | 0.0253 | 0.0116 | 0.0641 | 0.0504 | 0.0632 | 0.0362 |
| 60-72 hr | Ae | 0.0133 | 0.0122 | 0.8139 | 0.3464 | 1.3598 | 0.7454 | 2.0366 | 0.9219 |
| | CumAe | 0.0058 | 0.0061 | 0.1248 | 0.0545 | 0.2374 | 0.1904 | 0.2966 | 0.1670 |
| 156-168 hr | Ae | 0.0179 | 0.0163 | 0.6513 | 0.4119 | 1.1785 | 0.1517 | 1.3023 | 0.7430 |
| | CumAe | 0.0085 | 0.0092 | 0.2005 | 0.1129 | 0.3493 | 0.1676 | 0.4374 | 0.1767 |

0-12 hr collecting period corresponds to Baseline, when only Dextromethorphan (no Quinidine) was administered at the specific dose.

Ae = Amount excreted (mcg)

CumAe = Cumulative Amount Excreted (mcg)

US 7,659,282 B2

**39**

A summary of statistical comparisons of urinary metabolic ratio for Ae (156-168 Hr) as relates to the effect of quinidine doses on a 60 mg dose of dextromethorphan are provided Table 20.

TABLE 20

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 0.01 | 1.12 | 0.01 | 0.0001 |
| B vs. D | 0.54 | 1.12 | 0.49 | 0.1947 |
| C vs. D | 1.17 | 1.12 | 1.05 | 0.9347 |

A summary of statistical comparisons of urinary metabolic ratio for CumAe (156-168 Hr) as relates to the effect of quinidine doses on a 60 mg dose of dextromethorphan are provided Table 21.

TABLE 21

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 0.01 | 0.41 | 0.02 | 0.0001 |
| B vs. D | 0.18 | 0.41 | 0.45 | 0.0822 |
| C vs. D | 0.32 | 0.41 | 0.80 | 0.6485 |

A summary of the metabolic ratios for urinary pharmacokinetic parameters following a 45 mg dose of dextromethorphan are provided in Table 22.

TABLE 22

|  |  | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| Period | Pharmacokinetic Parameters | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. |
| 0-12 hr | Ae | 0.0022 | 0.0043 | 0.0454 | 0.0768 | 0.0130 | 0.0271 | 0.0017 | 0.0025 |
|  | CumAe | 0.0022 | 0.0043 | 0.0454 | 0.0768 | 0.0130 | 0.0271 | 0.0017 | 0.0025 |
| 12-24 hr | Ae | 0.0044 | 0.0043 | 0.2338 | 0.1996 | 0.2647 | 0.1224 | 0.3252 | 0.1955 |
|  | CumAe | 0.0032 | 0.0043 | 0.1078 | 0.1130 | 0.0798 | 0.0393 | 0.0774 | 0.0554 |
| 60-72 hr | Ae | 0.0089 | 0.0096 | 1.2159 | 0.4110 | 1.2594 | 0.5056 | 0.8073 | 0.4256 |
|  | CumAe | 0.0052 | 0.0061 | 0.3673 | 0.1438 | 0.2837 | 0.1087 | 0.1889 | 0.0621 |
| 156-168 hr | Ae | 0.0087 | 0.0097 | 0.9387 | 0.2688 | 1.6276 | 0.7287 | 0.8770 | 0.4967 |
|  | CumAe | 0.0059 | 0.0054 | 0.4826 | 0.1201 | 0.4912 | 0.2480 | 0.3468 | 0.1477 |

0-12 hr collecting period corresponds to Baseline, when only Dextromethorphan (no Quinidine) was administered at the specific dose.
Ae = Amount excreted (mcg)
CumAe = Cumulative Amount Excreted (mcg)

A summary of statistical comparisons of urinary metabolic ratio for Ae (156-168 Hr) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan are provided Table 23.

TABLE 23

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 0.01 | 0.75 | 0.01 | 0.0001 |
| F vs. H | 0.90 | 0.75 | 1.20 | 0.5713 |
| G vs. H | 1.46 | 0.75 | 1.95 | 0.0469 |

A summary of statistical comparisons of urinary metabolic ratio for CumAe (156-168 Hr) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan are provided Table 24.

**40**

TABLE 24

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 0.01 | 0.32 | 0.02 | 0.0001 |
| F vs. H | 0.47 | 0.32 | 1.48 | 0.2201 |
| G vs. H | 0.43 | 0.32 | 1.36 | 0.3345 |

The data suggest that co-administration of dextromethorphan and quinidine sulfate is safe and moderately well tolerated up to the highest dose level (60 mg dextromethorphan/60 mg quinidine).

There were a total of 279 treatment-emergent adverse events experienced by forty-eight of the sixty-five subjects dosed (74%) during the trial. There were 206 adverse events reported by twenty-seven of the thirty-two subjects dosed (84%) following the 60 mg dextromethorphan treatments and seventy-three adverse events reported by twenty-one of the thirty-three subjects dosed (64%) following the 45 mg dextromethorphan treatments. Twelve subjects following the 60 mg dextromethorphan treatments and five subjects following the 45 mg dextromethorphan treatments were discontinued from the trial due to adverse events.

Dizziness, nausea, and headache were the most common adverse events following both dextromethorphan groups, and fewer adverse events were reported following the 45 mg dextromethorphan treatments. All of the adverse events were mild or moderate in severity and no serious adverse events occurred. No clinically significant differences were observed between the treatment groups regarding clinical laboratory results, vital signs, physical examination, or ECG results.

Over the course of this study, quinidine inhibited the metabolism of dextromethorphan dosed at 45 and 60 mg resulting in increased systemic availability of dextromethorphan. The 60 mg quinidine dose resulted in the largest dextromethorphan AUC at both the 45 and 60 mg dextromethorphan doses, compared to the 30 and 45 mg quinidine doses. The statistical comparisons, however, showed there were not only statistically significant differences in the quinidine inhibition of dextromethorphan metabolism among the different quinidine doses. Based on dextromethorphan AUC statistical comparisons, the lowest effective dose of quinidine that inhibits the metabolism of 45 and 60 mg dextromethorphan is 30 mg. Thus, a 30 mg quinidine dose is recommended for dextromethorphan inhibition.

US 7,659,282 B2

**41**

The occurrence of side effects during the co-administration of dextromethorphan and quinidine sulfate indicated the treatments were moderately well tolerated up to the highest dose level (60 mg dextromethorphan/60 mg quinidine).

Clinical Study #4

The objectives of this study were to compare and evaluate the efficacy, safety, and tolerance of a combination of 30DM/30Q taken twice daily relative to 30 mg DM and 30 mg Q taken individually in a population of ALS subjects with pseudobulbar affect.

This was a multicenter, randomized, double-blind, controlled, parallel-group study. All study drugs were self-administered orally every twelve hours for twenty-eight days. The study included a screening visit and three other clinic visits on Days 1, 15, and 29. Day 29 was the last day the subject was on study and could occur anywhere between the morning of Day 26 and the morning of Day 32.

Subjects with clinically diagnosed pseudobulbar affect were screened for general health within four weeks before entry into the study. All eligible subjects had attained a score of 13 or above on the Center for Neurologic Study-Lability Scale (CNS-LS) at the clinic visit on Day 1.

Subjects were randomized to one of three treatment groups to receive 30DM/30Q, or 30 mg DM, or 30 mg Q. They received a diary in which they recorded the date and time each dose was taken, the number of laughing/crying episodes experienced, and any adverse events that had occurred since the last visit. Diary cards were collected on Day 15 and at the time of study completion.

Subjects completed the CNS-LS questionnaire and visual analog scales assessing quality of life (QOL) and quality of relationships (QOR) every two weeks (Days 1, 15, and 29) during the treatment period. A clinical psychologist, or other approved clinician, administered the Hamilton Rating Scale for Depression (HRSD) at the Screening Visit and on Day 29. Safety was evaluated on Day 15 and Day 29 by examining adverse events, results of physical examinations, vital signs, clinical laboratory values, and resting electrocardiograms (ECGs). In addition to blood samples taken to provide clinical laboratory data, blood was also taken for pharmacokinetic analysis and CYP2D6 genotyping. Each subject completed a diary in which the number of episodes experienced, medications taken, and any adverse events were recorded daily.

DM and Q were chosen as control groups because they are the components of the drug investigated in this study (30DM/30Q).

Subjects included in the study were 18 to 80 years of age, inclusive. The subjects had a confirmed diagnosis of ALS or probable ALS according to the World Federation of Neurology (WFN) criteria, and a clinical history of pseudobulbar affect. Every effort was made by the to continue a subject in the study; however, if the subject decided to withdraw, all efforts were made to complete all assessments listed on Day 29 in Table 25. An explanation of why the subject withdrew from the study was obtained. Subjects who withdrew from the study could not re-enter it, and no subject who had been randomized was replaced.

The study drugs were randomized in blocks of four. Each block contained two assignments to the 30DM/30Q, one to DM and one to Q in random order. Specifically, each block was constructed by selecting one of the four possibilities to be received first. From the three remaining treatments, one was selected to be received next, and so forth. Subject numbers were allocated to study sites in one block of four assignments at a time.

**42**

There were three treatments administered in the study: 30DM/30Q, or 30 mg DM, or 30 mg Q. Study medications were provided as hard, gelatin capsules. The contents of the capsules is listed in Table 25. All medication used in the study was prepared according to current Good Manufacturing Practice (cGMP).

TABLE 25

| | Amount (mg) | | |
|---|---|---|---|
| Ingredient | DM/Q | DM | Q |
| Dextromethorphan hydrobromide monohydrate USP | 31.50 | 31.50 | 0.00 |
| Quinidine sulfate dihydrate USP | 31.40 | 0.00 | 31.40 |
| Croscarmellose sodium NF | 7.80 | 7.80 | 7.80 |
| Microcrystalline cellulose NF | 94.00 | 109.70 | 109.75 |
| Colloidal silicone dioxide NF | 0.65 | 0.65 | 0.65 |
| Lactose monohydrate NF | 94.00 | 109.70 | 109.75 |
| Magnesium stearate NF | 0.65 | 0.65 | 0.65 |

Subjects took one capsule twice a day (every 12 hours) for twenty-eight days. The first dose was taken in the evening of Day 1, and the final dose was taken in the morning on Day 29. The investigators were supplied with capsules of 30DM/30Q, DM, and Q in identical blister-packs, and all capsules were identical in appearance and weight.

Subjects could not take any disallowed medications during the study or for one week before the start of dosing on Day 1. These medications included amantadine, amitriptyline, any anti-depressant medication including St. John's Wort, any monoamine oxidase inhibitor, aspirin (for pain or fever acetaminophen was recommended), captopril, cimetidine, desipramine, dextromethorphan (over-the-counter cough medicines), digoxin, diltiazem, erythromycin, fluoxetine, imipramine, itraconazole, ketoconazole, nortriptyline, paroxetine, quinidine, quinine, and verapamil. At each visit, subjects were queried as to whether or not they had taken any medications, and if they had, the medication was recorded on the Case Report Form.

Subjects were instructed to bring unused study medication to the visit on Day 15 visit and to return all unused study medication to the clinic at the end of study participation. Percent of doses taken was calculated as the total number of doses taken divided by the total number of doses planned, and the result was multiplied by 100. Subjects were considered to be compliant if they had taken 80% of their prescribed doses.

The primary efficacy variable was the CNS-LS score. All efficacy variables involving a change were determined by the baseline score being subtracted from the mean of the non-missing scores on Days 15 and 29. The secondary efficacy variables were laughing/crying episodes, QOL scores, and QOR scores. All efficacy variables involving a change were determined by subtracting the baseline score from the mean of the scores on Days 15 and 29.

The CNS-LS questionnaire used to assess primary efficacy is a seven-item self-report measure that provides a score for total pseudobulbar affect; it required approximately five minutes for the subject to complete. The range of possible scores was 7 to 35. The cut-off score of 13 was selected because it has been reported in the literature to provide the highest incremental validity, accurately predicting the neurologists' diagnoses for 82% of participants with a sensitivity of 0.84 and a specificity of 0.81. This questionnaire is the only instrument for the measurement of pseudobulbar affect validated for use with ALS subjects.

Secondary efficacy was assessed by using two, 10-cm visual analog scales (VAS). One scale asked subjects to rate

US 7,659,282 B2

43

how much uncontrollable laughter, tearfulness, or anger had affected the overall quality of their life during the past week, and one scale asked subjects to rate how much uncontrollable laughter, tearfulness, or anger had affected the quality of their relationships with others during the past week. Each scale required less than one minute to complete. The subjects recorded episodes of pathological laughing and crying in a diary daily.

Safety was assessed by the following measurements: adverse events; clinical laboratory values; vital signs; physical examinations; and resting ECGs. An adverse event was defined any untoward medical occurrence or unintended change from the subject's baseline (pre-treatment) condition, including intercurrent illness, that occurs during the course of a clinical trial after treatment has started, whether considered related to treatment or not. An adverse event was any unfavorable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product. Changes associated with normal growth and development not varying in frequency or magnitude from that ordinarily anticipated clinically are not adverse events (for example, onset of menstruation occurring at a physiologically appropriate time). Clinical adverse events were described by diagnosis and not by symptoms when possible (for example, cold or seasonal allergies, instead of "runny nose").

The severity of adverse events was graded on a 3-point scale and reported in detail as indicated on the Case Report Form: mild—easily tolerated, causing minimal discomfort, and not interfering with normal everyday activities; moderate—sufficiently discomforting to interfere with normal everyday activities; and severe—incapacitating and/or preventing normal everyday activities. The relationship of study medication to each adverse event was determined by the investigator by using the following definitions: not related—the event was clearly related to other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; unlikely—the event was most likely produced by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject, and did not follow a known response pattern to the study drug; possible—the event followed a reasonable temporal sequence from the time of drug administration, and/or followed a known response pattern to the study drug, but could have been produced by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; probable—the event followed a reasonable temporal sequence from the time of drug administration, followed a known response pattern to the trial drug, and could not be reasonably explained by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; highly probable—the event followed a reasonable temporal sequence from the time of drug administration, and followed a known response pattern to the trial drug, and could not be reasonably explained by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject, and either occurs immediately following study drug administration or improves on stopping the drug or reappears on repeat exposure.

A serious adverse event was any adverse event occurring at any dose that resulted in any of the following outcomes: death; life-threatening experience (one that places the subject at immediate risk of death from the adverse event as it occurred, for example, it does not include an adverse event

44

that, had it occurred in a more severe form, might have caused death); persistent or significant disability/incapacity (disability is a substantial disruption of a person's ability to conduct normal life functions); in-patient hospitalization or prolongation of hospitalization; and congenital anomaly/birth defect.

Subjects were instructed to promptly report any adverse event. The serious adverse event was assessed for the following details: seriousness of event, start date, stop date, intensity, frequency, relationship to test drug, action taken regarding test drug, treatment required, and outcome to date. These details were recorded on the Case Report Form. Such preliminary reports were followed by detailed descriptions that included copies of hospital case reports, autopsy reports, and other documents when requested and applicable.

Blood and urine were collected at the screening visit on Day 29 for clinical chemistry, hematology, urinalysis, and pregnancy testing. In the event of an abnormal laboratory test value, the test was repeated within one week, and the subject was followed up until the value returned to the normal range and/or until an adequate explanation of the abnormality was found.

Values were obtained for systolic and diastolic blood pressure, heart rate, and respiration rate on the screening visit and all other study visits. All values outside the pre-defined ranges were flagged in the subject data listings. Electrocardiography (twelve lead) was used to obtain ventricular rate (VR), QT, Q-$T_c$ intervals, pulse rate (PR), and QRS duration. A blood sample (10 mL whole blood) was taken from each subject at the Screening Visit for CYP2D6 genotyping to determine which subjects were poor metabolizers of DM and which were extensive metabolizers. Blood samples were taken on Day 29 for the determination of concentrations of DM, DX, and Q in plasma. The relationship between the concentration of drug in plasma and changes in CNS-LS scores was determined, and the effect of the CYP2D6 genotype on this relationship was evaluated.

Sample sizes of forty-eight subjects in the 30DM/30Q group and twenty-four subjects in each of the DM and Q groups were sufficient to detect a difference in CNS-LS score of 5.5 between the DM/Q group and each of the other groups. These calculations were based on standard deviations of 7, 5, and 3 in the DM/Q, DM, and Q groups, respectively. The power is approximately 85% based on a 2-sided, 5% test, assuming baseline/Day 15 and baseline/Day 29 correlations are both 0.3, and the Day 15/Day 29 correlation is 0.7. The assumptions on which sample sizes were based were drawn from a small, fourteen subject crossover study, in which DM/Q subjects had a mean change from baseline of −6.6 points with standard deviation of 7.5; and placebo-treated subjects had a mean change of +0.83 with a standard deviation of 3.2.

A total of 140 subjects were randomized to treatment; seventy were in the 30DM/30Q group, thirty-three were in the DM group, and thirty-seven were in the Q group. The sample size calculations required that there be only forty-eight subjects in the 30DM/30Q group and twenty-four subjects in each of the other treatment groups. Therefore, under the assumptions made in the sample size calculations, the number of subjects in each group was adequate to detect the defined difference in treatment effect. The percent of subjects with compliance $\geq 80\%$ was 73.5 in the 30DM/30Q group, 87.9 in the DM group, and 86.5 in the Q group.

Three data sets were analyzed in this study; the safety data set consisting of data for 140 subjects, the intent-to-treat data

US 7,659,282 B2

**45**

set consisting of data for 129 subjects, and the efficacy-evaluable data set consisting of data for 101 subjects. The definitions of these three populations are as follows: safety population—all randomized subjects; intent-to-treat population—all randomized subjects who are not "poor metabolizers" of cytochrome P450 2D6; and efficacy evaluable population—all subjects in the ITT population who were protocol adherent. Subjects were considered adherent if they completed the visit on Day 29, completed all study procedures, and took 80% of their scheduled doses.

The demographic characteristics of the ITT population are provided in Table 26; the history of ALS is in Table 27, and the scores at baseline for depression, pseudobulbar affect, QOL, and QOR are in Table 28.

TABLE 26

| Category | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[a] | |
|---|---|---|---|---|---|
| | | | | 30DM/30Q vs DM | 30DM/30Q vs Q |
| Age (years) | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 54.82 | 53.77 | 55.32 | 0.7788 | 0.9976 |
| Std Dev | 12.79 | 11.25 | 9.47 | | |
| Median | 55 | 54 | 58 | | |
| Min/Max | 38/82 | 33/75 | 35/72 | | |
| Gender, n (%) | | | | | |
| Female | 23 (35.4) | 14 (46.7) | 12 (35.3) | 0.1549 | 0.8105 |
| Male | 42 (64.6) | 16 (53.3) | 22 (64.7) | | |
| Race, n (%) | | | | | |
| Asian | 0 (0) | 1 (3.3) | 0 (0) | 0.2100 | 0.5522 |
| Black | 2 (3.1) | 0 (0) | 0 (0) | | |
| Caucasian | 58 (89.2) | 25 (83.3) | 31 (91.2) | | |
| Hispanic | 5 (7.7) | 3 (10.0) | 3 (8.8) | | |
| Other | 0 (0.00) | 1 (3.3) | 0 (0.00) | | |

[a]P-values to compare means for continuous variables are computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests. P-values for categorical values were computed by using Cochran-Mantel-Haenszel chi-square with an adjustment for center.

TABLE 27

| Category | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[a] | |
|---|---|---|---|---|---|
| | | | | 30DM/30Q vs DM | 30DM/30Q vs Q |
| ALS Type, n (%) | | | | | |
| Bulbar | 29 (44.6) | 14 (46.7) | 21 (61.8) | 0.8341 | 0.0793 |
| Limb | 36 (55.4) | 16 (53.3) | 13 (38.2) | | |
| Weekly Episode of Laughing/Crying | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 22.18 | 38.93 | 19.35 | 0.0897 | 0.7043 |
| Std Dev | 31.62 | 66.28 | 19.04 | | |
| Median | 11 | 17 | 13 | | |
| Min/Max | 2/210 | 1/350 | 2/70 | | |

[a]P-values to compare means for continuous variables are computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests. P-values for categorical values were computed by using Cochran-Mantel-Haenszel chi-square with an adjustment for center.

**46**

TABLE 28

| Baseline Characteristics[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[b] | |
|---|---|---|---|---|---|
| | | | | 30DM/30Q vs DM | 30DM/30Q vs Q |
| HRSD | | | | | |
| N | 65 | 30 | 34 | 0.1404 | 0.7066 |
| Mean | 5.37 | 4.27 | 5.79 | | |
| Std Dev | 4.33 | 3.05 | 4.20 | | |
| Median | 4.0 | 3.5 | 5.0 | | |
| Min/Max | 0/16 | 0/14 | 0/15 | | |
| CNS-LS | | | | | |
| n | 65 | 30 | 34 | 0.3202 | 0.0705 |
| Mean | 20.06 | 21.40 | 22.26 | | |
| Std Dev | 5.46 | 6.17 | 5.22 | | |
| Median | 19.0 | 20.0 | 21.0 | | |
| Min/Max | 11/33 | 13/35 | 13/33 | | |
| VAS-QOL | | | | | |
| n | 65 | 30 | 34 | 0.0209 | 0.0261 |
| Mean | 35.05 | 47.57 | 46.56 | | |
| Std Dev | 26.70 | 27.24 | 26.93 | | |
| Median | 33.0 | 48.5 | 42.0 | | |
| Min/Max | 0/96 | 5/95 | 2/100 | | |
| VAS-QOR | | | | | |
| n | 65 | 30 | 34 | 0.1435 | 0.0646 |
| Mean | 31.77 | 41.07 | 42.18 | | |
| Std Dev | 28.50 | 28.16 | 29.93 | | |
| Median | 28.0 | 41.5 | 34.5 | | |
| Min/Max | 0/99 | 0/100 | 0/100 | | |

[a]HRSD = Hamilton Rating Scale for Depression; CNS-LS = Center for Neurologic Study Lability Scale; VAS = Visual Analog Scale; QOL = Quality of Life; QOR = Quality of Relationships. Baseline measurements for HRSD were done at screening. Baseline measurements for CNS-LS, VAS-QOL, and VAS-QOR were done on Day 1.
[b]P-values to compare means were computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests.

There were no statistically significant differences between the 30DM/30Q group and the DM and Q groups for any demographic variable. The only statistically significant difference in the baseline characteristics was in the QOL scores. Subjects in the 30DM/30Q group rated their QOL better at baseline than did the subjects in either of the other two treatment groups. Similar demographic results were obtained in the efficacy-evaluable population, and the trend in the baseline characteristics was in the same direction as that in the ITT population. The population of interest in the primary and secondary analyses of efficacy was the ITT population. Therefore, all results shown in the text are those obtained from this population.

The primary efficacy analysis was the change from baseline in CNS-LS scores, adjusted for center and baseline CNS-LS score. The descriptive statistics for the ITT Population are in Table 29.

TABLE 29

| Change in Score[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| n | 61 | 30 | 34 |
| Mean | −7.39 | −5.12 | −4.91 |
| Std Dev | 5.37 | 5.56 | 5.56 |
| Median | −6.50 | −4.50 | −4.25 |
| Min/Max | −24.00/0.0 | −25.00/2.0 | −21.00/2.0 |

[a]Change in CNS-LS scores was defined as the mean of scores on Day 15 and Day 29 minus the baseline (Day 1) score.

US 7,659,282 B2

47

The distributions of CNS-LS scores at baseline, Day 15, and Day 29 for each of the three treatment groups are provided in FIG. 1. These distributions have not been adjusted for baseline scores or for study site. As shown in FIG. 1, the distributions of CNS-LS scores are symmetrical and contain only one outlier. These distributions support the use of ANCOVA for the analysis of the CNS-LS scores. As prospectively specified in the protocol, the differences in mean improvement in CNS-LS scores, adjusted for center and baseline CNS-LS scores, were analyzed by using linear regression according to the ANCOVA method of Frison and Pocock. The results of this analysis are in Table 30. The results of additional analyses without any adjustments or with an adjustment for baseline CNS-LS score alone are also in this table.

TABLE 30

| Statistics | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| Unadjusted difference in mean score | −2.27 | −2.47 |
| Std Err | 1.22 | 1.17 |
| p-value | 0.0652 | 0.0366 |
| Difference in mean score adjusted for baseline CNS-LS score | −2.97 | −3.65 |
| Std Err | 1.03 | 1.00 |
| p-value | 0.0046 | 0.0004 |
| Difference in mean score adjusted for baseline CNS-LS score and center[b] | −3.29 | −3.71 |
| Std Err | 1.00 | 0.97 |
| p-value | 0.0013 | 0.0002 |

[a]Change in CNS-LS scores was defined as the mean of the scores on Day 15 and Day 29 minus the baseline (Day 1) score.
[b]Analysis in italics was pre-specified in the Statistical Analysis Plan.

The mean score in the group treated with 30DM/30Q was statistically significantly different from the mean scores of the group treated with DM and from the mean scores of the group treated with Q. Therefore, subjects treated with 30DM/30Q showed a significant improvement in pseudobulbar affect.

The results for the analysis pre-specified in the protocol are shown graphically in FIG. 2. Adjusted mean reductions in CNS-LS scores for the three treatment groups from the primary efficacy analysis of the ITT population. Reductions in CNS-LS scores below the horizontal lines are statistically significantly different from 30DM/30Q at the significence levels indicated.

The primary efficacy analysis was also done for the efficacy-evaluable and the safety populations. These results are in Table 31. The results in these populations also showed that 30DM/30Q significantly improved pseudobulbar affect.

TABLE 31

| | | | P-values vs 30DM/30Q | |
|---|---|---|---|---|
| Statistics[b] | DM | Q | DM | Q |
| ITT Population (n = 125) | | | | |
| Difference vs 30DM/30Q | −3.29 | −3.71 | 0.0013 | 0.0002 |
| Std Error | 1.00 | 0.97 | | |
| Efficacy Evaluable Population (n = 101) | | | | |
| Difference vs 30DM/30Q | −3.78 | −5.00 | 0.0009 | <0.0001 |
| Std Error | 1.10 | 1.10 | | |

48

TABLE 31-continued

| | | | P-values vs 30DM/30Q | |
|---|---|---|---|---|
| Statistics[b] | DM | Q | DM | Q |
| Safety Population (n = 136) | | | | |
| Difference vs 30DM/30Q | −3.09 | −4.23 | 0.0016 | <0.0001 |
| Std Error | 0.96 | 0.93 | | |

[a]The ITT and EFF populations excluded poor metabolizers.
[b]Differences are mean differences in the CNS-LS reduction, controlling for baseline CNS-LS and study site, using the analysis pre-specified in the Statistical Analysis Plan.

The results in these populations also showed that 30DM/30Q significantly improved pseudobulbar affect.

The primary efficacy data were also analyzed by using linear regression according to the ANCOVA method of Frison and Pocock with an adjustment for center, baseline CNS-LS scores, and treatment-by-center interaction. Because of small sample sizes at some centers, this interaction could not be estimated.

An analysis of secondary efficacy data was conducted. Weekly episode counts were analyzed by using the Poisson regression model as specified in the statistical analysis plan, and the results are in Table 32.

TABLE 32

| Episode[a] Statistic | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| Laughing | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 4.70 | 35.29 | 6.79 |
| Wtd. Std Dev | 49.66 | 709.97 | 53.93 |
| Median | 0.66 | 2.50 | 2.23 |
| Min/Max | 0.00/116.67 | 0.00/726.55 | 0.00/45.00 |
| Crying | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 2.04 | 4.30 | 5.64 |
| Wtd. Std Dev | 33.99 | 32.86 | 28.14 |
| Median | 0.44 | 0.70 | 4.00 |
| Min/Max | 0.00/66.00 | 0.00/21.00 | 0.00/19.83 |
| Laughing/Crying | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 6.74 | 39.58 | 12.45 |
| Wtd. Std Dev | 69.23 | 707.62 | 69.91 |
| Median | 2.00 | 8.97 | 6.19 |
| Min/Max | 0.00/116.67 | 0.00/726.55 | 0.00/49.00 |

[a]The number of episodes were collected continuously by each subject in a diary. The diaries were reviewed at the visits on Days 15 and 29.
[b]The mean across all subjects was the weighted mean of each subject's mean (total number of episodes divided by the total number of days). The weight is the number of days in the study for each subject.

This analysis of episode rates, pre-specified in the protocol, showed that total episodes were 6.4 times greater (calculated by using the episode rates from the Poisson regression model with an adjustment for center) in the DM group than in the 30DM/30Q group and were 1.9 times greater in the Q group than in the 30DM/30Q group. A single outlier in the DM group was a subject who reported 10 times more episodes than any other subject in the study—an average of over 100 episodes per day. When this outlier was omitted, the ratios were 2.3 and 1.8 for the DM and Q groups, respectively. In each case, the calculated p-values were <0.0001. Separate assessments for crying and laughing were also highly statistically significant. This subject's extreme episodes counts

US 7,659,282 B2

49 50

were primarily laughing episodes; as a result, the estimated effects on crying were changed little by omitting this subject.

For the assessments for episode counts described above, there is evidence of substantial overdispersion in the data, signifying that the data did not meet the assumptions of the model. A number of additional analyses were carried out to assess the sensitivity of the conclusions to model specification; these analyses are discussed below.

When the data were analyzed by using the quadratic-variance (mean dispersion) negative binomial model (one model for overdispersion), the results indicated that 30DM/30Q crying rates were twice as large as those for DM (p=0.06) and 4.5 times as large as those for Q (p<0.001). The corresponding factors for laughing were 2.6 (p=0.10) and 0.9 (p=0.84) and for total are 2.6 (p=0.013) and 1.5 (p=0.29). However, there is a continued lack of fit of the data in this model also.

The data were also analyzed by using the proportional-variance (constant dispersion) negative binomial model (another model that takes overdispersion into account). The results, indicated by an analysis of residuals, showed a better fit to this overdispersed data. The estimated ratios from this model for crying were 2.0 (p=0.007) and 3.3 (p<0.001) relative to DM and Q, respectively. For laughing, the ratios were 1.4 and 1.5, with p-values of 0.21 and 0.13 for DM and Q, respectively. (With the outlier subject omitted, the laughing ratios were 1.5 (p=0.14) and 1.6 (p=0.05). Total counts had ratios of 1.7 and 1.8, with p-values 0.02 and 0.006 relative to DM and Q, respectively.

When center was omitted from the model as a sensitivity analysis, the magnitude of response was similar to the analyses with center. The p-values increased somewhat, as expected. The normal probability plots of residuals from these models, however, indicate that adjustment for center substantially improved the normality of the residuals.

Additional studies to determine the sensitivity of the results to model assumptions were also carried out. These analyses explored nonparametric approaches, as well as an assessment designed to examine "steady-state" differences between groups.

The assessment of statistical significance of the relative effects of 30DM/30Q, DM, and Q is dependent on the model assumptions used. However, statistical estimates of the relative effects in all models consistently favored 30DM/30Q over DM and Q, even when statistical significance was not reached. In the model for which the assumptions best describe the observed data, these differences were statistically significant.

To help quantify and understand how changes in the primary efficacy variable, CNS-LS score, affect episode count, the effect of a 1-point difference in CNS-LS score on the episode rate during the previous two weeks was estimated. For each 1-point increase in CNS-LS score, the average episode rate increased 12%. Thus, a 3.5-point decrease in CNS-LS score would correspond to a 50% decrease in episode rate. This was true for both laughing and crying episodes. Summary statistics of QOL and QOR scores are provided in Table 33.

TABLE 33

| Change in Score[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| QOL | All Days | | |
| n | 51 | 27 | 32 |
| Mean | −23.34 | −17.41 | −18.97 |
| Std Dev | 24.38 | 27.61 | 28.30 |
| Median | −19.0 | −11.0 | −14.3 |
| Min/Max | −84.0/29 | −90.5/27 | −98.0/19 |
| QOR | | | |
| n | 51 | 27 | 32 |
| Mean | −22.36 | −9.98 | −14.14 |
| Std Dev | 27.32 | 22.09 | 27.54 |
| Median | −12.00 | −4.50 | −10.50 |
| Min/Max | −90.0/24.0 | −71.0/23.5 | −74.5/42.0 |
| QOL | Day 15 | | |
| n | 52 | 28 | 33 |
| Mean | −20.54 | −17.14 | −15.94 |
| Std Dev | 23.05 | 29.06 | 28.51 |
| Median | −18 | −13 | −6 |
| Min/Max | −84/28 | −90/55 | −96/22 |
| QOR | | | |
| n | 52 | 28 | 33 |
| Mean | −20.77 | −11.75 | −12.15 |
| Std Dev | 26.11 | 24.88 | 29.05 |
| Median | −10 | −7 | −2 |
| Min/Max | −89/25 | −71/34 | −84/41 |
| QOL | Day 29 | | |
| n | 60 | 29 | 33 |
| Mean | −24.13 | −19.31 | −21.15 |
| Std Dev | 25.77 | 29.29 | 30.97 |
| Median | −17 | −7 | −14 |
| Min/Max | −90/30 | −91/27 | −100/23 |
| QOR | | | |
| n | 59 | 29 | 33 |
| Mean | −22.42 | −10.38 | −15.67 |
| Std Dev | 27.92 | 23.62 | 27.85 |
| Median | −13.0 | −3.0 | −13.0 |
| Min/Max | −91/34 | −71/26 | −77/43 |

[a]The change in VAS scores for all days was defined as the mean of the scores on Days 15 and 29 minus the score on Day 1; the change in score for Day 15 was defined as the score on Day 15 minus the score on Day 1; and the score on Day 29 was defined as the score on Day 29 minus the score on Day 1.

The differences in the mean changes in QOL and QOR scores between 30DM/30Q and DM and Q, adjusted for baseline and study site, are in Table 34. The group treated with 30DM/30Q showed a statistically significant improvement in these scores when compared with the group treated with DM and compared with the group treated with Q. These results were similar for all time periods.

TABLE 34

| Variable Statistics[a] | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| QOL | All Days | |
| Difference | −15.00 | −14.67 |
| Std Err | 4.58 | 4.44 |
| p-value[b] | 0.0015 | 0.0013 |

**51**

TABLE 34-continued

| Variable Statistics[a] | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| QOR | | |
| Difference | −18.35 | −16.08 |
| Std Err | 4.27 | 4.16 |
| p-value | <0.0001 | 0.0002 |
| QOL | | Day 15 |
| Difference | −11.11 | −12.60 |
| Std Err | 4.03 | 4.63 |
| p-value | 0.0235 | 0.0077 |
| QOR | | |
| Difference | −15.04 | −15.25 |
| Std Err | 4.49 | 4.32 |
| p-value | 0.0012 | 0.0006 |
| QOL | | Day 29 |
| Difference | −16.33 | −13.57 |
| Std Err | 4.78 | 4.62 |
| p-value | 0.0009 | 0.0041 |
| QOR | | |
| Difference | −19.14 | −14.77 |
| Std Err | 4.33 | 4.24 |
| p-value | <0.0001 | 0.0007 |

[a]Change in VAS "all-day" scores was defined as the mean of the scores on Day 15 and Day 29 minus the baseline (Day 1) score. Change in the scores on Day 15 and Day 29 was defined as the score on that day minus the baseline score. Differences in changed scores were adjusted for baseline levels and center effects.
[b]P-values were computed by using linear regression according to the ANOVA method of Frison and Pocock with an adjustment for center and baseline QOL and QOR scores.

To account for multiple comparisons, all the secondary efficacy variables were combined and analyzed simultaneously by using the O'Brien Rank Sum Method, as specified in the protocol. The results showed that subjects treated with 30DM/30Q had a statistically significant reduction in episodes of laughing and crying and an improvement in QOL and QOR relative to the subjects treated with DM (p=0.0041) or Q (p=0.0001) after adjustment for multiple comparisons. 30DM/30Q was statistically significantly better that either DM or Q in improving pseudobulbar affect, number of episodes of laughing and crying, QOL, and QOR in subjects with ALS.

The extent of exposure to study medication, in terms of number of doses taken, is reported in Table 35. The mean days of exposure were very similar across all treatment groups.

TABLE 35

| Exposure Statistics[a] | 30DM/30Q (N = 70) | DM (N = 33) | Q (N = 37) |
|---|---|---|---|
| n | 68 | 33 | 36 |
| Mean | 24.4 | 27.6 | 28.0 |
| Std Dev | 9.66 | 6.25 | 4.40 |
| Median | 29.0 | 29.0 | 29.0 |
| Min/Max | 3/32 | 7/33 | 5/32 |

[a]Exposure was calculated by using the date of the last dose of study drug minus the date of the first dose of study drug + 1.

Nausea was the most common adverse event experienced, and it afflicted more subjects [twenty-three (32.9%)] in the 30DM/30Q group than in either the DM [2 (6.1%)] or the Q [3 (8.1%)] groups. However, in the 30DM/30Q group, nausea was judged to be mild or moderate in twenty of the twenty-three subjects, but it was judged to be at least possibly related to treatment with 30DM/30Q in nineteen of the twenty-three

**52**

subjects. All instances of nausea in the DM and Q groups were mild or moderate, and all but one was judged to be at least possibly related to treatment. Dizziness was also reported by more subjects [fourteen (20%)] in the 30DM/30Q group than in either the DM [five (15.2%)] or the Q [one (2.7%)] groups. All instances of this adverse event in all treatment groups were mild or moderate, and almost all were judged to be at least possibly related to treatment. Somnolence was the third event that was reported by more subjects [nine (12.9%)] in the 30DM/30Q group than in either the DM [one (3.0%)] or the Q [zero (0%)] groups. All instances of this adverse event in all treatment groups were mild or moderate, and almost all were judged to be at least possibly related to treatment. Three subjects experienced loose stools as an adverse event, and all of them were in the DM group. All instances of the event were mild, and all were judged to be related to treatment.

A total of twenty-two subjects withdrew from the study because of adverse events; seventeen (24.3%) were in the 30DM/30Q group, two (6.1%) in the DM group, and three (8.1%) in the Q group. The seventeen subjects in the 30DM/30Q group experienced fifty adverse events, and most of these [seventeen (34%)] were related to the nervous system. All of these fifty events except four were mild or moderate, and all but one were judged to be at least possibly related to treatment. One subject had a severe headache, one subject had severe nausea and severe vomiting, and one subject had severe respiratory failure. The subject died as a result of the respiratory failure. This was judged not related to study medication. The other two subjects recovered without sequelae.

In the DM group, there were seven adverse events experienced by two subjects. All of these events except one were mild or moderate, and all were judged to be related to treatment. One subject, who had six of the seven adverse events, experienced severe diarrhea; received appropriate drug treatment for this condition; and recovered without sequelae.

Three subjects in the Q group experienced five adverse events. One subject had a severe kidney infection that was judged to be not related to treatment, and one subject had severe muscle cramping that was judged to be related to treatment. Both of these subjects recovered without sequelae. All other adverse events were mild or moderate, and most were judged to be not related to treatment.

Overall, there were four serious adverse events experienced by subjects in this study. Three subjects in the 30DM/30Q group reported serious adverse events, but only one of these discontinued taking the drug. All three of these serious adverse events were judged to be not related to the study drug. The only other serious adverse event was experienced by a subject in the Q group. This subject continued on the study drug, and the event was also judged to be not related to the study drug. There was one death during the study; one subject in the 30DM/30Q group died because of respiratory failure unrelated to study treatment.

There was no statistically significant change in hematology, clinical chemistry, or urinalysis values from Baseline to Day 29 in any treatment group, nor any statistically significant change among the treatment groups in any laboratory value except a significant increase in CPK in the DM group relative to the 30DM/30Q group. There were no clinically relevant changes from Baseline to Day 29 in systolic blood pressure, diastolic blood pressure, heart rate, or respiration. There were no clinically relevant changes from Baseline to Day 29 in the results of physical examinations. There was a statistically significant difference in the change from Baseline to Day 29 in VR and in the QT interval between the 30DM/30Q and Q groups. However, these changes were so

US 7,659,282 B2

**53**

small that they were not clinically relevant. There was no statistically significant difference among the treatment groups in $QT_c$, PR, and QRS duration.

Since the nature, frequency, and intensity of the adverse events were within acceptable limits in this subject population, and there were no clinically relevant findings for any other safety variable, 30DM/30Q is safe in this subject population.

The CYP2D6 genotypes in each treatment group of the safety population were determined and are provided in Table 36. As defined in the Statistical Analysis Plan, the ITT population did not include poor metabolizers. Extensive metabolizer was the most prevalent genotype in all treatment groups in the ITT population.

TABLE 36

| Genotype | 30DM/30Q (N = 70) n (%) | DM (N = 33) n (%) | Q (N = 37) n (%) |
|---|---|---|---|
| Poor metabolizer | 5 (7.2) | 3 (9.1) | 3 (8.1) |
| Extensive metabolizer | 61 (88.4) | 30 (90.9) | 32 (86.5) |
| Ultrarapid metabolizer | 3 (4.3) | 0 (0.0) | 2 (5.4) |

Q in this combination product inhibits the rapid first-pass metabolism of DM. Therefore, it was expected that the concentrations of DM in plasma would be higher and the concentration of its metabolite, DX, would be lower in subjects who had received 30DM/30Q. The concentrations of DM and DX in the group receiving 30DM/30Q and the group receiving DM are provided in Table 37.

TABLE 37

| Statistics | 30DM/30Q N = 70 | | DM N = 33 | | P-values[b] | |
|---|---|---|---|---|---|---|
| | DM | DX | DM | DX | DM | DX |
| n | 35 | 35 | 23 | 23 | | |
| Mean | 96.37 | 89.46 | 5.18 | 295.92 | <0.0001 | <0.0001 |
| Std Dev | 46.71 | 52.25 | 4.97 | 143.21 | | |
| Median | 96.26 | 78.24 | 4.55 | 262.35 | | |
| Min/Max | 1.07/212.40 | 8.17/235.27 | 0.35/15.81 | 101.07/526.65 | | |

[a]Only those subjects whose time of blood collection was within 8 hours of the time of their last dose of study medication were included in this table.
[b]P-value from ANOVA with adjustment for treatment.

The mean DM concentration was 18.6-fold higher in the 30DM/30Q group than in the DM group, and the mean DX concentration was 3.3-fold lower in the 30DM/30Q group than in the DM group. These differences were both statistically significant. The data for the levels in plasma of all subjects show the same results as in those subjects whose blood was collected within eight hours of the last dose of study medication.

The results of the study demonstrate that 30DM/30Q was statistically significantly more effective than its components in the treatment of pseudobulbar affect as indicated by the primary and all secondary endpoints. Expected adverse events were reported, and no unexpected safety issues emerged. More subjects in the 30DM/30Q group had adverse events than in either of the other groups, and seventeen subjects in the 30DM/30Q group discontinued the study because of adverse events; however, all adverse events except four in the subjects who discontinued were mild or moderate. Only two of the seventeen subjects had severe adverse events (headache, nausea, vomiting), and these events, although

**54**

debilitating, resolved without sequelae. There were three subjects treated with 30DM/30Q with serious events, and all of the events were unrelated to this treatment. Furthermore, as the results of the assessments of QOL and QOR were markedly and statistically significantly better in the subjects treated with 30DM/30Q, the benefits of the drug outweighed any discomfort caused by the adverse events. Therefore, 30DM/30Q was very effective in treating pseudobulbar affect in ALS subjects, and the drug was safe and well tolerated.

Clinical Study #5

The primary objective of this study was to evaluate the safety and tolerability of capsules containing dextromethorphan hydrobromide and quinidine sulfate (DM/Q) during an open-label, dose-escalation study to the subject's maximum tolerated dose (MTD), not to exceed 120 mg DM/120 mg Q per day. The secondary objective was to obtain a preliminary assessment of the efficacy of DM/Q in the treatment of pain associated with diabetic neuropathy.

This was an open-label, dose-escalation study in subjects experiencing pain associated with diabetic neuropathy. After screening for inclusion/exclusion criteria, subjects underwent a washout period during which all analgesics were discontinued. This was followed by twenty-nine days of treatment with capsules containing 30 mg DM/30 mg Q, beginning with one capsule per day and escalating approximately weekly to a maximum permitted dose of four capsules per day. Subjects who could not tolerate a dose level could return to the previous level; could substitute a capsule containing 15 mg DM/30 mg Q; or, if they were unable to tolerate the lowest dose level, could be discontinued from the study.

Subjects were screened for general health, including electrocardiography, within four weeks before Day 1 of dosing. The first dose of DM/Q was administered at the clinic, and a resting electrocardiogram was obtained one hour after this dose and interpreted on site. If the corrected QT interval ($QT_c$) determined in this preliminary interpretation was not $\geq 450$ msec for males or $\geq 470$ msec for females, and the $QT_c$ did not change from the screening electrocardiogram by more than 30 msec, the subject was issued study medication to take as directed by the physician. The subject was instructed on the use of a daily diary to record study medication taken and scores from rating scales for sleep, present and average pain intensity, and activity.

Subjects visited the clinic every two weeks during the four-week duration of the study and were contacted by telephone during weeks without clinic visits. At each subsequent study visit or weekly phone call, the subjects were given the Pain Intensity Rating Scale and the Pain Relief Rating Scale and were queried regarding any adverse events that might have occurred since their previous visit. Subjects were admin-

US 7,659,282 B2

**55**

istered the Peripheral Neuropathy Quality of Life (QOL) Instrument on Days 1 and 29 (or the final visit). Blood samples were taken at the visits on Day 15 and Day 29 to determine concentrations in plasma of DM, DX, and Q.

Subjects selected were 18 to 80 years of age, inclusive, and had a confirmed diagnosis of diabetes mellitus. Subject had acceptable glycemic control, with total glycosylated hemoglobin (HbA1c)<12%, had been on established diabetic therapy for at least 3 months, had a clinical diagnosis of distal symmetrical diabetic neuropathy, and had daily pain associated with diabetic neuropathy for the previous 3 months. Subjects scored moderate or greater ($\geqq 2$) on the Pain Intensity Rating Scale before receiving DM/Q on Day 1.

Every effort was made to continue each subject in the study. However, if a subject decided to withdraw, all efforts were made to complete all assessments and an explanation of why the subject withdrew from the study was provided.

Subjects received capsules containing 30 mg DM/30 mg Q or 15 mg DM/30 mg Q in increasing dosages, to a maximum of 120 mg DM/120 mg Q. Study medications were provided as hard gelatin capsules; Capsule A was opaque orange, and Capsule B was opaque white. The contents of the capsules are listed in Table 38.

TABLE 38

| Ingredient | Amount (mg) | |
| --- | --- | --- |
| | Capsule A 30 mg DM/ 30 mg Q | Capsule B[a] 15 mg DM/ 30 mg Q |
| Dextromethorphan hydrobromide monohydrate USP (DM) | 31.50[b] | 15.75[c] |
| Quinidine sulfate dihydrate USP (Q) | 31.40[d] | 31.40[d] |
| Croscarmellose sodium NF | 7.80 | 7.80 |
| Microcrystalline cellulose NF | 94.00 | 101.87 |
| Colloidal silicone dioxide NF | 0.050 | 0.065 |
| Lactose monohydrate NF | 94.00 | 101.88 |
| Magnesium stearate NF | 0.05 | 0.05 |

[a]For optional use if Capsule A was not tolerated.
[b]Equivalent to 30.0 mg dextromethorphan hydrobromide.
[c]Equivalent to 15.0 mg dextromethorphan hydrobromide.
[d]Equivalent to 30.0 mg quinidine sulfate.

Subjects received capsules containing DM/Q in escalating doses, as indicated in Table 39. Subjects who could not tolerate a dose level were permitted to return to the previous level, substitute a capsule containing 15 mg DM/30 mg Q, or be discontinued from the study if they were unable to tolerate the lowest dose level.

TABLE 39

| | AM Dose | | | PM Dose | | | Total Daily Dose | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Study Day | Number of Capsules | DM (mg) | Q (mg) | Number of Capsules | DM (mg) | Q (mg) | Number of Capsules | DM (mg) | Q (mg) |
| 1 (in clinic) | 0 | 0 | 0 | 1 | 30 | 30 | 1 | 30 | 30 |
| 2 to 3 | 0 | 0 | 0 | 1 | 30 | 30 | 1 | 30 | 30 |
| 4 to 13 | 1 | 30 | 30 | 1 | 30 | 30 | 2 | 60 | 60 |
| 14 to 20 | 1 | 30 | 30 | 2 | 60 | 60 | 3 | 90 | 90 |
| 21 to 29 | 2 | 60 | 60 | 2 | 60 | 60 | 4 | 120 | 120 |

Subjects could not take any disallowed medications during the study or for one week (or two weeks, where applicable) before the start of dosing on Day 1. These medications included: amantadine; amitriptyline; any antidepressant medication, including St. John's Wort; any monoamine oxi-

**56**

dase inhibitor; analgesics (only acetaminophen could be used); captopril; cimetidine; carbonic anhydrase inhibitors; desipramine; dextromethorphan (OTC cough medicines); digoxin; diltiazem; erythromycin; fluoxetine; haloperidol; imipramine; itraconazole; ketoconazole; nortriptyline; paroxetine; quinidine or other antiarrhythmic drugs; sodium bicarbonate; thiazide diuretics; and verapamil. If a subject was unable to complete the washout period without analgesia, he/she was permitted to begin the dose-escalation phase of the study, provided that sufficient washout of other disallowed, non-pain medications had occurred. Daily, low-dose aspirin was not considered an analgesic and was permitted for cardiac prophylaxis.

Acetaminophen was the only analgesic permitted as a rescue pain medication and was to be taken at the dosage specified on the package label. Subjects were instructed to consult the study clinic before taking any medication, including over-the-counter (OTC) medications, and they were counseled that acetaminophen-containing products that also contained other analgesics (e.g., codeine) or dextromethorphan should be avoided.

Subjects were instructed to bring unused study medication to the clinic on Day 15 and to return all unused study medication to the clinic at the final visit. Diary cards were collected from subjects at these visits. The percent of doses taken was calculated as the total number of doses taken divided by the total number of doses prescribed, multiplied by 100.

Safety was assessed by the following measurements: adverse events; clinical laboratory values; vital signs; physical examinations; electrocardiograms; and measurements of nerve conduction velocity.

Subjects underwent nerve conduction studies at Screening and on Day 29 (or the final visit). Nerve conduction velocity was measured with surface stimulation and recording. Bilateral sural nerve sensory studies and a unilateral peroneal nerve motor study were performed or supervised by a clinical electromyographer certified by the American Board of Electrodiagnostic Medicine. Techniques were standardized to minimize variability among electromyographers. Limb temperature was maintained above a standard temperature in all studies. Results were interpreted at a central reading laboratory.

Efficacy was assessed through the following instruments: Pain Intensity Rating Scale; Diary Present Pain Intensity Scale; Pain Relief Rating Scale; Diary Activity Rating Scale; Peripheral Neuropathy QOL Instrument; Diary Average Pain Rating Scale; and Diary Sleep Rating Scale.

Score on the Pain Intensity Rating Scale was determined on Day 8, Day 15, Day 22, and Day 29 (or the final visit). Subjects indicated the amount of pain experienced in the lower extremities within the previous twenty-four hours by using a 5-point Likert scale (0=None, 1=Mild, 2=Moderate,

**57**

3=Severe, 4=Extreme). Subjects were required to complete the Pain Intensity Rating Scale at the clinic on Day 1, before entry into the study and on Day 15 and Day 29 (or the final visit). The scale was also administered verbally in telephone calls to the subject during weeks when no clinic visit was scheduled (Day 8 and Day 22).

The Pain Relief Rating Scale was completed on Day 8, Day 15, Day 22, and Day 29 (or the final visit). Subjects indicated the amount of pain relief experienced in the lower extremities relative to the end of the washout/screening phase by using a 6-point Likert scale (−1=Worse, 0=None, 1=Slight, 2=Moderate, 3=A lot, 4=Complete). Subjects were required to complete the scale at the clinic on Day 15 and Day 29 (or the final visit). The Pain Relief Rating Scale was also administered verbally in telephone calls to the subject during weeks when no clinic visit was scheduled (Day 8 and Day 22).

The QOL score was obtained at the clinic on Day 1 and Day 29 (or the final visit). QOL was assessed by using the Peripheral Neuropathy QOL Instrument-97 as in Vickrey et al., Neurorehabi. Neural. Repair, 2000; 14:93-104. This is a self-administered, health-related, QOL measure for peripheral neuropathy. It incorporates the Health Status Survey SF-36 scale in its entirety and includes additional questions determined to be particularly relevant to subjects with peripheral neuropathy.

The instrument comprises 21 subscales containing items about general health issues, specific peripheral neuropathy issues, health symptoms or problems, assessment of overall health, and feelings in general and about health. All of the items use 3-, 4-, 5-, or 6-point categorical rating scales, except for number of disability days, overall health rating (0 to 100), and a yes/no question about sexual activity.

To analyze the QOL results, a scoring algorithm was used to convert the categorical item ratings to appropriate percent ratings. The most favorable rating was 100%, the least favorable was 0%, and the intermediate percents were spaced at equal intervals, depending on the number of points in the scale (e.g., 0, 25, 50, 75, 100 for a 5-point ascending scale; 100, 50, 0 for a 3-point descending scale). The converted ratings for each item in a subscale were averaged to provide the subscale scores. All subscale scores were constructed so that a higher value reflected a more favorable result. The composite QOL score was obtained by averaging all subscale scores, except for number of disability days.

The subject diary included a sleep rating scale and a present pain intensity scale to be completed in the morning, and an activity rating scale and an average pain rating scale to be completed in the evening. In the Sleep Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 that best described the extent that pain had interfered with their sleep in the past 24 hours (0=Does not interfere and 10=Completely interferes). In the Present Pain Intensity Scale, subjects were instructed to circle the statement that best described their present pain intensity: 0—No Pain; 1—Mild; 2—Discomforting; 3—Distressing; 4—Horrible; and 5—Excruciating. In the Activity Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 (the same as the Sleep Rating Scale) that best described the extent that pain had interfered with their general activity in the past 24 hours (0=Does not interfere and 10=Completely interferes).

**58**

In the Average Pain in Past 12 Hours Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 (the same as the Sleep Rating Scale) that best described their average pain intensity during the past 12 hours (0=None and 10=Worst pain ever). The rating scales used as efficacy measures are well-established instruments in pain research, and the Peripheral Neuropathy QOL instrument, in particular, contains material that is specific for subjects with peripheral neuropathy.

Efficacy evaluations consisted of inferential analyses and summary statistics, calculated on all subjects and on subjects categorized by MTD, for the following variables (except where noted): change from baseline in the Pain Intensity Rating Scale score on Days 8, 15, 22, and 29 (or the final visit); the Pain Relief Rating Scale score on Days 8, 15, 22, and 29 (or the final visit); change from baseline in the composite score on the Peripheral Neuropathy Quality of Life Instrument on Day 29 (or the final visit); Sleep Interference score calculated from values recorded in the diary for the Sleep Rating Scale (the score for Day 15 was the average of the Sleep Rating Scale scores from the subject diary for Days 13, 14, and 15; the score for Day 29 was the average of the Day 27, 28, and 29 scores; and the Final Visit score was the average of scores from the final 3 consecutive days of study treatment); Daily Present Pain Intensity, Activity, Pain, and Sleep Rating scales, recorded in subject diaries; the percent of subjects experiencing improved scores for each of the efficacy variables.

The disposition of subjects is provided in FIG. 3. Subjects are classified by MTD group in this figure and in subsequent summary tables and figures. Except for a subject with an MTD of 45 mg, who was classified with the 60-mg group (see below), subjects in the 30-, 60-, and 90-mg groups received the MTDs indicated. Subjects in the 120-mg group tolerated this dose, which was the highest dose permitted in the study but is technically not an MTD. For brevity these groupings are all referred to as "MTDs."

Of the thirty-six subjects who were enrolled and received study medication, thirty-three completed the study. One subject completed the study with an MTD of 45 mg DM. Because there was only one subject with this MTD, this subject is included with the 60-mg MTD group in the data tables and in FIG. 3. The number of subjects in each MTD group and overall in each study site is reported in Table 40.

TABLE 40

| Site | MTD (mg) | | | | | Total |
| | 30 | 45 | 60 | 90 | 120 | |
|---|---|---|---|---|---|---|
| 01 | 1 | 0 | 0 | 0 | 4 | 5 |
| 02 | 1 | 0 | 0 | 0 | 3 | 4 |
| 03 | 0 | 0 | 3 | 0 | 0 | 3 |
| 04 | 2 | 1 | 2 | 2 | 5 | 12 |
| 05 | 1 | 0 | 0 | 0 | 11 | 12 |
| Total | 5 | 1 | 5 | 2 | 23 | 36 |

Only one population was used in the data analyses. Analyses and summaries were performed by using all 36 subjects who took study medication. The demographic characteristics of the study population are reported in Table 41.

US 7,659,282 B2

**59**

TABLE 41

| Charac-teristic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Age (years) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 62.2 | 57.7 | 57.0 | 57.1 | 57.9 |
| SD[d] | 10.99 | 8.14 | 9.90 | 11.99 | 10.94 |
| Median | 65.0 | 59.0 | 57.0 | 56.0 | 57.0 |
| Min/Max | 49/77 | 45/67 | 50/64 | 22/78 | 22/78 |
| Gender, n (%) | | | | | |
| Male | 4 (80.0) | 3 (50.0) | 1 (50.0) | 11 (47.8) | 19 (52.8) |
| Female | 1 (20.0) | 3 (50.0) | 1 (50.0) | 12 (52.2) | 17 (47.2) |
| Race, n (%) | | | | | |
| Caucasian | 3 (60.0) | 5 (83.3) | 2 (100.0) | 15 (65.2) | 25 (69.4) |
| Black | 1 (20.0) | 0 (0.0) | 0 (0.0) | 2 (8.7) | 3 (8.3) |
| Asian | 0 (0.0) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 0 (0.0) |
| Other[e] | 1 (20.0) | 1 (16.7) | 0 (0.0) | 6 (26.1) | 8 (22.2) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[c]This group included one subject whose MTD was 45 mg.

[d]SD = Standard deviation.

[e]All of the subjects in the category "Other" were described as Hispanic.

**60**

The history of the subjects' diabetic neuropathy is summarized in Table 42.

TABLE 42

| Characteristic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Duration of Diabetic Neuropathy (years) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 3.9 | 3.8 | 3.2 | 5.3 | 4.7 |
| SD | 4.30 | 5.01 | 0.21 | 6.35 | 5.63 |
| Median | 2.5 | 0.9 | 3.2 | 2.4 | 2.5 |
| Min/Max | 0.6/11.4 | 0.2/10.4 | 3.0/3.3 | 0.5/24.3 | 0.2/24.3 |
| Duration of Daily Pain (months) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 30.2 | 30.0 | 9.0 | 38.0 | 34.0 |
| SD | 30.99 | 17.47 | 4.24 | 46.32 | 39.42 |
| Median | 24.0 | 27.0 | 9.0 | 18.0 | 24.0 |
| Min/Max | 7/84 | 7/60 | 6/12 | 4/180 | 4/180 |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[c]This group included one subject whose MTD was 45 mg.

Subjects enrolled in the study had received their diagnosis of diabetic neuropathy a minimum of 0.2 years and a maximum of 24.3 years previously (median of 2.5 years). Subjects had experienced daily pain from their diabetic neuropathy for a minimum of four months and a maximum of 180 months/15.0 years (median of 24.0 months/2.0 years).

Concomitant medications were reported for up to 30 days before the study and throughout the treatment period. Concomitant medications reported by at least 10% of subjects overall are listed in Table 43 by WHO term.

TABLE 43

| Drug Category WHO Preferred Term | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Analgesics | | | | | |
| Paracetamol (acetaminophen) | 0 (0.0) | 1 (16.7) | 1 (50.0) | 2 (8.7) | 4 (11.4) |
| ACE inhibitors | | | | | |
| Lisinopril | 0 (0.0) | 1 (16.7) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Diuretics | | | | | |
| Furosemide | 0 (0.0) | 1 (16.7) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Hydrochlorothiazide | 2 (40.0) | 1 (16.7) | 0 (0.0) | 2 (8.7) | 5 (14.3) |
| Anticoagulants | | | | | |
| Acetylsalicylic acid[d] | 1 (20.0) | 2 (33.3) | 1 (50.0) | 6 (26.1) | 10 (28.6) |
| Lipid-lowering agents | | | | | |
| Atorvastatin | 1 (20.0) | 0 (0.0) | 0 (0.0) | 5 (21.7) | 6 (17.1) |
| Antidiabetic agents | | | | | |
| Glibenclamide | 1 (20.0) | 1 (16.7) | 1 (50.0) | 5 (21.7) | 8 (22.9) |
| Glipizide | 0 (0.0) | 2 (33.3) | 0 (0.0) | 2 (8.7) | 4 (11.4) |
| Insulin | 2 (40.0) | 0 (0.0) | 0 (0.0) | 3 (13.0) | 5 (14.3) |

US 7,659,282 B2

**61**                                           **62**

TABLE 43-continued

| Drug Category WHO Preferred Tem | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Insulin human injection, isophane | 0 (0.0) | 2 (33.3) | 0 (0.0) | 2 (8.7) | 4 (11.4) |
| Metformin | 1 (20.0) | 1 (16.7) | 1 (50.0) | 6 (26.1) | 9 (25.7) |
| Metformin hydrochloride | 0 (0.0) | 1 (16.7) | 0 (0.0) | 6 (26.1) | 7 (20.0) |
| Oral antidiabetics | 4 (80.0) | 1 (16.7) | 1 (50.0) | 11 (47.8) | 17 (48.6) |
| Nutritional supplements | | | | | |
| Ascorbic acid | 1 (20.0) | 0 (0.0) | 1 (50.0) | 2 (8.7) | 4 (11.4) |
| Calcium | 1 (20.0) | 1 (16.7) | 1 (50.0) | 3 (13.0) | 6 (17.1) |
| Multivitamins | 0 (0.0) | 0 (0.0) | 1 (50.0) | 3 (13.0) | 4 (11.4) |
| Tocopherol | 1 (20.0) | 0 (0.0) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Other | | | | | |
| Levothyroxine sodium | 0 (0.0) | 0 (0.0) | 1 (50.0) | 3 (13.0) | 4 (11.4) |
| Sildenafil citrate | 1 (20.0) | 3 (50.0) | 0 (0.0) | 0 (0.0) | 4 (11.4) |
| All other therapeutic products | 1 (20.0) | 1 (16.7) | 0 (0.0) | 2 (8.7) | 4 (11.4) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]All subjects who took acetylsalicylic acid concurrently with their study treatment did so for the indication of cardiac prophylaxis and not analgesia.

Use of rescue medication (acetaminophen) was limited. Only four subjects took rescue medication: one took acetaminophen on twenty-eight out of twenty-nine study days, one on sixteen study days, and two on only one study day. Overall, there was little use of rescue medication for pain during this study; subjects took rescue medication on an average of 1.3 days each (4.5% of study days).

The extent of exposure to study medication is in Table 44.

TABLE 44

| Exposure Statistic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Amount of DM Taken (mg) | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 960.0 | 1442.5 | 2160 | 2321.7 | 2006.1 |
| SD | 667.68 | 682.42 | 42.43 | 121.94 | 609.17 |
| Median | 1095 | 1530 | 2160 | 2310 | 2310 |
| Min/Max | 30/1620 | 270/2370 | 2130/2190 | 2010/2640 | 30/2640 |
| Amount of Q Taken (mg) | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 1200.0 | 1525.0 | 2160.0 | 2321.7 | 2047.7 |
| SD | 781.15 | 682.90 | 42.43 | 121.94 | 562.49 |
| Median | 1575 | 1620 | 2160 | 2310 | 2310 |
| Min/Max | 30/1620 | 270/2370 | 2130/2190 | 2010/2640 | 30/2640 |
| Days on Study Medication[d] | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 22.0 | 25.3 | 29.0 | 29.0 | 27.6 |
| SD | 14.00 | 9.48 | 0.00 | 1.22 | 6.13 |

TABLE 44-continued

| Exposure Statistic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Median | 29 | 29 | 29 | 29 | 29 |
| Min/Max | 1/29 | 6/30 | 29/29 | 25/32 | 1/32 |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]Number of days on study medication was calculated by using the date of the last dose of study drug minus the date of the first dose of study drug, plus 1.

The number of subjects with adverse events is reported in Table 45.

TABLE 45

| Category | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Adverse Events | 4 (80.0) | 6 (100.0) | 2 (100.0) | 19 (82.6) | 31 (86.1) |
| Serious Adverse Events | 1 (20.0) | 2 (33.3) | 0 (0.0) | 0 (0.0) | 3 (8.3) |
| Discontinued Because of Adverse Events | 1 (20.0) | 1 (16.7) | 0 (0.0) | 0 (0.0) | 2 (5.6) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.

The majority of subjects had at least one adverse event during the study. Nearly all of the adverse events were mild or moderate in intensity. Four subjects had a total of seven serious adverse events. Two subjects had four severe adverse

US 7,659,282 B2

63

64

events. One subject had severe insomnia and recovered with a reduced dose of study drug; and one subject had severe fatigue and severe rigors, and recovered without change in study drug. Adverse events experienced by at least 5% of subjects overall are reported in Table 46.

and was hospitalized that day. On Day 33 the subject died suddenly while still in the hospital; his primary care physician indicated myocardial infarction and arrhythmia as the presumed causes of death. The investigator indicated that this subject's COPD exacerbation was not related to study drug

TABLE 46

| | Maximum Tolerated Dose (mg)[a] | | | | | | | | | |
| | 30[b] (N = 5) | | 60[c] (N = 6) | | 90 (N = 2) | | 120 (N = 23) | | Total (N = 36) | |
| Adverse Event Preferred Term | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Alanine aminotransferase increased | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Appetite decreased NOS[d] | 1 | (20.0) | 0 | (0.0) | 0 | (0.0) | 1 | (4.3) | 2 | (5.6) |
| Back pain | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Constipation | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 3 | (13.0) | 3 | (8.3) |
| Diarrhea NOS | 2 | (40.0) | 0 | (0.0) | 1 | (50.0) | 3 | (13.0) | 6 | (16.7) |
| Dizziness (exc. vertigo) | 1 | (20.0) | 2 | (33.3) | 1 | (50.0) | 5 | (21.7) | 9 | (25.0) |
| Dry mouth | 2 | (40.0) | 1 | (16.7) | 0 | (0.0) | 1 | (4.3) | 4 | (11.1) |
| Fatigue | 0 | (0.0) | 3 | (50.0) | 1 | (50.0) | 2 | (8.7) | 6 | (16.7) |
| Flatulence | 2 | (40.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (5.6) |
| Gamma-glutamyltransferase increased | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Headache NOS | 1 | (20.0) | 3 | (50.0) | 1 | (50.0) | 4 | (17.4) | 9 | (25.0) |
| Insomnia NEC[e] | 1 | (20.0) | 0 | (0.0) | 1 | (50.0) | 1 | (4.3) | 3 | (8.3) |
| Libido decreased | 1 | (20.0) | 0 | (0.0) | 0 | (0.0) | 1 | (4.3) | 2 | (5.6) |
| Nausea | 2 | (40.0) | 2 | (33.3) | 1 | (50.0) | 5 | (21.7) | 10 | (27.8) |
| Somnolence | 2 | (40.0) | 0 | (0.0) | 1 | (50.0) | 3 | (13.0) | 6 | (16.7) |
| Syncope | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Tinnitus | 0 | (0.0) | 0 | (0.0) | 1 | (50.0) | 1 | (4.3) | 2 | (5.6) |
| Upper respiratory tract infection NOS | 0 | (0.0) | 1 | (16.7) | 0 | (0.0) | 2 | (8.7) | 3 | (8.3) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]NOS = Not otherwise specified.
[e]NEC = Not elsewhere classified.

Nausea was the most common adverse event experienced, occurring in 10 (27.8%) subjects overall. Nausea was judged to be mild in seven subjects (19.4%) and moderate in three subjects. Nausea was judged to be at least possibly related to treatment in all cases. There was no apparent relationship between the maximum tolerated dose and the occurrence, severity, or relationship of nausea to study drug. Dizziness was reported by nine subjects (25.0%) overall. Dizziness was mild in six subjects (16.7%) and moderate in three subjects (8.3%). For the majority of these subjects (seven versus two), dizziness was judged to be at least possibly related to treatment. Nine subjects (25.0%) reported headache. All instances of this adverse event were mild or moderate, and the majority (six out of nine) were judged to be possibly related to treatment. Two subjects withdrew from the study because of adverse events. One subject, with an MTD of 30 mg, withdrew after one dose of study medication because of a pre-existing colon polyp that required resection. The other subject, with an MTD of 60 mg, withdrew on Day 6 because of recurring, intermittent chest pain.

One subject had an exacerbation of Chronic Obstructive Pulmonary Disease (COPD) at the time of his final visit on Day 29, was counseled to contact his primary care physician,

and that his myocardial infarction and arrhythmia were unlikely to be related to study drug.

One subject, whose MTD was 60 mg, had a history of hypertension (four years) and atypical chest pain (two years). She developed recurring, intermittent chest pain on Day 6 and was admitted to the hospital on Day 7. She discontinued study medication. All tests for cardiac causes were negative. The subject recovered on Day 8, was discharged on Day 9, and returned to work on Day 10. The underlying cause of this subject's chest pain was unclear and her chest pain was possibly related to study drug.

All of the clinical laboratory adverse events were mild or moderate in intensity. Two subjects had elevated creatine kinase values, two subjects had elevated liver enzyme values accompanied by other abnormalities, and one subject had blood in the stool. Two subjects recovered from all of their

US 7,659,282 B2

65

clinical laboratory adverse events, one subject did not recover, and the outcome of the adverse events was unknown for 2 subjects because they did not return to the study clinic for follow-up testing. The majority of these adverse events were judged to have a "possible" relationship to study drug. None of the clinical laboratory adverse events were serious adverse events, and none required a dosage reduction or discontinuation of study drug.

There were no clinically relevant changes from Baseline to Day 29 in systolic blood pressure, diastolic blood pressure, heart rate, or respiration at any MTD. There were no clinically relevant changes in the results of physical examinations during study treatment. There was no clinically relevant difference among the MTD groups in mean QT, $QT_c$, PR, or QRS duration, or change in any electrocardiogram values during the study.

There were no meaningful differences in motor conduction velocities in the distal peroneal nerve segment, between the fibular head and ankle, for each of the 4 MTD groups at Screening. The mean baseline motor conduction velocity was 39.2 m/sec (range of 26.6 to 49.0 m/sec). There were also no differences between the change in motor nerve conduction from Screening to the final visit for each of the MTDs. The mean change in motor conduction velocity in the fibular head-to-ankle segment for the total study population was 0.8 m/sec (range of −4.0 to +7.7 m/sec). There was a marked slowing of conduction velocity in the proximal peroneal nerve segment, between the fibular head and popliteal fossa, for the 120-mg MTD group (−6.7 m/sec) and for the total study population (−5.5 m/sec). However, this can be explained by the unusually high nerve conduction velocity measured in this segment at Screening (mean of 47.6 m/sec and range of 21.7 to 66.7 m/sec in the 120-mg MTD group).

66

Twelve of the twenty-three subjects in this group had baseline motor conduction velocities greater than 50 m/sec; these unusually high values for this population could reflect the short distance over which this segment of the nerve was stimulated, which could have resulted in measurement errors.

Any significant slowing of nerve conduction velocity would manifest more severely in distal segments of nerve, as is seen electrophysiologically in diabetic neuropathy, because the frequency of this condition increases with length of the nerve pathway. For these reasons, the proximal conduction velocities measured in this study were interpreted as an assessment of the presence of focal peroneal neuropathy at the fibular head, and not as a measure of safety or tolerance of the study medication. In conclusion, there was no electrophysiologic evidence to suggest that the analgesic property of DM/Q is due to a toxic effect on peripheral nerves.

The combination of DM/Q, at daily doses from 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, was safe and well tolerated in this subject population. The nature, frequency, and intensity of adverse events were within acceptable limits. Although five subjects had at least one laboratory adverse event, all were mild or moderate in intensity and none required a change in study drug dosing. There were no findings of clinical concern for vital signs, physical examinations, or electrocardiographic results. No clinically significant changes in nerve conduction velocity were detected. Study treatment was well tolerated; and the majority of subjects had an MTD of the highest permissible dose (120 mg DM/120 mg Q).

The frequencies of subjects with each pain intensity score at each time point are reported in Table 47.

TABLE 47

| | Pain Intensity Rating Scale Score | | | | | |
| Study Visit | 0 (None) | 1 (Mild) | 2 (Moderate) | 3 (Severe) | 4 (Extreme) | Total |
|---|---|---|---|---|---|---|
| Day 1 | 0 (0.0) | 0 (0.0) | 20 (55.6) | 15 (41.7) | 1 (2.8) | 36 (100.0) |
| Day 8 | 3 (9.1) | 14 (42.4) | 14 (42.4) | 2 (6.1) | 0 (0.0) | 33 (100.0) |
| Day 15 | 5 (15.2) | 18 (54.6) | 10 (30.3) | 0 (0.0) | 0 (0.0) | 33 (100.0) |
| Day 22 | 10 (30.3) | 15 (45.5) | 6 (18.2) | 2 (6.1) | 0 (0.0) | 33 (100.0) |
| Final Visit | 14 (40.0) | 14 (40.0) | 5 (14.3) | 2 (5.7) | 0 (0.0) | 35 (100.0) |

US 7,659,282 B2

| 67 | 68 |
|---|---|

On Day 1 (baseline), all subjects had a pain intensity of 2 (moderate) or greater, as specified in the protocol inclusion-criteria. By the final visit, only a minority of subjects (20.0%) had moderate or greater pain, and 40% reported no pain.

The changes from baseline in the Pain Intensity Rating Scale scores are reported in Table 48.

TABLE 48

| Visit | Statistic | Maximum Tolerated Dose (mg)[a] | | | | | P-value | |
|---|---|---|---|---|---|---|---|---|
| | | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) | Baseline and MTD[d] | Baseline[e] |
| Day 8 | n | 3 | 5 | 2 | 23 | 33 | 0.9525 | <0.0001 |
| | Mean | −1.0 | −1.0 | −0.5 | −1.1 | −1.0 | | |
| | SD | 1.00 | 1.00 | 0.71 | 0.90 | 0.88 | | |
| | Median | −1.0 | −1.0 | −0.5 | −1.0 | −1.0 | | |
| | Min/Max | −2/0 | −2/0 | −1/0 | −3/0 | −3/0 | | |
| Day | n | 3 | 5 | 2 | 23 | 33 | 0.4858 | <0.0001 |
| 15 | Mean | −0.3 | −1.8 | −0.5 | −1.4 | −1.3 | | |
| | SD | 0.58 | 0.45 | 0.71 | 0.84 | 0.85 | | |
| | Median | 0.0 | −2.0 | −0.5 | −1.0 | −1.0 | | |
| | Min/Max | −1/0 | −2/−1 | −1/0 | −3/0 | −3/0 | | |
| Day | n | 3 | 5 | 2 | 23 | 33 | 0.2053 | <0.0001 |
| 22 | Mean | −0.3 | −1.6 | −1.5 | −1.6 | −1.5 | | |
| | SD | 0.58 | 0.55 | 0.71 | 1.08 | 1.00 | | |
| | Median | 0.0 | −2.0 | −1.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −2/−1 | −3/1 | −3/1 | | |
| Day | n | 3 | 5 | 2 | 22 | 32 | 0.1628 | <0.0001 |
| 29 | Mean | −0.7 | −1.6 | −2.5 | −1.8 | −1.7 | | |
| | SD | 0.58 | 0.55 | 0.71 | 0.96 | 0.92 | | |
| | Median | −1.0 | −2.0 | −2.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −3/−2 | −3/0 | −3/0 | | |
| Final | n | 4 | 6 | 2 | 23 | 35 | 0.0348 | <0.0001 |
| Visit | Mean | −0.5 | −1.5 | −2.5 | −1.8 | −1.6 | | |
| | SD | 0.58 | 0.55 | 0.71 | 0.95 | 0.94 | | |
| | Median | −0.5 | −1.5 | −2.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −3/−2 | −3/0 | −3/0 | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[c]This group included one subject whose MTD was 45 mg.

[d]P-value for MTD from a regression model that models the efficacy variable as a function of both baseline score and MTD.

[e]P-value for mean change in score from a regression model that models the efficacy variable as a function of baseline score.

US 7,659,282 B2

**69**

Mean scores on the Pain Intensity Rating Scale decreased between baseline and each subsequent visit for subjects overall. This decrease was highly significant (all p-values<0.0001). For the change from baseline to the final visit, the score decreases were significantly related to MTD (p=0.0348), but there was no significant effect of MTD on scores for any of the other visits (all p-values≧0.1628).

Frequencies of subjects with each pain relief score at each study visit are reported in Table 49.

TABLE 49

| | Pain Relief | | | | | |
|---|---|---|---|---|---|---|
| Study Visit | −1 (Worse) | 0 (None) | 1 (Slight) | 2 (Moderate) | 3 (A Lot) | 4 (Complete) | Total |
| Day 8 | 0 (0.0) | 3 (9.1) | 6 (18.2) | 13 (39.4) | 8 (24.2) | 3 (9.1) | 33 (100.0) |
| Day 15 | 0 (0.0) | 1 (3.0) | 5 (15.2) | 6 (18.2) | 18 (54.6) | 3 (9.1) | 33 (100.0) |
| Day 22 | 0 (0.0) | 1 (3.0) | 5 (15.2) | 4 (12.1) | 17 (51.5) | 6 (18.2) | 33 (100.0) |
| Final Visit | 0 (0.0) | 1 (2.9) | 6 (17.7) | 5 (14.7) | 13 (38.2) | 9 (26.5) | 34 (100.0) |

In general, pain relief scores increased during the study. At Day 8, only 33.3% of subjects reported "a lot" or "complete" pain relief; by the final visit, the majority (64.7%) did so. No subject reported "worse" pain compared to baseline at any visit, and only 1 subject reported "None" at any visit after Day 8.

Summary statistics for Pain Relief Scale scores are reported in Table 50.

TABLE 50

| | | Maximum Tolerated Dose (mg)[a] | | | | | P-value | |
|---|---|---|---|---|---|---|---|---|
| Visit | Statistic | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) | MTD[d] | Difference from 0[e] |
| Day 8 | n | 3 | 5 | 2 | 23 | 33 | 0.4880 | <0.0001 |
| | Mean | 2.7 | 2.0 | 2.0 | 2.0 | 2.1 | | |
| | SD | 0.58 | 1.58 | 0.00 | 1.09 | 1.09 | | |
| | Median | 3.0 | 2.0 | 2.0 | 2.0 | 2.0 | | |
| | Min/Max | 2/3 | 0/4 | 2/2 | 0/4 | 0/4 | | |
| Day 15 | n | 3 | 5 | 2 | 23 | 33 | 0.7953 | <0.0001 |
| | Mean | 2.0 | 2.8 | 2.5 | 2.5 | 2.5 | | |
| | SD | 1.00 | 1.10 | 0.71 | 0.99 | 0.97 | | |
| | Median | 2.0 | 3.0 | 2.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 2/3 | 0/4 | 0/4 | | |
| Day 22 | n | 3 | 5 | 2 | 23 | 33 | 0.6110 | <0.0001 |
| | Mean | 2.3 | 2.6 | 3.0 | 2.7 | 2.7 | | |
| | SD | 0.58 | 1.14 | 0.00 | 1.15 | 1.05 | | |
| | Median | 2.0 | 3.0 | 3.0 | 3.0 | 3.0 | | |
| | Min/Max | 2/3 | 1/4 | 3/3 | 0/4 | 0/4 | | |
| Day 29 | n | 3 | 5 | 2 | 22 | 32 | 0.6263 | <0.0001 |
| | Mean | 2.3 | 2.6 | 3.5 | 2.7 | 2.7 | | |
| | SD | 1.15 | 1.14 | 0.71 | 1.20 | 1.14 | | |
| | Median | 3.0 | 3.0 | 3.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 3/4 | 0/4 | 0/4 | | |
| Final Visit | n | 3 | 6 | 2 | 23 | 34 | 0.7958 | <0.0001 |
| | Mean | 2.3 | 2.7 | 3.5 | 2.7 | 2.7 | | |
| | SD | 1.15 | 1.03 | 0.71 | 1.23 | 1.15 | | |
| | Median | 3.0 | 3.0 | 3.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 3/4 | 0/4 | 0/4 | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]P-value for MTD from a regression model that models the efficacy variable as a function of MTD.
[e]P-value from a t-test testing that the mean of the total column is significantly different from 0.

US 7,659,282 B2

71

Mean scores on the Pain Relief Rating Scale increased significantly from Day 8 to each subsequent visit for subjects overall (all p-values<0.0001). There was no significant effect of MTD on pain relief scores at any visit (all p-values≧0.4880).

The change from baseline in the composite score from the Peripheral Neuropathy QOL Instrument is reported in Table 51.

### TABLE 51

| Visit/Variable | Statistic | Maximum Tolerated Dose (mg)[a] | | | | | P-value | |
| | | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) | Baseline and MTD[d] | Baseline[e] |
|---|---|---|---|---|---|---|---|---|
| Day 1 | n | 4 | 6 | 2 | 23 | 35 | N/A[f] | N/A |
| (Baseline)/ | Mean | 61.3 | 69.7 | 72.8 | 63.7 | 65.0 | | |
| Score | SD | 15.26 | 13.68 | 0.18 | 13.48 | 13.26 | | |
| | Median | 60.8 | 66.8 | 72.8 | 65.3 | 66.7 | | |
| | Min/Max | 47.1/76.4 | 49.8/86.9 | 72.7/72.9 | 35.6/87.2 | 35.6/87.2 | | |
| Day 29/ | n | 3 | 5 | 2 | 22 | 32 | N/A | N/A |
| Score | Mean | 68.3 | 75.7 | 79.0 | 75.5 | 75.0 | | |
| | SD | 13.38 | 15.88 | 4.68 | 9.93 | 10.82 | | |
| | Median | 66.3 | 79.9 | 79.0 | 75.4 | 76.5 | | |
| | Min/Max | 56.0/82.6 | 49.1/91.8 | 75.7/82.3 | 51.4/88.5 | 49.1/91.8 | | |
| Day 29/ | n | 3 | 5 | 2 | 22 | 32 | 0.1397 | <0.0001 |
| Change | Mean | 2.4 | 8.8 | 6.2 | 12.1 | 10.3 | | |
| from | SD | 10.87 | 13.35 | 4.85 | 10.77 | 10.95 | | |
| Baseline | Median | 6.9 | 10.7 | 6.2 | 12.8 | 10.4 | | |
| | Min/Max | −10.1/10.2 | −6.8/27.7 | 2.7/9.6 | −10.2/34.5 | −10.2/34.5 | | |
| Final Visit/ | n | 3 | 6 | 2 | 23 | 34 | N/A | N/A |
| Score | Mean | 68.3 | 77.6 | 79.0 | 75.4 | 75.4 | | |
| | SD | 13.38 | 14.99 | 4.68 | 9.71 | 10.71 | | |
| | Median | 66.3 | 80.0 | 79.0 | 75.1 | 76.5 | | |
| | Min/Max | 56.0/82.6 | 49.1/91.8 | 75.7/82.3 | 51.4/88.5 | 49.1/91.8 | | |
| Final Visit/ | n | 3 | 6 | 2 | 23 | 34 | 0.1828 | <0.0001 |
| Change | Mean | 2.4 | 7.9 | 6.2 | 11.6 | 9.8 | | |
| from | SD | 10.87 | 12.11 | 4.85 | 10.76 | 10.78 | | |
| Baseline | Median | 6.9 | 7.2 | 6.2 | 12.7 | 9.9 | | |
| | Min/Max | — | −6.8/27.7 | 2.7/9.6 | — | — | | |
| | | 10.1/10.2 | | | 10.2/34.5 | 10.2/34.5 | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]P-value for MTD from a regression model that models the efficacy variable as a function of both baseline score and MTD.
[e]P-value for mean change in score from a regression model that models the efficacy variable as a function of baseline score.
[f]N/A = Not applicable.

Mean composite scores on the Peripheral Neuropathy QOL Instrument increased (i.e., improved) significantly from Day 1 (baseline) to Day 29 and to the final visit for subjects overall (both p-values<0.0001). Change from baseline to either Day 29 or the final visit was not related to MTD (all p-values≧0.1837).

P-values for change from baseline to the final visit in individual QOL scales are reported in Table 52.

### TABLE 52

| Scale | P-value |
|---|---|
| Physical Functioning | 0.0012 |
| Role Limitations | 0.0003 |
| Disease-Targeted Pain | <0.0001 |
| Energy/Fatigue | 0.0001 |
| Upper Extremities | 0.0007 |
| Balance | 0.0001 |
| Self Esteem | 0.1258 |
| Emotional Well Being | 0.0277 |
| Stigma | 0.7851 |
| Cognitive Function | 0.0313 |
| Emotional Role Limitations | 0.2956 |
| General Health Perceptions | <0.0001 |

72

### TABLE 52-continued

| Scale | P-value |
|---|---|
| Sleep | <0.0001 |
| Social Functioning | <0.0001 |
| Sexual Function | 0.7714 |
| Health Distress | <0.0001 |

### TABLE 52-continued

| Scale | P-value |
|---|---|
| Severity | 0.0129 |
| Disability Days | 0.1096 |
| Health Change | 0.0001 |
| Overall Health Rating | 0.0064 |
| Satisfaction with Sexual Functioning | 0.3413 |

[a]P-value for the change from baseline. A regression model was used to test whether the mean baseline value was different from the mean value at the final visit.

The majority of individual QOL scale items improved significantly between baseline and the final visit ($^{15}/_{21}$, 74.1%).

Sleep interference scores, calculated for Day 15, Day 29, and the final visit, are reported in Table 53.

US 7,659,282 B2

73

TABLE 53

| Visit | Statistic | Maximum Tolerated Dose (mg)[b] | | | | Total | |
|---|---|---|---|---|---|---|---|
| | | 30[c] (N = 5) | 60[d] (N = 6) | 90 (N = 2) | 120 (N = 23) | (N = 36) | P-value MTD[e] |
| Day 15 | n | 3 | 5 | 2 | 23 | 33 | 0.8509 |
| | Mean | 1.4 | 2.2 | 2.2 | 1.8 | 1.8 | |
| | SD | 1.35 | 1.66 | 0.71 | 1.64 | 1.54 | |
| | Median | 1.7 | 2.0 | 2.2 | 1.3 | 1.7 | |
| | Min/ Max | 0/3 | 0/4 | 2/3 | 0/5 | 0/5 | |
| Day 29 | n | 3 | 5 | 2 | 22 | 32 | 0.1405 |
| | Mean | 1.6 | 2.5 | 0.2 | 1.2 | 1.4 | |
| | SD | 1.35 | 2.09 | 0.24 | 1.29 | 1.47 | |
| | Median | 1.3 | 2.0 | 0.2 | 0.7 | 0.8 | |
| | Min/ Max | 0/3 | 0/5 | 0/0 | 0/4 | 0/5 | |
| Final Visit | n | 3 | 5 | 2 | 23 | 33 | 0.1077 |
| | Mean | 1.6 | 2.5 | 0.2 | 1.1 | 1.3 | |
| | SD | 1.35 | 2.09 | 0.24 | 1.29 | 1.41 | |
| | Median | 1.3 | 2.0 | 0.2 | 0.7 | 1.0 | |
| | Min/ Max | 0/3 | 0/5 | 0/0 | 0/4 | 0/5 | |

[a]The score for Day 15 is the average of the Sleep Rating Scale scores from the subject diary for Days 13, 14, and 15; the score for Day 29 is the average of the Day 27, 28, and 29 scores; and the Final Visit score is the average of the final 3 consecutive days of study treatment.
[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[d]This group included one subject whose MTD was 45 mg.
[e]P-value for MTD from a regression model that models the efficacy variable as a function of MTD.

74

Mean sleep interference scores declined during the study, indicating decreasing interference of the subjects' pain with their sleep. There was no significant effect of MTD on sleep interference scores at any visit (all p values$\geqq$0.1077). Results from the Sleep Rating Scale are plotted by study day in FIG. 4. Sleep scores decreased significantly (regression p<0.001) from Day 2 to the final study day (the lower the score, the less pain was judged to interfere with sleep).

Results from the Present Pain Intensity Rating Scale are plotted by study day in FIG. 5. Present Pain Intensity scores decreased significantly (regression p<0.001) from Day 2 to the final study day. Results from the Activity Rating Scale are plotted by study day in FIG. 6. Activity scores decreased significantly (regression p<0.001) from Day 1 to the final study day (the lower the score, the less pain was judged to interfere with general activity). Results from the Pain Rating Scale are plotted by study day in FIG. 7. Scores for average pain over the previous twelve hours decreased significantly (regression p<0.001) from Day 1 to the final study day.

An improvement in efficacy score was defined as an improvement from the first recorded value to the last recorded value, except for the Pain Relief Rating Scale, where an improvement was defined as a value>0 for the last recorded value. The frequencies of subjects whose score improved during the study are presented for each efficacy measure in Table 54.

TABLE 54

| Efficacy Variable | Maximum Tolerated Dose (mg)[b] | | | | | P-value | |
|---|---|---|---|---|---|---|---|
| | 30[c] (N = 5) | 60[d] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) | | |
| | n (%) | n (%) | n (%) | n (%) | n (%) | MTD[e] | 50%[f] |
| Pain Intensity Rating Scale | 2 (50.0) | 6 (100.0) | 2 (100.0) | 21 (91.3) | 31 (88.6) | 0.1698 | <0.0001 |
| Pain Relief Rating Scale | 3 (100.0) | 5 (100.0) | 2 (100.0) | 22 (95.7) | 32 (97.0) | 0.9419 | <0.0001 |
| QOL Composite Score | 2 (66.7) | 5 (83.3) | 2 (100.0) | 19 (82.6) | 28 (82.4) | 0.6877 | 0.0002 |
| Sleep Rating Scale (Diary) | 3 (100.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | 30 (88.2) | 0.7222 | <0.0001 |
| Present Pain Intensity Rating Scale (Diary) | 2 (66.7) | 3 (50.0) | 2 (100.0) | 16 (69.6) | 23 (67.6) | 0.5877 | 0.0396 |
| Activity Rating Scale (Diary) | 2 (50.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | 29 (82.9) | 0.1668 | 0.0001 |
| Pain Rating Scale (Diary) | 3 (75.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | 30 (85.7) | 0.5772 | <0.0001 |

[a]An improvement in efficacy score is an improvement from the first recorded value to the last recorded value, except for the Pain Relief Rating Scale, where an improvement is a value > 0 for the last recorded value.
[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[d]This group included one subject whose MTD was 45 mg.
[e]P-value for MTD from a regression model that models improvement in the efficacy variable as a function of MTD.
[f]P-value from a test that the total percent of subjects whose score improved = 50%.

US 7,659,282 B2

75

76

A significant proportion of subjects improved during the study in every efficacy measure (all p-values$\leqq$0.0396). Improvement was not related to MTD for any of the efficacy measures (all p-values$\leqq$0.1668).

Subjects treated with open-label DM/Q, in the dose range of 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, reported a statistically significant reduction in pain from diabetic peripheral neuropathy and in the extent to which this pain interfered with general activity and sleep. Subjects receiving this treatment also experienced statistically significant improvement in their QOL.

The CYP2D6 phenotypes of subjects, based upon their genotype results, are summarized in Table 55. There were no intermediate or ultra-rapid metabolizers in this study population.

TABLE 55

| | Maximum Tolerated Dose (mg)[a] | | | | |
| Phenotype | 30[a] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
|---|---|---|---|---|---|
| Extensive Metabolizer | 5 (100.0) | 5 (83.3) | 2 (100.0) | 23 (100.0) | 35 (97.2) |
| Poor Metabolizer | 0 (0.0) | 1 (16.7) | 0 (0.0) | 0 (0.0) | 1 (2.8) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.

All except one subject were extensive metabolizers. Concentrations in plasma of DM increased between the visit on Day 15 and the final visit for the 90-mg and 120-mg MTDs. A similar increase in concentration was seen for the metabolite DX and for Q. Concentrations of DM, DX, and Q in plasma of extensive metabolizers at the final visit are summarized by MTD in Table 56.

TABLE 56

| Drug or | | MTD[b] (mg) | | | | |
| Metabolite (ng/mL) | Statistic | 30[c] N = 5 | 60[d] N = 5 | 90 N = 2 | 120 N = 23 | Total N = 35 |
|---|---|---|---|---|---|---|
| DM | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 59.0 | 46.2 | 117.0 | 192.6 | 153.7 |
| | SD | 30.28 | 67.38 | 44.47 | 98.93 | 106.01 |
| | Median | 67.4 | 1.5 | 117.0 | 178.0 | 144.5 |
| | Min/Max | 25.4/84.2 | 0.0/150.2 | 85.5/148.4 | 48.7/388.5 | 0.0/388.5 |
| DX | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 70.7 | 65.4 | 88.4 | 146.6 | 123.9 |
| | SD | 48.49 | 67.38 | 34.83 | 96.88 | 91.94 |
| | Median | 94.6 | 58.2 | 88.4 | 122.6 | 102.6 |
| | Min/Max | 14.9/102.6 | 0.0/135.6 | 63.8/113.0 | 53.2/417.9 | 0.0/417.9 |
| Q | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 114.0 | 41.8 | 114.5 | 269.0 | 211.1 |
| | SD | 48.75 | 66.72 | 70.00 | 176.88 | 175.28 |
| | Median | 137.0 | 0.0 | 114.5 | 211.0 | 164.0 |
| | Min/Max | 58/147 | 0/153 | 65/164 | 74/681 | 0/681 |

[a]One of the thirty-six subjects was a poor metabolizer.

[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[d]This group included one subject whose MTD was 45 mg.

US 7,659,282 B2

77

For comparison, the poor metabolizer (MTD of 60 mg) had the following concentrations in plasma at the final visit: DM 126.4 ng/mL, DX 41.0 ng/mL, and Q 165.0 ng/mL.. Correlations between the concentration of DM in plasma with pain intensity ratings on Day 15, Day 29, and the final visit are summarized in Table 57 (extensive metabolizers only).

TABLE 57

| Visit | n[b] | Correlation Coefficient | P-value |
|-------|------|------------------------|---------|
| Day 15 | 33 | −0.3479 | 0.0473 |
| Day 29 | 30 | −0.1336 | 0.4817 |
| Final Visit | 33 | −0.1487 | 0.4088 |

[a]One of the thirty-six subjects was a poor metabolizer.
[b]Data were not available for all subjects.

There was a weak, negative correlation between concentration of DM in plasma and rating of pain intensity at Day 15 (coefficient of −0.3572) and negligible correlations at the other time points (≦−0.1487). The Day 15 correlation was statistically significant (p=0.0473), but the correlations at Day 29 and the final visit were not (p≧0.4088). However, a weak or nonexistent correlation between concentrations of drug in plasma and pain ratings is a typical result in pharmacodynamic studies of analgesics.

The safety results demonstrate that the combination of DM/Q, in the dose range from 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, is safe and well tolerated in the treatment of subjects with pain associated with diabetic peripheral neuropathy, and provide indications of efficacy in pain reduction.

The preferred embodiments have been described in connection with specific embodiments thereof. It will be understood that it is capable of further modification, and this application is intended to cover any variations, uses, or adaptations of the invention following, in general, the principles of the invention and including such departures from the present disclosure as come within known or customary practices in the art to which the invention pertains and as may be applied to the essential features hereinbefore set forth, and as fall within the scope of the invention and any equivalents thereof. All references cited herein, including but not limited to technical literature references and patents, are hereby incorporated herein by reference in their entireties.

78

What is claimed is:

1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and wherein the amount of quinidine administered comprises from about 10 mg/day to less than about 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

2. The method of claim 1, wherein the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

3. The method of claim 1, wherein the dextromethorphan and the quinidine are administered as one combined dose per day.

4. The method of claim 1, wherein the dextromethorphan and the quinidine are administered as at least two combined doses per day.

5. The method of claim 1, wherein the amount of quinidine administered comprises from about 20 mg/day to about 30 mg/day.

6. The method of claim 1, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 60 mg/day.

7. The method of claim 1, wherein at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

8. The method of claim 1, wherein at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt selected from the group consisting of salts of free acids, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

9. The method of claim 1, wherein about 20 mg quinidine sulfate is administered per day.

10. The method of claim 9, wherein about 60 mg dextromethorphan hydrobromide is administered per day.

11. The method of claim 1, wherein about 60 mg dextromethorphan hydrobromide is administered per day.

12. The method of claim 1 wherein the dextromethorphan and quinidine are administered in separate doses.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,659,282 B2                                                      Page 1 of 1
APPLICATION NO. : 11/035213
DATED              : February 9, 2010
INVENTOR(S)      : Yakatan et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1123 days.

Signed and Sealed this

Eighteenth Day of January, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

# EXHIBIT 3

**Drug Databases (https://www.fda.gov/Drugs/InformationOnDrugs/)**

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

**Home (index.cfm?resetfields=1)** | **Back to Product Details**

Additional Information about Patents

- Patent information is published on or after the submission date as defined in 21 CFR 314.53(d)(5).
- Patent listings published prior to August 18, 2003, only identify method-of-use claims. The listed patents may include drug substance and/or drug product claims that are not indicated in the listing.
- As of December 5, 2016, an NDA holder submitting information on a patent that claims both the drug substance and the drug product (and is eligible for listing on either basis) is required only to specify that it claims either the drug substance or the drug product. Orange Book users should not rely on an Orange Book patent listing, regardless of when first published, to determine the range of patent claims that may be asserted by an NDA holder or patent owner.

## Patent and Exclusivity for: N021879

Product 001
DEXTROMETHORPHAN HYDROBROMIDE; QUINIDINE SULFATE (NUEDEXTA)
CAPSULE 20MG;10MG

### Patent Data

| Product No | Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|---|
| 001 | 7659282 | 08/13/2026 | | | **U-1093** | | |

### Exclusivity Data

| Product No | Exclusivity Code | Exclusivity Expiration |
|---|---|---|
| Your search did not return any results | | |

**View a list of all patent use codes (results_patent.cfm)**
**View a list of all exclusivity codes (results_exclusivity.cfm)**

# EXHIBIT 4



/ **Drugs@FDA (/scripts/cder/daf/index.cfm)**

# Drugs@FDA: FDA-Approved Drugs

**Home (index.cfm)** | **Previous Page**

**Abbreviated New Drug Application (ANDA):** 218426
**Company:** HETERO LABS LTD III

✉ **EMAIL (MAILTO:?SUBJECT=DRUGS@FDA: FDA APPROVED DRUG PRODUCTS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/DAF/INDEX.CFM? EVENT=OVERVIEW.PROCESS%26VARAPPLNO=218426)**

### Products on ANDA 218426                                    ⌄

| CSV | Excel | Print |

| Drug Name | Active Ingredients | Strength | Dosage Form/Route | Marketing Status | TE Code | RLD | RS |
|-----------|-------------------|----------|-------------------|------------------|---------|-----|-----|
| DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE | DEXTROMETHORPHAN HYDROBROMIDE; QUINIDINE SULFATE | 20MG;10MG | CAPSULE;ORAL | Prescription | AB | No | No |

Showing 1 to 1 of 1 entries

### Approval Date(s) and History, Letters, Labels, Reviews for ANDA 218426    ⌃

### Original Approvals or Tentative Approvals

2/17/25, 1:05 PM

Drugs@FDA: FDA-Approved Drugs

| | CSV | Excel | Print |
|---|---|---|---|

| Action Date | Submission | Action Type | Submission Classification | Review Priority; Orphan Status | Letters, Reviews, Labels, Patient Package Insert | Notes |
|---|---|---|---|---|---|---|
| 08/28/2024 | ORIG-1 | Approval | | STANDARD | | Label is not available on this site. |

Showing 1 to 1 of 1 entries

**Therapeutic Equivalents for ANDA 218426** 

# EXHIBIT 5 REDACTED IN ITS ENTIRETY

# EXHIBIT 6


 **(https://ndclist.com/)**

> NDC Lookup                  **Search**

**Home (https://ndclist.com)** / **Labeler Index (https://ndclist.com/labeler/index-view-all)**
/ **Camber Pharmaceuticals, Inc. (https://ndclist.com/labeler/camber-pharmaceuticals-inc)**
/ NDC Product Code: 31722-693 Dextromethorphan Hydrobromide And Quinidine Sulfate

# NDC 31722-693 DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE

## Capsule Oral - View Dosage, Usage, Ingredients, Routes, UNII

**(https://www.facebook.com/sharer.php?u=https://ndclist.com/ndc/31722-693)** ✕ **(https://twitter.com/share?url=https://ndclist.com/ndc/31722-693&text=NDC 31722-693 Dextromethorphan Hydrobromide And Quinidine Sulfate Capsule Oral&hashtags=NDC, 31722-693, Dextromethorphan Hydrobromide And Quinidine Sulfate, Dextromethorphan Hydrobromide And Quinidine Sulfate, National Drug Code)** 🔗 **(https://www.linkedin.com/shareArticle?url=https://ndclist.com/ndc/31722-693&title=NDC 31722-693 Dextromethorphan Hydrobromide And Quinidine Sulfate Capsule Oral)** 🔴 **(https://reddit.com/submit?url=https://ndclist.com/ndc/31722-693&title=NDC 31722-693 Dextromethorphan Hydrobromide And Quinidine Sulfate Capsule Oral)** ✉ **(mailto:?subject=NDC 31722-693 Dextromethorphan Hydrobromide And Quinidine Sulfate Capsule Oral&body=Check out this link from ICD List: https://ndclist.com/ndc/31722-693)** 🖨

**Product 🛈 (https://ndclist.com/ndc/31722-693)**

**Package 🛍 (https://ndclist.com/ndc/31722-693/package/31722-693-60)**

**Label 🏷 (https://ndclist.com/ndc/31722-693/label)**

**Images 🖼 (https://ndclist.com/ndc/31722-693/images)**

**RxNorm ℞ (https://ndclist.com/ndc/31722-693/rxnorm)**

Similar 🖹 (https://ndclist.com/ndc/31722-693/similar)

---

TABLE OF CONTENTS ⌄

---

### PRODUCT INFORMATION

Get all the details for National Drug Code (NDC) 31722-693 in one place. This page breaks down everything you need to know about the NDC, including proprietary name, active and inactive substances, package configurations, billing units, labeler information, and routes of administration. It also includes enhanced data such as HCPCS codes, FDA product labels with images, UNIIs, and RxNorm cross-references. Whether you're a healthcare professional verifying drug data or a consumer researching medication, this NDC page helps you make informed, accurate decisions.

NDC PRODUCT CODE:

# 31722-693

PROPRIETARY NAME:

# Dextromethorphan Hydrobromide And Quinidine Sulfate

NON-PROPRIETARY NAME: [1]

Dextromethorphan Hydrobromide And Quinidine Sulfate

SUBSTANCE NAME: [2]

Dextromethorphan Hydrobromide; Quinidine Sulfate

NDC DIRECTORY STATUS:

Human Prescription Drug

PRODUCT TYPE: [3]

ACTIVE PRODUCT INCLUDED in the NDC Directory

DOSAGE FORM:

*Capsule -* A solid oral dosage form consisting of a shell and a filling. The shell is composed of a single sealed enclosure, or two halves that fit together and which are sometimes sealed with a band. Capsule shells may be made from gelatin, starch, or cellulose, or other suitable materials, may be soft or hard, and are filled with solid or liquid ingredients that can be poured or squeezed.

ADMINISTRATION ROUTE(S): [4]

Oral - Administration to or by way of the mouth.

LABELER NAME: **[5]**

**Camber Pharmaceuticals, Inc. (https://ndclist.com/labeler/camber-pharmaceuticals-inc)**

LABELER CODE:

31722

PRODUCT LABEL ID:

**7028dcb7-f436-4cf6-9beb-23c1d215c798 (https://ndclist.com/ndc/31722-693/label)**

FDA APPLICATION NUMBER: **[6]**

ANDA218426

MARKETING CATEGORY: **[8]**

ANDA - A product marketed under an approved Abbreviated New Drug Application.

START MARKETING DATE: **[9]**

08-28-2024

LISTING EXPIRATION DATE: **[11]**

12-31-2026

EXCLUDE FLAG: **[12]**

N

CODE NAVIGATOR:

View Adjacent Codes ⊡

## 🔍 Product Characteristics

COLOR(S):

WHITE (C48325 - WHITE TO OFF WHITE) ☐

SHAPE:

CAPSULE (C48336)

SIZE(S):

19 MM

IMPRINT(S):

H;D22

SCORE:

1

📁 Code Structure Chart



```
                                    (UNII: PNR0YF69
                                    (https://ndclist.com/unii/P


              PRODUCT              MAGNESIUM STEARAT
                                        70097M6I30
            31722-693              (https://ndclist.com/unii/7
                    ──contains──▶
                                    AMMONIA (UNII: 5138
                                   (https://ndclist.com/unii/5

                                   FERROSOFERRIC OXID
                                        XM0M87F357
                                   (https://ndclist.com/unii/X

                                   PROPYLENE GLYCOL (UNII:
                                   (https://ndclist.com/unii/6

                                   POTASSIUM HYDROXID
                                        WZH3C48M4T
                                   (https://ndclist.com/unii/W

                                    SHELLAC (UNII: 46N1
                                   (https://ndclist.com/unii/4

                                   GELATIN, UNSPECIFIE
```

PHARMACEUTICAL CLASSES

Antiarrhythmic
(https://ndclist.com/pharm
class/N0000175426) - [EPC
(Established Pharmacologi
Class)

Cytochrome P450 2D6
Inhibitor
(https://ndclist.com/pharm
class/N0000182135) - [EPC
(Established Pharmacologi
Class)

Cytochrome P450 2D6

Cytochrome P450 2D6
Inhibitors
(https://ndclist.com/pharm
class/N0000182137) - [MoA
(Mechanism of Action)

Sigma-1 Agonist
(https://ndclist.com/pharm
class/N0000182149) - [EPC
(Established Pharmacologic
Class)

Sigma-1 Receptor Agonists
(https://ndclist.com/pharm
class/N0000182147) - [MoA
(Mechanism of Action)

Uncompetitive N-methyl-D

RxNORM

RxCUI: 10400
(https://ndclist.com/rxnorm
- *dextromethorphan HBr 2*
*sulfate 10 MG Ora*

RxCUI: 10400
(https://ndclist.com/rxnorm
- *dextromethorphan hydro*
*quinidine sulfate 10 MG*

## PRODUCT DETAILS

### WHAT IS NDC 31722-693?

The NDC code 31722-693 is assigned by the FDA to the product Dextromethorphan Hydrobromide And Quinidine Sulfate which is a human prescription drug product labeled by Camber Pharmaceuticals, Inc.. The product's dosage form is capsule and is administered via oral form. The product is distributed in a single package with assigned NDC code 31722-693-60 60 capsule in 1 bottle . This page includes all the important details about this product, including active and inactive ingredients, pharmagologic classes, product uses and characteristics, UNII information and RxNorm crosswalk.

**WHAT ARE THE USES FOR DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE?**

Dextromethorphan hydrobromide and quinidine sulfate capsules are indicated for the treatment of pseudobulbar affect (PBA).PBA occurs secondary to a variety of otherwise unrelated neurologic conditions, and is characterized by involuntary, sudden, and frequent episodes of laughing and/or crying. PBA episodes typically occur out of proportion or incongruent to the underlying emotional state. PBA is a specific condition, distinct from other types of emotional lability that may occur in patients with neurological disease or injury.

**WHAT ARE DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE ACTIVE INGREDIENTS?**

An active ingredient is the substance responsible for the medicinal effects of a product specified by the substance's molecular structure or if the molecular structure is not known, defined by an unambiguous definition that identifies the substance. Each active ingredient name is the preferred term of the UNII code submitted.

- **DEXTROMETHORPHAN HYDROBROMIDE 20 mg/1 (https://ndclist.com/active-ingredients/dextromethorphan-hydrobromide)** - *Methyl analog of DEXTRORPHAN that shows high affinity binding to several regions of the brain, including the medullary cough center. This compound is an NMDA receptor antagonist (RECEPTORS, N-METHYL-D-ASPARTATE) and acts as a non-competitive channel blocker. It is one of the widely used ANTITUSSIVES, and is also used to study the involvement of glutamate receptors in neurotoxicity.*

- **QUINIDINE SULFATE 10 mg/1 (https://ndclist.com/active-ingredients/quinidine-sulfate)** - *An optical isomer of quinine, extracted from the bark of the CHINCHONA tree and similar plant species. This alkaloid dampens the excitability of cardiac and skeletal muscles by blocking sodium and potassium currents across cellular membranes. It prolongs cellular ACTION POTENTIALS, and decreases automaticity. Quinidine also blocks muscarinic and alpha-adrenergic neurotransmission.*

**WHICH ARE DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE UNII CODES?**

The UNII codes for the active ingredients in this product are:

- DEXTROMETHORPHAN HYDROBROMIDE (UNII: **9D2RTI9KYH** **(https://ndclist.com/unii/9D2RTI9KYH)**)

- DEXTROMETHORPHAN (UNII: **7355X3ROTS** **(https://ndclist.com/unii/7355X3ROTS)**) *(Active Moiety)*

- QUINIDINE SULFATE (UNII: **J13S2394HE (https://ndclist.com/unii/J13S2394HE)**)

- QUINIDINE (UNII: **ITX08688JL (https://ndclist.com/unii/ITX08688JL)**) *(Active Moiety)*

## WHICH ARE DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE INACTIVE INGREDIENTS UNII CODES?

The inactive ingredients are all the component of a medicinal product OTHER than the active ingredient(s). The acronym "UNII" stands for "Unique Ingredient Identifier" and is used to identify each inactive ingredient present in a product. The UNII codes for the inactive ingredients in this product are:

- CROSCARMELLOSE SODIUM (UNII: **M28OL1HH48** **(https://ndclist.com/unii/M28OL1HH48)**)
- SILICON DIOXIDE (UNII: **ETJ7Z6XBU4 (https://ndclist.com/unii/ETJ7Z6XBU4)**)
- LACTOSE MONOHYDRATE (UNII: **EWQ57Q8I5X (https://ndclist.com/unii/EWQ57Q8I5X)**)
- MICROCRYSTALLINE CELLULOSE 102 (UNII: **PNR0YF693Y** **(https://ndclist.com/unii/PNR0YF693Y)**)
- MAGNESIUM STEARATE (UNII: **70097M6I30 (https://ndclist.com/unii/70097M6I30)**)
- AMMONIA (UNII: **5138Q19F1X (https://ndclist.com/unii/5138Q19F1X)**)
- FERROSOFERRIC OXIDE (UNII: **XM0M87F357 (https://ndclist.com/unii/XM0M87F357)**)
- PROPYLENE GLYCOL (UNII: **6DC9Q167V3 (https://ndclist.com/unii/6DC9Q167V3)**)
- POTASSIUM HYDROXIDE (UNII: **WZH3C48M4T (https://ndclist.com/unii/WZH3C48M4T)**)
- SHELLAC (UNII: **46N107B71O (https://ndclist.com/unii/46N107B71O)**)
- GELATIN, UNSPECIFIED (UNII: **2G86QN327L (https://ndclist.com/unii/2G86QN327L)**)
- TITANIUM DIOXIDE (UNII: **15FIX9V2JP (https://ndclist.com/unii/15FIX9V2JP)**)

## WHAT IS THE NDC TO RXNORM CROSSWALK FOR DEXTROMETHORPHAN HYDROBROMIDE AND QUINIDINE SULFATE?

RxNorm is a normalized naming system for generic and branded drugs that assigns unique concept identifier(s) known as RxCUIs to NDC products.The **NDC to RxNorm Crosswalk (https://ndclist.com/ndc/31722-693/rxnorm)** for this produdct indicates multiple concept unique identifiers (RXCUIs) are associated with this product:

- **RxCUI: 1040054 (https://ndclist.com/rxnorm/rxcui/1040054)** - *dextromethorphan HBr 20 MG / quiNIDine sulfate 10 MG Oral Capsule*
- **RxCUI: 1040054 (https://ndclist.com/rxnorm/rxcui/1040054)** - *dextromethorphan hydrobromide 20 MG / quinidine sulfate 10 MG Oral Capsule*

Case 1:25-cv-00647-GBW Document 97-1 Filed 07/18/25 Page 86 of 135 PageID #:
2607

**WHICH ARE THE PHARMACOLOGIC CLASSES FOR DEXTROMETHORPHAN
HYDROBROMIDE AND QUINIDINE SULFATE?**

A pharmacologic class is a group of drugs that share the same scientifically documented
properties. The following is a list of the reported pharmacologic class(es) corresponding to the
active ingredients of this product.

- **Antiarrhythmic - [EPC] (Established Pharmacologic Class)
  (https://ndclist.com/pharma-class/N0000175426)**
- **Cytochrome P450 2D6 Inhibitor - [EPC] (Established Pharmacologic Class)
  (https://ndclist.com/pharma-class/N0000182135)**
- **Cytochrome P450 2D6 Inhibitors - [MoA] (Mechanism of Action)
  (https://ndclist.com/pharma-class/N0000182137)**
- **Sigma-1 Agonist - [EPC] (Established Pharmacologic Class)
  (https://ndclist.com/pharma-class/N0000182149)**
- **Sigma-1 Receptor Agonists - [MoA] (Mechanism of Action)
  (https://ndclist.com/pharma-class/N0000182147)**
- **Uncompetitive N-methyl-D-aspartate Receptor Antagonist - [EPC] (Established
  Pharmacologic Class) (https://ndclist.com/pharma-class/N0000181821)**
- **Uncompetitive NMDA Receptor Antagonists - [MoA] (Mechanism of Action)
  (https://ndclist.com/pharma-class/N0000181819)**

\* Please review the disclaimer below.

Product Footnotes

[1] What is the Non-Proprietary Name? - The non-proprietary name is sometimes called the generic
name. The generic name usually includes the active ingredient(s) of the product.

[2] What is the Substance Name? - An active ingredient is the substance responsible for the medicinal
effects of a product specified by the substance's molecular structure or if the molecular structure is not
known, defined by an unambiguous definition that identifies the substance. Each active ingredient
name is the preferred term of the UNII code submitted.

[3] What kind of product is this? - Indicates the type of product, such as Human Prescription Drug or
Human Over the Counter Drug. This data element matches the "Document Type" field of the Structured
Product Listing.

[4] What are the Administration Routes? - The translation of the route code submitted by the firm,
indicating route of administration.

[5] What is the Labeler Name? - Name of Company corresponding to the labeler code segment of the Product NDC.

[6] What is the FDA Application Number? - This corresponds to the NDA, ANDA, or BLA number reported by the labeler for products which have the corresponding Marketing Category designated. If the designated Marketing Category is OTC Monograph Final or OTC Monograph Not Final, then the Application number will be the CFR citation corresponding to the appropriate Monograph (e.g. "part 341"). For unapproved drugs, this field will be null.

[8] What is the Marketing Category? - Product types are broken down into several potential Marketing Categories, such as NDA/ANDA/BLA, OTC Monograph, or Unapproved Drug. One and only one Marketing Category may be chosen for a product, not all marketing categories are available to all product types. Currently, only final marketed product categories are included. The complete list of codes and translations can be found at www.fda.gov/edrls under Structured Product Labeling Resources.

[9] What is the Start Marketing Date? - This is the date that the labeler indicates was the start of its marketing of the drug product.

[11] What is the Listing Expiration Date? - This is the date when the listing record will expire if not updated or certified by the product labeler.

[12] What is the NDC Exclude Flag? - This field indicates whether the product has been removed/excluded from the NDC Directory for failure to respond to FDA"s requests for correction to deficient or non-compliant submissions, or because the listing certification is expired, or because the listing data was inactivated by FDA, or because it was discontinued by the labeler. Possible values in this field are: "D", "E", "I", "N", "U".

◉ **Previous: 31722-691 (https://ndclist.com/ndc/31722-691)**

**Next: 31722-700** ◉ **(https://ndclist.com/ndc/31722-700)**

Page Last Updated: May 09, 2025

**About Us (https://ndclist.com/about-us) | What is NDC? (https://ndclist.com/what-is-ndc) | Contact Us (https://ndclist.com/contact)**

**Terms of Service (https://ndclist.com/terms-of-service) | Privacy (https://ndclist.com/privacy)**

NDC List 2025 - The complete repository of National Drug Codes Information

DISCLAIMER:

All contents of this website are provided on an "as is" and "as available" basis without warranty of any kind. While we strive to ensure that the information presented is accurate, up-to-date, and complete, we cannot guarantee or warrant its absolute correctness or timeliness. The contents of the National Drug Codes List website are provided for educational purposes only and are not intended in any way as medical advice, medical diagnosis, or treatment. Reliance on any information provided by the National Drug Codes List website or other visitors to this website is solely at your own risk. We do not warrant that the information on this site will meet your health-related requirements or that it is complete, timely, or suitable for your personal or professional circumstances.

By accessing or using this website, you agree to be bound by these Terms of Service. If you do not agree with any part of these terms, please do not use this site. We reserve the right to update or modify this Disclaimer or our Terms of Service at any time without prior notice. Your continued use of this site following any such changes signifies your acceptance of the revised terms.

This site is not affiliated, endorsed, or administered by the Food and Drug Administration (FDA). Many Over-the-Counter drugs are not reviewed by the FDA but may be marketed to the public if the product complies with applicable rules and regulations. The information on this website is intended for healthcare providers and consumers in the United States. The absence of a warning or notice for a given drug or drug combination does not indicate that the drug or drug combination is safe, appropriate, or effective for any given patient. If you have questions or concerns about the substances you are taking, please consult your healthcare provider.

If you think you may have a medical emergency, call your doctor or dial 911 immediately.

# EXHIBITS 7-10 REDACTED IN THEIR ENTIRETY

# EXHIBIT 11

# 2025 UPS® Tariff/Terms & Conditions of Service
## United States

Effective June 2, 2025



*Effective June 2, 2025 (unless otherwise noted)*

# UPS® Tariff/Terms and Conditions of Service – United States

## TABLE OF CONTENTS

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. Definitions Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3. Commodities Handled
   and Restrictions on Service . . . . . . . . . . . . . . . . . . . . . . . . 5
   3.1 Items Not Accepted for Transportation . . . . . . . . . . . . . 5
   3.2 Maximum Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.3 Prohibited by Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.4 Alcoholic Beverages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.5 Marijuana and Hemp . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.6 Biological Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.7 Firearms and Ammunition . . . . . . . . . . . . . . . . . . . . . . . 7
       3.7.1 Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       3.7.2 Ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.8 Food Transport;
       Assumption of Legal Responsibility . . . . . . . . . . . . . . . 8
   3.9 Hazardous Materials Service . . . . . . . . . . . . . . . . . . . . . 8
   3.10 Dry Ice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   3.11 Limited Quantity Packages . . . . . . . . . . . . . . . . . . . . . . . 9
   3.12 Hazardous Waste, Mercury,
        and Mercury-Containing Waste . . . . . . . . . . . . . . . . . . 9
   3.13 Live Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   3.14 Perishable Commodities . . . . . . . . . . . . . . . . . . . . . . . . 9
   3.15 Pharmaceuticals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   3.16 Portable Electronic Devices . . . . . . . . . . . . . . . . . . . . . 10
   3.17 Tobacco and Vaping Products . . . . . . . . . . . . . . . . . . . 10
   3.18 Prohibited Item Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   3.19 Unlawful Drug Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

4. Provisions for Export and Customs Clearance
   of International Shipments . . . . . . . . . . . . . . . . . . . . . . . . 10
   4.1 Electronic Export Information . . . . . . . . . . . . . . . . . . . . 11
   4.2 Certificate of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   4.3 UPS Paperless® Invoice Service . . . . . . . . . . . . . . . . . . . 12
   4.4 Pre-Release Notification for Import Shipments . . . . . . 12
   4.5 Record-Keeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5. UPS Import Control® Service . . . . . . . . . . . . . . . . . . . . . . 12

6. Right of Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7. Refusal of Service; Synchronized Delivery Hold . . . . . 13

8. Packaging and Labeling . . . . . . . . . . . . . . . . . . . . . . . . . 13

9. Use of UPS-Provided Materials and Services . . . . . . . . 13

10. Use of UPS Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11. Use of UPS Electronic Information Systems . . . . . . . . . 14

12. Timely Upload of PLD; Missing PLD Fee . . . . . . . . . . . . 14
    12.1 Use of PLD Obtained Email Addresses
         and Telephone Numbers . . . . . . . . . . . . . . . . . . . . . . . 14

13. ZIP Code/Postal Code Information . . . . . . . . . . . . . . . . . 14

14. P.O. Boxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15. UPS Customer Center and
    UPS Worldwide Express Freight® Center . . . . . . . . . . . . 14

16. Third-Party Retailer . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17. UPS Access Point® Locations . . . . . . . . . . . . . . . . . . . . . 15
    17.1 Ship to a UPS Access Point Location Service . . . . . . . . 15
    17.2 Ship to a UPS Access Point Location Service –
         Deliver to Addressee Only . . . . . . . . . . . . . . . . . . . . . . 15
    17.3 Ship to a UPS Access Point Location Service –
         Package Release Code . . . . . . . . . . . . . . . . . . . . . . . . . 15

18. Pickup Services – Scheduled . . . . . . . . . . . . . . . . . . . . . 15

19. UPS On-Call Pickup® Service . . . . . . . . . . . . . . . . . . . . . 16

20. Saturday Air Processing Fee; Saturday Export
    Processing Fee; Saturday Stop Charge . . . . . . . . . . . . . . 16

21. Drop Shipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22. Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

23. Direct Delivery Only Surcharge . . . . . . . . . . . . . . . . . . . . 17

24. Residential Surcharge . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

25. Delivery Area Surcharge . . . . . . . . . . . . . . . . . . . . . . . . . 17

26. Delivery Attempts; UPS Access Point® Locations . . . . . 17

27. Hold for Pickup and Hold at Location Services . . . . . . 17

28. Shipper Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

29. UPS carbon neutral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

30. UPS Delivery Intercept® Service . . . . . . . . . . . . . . . . . . . 17

31. Delivery Change Requests . . . . . . . . . . . . . . . . . . . . . . . . 18

32. Correction of Addresses . . . . . . . . . . . . . . . . . . . . . . . . . 18

33. Saturday Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

34. Signature Required Services . . . . . . . . . . . . . . . . . . . . . . 19
    34.1 Signature Required
         (domestic and international) . . . . . . . . . . . . . . . . . . . . . 19
    34.2 Adult Signature Required
         (domestic and international) . . . . . . . . . . . . . . . . . . . . . 19
    34.3 Delivery Confirmation
         (domestic only) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

35. Proof of Delivery (P.O.D.) . . . . . . . . . . . . . . . . . . . . . . . . 19

36. Tracking/Tracing and Refund Request Charge . . . . . . 19

37. Special Handling of Undeliverable Shipments;
    Refused Shipments Returned . . . . . . . . . . . . . . . . . . . . 19

# UPS® Tariff/Terms and Conditions of Service – United States

TABLE OF CONTENTS *(continued)*

**38. C.O.D. Service**........................................20
    38.1 Preparation and Listing of C.O.D. Packages.........20
    38.2 Responsibility for C.O.D.s..........................20
    38.3 Consignee's Checks in Payment of C.O.D.s..........20
    38.4 C.O.D. Package of $10,000 or More.................20
    38.5 Acceptance of Personal Check.....................20
    38.6 C.O.D. Remittance Verification....................20
    38.7 Restrictions......................................20
    38.8 Charges for C.O.D. Collections....................20
    38.9 Remittance of C.O.D.s............................20

**39. UPS Returns® Services**................................21

**40. UPS Rates**............................................21
    40.1 Daily Rates and Retail Rates.......................22
    40.2 UPS® Simple Rate..................................22
    40.3 Letter Rates.......................................22
    40.4 Pak Rates.........................................22
    40.5 UPS 10 KG Box and UPS 25 KG Box Rates...........22
    40.6 Private Express Statutes...........................22
    40.7 Rates for Large Packages;
        Large Package Surcharge..........................22
    40.8 Over Maximum Limits Charge.....................22
    40.9 Additional Handling Charge.......................23
    40.10 Oversize Pallet Handling Surcharge..............23

**41. Demand Surcharges**..................................23

**42. Surge Fees**..........................................23

**43. Fuel Surcharges**.....................................23

**44. Manual Processing Charges**..........................23

**45. Third Party Billing Service**..........................23

**46. Billing Options for Domestic Shipments**.............23

**47. Billing Options for International Shipments**.........24

**48. Bill My Account**.....................................24

**49. Disbursement Fee**...................................24

**50. Currency Conversion Rate**...........................24

**51. Missing/Invalid Account Number or Refusal Fee**.....24

**52. Shipping Charge Corrections; Audit Fee**.............24

**53. Payment of Charges**.................................25
    53.1 Invoice Adjustment...............................25
        53.1a Invoice Adjustments (General)...............25
        53.1b Invoice Adjustments (Unauthorized Charges)...25
        53.1c Invoice Adjustments (Procedures For Requesting).26
    53.2 Alternative Payment Plans........................26
    53.3 Late Payment Fee.................................27
    53.4 Lien on Shipments................................27

**54. UPS Service Guarantee**...............................27
    54.1 Conditions.......................................28
    54.2 Exclusions.......................................28

**55. Claims and Legal Actions:
    Individual Binding Arbitration of Claims**............29
    55.1 Making Claims for Loss or Damage to Property.....31
    55.2 Acknowledgment of Claims for Loss
        or Damage to Property...........................31
    55.3 Time Limit for Notice and Filing of Claims
        for Loss or Damage to Property..................31
    55.4 Investigation of Claims for Loss
        or Damage to Property...........................31
    55.5 Salvage.........................................32
    55.6 Disposition of Claims for Loss
        or Damage to Property...........................32
    55.7 Authorization of Electronic Payment.............32

**56. Declared Value; Liability**.............................32
    56.1 Maximum Declared Values.........................33
    56.2 Liability Limits...................................34
    56.3 Exclusions from Liability..........................34

**57. Data Handling**.......................................35

**58. Incorporation of Documents; Waiver;
    Future Changes**.....................................35

*Effective June 2, 2025 (unless otherwise noted)*

# UPS® Tariff/Terms and Conditions of Service – United States

## 1. Introduction

The following contains the general terms and conditions of contract under which United Parcel Service, Inc. ("UPS"), the Ohio corporation (certificate number MC-115495) is engaged in the transportation of Package shipments itself and jointly through interchange with its affiliates via the services described below.

The UPS Tariff/Terms and Conditions of Service ("Terms") are effective on the date set forth above and are subject to change without prior notice. The Terms are published electronically on the UPS website (ups.com). The most current and controlling version of the Terms is published at ups.com/termsofservice. In tendering a Shipment for service, the Shipper agrees that the version of the Terms and the applicable UPS Rate and Service Guide ("Service Guide") in effect at the time of shipping will apply to the Shipment and its transportation (however, the binding arbitration requirement in Section 55 applies to all disputes within its scope, even as to shipments tendered before the effective date of these Terms). The Terms apply to the following services:[1]

– UPS Air Services

– UPS Hundredweight Service® Air Services

– UPS 3 Day Select®

– UPS Hundredweight Service® UPS 3 Day Select®

– UPS® Ground

– UPS® Ground with Freight Pricing

– UPS Hundredweight Service® Ground

– UPS Returns® Services

"UPS Air Services" includes:

– UPS Next Day Air® Early

– UPS Next Day Air®

– UPS Next Day Air Saver®

– UPS 2nd Day Air A.M.®

– UPS 2nd Day Air®

"UPS Hundredweight Air Services" includes:

– UPS Hundredweight Service® UPS Next Day Air®

– UPS Hundredweight Service® UPS Next Day Air Saver®

– UPS Hundredweight Service® UPS 2nd Day Air A.M.®

– UPS Hundredweight Service® UPS 2nd Day Air®

The Terms apply to the following international services:

– UPS Worldwide Express Plus®

– UPS Worldwide Express NA1®

– UPS Worldwide Express®

– UPS Worldwide Express Freight® Midday

– UPS Worldwide Express Freight®

– UPS Worldwide Saver®

– UPS Worldwide Expedited®

– UPS 3 Day Select® from Canada

– UPS® Standard services

"UPS Worldwide Express Freight Service" includes:

– UPS Worldwide Express Freight Midday

– UPS Worldwide Express Freight

## 2. Definitions Used

– **"Alaska and Hawaii Rates"** refer to the effective UPS Rates for Shipments originating in Alaska and Hawaii published in the effective Service Guide for Alaska and Hawaii, or Retail Rates established by UPS for the service selected by the Shipper that apply to the Shipper and the Package, and are in effect at the time of shipping, plus any additional charges or rates for nonstandard service, additional or nonstandard usage, and any other additional charges referenced within the Terms or the Service Guide, or those applicable additional rates set out in any customized contracts.

– **"Business day"** means Monday through Friday except the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day (December 25), and New Year's Eve.*

– **"Charges"** means all applicable transportation and other charges including, but not limited to, all applicable accessorial charges, brokerage service fees, surcharges, additional handling charges and late payment fees. Any such Charges, including but not limited to any surcharges, are not intended solely to cover the cost of providing service and may result in profit to UPS.

– **"Claimant"** means any person asserting or against whom UPS asserts any claim

in any forum for legal or equitable relief – including, but not limited to, any claim for damages, refunds, credits, injunctive relief, and declaratory relief – arising out of or related to the provision of services by UPS.

– **"C.O.D."** means Collect on Delivery.

– **"Freight Collect"** refers to a billing option in which the Consignee (Receiver) is billed for Charges.

– **"Commercial"** refers to any address that is not Residential.

– **"Daily Rates" and "Retail Rates"** refer to the effective UPS Rates for Shipments originating in the 48 contiguous United States established by UPS for the service selected by the Shipper that apply to the Shipper and the Package, and are in effect at the time of shipping, plus any additional charges or rates for nonstandard service, or additional or nonstandard usage, and any other additional charges referenced within the Terms or the Service Guide, or those applicable additional rates set out in any customized contracts. Effective December 28, 2015, "Daily Rates" is deemed to mean "Standard List Rates."

– **"Delivery"** shall be deemed to include, but not be limited to any of the following: (1) delivery to the Consignee or the Consignee's actual or apparent agent or representative, or pursuant to Consignee's instructions, (2) delivery to the address or location specified in the UPS Shipping System or, to any person present at such address, (3) delivery to an alternate address or location, including to a UPS Access Point® location, (4) delivery in accordance with trade custom or usage, (5) delivery pursuant to UPS's driver release procedures, (6) delivery pursuant to UPS's Shipper Release procedures, or (7) delivery otherwise permitted under the Terms.

– **"Drop Shipment"** means any Shipment tendered pursuant to a written agreement or prior arrangement between UPS and a specific Shipper that permits the Shipper to tender quantities of individual Packages directly to UPS at a UPS pre-approved designated location.

– **"Letter Rates"** refers to the UPS Rates applicable to single package Shipments using UPS Express® Envelope or UPS® Letter packaging containing correspondence, urgent documents, or electronic

---

[1] The Third Party Billing Service fee described in Section 45 applies to all UPS services worldwide, regardless of origin or destination. In addition, UPS Hundredweight services and UPS Ground with Freight Pricing are offered only as a contract service.

*Refer to ups.com/holidays for service limitations during the holiday season.

**Note:** Visit ups.com for guarantee details, service availability, delivery time commitments or to request a pickup.

# UPS® Tariff/Terms and Conditions of Service – United States

media, with an actual weight of eight (8) ounces or less. ("UPS Express® Envelope" and "UPS Letter" may be referred to interchangeably.)

– **"Package"** means any container and its contents, and includes a UPS Express® Envelope, as well as any article that may be handled without packaging if the handling thereof can be accomplished in a reasonably safe and practicable manner.

– **"Perishable Commodity"** refers to a perishable commodity or a commodity requiring protection from heat or cold, including, but not limited to, live animals, foods, dry ice, flowers, biological materials.

– **"Receiver" or "Consignee"** refers to the party to whom the Shipment is being sent.

– **"Residential"** refers to an address that is a home, including, but not limited to, a business operating out of a home. If an address can be construed as either Residential or Commercial, then it will be considered Residential.

– **"Shipment"** means one or more Packages, or one or more pallets in a UPS Worldwide Express Freight® Service, shipped under a single Source Document or UPS Automated Shipping System entry to one Receiver.

– **"Shipper"** refers to the party holding the UPS account used to process and tender a Shipment to UPS or, if no account was used for the Shipment, then the party that contracted with UPS for the Shipment. The term Shipper does not include, for example, a party to whom a Shipment was Third Party or Freight Collect billed, the party who drops off a UPS Returns® Services package, or a party that uses another party's account for a Shipment.

– **"Third Party"** means any party that is not the Shipper or Receiver/Consignee.

– **"Third-Party Retailers"** means locations of The UPS Store® centers, UPS Authorized Shipping Outlet locations, and UPS Alliance Locations (located within Staples® retail locations). UPS may designate certain Third-Party Retailers as UPS Access Point® locations, as that term is defined below, but all terms and conditions applicable to Third-Party Retailers set forth herein shall continue to apply, regardless of such designation.

– A **"UPS Access Point®"** location is an independently owned and operated business or a location (including a UPS Access Point® locker) designated as a UPS Access Point location by UPS where a Consignee or other recipient may, where available, receive a Package Delivery. Where available, Packages processed for shipment prior to tender using a UPS Shipping System may be tendered to a UPS Access Point® location. Hours of operation and availability of staffing vary by location.

– **"UPS® Automated Shipping System," "Source Document" and "PLD Upload."** Source Document means a shipping document provided by UPS for the purpose of tendering a Shipment to UPS for transportation. UPS Automated Shipping System means WorldShip® technology, UPS CampusShip® technology, *ups.com* shipping (also referred to as online shipping), UPS marketplace shipping, UPS® Developer Kit, iShip® technology, UPS Host Access, UPS Mobile™ shipping apps, or an approved UPS Ready® solution that meets UPS requirements at the time of Shipment. PLD Upload means the transmission to UPS of Package manifest information, including without limitation, by Host Manifest Upload and Electronic Manifest Tool. The term "UPS Automated Shipping System," "Source Document" and "PLD Upload," individually or collectively, are sometimes referred to by the term "UPS Shipping System."

– **"UPS Customer Center"** means a UPS facility where Shippers may tender Packages to UPS for transportation, and a Consignee or other recipient may receive a Package Delivery.

– **"UPS Rates"** refers collectively to Daily Rates (which are inclusive of Standard List Rates), Retail Rates, Alaska and Hawaii Rates, Letter Rates, Pak Rates, and UPS 10 KG Box and UPS 25 KG Box Rates.

– **"UPS Returns® Services"** refers collectively to UPS Authorized Return®, Print Return Label, Electronic Return Label, and Print and Mail Return Label, 1 UPS Pickup Attempt, 3 UPS Pickup Attempts, UPS Returns® on the Web, and UPS Returns® Exchange. Effective January 12, 2025, the 1 UPS Pickup Attempt service will be discontinued as a general service offering and only available for select customers upon express written approval by UPS.

– **"UPS Smart Label®"** tag as defined here and described in the *UPS Guide to Labeling*

includes but is not limited to the MAXI-CODE, postal code bar code, current UPS Routing Code, appropriate UPS service level icon, and UPS 1Z tracking number bar code.

– **"UPS Worldwide Express Freight® Center"** means a UPS facility where Shippers may tender UPS Worldwide Express Freight® Service pallets to UPS for transportation, and a Consignee or other recipient may receive pallets.

## 3. Commodities Handled and Restrictions on Service

UPS holds itself out to transport general commodities, as usually defined, subject to the following restrictions.

The Shipper agrees to indemnify, defend, and hold harmless UPS and its affiliated companies, their officers, directors, employees, agents from all claims, demands, expenses, liabilities, causes of action, enforcement procedures, and suits of any kind or nature brought arising from or relating to a Shipment in violation of applicable law or regulation, or of these Terms.

**3.1 Items Not Accepted for Transportation**
No service shall be rendered in the transportation of any of the prohibited articles listed in the applicable Service Guide or the Terms.

UPS does not accept for transportation, and Shippers are prohibited from shipping:

– Articles of unusual value, which shall be deemed to include, but are not limited to:

- Any Package with an actual value of more than $50,000, except that the actual value of Packages declared in accordance with the Enhanced Maximum Declared Value provisions of Section 56.1 ("Maximum Declared Values") cannot exceed $70,000;

- Any pallet with an actual value of more than $100,000;

- Coins, cash, currency, bonds, postage stamps, money orders, and negotiable instruments (such as drafts, bills of exchange, or promissory notes, but excluding checks);

- Any article that contains more than 50 percent by weight of gold or platinum, or any combination thereof in raw form including, but not limited to, bullion, bars, or scraps of these metals.

– Hazardous waste, defined as a solid waste that meets any of the criteria of the hazardous waste as described in 40 C.F.R. § 261.3;

# UPS® Tariff/Terms and Conditions of Service – United States

– Human remains, fetal remains, human body parts, human embryos, or components thereof;

– Common fireworks;

– Ivory;

– Shark fins;

– Replica or inert explosives or weapons that bear an appearance to actual explosives or weapons;

– Packages containing marijuana, as defined in 21 U.S.C. § 802(16), including marijuana intended for medicinal use;

–Packages with duplicate or previously used shipping labels, Packages with a label that has been altered or created without UPS's express authorization or processed or tendered in any manner that may prevent or hinder UPS from assessing or collecting full and accurate Charges, Packages that have been processed or tendered without authorization of the Shipper or account holder to which Packages are billed, Packages that have been processed or tendered in violation of Section 9 ("Use of UPS-Provided Materials and Services") or Section 10 ("Use of UPS Accounts"), or Packages for which false information is submitted as part of the claims process. Items shipped in such Packages are considered prohibited articles;

– Packages with an actual weight of more than 150 pounds, or Packages that when measured to determine the billable weight exceed 108 inches in length, or exceed a total of 165 inches in length plus girth [(2 x width) + (2 x height)] combined. If found in the UPS system, they are subject to one or more of the following additional charges: Over Maximum Weight, Over Maximum Length, or Over Maximum Size. Such charges apply in addition to all other applicable Charges including, but not limited to, a Large Package Surcharge. UPS reserves the right in its sole and unlimited discretion to return such Packages to the Shipper at Shipper's expense;

– Without prior approval by UPS, UPS Worldwide Express Freight® Service pallets that exceed maximum size or weight restrictions (which vary by origin and destination) as set forth at *ups.com/wwef-maxdimweight*. Such pallets are subject to an Oversize Pallet Handling Surcharge;

– Shipments tendered (including pre-processed drop offs) to a Third-Party Retailer or UPS Access Point® location containing any hazardous materials

requiring shipping papers, ammunition, or Firearm Products, (with the exception that pre-processed Firearm Products that otherwise comply with these Terms may be dropped off at The UPS Store locations). These prohibitions also apply to shipments delivered to a Third-Party Retailer or UPS Access Point location, except for ammunition that satisfies all requirements for the shipment of ammunition set forth in Section 3.7.2 ("Ammunition"), including qualifying for the exception for Limited Quantity packages;

– UPS Returns® Services Shipments containing hazardous materials (except for Limited Quantity Ground Packages, as set forth below), or firearms, or Signature Required services; and

– Any other items prohibited by the Service Guide, or on the *ups.com* website.

Shippers are prohibited from shipping and UPS will not accept for transportation Shipments containing articles that UPS is not authorized to accept or that UPS states in the Terms that it will not accept without prior approval, including when such Shipments are tendered for transportation at UPS Customer Centers, UPS Worldwide Express Freight® Centers, UPS Access Point® locations, or any Third-Party Retailer.

UPS reserves the right, but is not required, to return to the Shipper any Shipment containing a prohibited article. Such return will be made solely at the Shipper's risk and expense. UPS also reserves the right in its sole and unlimited discretion to dispose of a prohibited article found in the UPS system. UPS in its sole and unlimited discretion may subject each Package containing a prohibited article to an additional fee, set forth in the UPS Rates. In addition, UPS reserves the right in its sole and unlimited discretion to suspend or terminate, in whole or in part, services to a Shipper, a Shipper's contract, contractual discounts or incentives where the Shipper is found to have engaged in conduct prohibited by this Section or that is otherwise prohibited by the Terms, UPS policy (including without limitation UPS policies described on ups.com), or applicable law or regulation.

## 3.2 Maximum Values
UPS does not accept for service Packages with values as set forth below:

– Any Package with an actual value of more than $50,000, or $70,000 for Packages declared in accordance with the Enhanced Maximum Declared Value provisions of Section 56.1 ("Maximum Declared Values");

– Packages with a value of $1,000 or more shipped via a Third-Party Retailer or UPS Access Point® location (including a UPS Access Point® locker) if such Packages were processed for shipment using a UPS Shipping System prior to drop off at the Third-Party Retailer or UPS Access Point® location or billed using Bill My Account;

– Packages processed for shipment prior to tender using a UPS Shipping System and tendered to a UPS driver or UPS Customer Center with a value of more than $1,000, unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Package and signed by the driver or UPS Customer Center representative upon tender of the Package;

– Packages shipped to a UPS Access Point® location (excluding Packages shipped to The UPS Store® locations and Packages redirected to a UPS Access Point location by UPS, the Consignee, or the Shipper) with a value of $10,000 or more;

– Domestic Packages with a value of more than $1,000 returned via Print Return Label, Print and Mail Return Label, Electronic Return Label, or 1 UPS Pickup Attempt Return Services;

– International Shipments with a value of more than $1,000 per Package or pallet returned via Print Return Label, UPS Print and Mail Return Label, Electronic Return Label, 1 UPS Pickup Attempt, or 3 UPS Pickup Attempts Return Services (including via UPS Returns® on the Web) unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Shipment and signed by the driver or UPS Customer Center representative upon tender of the Shipment;

– International UPS Import Control® Shipments with a value of more than $1,000 per Package or pallet unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Shipment and signed by the driver or UPS Customer Center representative upon tender of the Shipment;

– Packages with a value of more than $500 shipped via a UPS Drop Box;

– Prepaid Letters with a value of more than $100;

– Packages with a value of more than $999 when Shipper Release is selected;

– Packages with a value in excess of $500 shipped via a UPS Drop Box;

– UPS Worldwide Express Freight® Service Shipments having a value of more than $100,000 per pallet.

# UPS® Tariff/Terms and Conditions of Service – United States

**3.3 Prohibited by Law**
No service shall be rendered by UPS in the transportation of any Shipment that is prohibited by applicable law or regulation of any federal, state, provincial, or local government in the origin or destination country. It is the responsibility of the Shipper to ensure that a Shipment tendered to UPS, and any UPS Shipping System entry that the Shipper prepares for that Shipment, does not violate any federal, state, provincial, or local laws or regulations applicable to the Shipment.

**3.4 Alcoholic Beverages**
Packages containing alcoholic beverages (wine, beer, or spirits) are accepted for transportation only as a contractual service and only from Shippers who are licensed and authorized under applicable laws and regulations to ship alcoholic beverages. To receive service for Packages containing alcoholic beverages, the Shipper must enter into an approved UPS agreement for the transportation of wine, beer, or spirits, as applicable. For all Packages containing alcoholic beverages, the Shipper must use Adult Signature Required service requesting an adult signature for each Package containing alcoholic beverages, and must affix a special UPS alcoholic beverages label to each Package. For all U.S. inbound import Shipments containing alcoholic beverages, the Receiver must be licensed and authorized to receive the alcoholic beverages. It is the responsibility of the Shipper to ensure that a Package tendered to UPS does not violate any federal, state, or local laws or regulations applicable to the Package.

UPS reserves the right to dispose of any alcoholic beverages tendered for shipment which Shippers are prohibited from shipping, which UPS is not authorized to accept, which UPS states that it will not accept, or which UPS has a right to refuse. UPS reserves the right to discontinue service to any Shipper for, among other reasons, tendering a Package containing alcoholic beverages that does not comply with all applicable laws and regulations or the Terms.

**3.5 Marijuana and Hemp**
Shipment of Marijuana, as defined in 21 U.S.C. § 802(16), is prohibited under any circumstances. Shipment of any synthetic cannabinoid compound or any synthetic cannabinoid derivative is also prohibited. Packages containing raw hemp are accepted for transportation only as a contractual service. To receive service for Packages containing hemp, the Shipper must enter into an approved UPS agreement for the transportation of hemp. Products made from Hemp (including cannabidiol) are accepted for shipment only as permitted by state and federal laws and regulations, including compliance with the Food, Drug & Cosmetic Act, 21 U.S.C. § 321, et seq. Shippers are prohibited from shipping Hemp products except as allowed under all applicable laws and regulations, and it is the responsibility of the Shipper to ensure compliance with all such laws and regulations. For all Hemp Product Shipments, the Shipper must use Adult Signature Required service requesting an adult signature at the time of delivery.

UPS reserves the right to dispose of any shipment containing Marijuana, Hemp, or Hemp products tendered for shipment which Shippers are prohibited from shipping, which UPS is not authorized to accept, which UPS states that it will not accept, or which UPS has a right to refuse. UPS reserves the right to discontinue service to any Shipper for, among other reasons, tendering a Package containing Marijuana, Hemp, or Hemp products that do not comply with all applicable laws and regulations or the Terms. See *ups.com/hemp* for additional information.

**3.6 Biological Materials**
UPS accepts Packages containing "Biological Substance, Category B" as defined in 49 C.F.R. § 173.134, which are prepared in accordance with all aspects of 49 C.F.R. § 173.199.

Transportation of other biological materials is limited, must be prearranged, and will only be provided under the following conditions: the Shipper has received prior written authorization from UPS for the specific Package tendered; and the Shipper requests service in accordance with the conditions set forth in the written authorization from UPS for the Package tendered. Any Package containing biological materials shall be considered a Perishable Commodity.

**3.7 Firearms and Ammunition**
UPS accepts Packages containing firearms or ammunition only pursuant to the following limitations.

**3.7.1 Firearms**
Packages containing firearms (as defined by Title 18, Chapter 44, and Title 26, Chapter 53 of the United States Code) and firearm parts that do not constitute firearms as defined by federal law (together, "Firearm Products") are accepted for transportation only as a contractual service and only from government agencies and Shippers who are licensed importers, licensed manufacturers, licensed dealers, or licensed collectors (as defined in Title 18, Chapter 44 of the United States Code). To transport Packages containing Firearm Products, the Shipper must enter into an approved UPS agreement for the transportation of Firearm Products. The Shipper shall comply with and shall ensure that each Shipment containing Firearm Products complies with all federal, state, and local laws and regulations applicable to the Shipper, recipient, and Package, including, without limitation, age restrictions.

– The Shipper must use Adult Signature Required and Direct Delivery Only services for each Package containing a firearm (including handguns) and affix a label requesting an adult signature upon delivery.

– The labeling and outer box markings on all Firearm Products shipments must not identify the contents as containing Firearm Products.

– Additional terms and restrictions on the shipment of Firearm Products are contained in the UPS agreement for the shipment of Firearm Products and at *ups.com/firearms*, which is incorporated here by reference.

**3.7.2 Ammunition**
UPS accepts ammunition for transportation where such ammunition constitutes "cartridges, small arms," as defined in 49 C.F.R. § 173.59. The Shipper shall comply with and shall ensure that each Shipment containing ammunition complies with all federal, state, and local laws and regulations applicable to the Shipper, recipient, and Package, including, without limitation, age restrictions.

– Ammunition will be transported only when packaged and labeled in compliance with 49 C.F.R. § 172 (Hazardous Materials), and must be shipped in accordance with the UPS Guide for Shipping Ground and Air Hazardous Materials. Ammunition may not be shipped in the same package as a firearm.

– To meet the exception for Limited Quantity, ammunition can be shipped via UPS Ground only within the 48 contiguous United States or UPS Ground

# UPS® Tariff/Terms and Conditions of Service – United States

Intra-Oahu and Intra-Alaska. All other allowable ammunition Shipments are accepted only on a contractual basis, and must be prepared under the rules for a fully regulated hazardous material. See further details in Section 3.11 ("Limited Quantity Packages").

– Ammunition is not accepted for shipment internationally.

Additional terms and restrictions on shipment of ammunition are contained at *ups.com/us/en/support/shipping-support/ shipping-special-care-regulated-items/ hazardous-materials-guide/how-to-ship- ammunition.page*, which is incorporated here by reference.

**3.8 Food Transport; Assumption of Legal Responsibility**
Shipments containing "food," as defined in section 201(f) of the Federal Food, Drug, and Cosmetic Act, will be accepted for transportation only according to the following terms. Shipper assumes all responsibility with respect to establishing and maintaining all records required under 21 C.F.R. Part 1 Subpart J §§ 1.326-1.363. In so doing, Shipper assumes the legal responsibility under 21 C.F.R. § 1.363 for establishing and maintaining records that would otherwise be required to be maintained by UPS. Shipper agrees its records will comply with 21 C.F.R. § 1.352 and shall identify the immediate recipient of the transported food; the origin and destination points of shipment; the date the Shipment is received and the date released; the number of Packages shipped; a description of the freight describing the type of food received and released; and the route of movement. Shipper agrees expressly to make all records required by 21 C.F.R. § 1.352 available to FDA as required by 21 C.F.R. § 1.361. Shipper commits, and recognizes that it has the responsibility, to ensure that all such records are maintained consistent with the record retention requirements provided in 21 C.F.R. § 1.360 and the record availability requirements provided in 21 C.F.R. § 1.363. Shipper agrees that within 45 days of the date of shipment, Shipper will obtain or request from UPS any information needed from UPS to satisfy Shipper's responsibility to establish and maintain records. Shipper recognizes that the foregoing obligations with respect to establishing and maintaining records cannot be terminated. Shipper

expressly agrees to immediately assume responsibility to establish and maintain records as provided in this paragraph, regardless of any FDA-designated compliance date for any FDA provision of 21 C.F.R. Part 1 Subpart J.

**3.9 Hazardous Materials Service**
Hazardous Materials, defined as those materials regulated under Title 49 of the Code of Federal Regulations (49 C.F.R.) (excluding Limited Quantity Ground Packages, as referenced below), and Dangerous Goods, defined as those materials regulated by the International Civil Aviation Organization (ICAO) and published in the International Air Transport Association (IATA) Dangerous Goods Regulations (collectively referred to as "Hazardous Materials," or "Dangerous Goods," or "International Dangerous Goods"), are accepted for transportation only as a contractual service and in accordance with the *UPS Guide for Shipping Ground and Air Hazardous Materials*, or the *UPS Guide for Shipping International Dangerous Goods*. To receive Hazardous Materials or Dangerous Goods service, the Shipper must sign and agree to the provisions set forth in an approved UPS agreement or agreements relating specifically to the transportation of Hazardous Materials, Dangerous Goods, or International Dangerous Goods ("Hazardous Materials Agreement(s)"). Contact UPS for specific information, including a list of "Common Items That May Be Classified as Hazardous Materials."

An additional charge will be assessed for each Hazardous Materials Shipment. If the Shipper fails to select a service level, provide the Dangerous Goods Class, or identify that a Shipment is not fully regulated, the Shipment will be charged at the highest level of service, as Accessible Dangerous Goods, as fully regulated, or any combination of the above based on the Shipper's failure to provide sufficient information to UPS. UPS may also assess an additional surcharge for Packages or pallets containing certain types of Hazardous Material. Applicable surcharges are described in the Service Guide and at the *ups.com* website.

It is the Shipper's responsibility to determine if a Shipment contains a Hazardous Material and to properly classify, label, mark, and package it in accordance with

applicable governmental regulations. When required, the Shipper is responsible for ensuring that all of its employees involved in the preparation of Hazardous Materials for transport are properly trained, tested, and certified in accordance with 49 C.F.R. Part 172.700 through 172.704, or with IATA (Section 1.5) and for ensuring that a program exists for the retraining, testing, and certification as required by these rules.

All packaging used by the Shipper for the transportation of Hazardous Materials, when required by regulation, must pass UN performance testing in accordance with 49 C.F.R. Part 178.602 through 178.609 or IATA (Section 6.0).

The Shipper must use a software system, such as the most current version of WorldShip® software that is acceptable to UPS for the preparation of documents for shipping Hazardous Materials, or an alternative method determined by UPS in its sole and unlimited discretion to perform the same functions. UPS will provide Shippers, upon request, a list of vendors who provide acceptable software systems.

UPS reserves the right to refuse to accept, to return, or to dispose of, in compliance with applicable laws and regulations, any Hazardous Material that it determines not to have been prepared in accordance with the *UPS Guide for Shipping Ground and Air Hazardous Materials*, the *UPS Guide for Shipping International Dangerous Goods*, and all applicable governmental laws and regulations. The Shipper agrees to reimburse UPS for any costs or expenses incurred as a result of any improperly packed or prepared Hazardous Materials which Shipper tenders to UPS. In addition, the Shipper agrees to reimburse UPS for any costs or expenses incurred by UPS if Hazardous Materials tendered by the Shipper are refused by the Shipper upon return or cannot otherwise be delivered for any reason including, but not limited to, wrong delivery address or refusal of Receiver to accept Delivery.

UPS reserves the right, in its sole and unlimited discretion and without prior notice to the Shipper, to dispose of any international Shipment containing Dangerous Goods refused by the Receiver or which for any other reason cannot be delivered. Shipper shall be responsible for all disposal fees.

# UPS® Tariff/Terms and Conditions of Service – United States

The Shipper agrees to indemnify, defend, and hold harmless UPS, its parent corporation, and affiliated companies, their officers, directors, employees, agents, and their successors and assigns, from all claims, demands, expenses (including reasonable attorney's and consultants' fees), liabilities, causes of action, enforcement procedures, and suits of any kind or nature brought by a governmental agency or any other person or entity arising from or relating to the transportation of a Hazardous Materials Shipment, from the Shipper's breach of the Hazardous Materials Agreement(s) or the Terms, or from the Shipper's non-compliance with governmental laws or regulations applicable to the transportation of Hazardous Materials whether such action is brought by a governmental agency or other person or entity. Under no circumstances shall UPS be liable for special, incidental, or consequential damages arising from the transportation of a Hazardous Materials Shipment.

Pursuant to 49 C.F.R. Part 173.30, in the event the Shipper loads any UPS vehicle, the Shipper agrees to segregate Hazardous Materials in accordance with 49 C.F.R. Part 177.848 and properly secure Hazardous Materials in accordance with 49 C.F.R. Part 177.834.

UPS does not accept Hazardous Materials in any amounts that require placarding under 49 C.F.R. Part 172, Subpart F. The Shipper agrees not to tender Hazardous Materials to UPS in any amount for a single vehicle that would require placarding in accordance with 49 C.F.R. Part 172, Subpart F.

UPS reserves the right to discontinue or terminate service immediately with respect to the transportation of Hazardous Materials if the Shipper fails to comply with any provisions of the Terms, or any applicable government regulations (including Limited Quantity Shipments that are tendered without the proper shipping documentation). If a Shipper tenders an undeclared Hazardous Materials Shipment to UPS, UPS shall not be liable for the Shipment in the event of loss, damage, delay, or misdelivery, nor shall UPS be liable for any special, incidental, or consequential damages.

If the Shipper ships Hazardous Materials from more than one location, and the Shipper fails to comply with any provisions of the Terms, the Hazardous Materials

Agreement(s), or any governmental regulations, UPS may, in its sole and unlimited discretion, terminate all of the Shipper's shipment locations or limit such termination to those locations where the failure to comply occurred.

Shippers are prohibited from shipping and UPS will not accept for transportation Shipments containing any Hazardous Materials requiring shipping papers (defined as those materials regulated under Title 49 of the Code of Federal Regulations) or Dangerous Goods requiring Shipper's Declaration for Dangerous Goods documents, when such Shipments are presented for shipment at UPS Customer Centers, Third-Party Retailers, or UPS Access Point® locations. Hazardous Materials requiring shipping papers cannot be picked up via UPS On-Call Pickup® service, or retrieved via any UPS Returns® Service, except as a contractual service. UPS Ground with Freight Pricing service is not available for Hazardous Materials Shipments (unless the Package qualifies as a Limited Quantity Package as set forth in Section 3.11 ("Limited Quantity Packages")).

Additional terms applicable to the shipment of Hazardous Materials are set forth in the *UPS Guide for Shipping Ground and Air Hazardous Materials*, and the *UPS Guide for Shipping International Dangerous Goods*, the terms of which are each incorporated here by this reference and available at *ups.com/hazmat*.

### 3.10 Dry Ice
Packages containing dry ice (carbon dioxide, solid) as a refrigerant, but no other Hazardous Materials, are accepted for transportation within the United States via UPS Ground and UPS Air Services (provided such Packages are prepared in accordance with all applicable governmental regulations) without a Hazardous Materials Agreement. Packages containing Hazardous Materials that use dry ice (carbon dioxide, solid) as a refrigerant are accepted for transportation within the United States via UPS Ground and UPS Air Services only as a contractual service. Any Package containing dry ice will be considered a Perishable Commodity. Packages containing dry ice may be tendered for shipment at The UPS Store® locations, where such services are available. A contract is required for all international Shipments of dry ice.

### 3.11 Limited Quantity Packages
Limited Quantity Packages are accepted for transportation without Hazardous Materials shipping papers and without a contract, only within the 48 contiguous United States via UPS Ground, UPS Ground with Freight Pricing service, and UPS Hundredweight Service® Ground, and via UPS Standard to Canada and UPS Ground Intra-Alaska and Intra-Oahu services, when properly classified, packaged and marked, provided the Shipper has reviewed the required checklist and service restrictions with a UPS representative. Limited Quantity Packages shipped via UPS Air Services and UPS 3 Day Select® service within the United States and Puerto Rico are accepted for transportation on a contractual basis only. Limited Quantity Packages containing ammunition are not accepted for shipment internationally.

### 3.12 Hazardous Waste, Mercury, and Mercury-Containing Waste
Packages containing hazardous waste, defined as a solid waste that meets any of the criteria of hazardous waste as described in 40 C.F.R. § 261.3, are not accepted for transportation.

UPS's acceptance for transportation of any elemental mercury, mercury-containing material, or used mercury-containing device (including, but not limited to, medical devices, spent fluorescent lamps, thermostats, or thermometers) is limited, must be prearranged, and will only be provided pursuant to prior written authorization from UPS upon satisfaction of certain requirements including appropriate packaging and financial assurances.

### 3.13 Live Animals
UPS provides service on a limited basis for some types of live animal Shipments. (The term "animal" as used here refers to anything living, except plants.) Live animals may be shipped only pursuant to the restrictions and conditions set forth on the *ups.com* website regarding Shipping Live Animals. A live animal Shipment will be considered a Perishable Commodity. Access *ups.com/hazmat* or contact UPS for information regarding shipping live animals.

### 3.14 Perishable Commodities
UPS does not provide a protective service for the transportation of Perishable Commodities. Such commodities will be accepted for transportation solely at

# UPS® Tariff/Terms and Conditions of Service – United States

the Shipper's risk for any damage arising from the perishable nature of the item. Shippers shall not file claims for, and UPS shall not be liable to Shippers or any third parties for, any damage arising from the transportation of Perishable Commodities arising from exposure to heat or cold or the perishable nature of the item, regardless of whether the Shipment is delivered pursuant to an applicable UPS Service Guarantee or is delayed in transit. UPS reserves the right to dispose of any Shipment in the UPS system containing a Perishable Commodity that UPS deems in its sole and unlimited discretion to be of no value, unsafe or unsanitary.

**3.15 Pharmaceuticals**
The Shipper shall comply with and shall ensure that each Shipment containing pharmaceutical products complies with all applicable federal, state, provincial, and local laws and regulations governing the dispensing, shipment or tender of shipment of pharmaceutical products.

**3.16 Portable Electronic Devices**
UPS transports Shipments containing radio frequency identification devices (RFID), ultrawideband devices (UWB), and other portable electronic devices (PED) only when such devices are in an inactivated state or otherwise in compliance with applicable laws and regulations, including 14 C.F.R. § 91.21, 14 C.F.R. § 121.306, or 47 C.F.R. § 15.521(a).

**3.17 Tobacco and Vaping Products**
Shipments containing Tobacco Products ("Tobacco Product Shipments"), are accepted for transportation only from Shippers who are licensed and authorized to ship Tobacco Products pursuant to applicable laws and regulations. UPS does not provide service to any person or entity listed in the Bureau of Alcohol, Tobacco, Firearms and Explosives PACT Act – Non-Compliant List.

For purposes of the UPS Tariff/Terms and Conditions of Service, the term "Tobacco Products" is defined at *ups.com/tobacco*. Shippers should consult *ups.com/tobacco* for the current definition of Tobacco Products, as the definition may change periodically. At present, and without limiting the complete definition posted at *ups.com/tobacco*, the term "Tobacco Products" includes any product made or derived from tobacco that is intended for human consumption, including any component, part, or accessory of a tobacco product; the term includes, without limitation, e-cigarettes, e-hookah, e-cigars, vape pens, advanced refillable personal vaporizers, and electronic pipes.

UPS prohibits the shipment of Cigarettes or Little Cigars (as those terms are defined at *ups.com/tobacco*) to consumers. UPS also prohibits the shipment of all Vaping Products (as the term is defined at *ups.com/tobacco*) throughout its U.S. domestic network, including import and export, regardless of nicotine content and destination state. To make other Tobacco Product Shipments, the Shipper must sign, agree to, and comply with the provisions set forth in an approved UPS agreement for the transportation of Tobacco Products. Shippers and receivers must comply with all applicable federal, state, provincial, or local laws or regulations, and all Tobacco Product Shipments must conform to the terms, conditions, restrictions, and prohibitions set forth at *ups.com/tobacco* at the time of shipping. It is the responsibility of the Shipper to ensure that a Shipment tendered to UPS, including a Tobacco Product Shipment, does not violate any federal, state, provincial, or local laws or regulations applicable to the Shipment. For all Tobacco Product Shipments, the Shipper must use Adult Signature Required service requesting an adult signature at the time of delivery. UPS reserves the right to refuse to accept, transport, or deliver any Tobacco Product Shipment that UPS, in its sole and unlimited discretion, determines does not comply with UPS requirements for the shipment or any applicable law or regulation, and to discontinue any or all service to any Shipper for, among other reasons, tendering such a Shipment. UPS reserves the right to dispose of any Tobacco Product Shipment that Shippers are prohibited from shipping, that UPS is not authorized to accept, or that UPS states that it will not accept, or that UPS has a right to refuse.

**3.18 Prohibited Item Fee**
Packages that contain any of the prohibited articles listed in the applicable Service Guide or the Terms are subject to additional charges, including but not limited to a Prohibited Item fee. Packages that contain restricted articles not in compliance with all UPS policies and procedures and applicable laws and regulations are also subject to additional charges, including but not limited to a Prohibited Item fee, if found in the UPS system. Such charges apply in addition to all other applicable Charges and in addition to any other rights to recovery UPS may have under the Terms or applicable law or regulation. UPS reserves the right in its sole and unlimited discretion to dispose of such Packages, submit such Packages to governmental authorities, or return such Packages to the Shipper solely at the Shipper's risk and expense.

The Shipper shall remain responsible for all Charges whether or not such Packages are delivered. The Shipper agrees to reimburse UPS for any costs or expenses incurred as a result of Shipper tendering any such Packages to UPS, including but not limited to all disposal fees.

**3.19 Unlawful Drug Fee**
Packages containing any form of unlawful drugs will be subject not only to seizure and reporting to relevant governmental authorities, but also to an additional charge as set forth in the applicable Service Guide. Such charge is in addition to any and all other obligations that may be owed to UPS in connection with the shipment of unlawful drugs.

## 4. Provisions for Export and Customs Clearance of International Shipments
The Shipper (or the party tendering an international Shipment to UPS for service, referred to for purposes of this Section 4 as "Shipper") is responsible for compliance with all applicable U.S. export control requirements, and must provide UPS with all documentation and information required by the laws and regulations of the origin and destination countries for export and import of Shipments (i.e., for export and customs clearance). The Shipper is responsible for determining export and import licensing or permitting requirements for a Shipment, obtaining any required licenses and permits, and ensuring that the Consignee is authorized by the laws and regulations of the origin and destination countries to receive the Shipment. The Shipper must regularly review its import and export transactions and immediately notify UPS of any incorrect or incomplete information provided, including information filed with, or otherwise transmitted (whether in writing or electronically) to, a U.S. or other governmental agency. By tendering an international Shipment for service and providing UPS with documentation (including any Source Documents), the Shipper certifies that the documentation includes all required licenses and permits, that the statements in that documentation and any other information that the Shipper provides to UPS relating to exportation and importation are complete, true, correct, and in compliance with the laws and regulations of the origin and destination countries, and that the Consignee is authorized by the laws and regulations of the origin and destination countries to receive the Shipment. Furthermore, the Shipper understands that civil and criminal penalties including seizure and

# UPS® Tariff/Terms and Conditions of Service – United States

forfeiture, may be imposed for failing to provide UPS with all required documentation, licenses, permits, statements, and information, for making inaccurate, false, or fraudulent statements, or for violating U.S. or other country laws and regulations regulating exports or imports (see, e.g., 13 U.S.C. § 305; 18 U.S.C. §§ 545, 554 and 1001; 19 U.S.C. §§ 1595a and 1592; 22 U.S.C. § 401; and Subchapter C of 15 C.F.R. (i.e., The Export Administration Regulations)).

Shipper further authorizes UPS to share information generally considered confidential under 19 CFR 111.24 or any applicable laws, rules, or regulations of countries other than the United States that govern the confidentiality of customs brokerage data, including but not limited to information concerning points of contact, addresses and telephone numbers, revenue, and customs entry data, with corporations owned by or under common ownership with UPS, with corporations owned and operated by United Parcel Service, Inc., Delaware, or with UPS's authorized service providers incidental to their provision of services.

When an international Shipment is tendered to UPS, UPS is thereby appointed as the agent for performance of customs clearance in the destination country to the extent allowed by law. The Shipper shall provide all Powers of Attorney and other authorizations required by applicable law for UPS to serve as the Shipper's agent to perform customs clearance in the destination country. UPS is specified as the nominal Consignee for the purpose of designating a customs broker to perform customs clearance. Local authorities may require documentation confirming that UPS has been designated as the nominal Consignee.

Fines, penalties, liquidated damages, storage charges, or other expenses incurred as a result of an action by U.S. Customs and Border Protection (or any other U.S. or other country's government agency regulating imports or exports), or as a result of the failure of the Shipper or Consignee to provide complete, true, and correct documentation, statements, or information required by the laws or regulations of the origin and destination countries (including the failure to obtain a required license or permit) will be charged to the Shipper or Consignee along with any applicable duties, fees, or taxes, and any applicable late payment fees assessed by UPS. Unless a written agreement between UPS and the Shipper specifies otherwise,

UPS reserves the right in its sole and unlimited discretion to charge the Shipper or Consignee for any such fines, penalties, liquidated damages, storage charges, expenses, duties, fees, taxes, or late payment fees. Regardless of any such written agreement specifying otherwise, in the event of non-payment by the Consignee, the Shipper is liable for all Charges.

The Shipper agrees to indemnify, defend, and hold harmless UPS, its parent corporation, and affiliated companies, their officers, directors, employees, agents, and their successors and assigns, from any and all claims, demands, expenses, or liabilities including, but not limited to, fines, penalties, liquidated damages, storage charges, duties, fees, taxes, late payment fees, or other money due, arising from the transportation, importation, exportation, or customs clearance of Shipments on behalf of the Shipper, or arising from the Shipper's noncompliance with the laws or regulations of the origin and destination countries, or UPS requirements applicable to the Shipment.

UPS provides routine customs clearance through UPS Supply Chain Solutions® brokerage offices designated by UPS for handling customs clearance of Shipments at no additional charge, except for UPS® Standard to and from Canada Shipments, for which a brokerage service charge applies. Other UPS Supply Chain Solutions® customs brokerage offices charge fees for the clearance of Packages and freight. For UPS Standard to Mexico, UPS Supply Chain Solutions® customs clearance is required. Failure to do so will result in Packages automatically returned to Shipper.

Additional charges may apply for complex customs clearance procedures, which include, but are not limited to, the following:
– Clearance procedures involving a government agency other than U.S. Customs and Border Protection;
– Customs Bonds;
– Drawbacks;
– Formal entries involving more than three tariff lines;
– Live Entries;
– Country of Origin Marking; or
– Temporary Import Bonds (T.I.B.).

UPS is under no obligation, unless the customer requests in writing and UPS agrees in writing, to undertake any pre- or post-importation action including, but not limited to, obtaining binding rulings,

advising of liquidations, filing protests, or filing petitions for relief.

UPS may prepay duties, fees, or taxes on behalf of the payer. For importation into the United States, a fee will be assessed and billed to the importer. A fee may also apply for shipments to other countries.

For any claims arising from import, export or customs clearance activities, the liability of UPS (including UPS Supply Chain Solutions) shall be limited to the lesser of (i) $50 per entry, filing, or transaction; or (ii) the amount of fees paid to UPS for such entry, filing, or transaction.

**4.1 Electronic Export Information**
If Electronic Export Information (EEI) is required to be filed through the Automated Export System (AES) under the Foreign Trade Regulations of the U.S. Bureau of the Census ("Census") (i.e., Part 30, 15 C.F.R.), and the Shipper has not filed the EEI and provided an Internal Transaction Number (ITN) to UPS to confirm that an EEI transaction was submitted to Census by the Shipper accepted and is on file in the AES, UPS will electronically file the required EEI on behalf of the Shipper, provided that all information required to file the EEI is supplied by the Shipper in the UPS Shipping System or other export documentation and UPS has received proper authorization or a Power of Attorney from the Shipper to complete and file the EEI. A processing fee will be assessed and billed to the Shipper. The Shipper is solely responsible for determining whether EEI is required to be filed through the AES for its shipment and for ensuring that the EEI is accurately and timely filed, whether by the Shipper or by UPS acting as the filing agent on behalf of the Shipper.

**4.2 Certificate of Origin**
UPS may, based solely on information that the Shipper furnishes, prepare a Certificate of Origin for goods manufactured and originating within the United States on behalf of the Shipper when one is required but not included with the export documents provided by the Shipper. When authorizing UPS to prepare a Certificate of Origin, the Shipper certifies that the information it provides to UPS is complete, true and correct, and that the completed Certificate of Origin complies with the laws and regulations of each country where a claim will be made that the goods are manufactured and originate in the United States. A processing fee will be assessed and billed to the Shipper.

# UPS® Tariff/Terms and Conditions of Service – United States

### 4.3 UPS Paperless® Invoice Service

By using UPS Paperless Invoice service (via a UPS Automated Shipping System or any other method, including, but not limited to, an API platform or a third-party system) or any other means on a UPS Automated Shipping System to electronically generate a paperless invoice, the Shipper authorizes UPS (or any UPS affiliate) to use the information the Shipper submits electronically to facilitate the delivery, export and/or import of the Shipment, including the Shipper's letterhead and electronic signature and the data, documents, and information that the Shipper provides to generate true, correct, and paperless invoices that reflect, in all material respects, the Shipper's actual commercial invoice and the Shipper's sale transactions of merchandise to its buyers (i.e., the "Sold To" Parties) and that are necessary to expedite in accordance with law the export and customs clearance of international Shipments. The Shipper agrees to indemnify and hold harmless UPS, its parent corporation, and affiliated companies, their officers, directors, employees, and agents from any and all claims asserted and liability or losses suffered by reason of any incorrect, incomplete, or false statement contained in the data, invoices, certificates of origin or international trade documents provided by Shipper. The Shipper shall provide to UPS in advance all required information including, but not limited to, the true and accurate price at which the merchandise was sold to the "Sold To" Party, any required additions to customs value (e.g., dutiable commissions, royalty/license fees, assists, packing costs, and proceeds of subsequent sales), the currency of the sale, country of origin, terms of sale, the quantities, ultimate Consignee, and a complete commercial description of the merchandise. By using the service, Shipper represents and certifies that the data, documents, and information the Shipper provides is true, complete, and accurate and that the paperless invoice the Shipper prepares is, in all material respects, an electronic copy of the actual commercial invoice provided to the buyer. The Shipper shall have an affirmative, non-delegable duty to disclose to UPS any and all required commercial invoice information, in accordance with 19 C.F.R. Part 141, Subpart F (Invoices) for shipments entering the United States and any other laws or regulations governing valuation and invoicing requirements of other countries of destination or origin, and to ensure its accuracy and completeness. In some instances, applicable laws and regulations may require the use of original invoices, certificates of origin or other international trade documents. The Shipper acknowledges that Shipper has an affirmative and non-delegable duty to determine whether a Shipment requires an original invoice, certificate of origin, or other international trade document, and that Shipper will attach such an original document to the Shipment when required by law. The Shipper shall maintain and produce to UPS, if requested, a copy of the original commercial invoice (between the buyer and the seller) and provide timely upload of PLD to use UPS Paperless Invoice service. An additional charge, set forth in the UPS Rates applicable to the Shipment in effect at the time of the request will be assessed to the Shipper when the commercial invoice is not provided using UPS Paperless® Invoice services prior to the processing of the commercial invoice by UPS.

The Shipper further acknowledges that a Shipment tendered to UPS (or any UPS affiliate) using this service is also subject to the terms and conditions set forth in Section 4 ("Provisions for Export and Customs Clearance of International Shipments"), and the effective UPS Technology Agreement, which is available at *ups.com*.

### 4.4 Pre-Release Notification for Import Shipments

A Shipper or Consignee may request that UPS notify the Consignee prior to submission of a U.S. import Shipment to U.S. Customs and Border Protection so that the importer may validate the classification, valuation, or other import information. An additional fee applies for this service and will be billed to the importer or to the Shipper when the Shipper is selected as the payer of the duties and taxes for the Shipment.

### 4.5 Record-Keeping

The Shipper agrees and consents that UPS may preserve a record of the carriage for an international Shipment using means other than producing a copy of the air waybill. The Shipper has a duty to and is solely liable for maintaining all records as required under the export and customs or other laws or regulations of the origin and destination countries, unless otherwise agreed to in writing. UPS assumes no responsibility to act as a record-keeper or record-keeping agent for the Shipper.

### 5. UPS Import Control® Service

UPS Import Control® service allows a Shipper to process an import Shipment, including commercial invoice. Where available, a Shipper may use UPS Import Control® service to create a Print Import Label, Electronic Import Label, or Print and Mail Import Label to provide to the sender or party tendering the Shipment to UPS, or a Shipper may request 1 UPS Pickup Attempt or 3 UPS Pickup Attempts to request that UPS make pickup attempts to retrieve import Shipments from a sender's address. 3 UPS Pickup Attempts is not available for UPS Worldwide Express Freight® Service Shipments. UPS Import Control® service is available only in countries where UPS pickup services are available. An additional charge will be assessed for each unique UPS Import Control label.

Shipments containing certain items are prohibited from being shipped and are not accepted by UPS for UPS Import Control® service including, but not limited to, Hazardous Materials Shipments shipping papers, Firearm Products, or Shipments with Signature Required services. C.O.D. service is not available for UPS Import Control® Shipments.

The maximum actual or declared value for each UPS Import Control® Shipment is $50,000 per Package and $100,000 per pallet, provided that, for any UPS Import Control® Package or pallet with an actual or declared value in excess of $1,000, the Shipper must ensure that a UPS high-value shipment summary is generated and signed by the UPS driver or UPS Customer Center representative upon tender of the Shipment to UPS. If no high-value shipment summary is obtained and signed, the maximum actual or declared value of each such Package or pallet is limited to $1,000.

Notwithstanding anything herein to the contrary, for all UPS Import Control® Shipments tendered to UPS for export from the U.S., that transit the U.S., or that contain U.S.-origin goods, the sender or tendering party is the exporter for purposes of the Export Administration Regulations ("EAR") and it shall be responsible for determining licensing authority (license, license exception, or NLR) and obtaining the appropriate license or other authorization as provided in Section 4 ("Provisions for Export and Customs Clearance of International Shipments"). In no event shall a party arranging for UPS Import Control® service provide

# UPS® Tariff/Terms and Conditions of Service – United States

a writing assuming responsibility for determining licensing requirements and obtaining license authority for any UPS Import Control Shipment to the tendering party. UPS does not agree to serve as the exporter for purposes of the EAR.

### 6. Right of Inspection

UPS reserves the right in its sole and unlimited discretion to open and inspect any Shipment tendered to it for transportation, but is not required to do so.

### 7. Refusal of Service; Synchronized Delivery Hold

UPS reserves the right to refuse to provide service, among other reasons, for any Shipment which by reason of the dangerous or other character of its contents may, in the sole judgment of UPS, soil, taint or otherwise damage other Shipments or UPS's equipment, or which is improperly or insecurely packed or wrapped, as determined by UPS in its sole judgment.

Before accepting any Shipment, UPS reserves the right to require sufficient verification, as determined by UPS in its sole and unlimited discretion, of the Shipper's name and address, or any other information necessary to accept the Shipment for service. UPS reserves the right to refuse to provide service for any Shipment or to or from any location, or to provide alternative service arrangements, or to intercept, hold or return any Shipment when, among other reasons, UPS, in its sole and unlimited discretion, determines that it is unsafe or economically or operationally impracticable to provide service, that its services are being used in violation of federal, state, or local laws or regulations, or for fraudulent purposes, or when the account of the person or entity responsible for payment is not in good standing.

In addition, UPS reserves the right in its sole and unlimited discretion to delay the Delivery of any UPS Ground and other Package not covered by the UPS Service Guarantee for one additional day beyond the scheduled Delivery date. Regardless of such delay, the effective UPS Rates for the service selected by the Shipper shall apply.

### 8. Packaging and Labeling

It is the responsibility of the Shipper to ensure that proper packaging is used and that contents are adequately and securely packed in a container, wrapped, and cushioned for transportation. Packaging, including the container, must be new or

in near new condition. Shipments must be so packed or wrapped as to meet UPS's published standards related thereto set forth in the Service Guide, or on the *ups.com* website, and as to pass tests set forth in the International Safe Transit Association ("ISTA") Procedure 3A, Procedure for Testing Packaged Products, published by ISTA. Acceptance of tender by UPS is not an indication that a Package is packed in accordance with UPS's published standards. In addition, any tested product must be free from damage and the packaging must afford reasonable protection as determined by UPS in its sole judgment.

Shippers must also securely affix to each Package a completed legible Source Document or label generated through a UPS® Automated Shipping System containing, among other things, the UPS tracking number, shipper name and address and consignee name and address. Previous labels or barcodes must be removed or concealed. Shippers are prohibited from duplicating or reusing labels or altering or creating labels without UPS's express authorization in a way that may prevent UPS from assessing or collecting accurate and full Charges. Shipments containing goods of high value or high risk, including without limitation jewelry, pharmaceuticals, computers, hand-held electronic devices, mobile telephones, and electronic components of these, must not have labels, customized shipping labels (including as created in a UPS Automated Shipping System), markings, logos, or other written notice of contents contained within the Package.

The use of UPS-provided packaging is not a guarantee that an item is sufficiently packaged for transportation. UPS does not provide special handling for Shipments with "Fragile," orientation markings (e.g., "UP" arrows or "This End Up" markings), or any other similar such markings.

When shipping media of any type containing sensitive personal information (such as personal financial or health information), it is recommended that the Shipper retain a copy of the data and secure the data on the media through encryption or other technological means. UPS is not liable or responsible for loss of, damage to, or irretrievability of data stored on media of any type, or for loss of information, including without limitation personal, health or financial information.

For the shipment of electronic media, or for breakable items, see the packaging guidelines located at the *ups.com* website. The guidelines advise against the use of UPS Express® Envelopes, UPS Express® Pak, or UPS Express® Pad Paks to ship sensitive personal information or breakable items.

Luggage, cases or other containers that have value and could be damaged in transit must be packaged and cushioned in a separate container.

UPS Worldwide Express Freight® Service Shipments must be palletized, stackable, able to be lifted by forklift, and shrink-wrapped or banded to a skid. Shipper must ensure that pallets and packaging comply with all applicable laws and regulations of the origin and destination country.

UPS reserves the right to affix labels or other markings on Packages for any purpose whatsoever, including but not limited to UPS operational purposes.

### 9. Use of UPS-Provided Materials and Services

UPS-provided materials including, but not limited to, packaging materials and supplies, envelopes, labels, label printers, shipping documents, publications and products are provided solely for the use of UPS Shippers to obtain UPS services on their behalf and to interact with UPS. Any other use of such UPS-provided materials is strictly prohibited.

UPS Express® Envelopes, UPS Express® Pak, UPS Express® Boxes, UPS Express® Tubes, UPS 10 KG Box and UPS 25 KG Box packaging may not be used for UPS® Ground, UPS® Standard, UPS 3 Day Select®, or UPS Worldwide Expedited® Shipments.

Under no circumstances may a Shipper sell any UPS-provided materials, products, or services to any third party without prior written authorization from UPS.

A weekly charge applies for use of UPS-provided thermal label printers.

### 10. Use of UPS Accounts

UPS account holders are prohibited from permitting the use of their UPS accounts by any third party to process or tender a Shipment to UPS without prior written approval from UPS. UPS account holders are also prohibited from using their UPS accounts to process or tender a Shipment to UPS on behalf of any third party without prior written approval from UPS.

# UPS® Tariff/Terms and Conditions of Service – United States

## 11. Use of UPS Electronic Information Systems

Use of UPS electronic information systems to which Shippers are granted access by UPS and which are accessed by means of hardware, software, or internet interfaces, including UPS Shipping Systems, are subject to and will be governed by the terms in effect at the time of shipping for the relevant system, including without limitation, the UPS Technology Agreement, the iShip® Master Enterprise Service Agreement, the ConnectShip® End User License Agreement, or that agreement licensing use of a UPS Ready® solution.

## 12. Timely Upload of PLD; Missing PLD Fee

The Shipper must provide Timely Upload of Package Level Detail ("PLD") to UPS. If timely upload of PLD is not provided, certain UPS services are unavailable, including but not limited to Direct Delivery Only, Ship to a UPS Access Point® location, UPS Delivery Intercept® service, and UPS Proactive Response® service. Timely Upload of PLD as used in these Terms refers to the electronic transmission of all applicable PLD information to UPS at or before the time that Shipments are tendered to UPS. PLD includes, but is not limited to, Consignee's full name, complete delivery address, and Shipment dimensions and weight. If Shipper does not upload all applicable PLD information to UPS, UPS reserves the right in its sole and unlimited discretion to determine missing PLD to be used for invoice purposes, up to and including maximum size and weight for the applicable service, and to dispose of (including salvage) or return to the sender any Shipment without Timely Upload of PLD. In addition, a processing fee will be charged for missing PLD if Shipper does not upload all applicable PLD information to UPS prior to Package Delivery or Delivery attempt.

### 12.1 Use of PLD Obtained Email Addresses and Telephone Numbers

By including the email address or telephone number of the Consignee or associated addressee in PLD for a Shipment ("PLD Contact(s)"), the Shipper acknowledges and agrees that UPS may use such PLD Contact(s) and may send notifications to the Shipment's associated PLD Contact(s) related to the delivery of such Shipment and actions the PLD Contact(s) may take with respect to the Shipment. The PLD Contact(s)

may be invited to enroll in UPS My Choice® to take these actions. The Shipper warrants that (i) informed and specific consent, in compliance with all applicable laws, rules, and regulations (including, where applicable, of the jurisdiction of Consignee's domicile), has been secured from the individual associated with each PLD Contact to receive notifications from UPS related to the delivery of such Shipments and actions the PLD Contact(s) may take with respect to the Shipment and for use by UPS of the PLD Contact(s) as provided above, and that (ii) the PLD Contact(s) is accurate and is controlled by the Consignee or associated addressee for the Shipment with which it is associated. Shipper will store such consents and, upon request by UPS, make available such consents to UPS.

The Shipper shall defend, indemnify and hold harmless UPS, its parent corporation, and affiliated companies, their officers, directors, employees, agents, and their successors and assigns, from and against any and all liability, losses, damages, costs and expenses (including reasonable legal fees) of any nature whatsoever incurred or suffered in connection with damages arising out of or resulting from any breach of the warranties in the previous paragraph.

The Shipper agrees that UPS and its representatives may contact the Shipper at any telephone number UPS has on file for the Shipper, including through the use of auto-dialed and/or prerecorded calls and text messages.

## 13. ZIP Code/Postal Code Information

The Receiver's ZIP Code is a required part of the address for domestic Shipments. When available, ZIP+4 should be used. The Receiver's postal code, telephone number, and contact name are required parts of the address for international Shipments.

## 14. P.O. Boxes

UPS does not provide Delivery to a P.O. Box. The Shipper must make every effort to obtain a street address. If the Shipper should use a P.O. Box address, the recipient's telephone number must be included. A Package addressed to a P.O. Box may experience delays, is not covered by any UPS Service Guarantee, and is subject to an Address Correction charge. Army Post Office (APO) and Fleet Post Office (FPO) addresses are not accepted.

## 15. UPS Customer Center and UPS Worldwide Express Freight® Center

Before accepting a Shipment tendered for transportation or releasing any Shipment at a UPS Customer Center or a UPS Worldwide Express Freight® Center to a Consignee or other recipient, UPS reserves the right to require sufficient verification, as determined by UPS in its sole and unlimited discretion, of the Shipper's or recipient's name, address, authorization to ship or receive the Shipment, or any other information UPS deems necessary to accept or release the Shipment in its sole and unlimited discretion. Persons tendering or picking up Shipments on behalf of a business may be required to provide identification issued by the business and a government-issued identification. A Residential Consignee will be required to provide a government-issued identification. UPS reserves the right to require payment to be made at Customer Centers and UPS Worldwide Express Freight® Centers by payment card only.

## 16. Third-Party Retailer

The UPS Store® locations are independently owned and operated by licensed franchisees of The UPS Store, Inc., a subsidiary of United Parcel Service, Inc., and are not agents of UPS. Other Third-Party Retailers are independently owned and operated businesses and are not agents of UPS. UPS assumes no liability other than to the Third-Party Retailer as the Shipper of the Package, for lost, damaged or delayed Packages sent by the Third-Party Retailer. Any such liability to the Third-Party Retailer is subject to the limitations set forth in the Terms. All inquiries regarding Packages shipped by any Third-Party Retailer must be directed to the Third-Party Retailer that shipped the Package. UPS will deal solely with the Third-Party Retailer in all matters concerning Packages shipped by any Third-Party Retailer including, but not limited to: tracking/tracing requests; claims and guarantees; C.O.D. preparation and remittance; return of undeliverable Packages; proper packaging and labeling; and billing. Even if UPS responds directly to customers of the Third-Party Retailer regarding tracking requests, UPS will not be liable to those customers. The Third-Party Retailer is solely responsible for the issuance of any refunds and claims to those who shipped Packages by the Third-Party Retailer. For any Package shipped by the Third-Party Retailer with a declared value in excess

# UPS® Tariff/Terms and Conditions of Service – United States

of $1,000, the Third-Party Retailer must provide a copy of the high-value control log to UPS at the time of tender of the Package. The Third-Party Retailer shall not ship any articles which UPS does not accept for transportation. The Third-Party Retailer shall indemnify and hold harmless UPS in any action against UPS arising from the loss, damage, or delay of a Package shipped by the Third-Party Retailer.

## 17. UPS Access Point® Locations

Packages that may be received for Delivery or tendered for shipment (meaning, Packages that have been processed for shipment prior to tender using a UPS Shipping System only) at a UPS Access Point® location are subject to restrictions, including, without limitation, in regard to weight and size and actual and declared value, as set forth in the applicable Service Guide and on the *ups.com* website. Subject to modification by the Shipper, UPS Access Point® locations will hold Packages for up to seven (7) calendar days. Refer to tracking detail for Package-specific information, including but not limited to, the last available pickup date. Shipments not picked up within seven (7) calendar days (or other time selected by the Shipper) will be considered undeliverable, and may be returned to the Shipper. See further details in Section 37 ("Special Handling of Undeliverable Shipments; Refused Shipments Returned"). Before accepting a Shipment tendered for transportation or releasing any Shipment at a UPS Access Point® location to a Consignee or other recipient, a Shipper, Consignee, or other recipient may be required to produce sufficient verification of the Shipper's or recipient's name, address, authorization to ship or receive the Shipment, and any other information UPS deems necessary to accept or release the Shipment in its sole and unlimited discretion, including, without limitation, provision of government-issued identification.

### 17.1 Ship to a UPS Access Point Location Service

Subject to an additional charge and where available, Shippers with a valid UPS account may ship Packages directly to a UPS Access Point location to be picked up by the Consignee.

Shipper will require the Consignee to select its preferred means of notification from UPS (where available, e-mail, text message, or telephone call) and to provide a valid e-mail and/or phone number for notification. Shipper will transfer Consignee's preferred means of notification email and/or telephone number (where available) to UPS as part of the package level detail required for correct delivery of each package. UPS may, as a service provider on behalf of Shipper and where available, provide by email, text, or phone call notifications relating to the Shipment to the Consignee via the Consignee's preferred means of notification.

Where Shipper provides an e-mail address or phone number, Shipper does so pursuant to **Section 12.1 ("Use of PLD Obtained Email Addresses and Telephone Numbers")**.

UPS will deliver Packages to designated UPS Access Point locations. Delivery attempts to the designated UPS Access Point location constitute a delivery attempt for the purposes of the UPS Service Guarantee. Delivery is deemed complete when the package is delivered to the designated UPS Access Point location.

Additional service options for Ship to a UPS Access Point location service must be selected when the Package is processed for shipment, where available and subject to additional charges.

Additional terms, restrictions and requirements are set forth in the Service Guide for the applicable destination country and at *ups.com/media/en/ ShiptoaUPSAccessPointlocation_US_EN.pdf*, which are each incorporated herein by this reference.

### 17.2 Ship to a UPS Access Point Location Service – Deliver to Addressee Only

If the Deliver to Addressee Only option is selected, the Package may only be picked up by the person identified on the shipping label. Pickup by any Third Party is not permitted. The Deliver to Addressee Only option is subject to an additional charge.

### 17.3 Ship to a UPS Access Point Location Service – Package Release Code

If the Package Release Code option is selected, the Shipper must enter a four- to six-digit numeric code when processing the Package for shipment and provide the code to the person picking up the package. The Shipper is solely responsible for generating, maintaining, and transmitting the Package Release Code. The Shipper must

also provide all other information required to comply with UPS policies and procedures and applicable laws and regulations, including but not limited to customs requirements, as part of the PLD. There is no additional charge for the Package Release Code option.

The Package Release Code must be presented to pick up the Package. Any person who presents the Package Release Code may pick up the Package. UPS cannot provide the Package Release Code to the Shipper, the Consignee, or any other person at any time. UPS shall not be liable for any loss, damage, or costs of any kind arising out of or relating to loss of or unauthorized access, acquisition, use, modification, disclosure, or destruction of the Package Release Code.

## 18. Pickup Services – Scheduled

UPS offers the following Scheduled Pickup Services:

– *Daily Pickup:* When Daily Pickup service is selected, UPS will call on Shipper's location once each business day to pick up Packages. UPS may not call upon a location on any day in which the account indicates that there are no Packages available for pickup. UPS reserves the right in its sole and unlimited discretion to shift accounts at locations that ship four or fewer times per week from Daily Pickup to UPS Smart Pickup.®

– *Daily On-Route Pickup:* When Daily On-Route Pickup service is selected, UPS will call on Shipper's location each business day to pick up Packages while making deliveries in Shipper's area.

– *Day-Specific Pickup:* When Day-Specific Pickup is selected, UPS will call on Shipper's location each business day as preselected by Shipper. Shipper may select up to four business days per week for Day-Specific Pickup.

– *UPS Smart Pickup® service:* When UPS Smart Pickup® service is selected, UPS will call on Shipper's location any business day when the Shipper transmits PLD using the current version of WorldShip® software, UPS CampusShip® software, or *ups.com* shipping, by the deadline designated by UPS, or if Shipper has scheduled a pickup by telephone or through the *ups.com* website, prior to the deadline designated by UPS. UPS reserves the right in its sole and unlimited discretion to shift accounts at locations that ship

# UPS® Tariff/Terms and Conditions of Service – United States

four or more times per week from UPS Smart Pickup® to Daily Pickup. UPS also reserves the right in its sole and unlimited discretion to shift accounts that do not process shipments using WorldShip, UPS CampusShip, or ups.com shipping from UPS Smart Pickup to Daily Pickup.

For Daily Pickup, Daily On-Route Pickup, and Day-Specific Pickup, a weekly service charge based on the account's weekly billing total, will be assessed. The weekly billing total may not necessarily reflect all Packages tendered during a calendar week. For UPS Smart Pickup® service, a weekly service charge will be assessed.

Scheduled Pickup Services are not available for any UPS Worldwide Express Freight® Service.

## 19. UPS On-Call Pickup® Service

When UPS On-Call Pickup® service is requested by the Shipper, UPS will arrange (where reasonably practicable) a pickup at the Shipper's location. An additional charge for UPS On-Call Pickup® service will be assessed.

UPS On-Call Pickup® service from a Residential address will be assessed an additional surcharge for residential pickup. If the Residential address is in a remote or less accessible area as designated by UPS, an additional surcharge for extended area or remote Residential pickup also will apply.

UPS On-Call Pickup® service must be requested for each UPS Worldwide Express Freight® Service Shipment pickup or drop-off (for door-to-door and non-door-to-door services), and may not be combined with a Package pickup. No additional charge for UPS On-Call Pickup® service applies to any UPS Worldwide Express Freight® Service.

## 20. Saturday Air Processing Fee; Saturday Export Processing Fee; Saturday Stop Charge

UPS offers Saturday pickup of UPS Air Services Packages and UPS Hundredweight Service® Air Services Shipments for Delivery in the United States and Puerto Rico where such services are available and subject to a processing fee. UPS offers Saturday pickup of UPS Worldwide Express Plus, UPS Worldwide Express, and UPS Worldwide Saver Shipments for Delivery to select destination countries where such services are

available and subject to a processing fee. Saturday pickup is available for domestic UPS 3 Day Select® Service, UPS Ground, UPS Ground with Freight Pricing, UPS Hundredweight Service® UPS 3 Day Select, and UPS Hundredweight Service Ground Shipments in select areas (these areas are referred to here as "Saturday Ground Service Territories"). Within Saturday Ground Service Territories, a Saturday Stop Charge that varies depending on the type of pickup service selected will apply any time the Shipper requests that UPS pick up any Packages on a Saturday, in addition to any Saturday Air Processing fee(s), regardless of whether there are packages to be picked up that day. Refer to the Service Guide for an explanation of applicable charges associated with pickup service on Saturdays.

The Shipper should contact UPS for information regarding UPS's Saturday pickup area. Refer to UPS's website for Delivery commitment information applicable to Packages picked up on Saturday. Saturday pickup service is provided by the following methods:

– A Shipper may request Saturday pickup via UPS On-Call Pickup® service by contacting UPS on or in advance of each Saturday, excluding holidays, on which the service is needed.

– At the Shipper's option, UPS will call at the Shipper's premises every Saturday, excluding holidays, to pick up qualifying Shipments.

– Shippers with UPS Smart Pickup service may schedule a Saturday pickup by processing a qualifying Package for pickup each Saturday, excluding holidays, on which the service is needed. Refer to Section 18 ("Pickup Services— Scheduled") for additional information regarding scheduling a pickup via UPS Smart Pickup service.

The Saturday Air Processing fee (formerly referred to as a "Saturday Pickup" charge) will be assessed for each UPS Air Services Package or each UPS Hundredweight Service® Air Services Shipment processed using a UPS Shipping System, tendered to UPS, or tendered to a Third-Party Retailer on a Saturday, in addition to any applicable UPS On-Call Pickup® charge and Saturday Stop Charge.

The Saturday Export Processing Fee will be assessed for each UPS Worldwide Express Plus, UPS Worldwide Express, or UPS Worldwide Saver Shipment processed using a UPS Shipping System, tendered to UPS, or tendered to a Third-Party Retailer on a Saturday, in addition to any applicable UPS On-Call Pickup® charge and Saturday Stop Charge.

Where a Saturday pickup is requested but there are no Packages to be picked up, a minimum processing fee will be assessed outside Saturday Ground Service Territories.

## 21. Drop Shipment

A unique Drop Shipper account number will be assigned to approved Shippers and must be used solely for the origin and destination locations as specified in the UPS Drop Ship Letter of Understanding or as required by UPS.

UPS reserves the right to refuse any Drop Shipment request, in its sole and unlimited discretion, including, but not limited to, any Drop Shipment that is operationally or economically impracticable to transport. A request for Drop Shipment service is not reasonable unless the Shipper makes a prior arrangement with UPS, agreed to in advance by UPS, as to timing, location, and volume of the Drop Shipment.

When a Shipper, through prior arrangements with UPS, tenders Packages at UPS's receiving stations with a return address requiring a movement greater than a Zone 2 movement from the point of tender, any undelivered Packages will be returned automatically and will be charged at the rate applicable between the point of tender and the return address. The effective UPS Rates for the applicable shipment will apply.

UPS does not accept, and Shippers are prohibited from shipping, any Package via a Drop Shipment that contains Hazardous Materials, except for Limited Quantity Packages that are tendered for UPS Ground service in the 48 contiguous United States.

## 22. Delivery

UPS does not limit Delivery of a Shipment to the person specified as the Receiver in the UPS Shipping System. Unless the Shipper selects a Signature Required service, UPS reserves the right, in its sole and unlimited discretion, to make a Delivery without obtaining a signature.

# UPS® Tariff/Terms and Conditions of Service – United States

### 23. Direct Delivery Only Surcharge

Where available and subject to a Direct Delivery Only surcharge, UPS may in its sole and unlimited discretion accept a Shipper's request to limit (1) reroutes of Packages to an alternate address by the Consignee (including but not limited to Delivery Change Requests and UPS My Choice® requests, other than requests to hold for will call at a UPS Customer Center) and (2) delivery to a UPS Access Point® location following a first delivery attempt at a Residential address.

Packages containing firearms must use Direct Delivery Only service.

Direct Delivery Only does not limit UPS Delivery Intercept® requests or Delivery pursuant to UPS's driver release or Shipper Release procedures, and does not require signature on Delivery or Delivery to the person specified as the Receiver in the UPS Shipping System. The Shipper must provide timely upload of PLD to request Direct Delivery Only.

### 24. Residential Surcharge

A Residential Surcharge will apply if either the delivery address entered in the UPS Shipping System or the actual delivery address is considered Residential (regardless of a Shipper's designation of the address as Commercial).

### 25. Delivery Area Surcharge

A Delivery Area Surcharge or Extended Delivery Area Surcharge will apply to each Package delivered to certain ZIP Codes within the 48 contiguous states. A Remote Area Surcharge will apply to each Package delivered to, and any UPS On-Call Pickup service from, certain ZIP Codes within Alaska and Hawaii. Refer to the Area Surcharge listing at ups.com/rates for the listings of effective applicable ZIP Codes for the Delivery Area Surcharge, Extended Delivery Area Surcharge and Remote Area Surcharge.

A Delivery Area Surcharge, Extended Delivery Area Surcharge or Remote Area Surcharge, respectively, will apply if either the delivery (or pickup, where applicable) address entered in the UPS Shipping System or the actual delivery (or pickup, where applicable) address falls within ZIP Codes designated by UPS as subject to such charges. Such charges apply in addition to all other applicable Charges, including but not limited to the Residential Surcharge.

### 26. Delivery Attempts; UPS Access Point® Locations

If UPS is unable to deliver a Shipment, a notice will be left at the Consignee's address stating that Delivery has been attempted. Thereafter, a second and, if necessary, a third attempt to deliver the Shipment may be made without additional charge. Shipments not delivered after three attempts will be considered undeliverable and may be returned to the Shipper. See further details in Section 37 ("Special Handling of Undeliverable Shipments; Refused Shipments Returned").

For Residential deliveries and where available, UPS may in its sole and unlimited discretion, after the first delivery attempt, deliver a Shipment to a UPS Access Point® location, where such Shipment will be held for pickup. Requests for subsequent Delivery attempts are subject to additional Charges which will be assessed to the Consignee. For UPS Worldwide Express Freight® Service Shipments, only one Delivery attempt will be made and subsequent Delivery attempts are subject to additional charges which will be assessed to the Consignee. Refer to Section 31 ("Delivery Change Requests") for further information.

### 27. Hold for Pickup and Hold at Location Services

At the time a Shipper tenders a Shipment to UPS, the Shipper may request that UPS hold a domestic Package at a designated UPS Customer Center for pickup by the Consignee. For each such Shipment, the Shipper will complete an address label showing the words "Hold for Pickup," the Consignee's name, telephone number, the name of a contact person, and the full address of the designated UPS Customer Center. In addition, the Shipper will apply a UPS Hold for Pickup label below the address label on the Shipment. Hold for Pickup is not available for international Package shipments.

For UPS Worldwide Express Freight® Service Shipments, the Shipper may request that UPS hold a UPS Worldwide Express Freight® Service Shipment at a UPS Worldwide Express Freight® Center location for pickup by the Consignee (Hold at Location). For each such Shipment, the Shipper will complete an address label showing the words "Hold for Pickup," the Consignee's name, telephone number, the name of a contact person, and the full address of the Consignee (designated UPS Worldwide Express Freight® Center address not required).

UPS will hold the Shipment at the designated UPS Customer Center or UPS Worldwide Express Freight® Center and will attempt to contact the Consignee at the telephone number shown on the label. Shipments not picked up within seven (7) calendar days from the date of arrival will be considered undeliverable.

### 28. Shipper Release

A Shipper may request that UPS release a Shipment on the first Delivery attempt. When Shipper Release is selected, UPS will make only one Delivery attempt, a signature will not be obtained upon Delivery, and a UPS Delivery record showing a completed Shipper Release delivery shall be conclusive proof that Delivery was completed. Shipper Release is provided solely at the Shipper's risk of loss or damage arising from the release of the Shipment by UPS and UPS will not be liable for any damages arising from the release of the Shipment.

### 29. UPS carbon neutral

A Shipper may request that UPS offset the climate impact of a Shipment via UPS carbon neutral service by selecting UPS carbon neutral at the time a Shipment is tendered to UPS. By selecting UPS carbon neutral, UPS will purchase and retire in the appropriate registry a sufficient number of voluntary or regulatory carbon credits as determined by UPS in its sole and unlimited discretion to offset calculated carbon dioxide emissions. UPS carbon neutral is available only for Shipments shipped using a UPS Automated Shipping System. An additional charge will be assessed for each Package or pallet.

### 30. UPS Delivery Intercept® Service

After a domestic Package has been tendered to UPS but before Delivery, a Shipper may request that UPS return a Package to the Shipper, reroute a Package (including a request by Shipper to correct an address, or where a Package has been returned to the Shipper after a Delivery attempt), hold the Package for pickup at a UPS Customer Center, or hold a Package for future Delivery. UPS may in its sole and unlimited discretion also accept a UPS Delivery Intercept® request from a Third Party

# UPS® Tariff/Terms and Conditions of Service – United States

when the Shipper has requested that the Third Party's UPS account number be billed for such Package. UPS will honor a UPS Delivery Intercept® request in its sole and unlimited discretion where practicable and where the Shipper has guaranteed payment of applicable Charges resulting from the change. UPS shall not be liable for any damages whatsoever for failure or refusal to comply with a UPS Delivery Intercept® request.

UPS may restrict Delivery Intercept Requests made by phone and email at the request of the Shipper; Shippers should contact their sales representative or call 1-800-PICK-UPS® (1-800-742-5877) to request restrictions. Shippers that do not request restriction of such Delivery Intercept Requests are deemed to agree that UPS will under no circumstances be liable for any damages whatsoever for complying with an intercept request made by phone or email even if made by an unauthorized party.

An additional charge, set forth in the UPS Rates applicable to the Shipment in effect at the time of the request will be assessed for each Package returned to the Shipper, rerouted, or held for future Delivery. If a request to reroute a Package requires a Package movement from the original Receiver address beyond a UPS Zone 2, additional Charges also will apply. Such additional Charges will be calculated as a newly-initiated Shipment between the original Receiver address and the new rerouted address, and will include (but not be limited to) all applicable surcharges. All original Charges will continue to apply as if the Package were delivered to the original Receiver address. For a request to return to the Shipper, all applicable Charges will apply and be assessed to the Shipper, as set forth in Section 37 ("Special Handling of Undeliverable Shipments; Refused Shipments Returned").

The Shipper must provide timely upload of PLD to initiate a UPS Delivery Intercept® request.

## 31. Delivery Change Requests

After the Receiver has received notice from UPS that Delivery has or will be attempted, the Receiver may request that UPS hold a Package for pickup at a UPS Customer Center. In addition, a Commercial Receiver may request that UPS return a Package to the Shipper before Delivery is attempted. After the Receiver has received notice from

UPS that Delivery has been attempted, the Receiver may request that UPS return a Package to the Shipper, hold for future Delivery, reroute a Package to a different address, direct eligible Packages to a UPS Access Point® location, redeliver to the original address a Package that was taken to a UPS Access Point location, or other such Delivery Changes as UPS in its sole and unlimited discretion may offer (collectively, "Delivery Change"). A UPS InfoNotice® tag is required for requests to reroute.

An additional charge set forth in the UPS Rates applicable to the Shipment in effect at the time of the request will be assessed to the Consignee for each Package rerouted, redelivered, directed to a UPS Access Point location, or held for future Delivery by a Delivery Change Request. If any Delivery Change Request requires a Package movement from the original Receiver address beyond a UPS Zone 2, additional Charges also will apply and be assessed to the Consignee. Such additional Charges will be calculated as a newly-initiated Shipment between the original Receiver address and the new rerouted address, and will include (but not be limited to) all applicable surcharges. All original Charges will continue to apply as if the Package were delivered to the original Receiver address. For a request to return to Shipper, all applicable Charges will apply and be assessed to the Shipper, as set forth in Section 37 ("Special Handling of Undeliverable Shipments; Refused Shipments Returned").

For UPS Worldwide Express Freight® Service pallets, after the Receiver has received notice from UPS that Delivery will occur, the Receiver may request that UPS hold a pallet at a UPS Worldwide Express Freight® Center. After the Receiver has received notice from UPS that Delivery has been attempted, the Receiver may request that UPS return a pallet to the Shipper, hold for future Delivery, or make a Delivery Reattempt. Delivery Reattempt charges will apply to subsequent attempts to deliver UPS Worldwide Express Freight® Service Shipments beyond the first Delivery attempt. For requests to return to the Shipper, all applicable Charges will apply and be assessed to the Shipper.

UPS will honor a Delivery Change Request in its sole and unlimited discretion where practicable and where the Receiver has guaranteed payment of any applicable Charges resulting from the change.

By requesting a Delivery Change, the Receiver acknowledges and agrees that the limitations of liability set forth in the Terms in effect at the time of Shipment apply to the Shipment subject to the Delivery Change Request and that the value originally declared by the Shipper, if any, shall continue to apply throughout the course of transportation pursuant to the Delivery Change Request. UPS assumes no liability other than to the Shipper of the Shipment for loss, damage, or delay of any Shipment subject to Delivery Change. UPS shall not be liable for any damages whatsoever for failure or refusal to comply with a Delivery Change Request.

UPS may restrict Delivery Change Requests at the request of the Shipper. Shippers should contact their sales representative or call 1-800-PICK-UPS® (1-800-742-5877) to request restrictions. Shippers that do not request restriction of all Delivery Change Requests are deemed to agree that UPS will under no circumstances be liable for any damages whatsoever for complying with a Delivery Change Request even if made by an unauthorized party. Delivery Change Requests for Packages containing firearms are not available. Delivery Change Requests to reroute or direct to a UPS Access Point location are not available for international Packages. It is the responsibility of the Receiver to ensure that a Delivery Change Request complies with all federal, state and local laws and regulations applicable to the Shipment.

## 32. Correction of Addresses

If any Shipment as addressed by the Shipper has an incorrect or incomplete address (examples include, but are not limited to, P.O. Boxes, missing suite, apartment, or unit numbers, old addresses, and missing/incorrect ZIP Codes), UPS will make reasonable efforts, to be determined in its sole and unlimited discretion, to secure the correct or complete address. An address validated by UPS may be incorrect or incomplete for purposes of completing Delivery, and may be corrected by UPS. If the correct or complete address is secured, UPS, at its sole and unlimited discretion, will attempt Delivery, and the Shipper, upon request, will be provided with the correct or complete address in order to update its internal records. UPS may in its sole and unlimited discretion correct or complete an address based on information obtained from the Shipper or

# UPS® Tariff/Terms and Conditions of Service – United States

Consignee. An address correction charge will be assessed to the Shipper for an address correction or completion.

## 33. Saturday Delivery

UPS offers Saturday Delivery by request for certain Delivery areas for certain UPS Air Services and international services, as set forth in the Service Guide. To request Saturday Delivery for these services, a Shipper must indicate the selection in the UPS Shipping System and attach a Saturday Delivery routing label to each Package or pallet. Refer to UPS's website for available Saturday Delivery areas for these services. Where Saturday Delivery is requested, an additional charge will be assessed for each such Shipment for Saturday Delivery and will be billed to the payer of the Charges.

Saturday Delivery is also available without an additional charge for certain Delivery areas for certain UPS Air Services and international services, but not by request. Refer to UPS's website for Saturday Delivery commitment information for these services. Where Saturday Delivery is available for such Shipments, a Saturday routing label is not required.

UPS offers Saturday Delivery by request to Commercial delivery addresses within Saturday Ground Service Territories for UPS 3 Day Select, UPS Ground, UPS Ground with Freight Pricing, UPS Hundredweight Service UPS 3 Day Select, and UPS Hundredweight Service Ground Shipments. To request Saturday Delivery for these services, a Shipper must indicate the selection in the UPS Shipping System. Refer to UPS's website for available Saturday Delivery areas for these services. Where Saturday Delivery is requested, an additional charge will be assessed for each such Shipment for Saturday Delivery and will be billed to the payer of the Charges.

Saturday Delivery is also available within Saturday Ground Service Territories for UPS 3 Day Select, UPS Ground, UPS Ground with Freight Pricing, UPS Hundredweight Service UPS 3 Day Select, UPS Hundredweight Service Ground, UPS Standard from Canada, and UPS Standard from Mexico Shipments, but not by request. Refer to UPS's website or call 1-800-PICK-UPS® (1-800-742-5877) for Saturday Delivery commitment information for these services. Where Saturday Delivery is available for these services, there is no additional charge,

except as set forth herein. Commercial Consignees in Saturday Ground Service Territories must pay for a Saturday Stop Charge – Scheduled Pickup and opt in to be eligible to receive such deliveries on Saturday.

## 34. Signature Required Services

UPS provides the following Signature Required services. An additional charge applies for each service:

### 34.1 Signature Required (domestic and international)

A Shipper may request UPS to obtain the recipient's signature on Delivery. The Shipper must use a UPS Automated Shipping System to initiate a request for this service. UPS may obtain, at its sole and unlimited discretion, a signature, other electronic acknowledgment of receipt or authorization to release without a signature upon delivery pursuant to the UPS My Choice® service from the recipient when this option is selected.

### 34.2 Adult Signature Required (domestic and international)

A Shipper may request UPS to obtain the signature of an adult 21 years of age or older on Delivery. UPS, in its sole and unlimited discretion, will determine if Delivery can be completed when such a request is made, and may request photo identification indicating the recipient's age, before completing Delivery. The Shipper must use a UPS Automated Shipping System to initiate a request for this service. UPS reserves the right to assess the Shipper the additional charge for this service when the Shipper requests UPS to obtain an adult signature on Delivery and an approved UPS label is not affixed to the Package or pallet indicating such request, or, the Shipper tenders a Package or pallet that, based upon its contents, requires an approved UPS label requesting an adult signature on Delivery and no such label has been affixed to the Package or pallet.

### 34.3 Delivery Confirmation (domestic only)

Delivery Confirmation is no longer available. If a Shipper nevertheless requests Delivery Confirmation, the Shipper will not receive Delivery Confirmation service, including mailed paper statements displaying the date of Delivery, nor either the name of the recipient or the disposition of the Package; or, in the event of a return,

the reason for the return and the date processed. UPS also will not assess an additional charge.

## 35. Proof of Delivery (P.O.D.)

Upon request, UPS will provide proof of Delivery of a Shipment via fax transmission, email, or mail. The request must include a fax number, including area code, for an operating fax machine, an email address for email delivery, or an address deliverable by the United States Postal Service for mail.

## 36. Tracking/Tracing and Refund Request Charge

UPS reserves the right to assess a Shipper an additional charge per request for each Tracking/Tracing and Refund Request initiated by or at the request of the Shipper. This charge will not be assessed for the first 50 tracking requests per calendar week, or for a quantity of tracking requests equal to or less than 20 percent of the Shipper's volume for that week, whichever is greater. This charge will not be assessed for a quantity of tracing requests equal to or less than two percent of the Shipper's volume for that week. UPS also reserves the right to assess the Shipper a charge set forth in the effective UPS Rates for Service Guarantee refund requests when the subject Shipment was delivered in accordance with the applicable UPS Service Guarantee in the effective Terms.

## 37. Special Handling of Undeliverable Shipments; Refused Shipments Returned

Shipments refused by the Consignee, or which are undeliverable for any reason, will be returned to the Shipper at Shipper's expense, including, but not limited to, forwarding costs, return transportation charges and all other applicable Charges, duties, and taxes. Such Charges will be calculated as a newly-initiated Shipment between the original delivery address and the return address, and will include (but not be limited to) all applicable surcharges. All original Charges will continue to apply as if the package were delivered to the original delivery address. Undeliverable international Shipments returned to the Shipper also are subject to an undeliverable Shipment surcharge set forth in the effective UPS Rates. The UPS Service Guarantee does not apply to undeliverable Shipments returned to the Shipper.

# UPS® Tariff/Terms and Conditions of Service – United States

UPS reserves the right to dispose of a Shipment, including salvage (for salvaged Shipments or goods found in the UPS system) if the Shipment is refused by the Consignee or for any other reason cannot be delivered, and return of the Shipment is refused by the Shipper or the Shipment or goods cannot be returned to the Shipper for any reason. UPS reserves the right in its sole discretion to determine whether and how long to retain such Shipments or goods prior to disposition.

## 38. C.O.D. Service

UPS may accept on behalf of Shippers C.O.D. Packages for Delivery in the United States and Puerto Rico. C.O.D. service is not provided for international Shipments except for international Shipments originating in Canada for Delivery in the United States. C.O.D. service is not available for UPS Worldwide Express Freight® Service from any origin. Shippers must be enrolled in one of the four Enhanced C.O.D. services through UPS Capital® to ship C.O.D. Packages. Details regarding how to enroll are set forth at *upscapital.com/ business-services/payment-services/cod*.

### 38.1 Preparation and Listing of C.O.D. Packages

Shippers not using a UPS Automated Shipping System must prepare and attach to each C.O.D. Package a UPS® C.O.D. tag showing the amount to be collected and enter such amount in the space provided for that purpose.

Shippers using a UPS Automated Shipping System will generate, and apply to each C.O.D. Package, a system-generated address label with a C.O.D. bar code and the amount to be collected for each individual Package. Each C.O.D. Package in a UPS Hundredweight Service® or UPS Ground with Freight Pricing C.O.D. Shipment must carry a C.O.D. tag or system-generated label for the goods contained in that Package.

### 38.2 Responsibility for C.O.D.s

Upon Delivery of each C.O.D. Package, UPS will attempt to collect the amount shown on the C.O.D. tag or the system-generated label attached to the Package and transmit to the Shipper the amount so collected (subject to the terms in Section 38.9, "Remittance of C.O.D.s," below), or, if collection cannot be made, will return

the Package to the Shipper. The Shipper must notify UPS within 45 days from the date of shipment of a C.O.D. Shipment if the Shipper has not received payment of the C.O.D. amount, or any claim relating thereto shall be deemed waived. Suits shall be instituted within two years after denial of any portion of the claim.

If collection cannot be made within three Delivery attempts, or the Consignee refuses Delivery, UPS will return the Package to the Shipper.

### 38.3 Consignee's Checks in Payment of C.O.D.s

Unless instructions to collect a cashier's check or money order only are shown on the C.O.D. tag (in conformity with the instructions on the tag) or system-generated label, UPS will accept a check or other negotiable instrument issued by or on behalf of the Consignee. When instructions to collect a cashier's check or money order only are clearly indicated on the C.O.D. tag or system-generated label, UPS reserves the right to accept a cashier's check, money order, official bank check, or other similar instrument issued by or on behalf of the Consignee.

All checks or other negotiable instruments (including cashier's checks, official bank checks, money orders, and other similar instruments) tendered in payment of C.O.D.s will be accepted by UPS solely on behalf of the Shipper and based solely upon the Shipper assuming all risk relating thereto, including, but not limited to, risk of non-payment, insufficient funds, and forgery, and UPS shall not be liable upon any such instrument.

All checks or other negotiable instruments (including cashier's checks, official bank checks, money orders, and other similar instruments) will be transmitted to the Shipper via direct deposit through one of UPS Capital's Enhanced C.O.D. services.

UPS may, in its sole and unlimited discretion, decide to accept payment of C.O.D.s through electronic payment methods.

### 38.4 C.O.D. Package of $10,000 or More

UPS may require payment for any C.O.D. Package of $10,000 or more to be received in a single check or other negotiable instrument such as a cashier's check, money order, official bank check, or other similar instrument.

### 38.5 Acceptance of Personal Check

In the event that UPS accepts a personal or company check when a Shipper has

properly instructed UPS to collect a cashier's check or money order only, UPS reserves the right, in its sole and unlimited discretion, and solely on behalf of the Shipper, to deposit into a UPS account the personal or company check collected and to provide the Shipper with a check issued by UPS.

### 38.6 C.O.D. Remittance Verification

In the event that a Shipper timely notifies UPS that the Shipper has not received payment of the C.O.D. amount, if UPS's records show that it collected a C.O.D. payment and the remittance has not been cashed, UPS may, in its sole and unlimited discretion, provide the Shipper with a digital image of the check or money order along with a C.O.D. Remittance Verification in order to assist the Shipper in locating the missing C.O.D. payment. If the Shipper is still unable to locate the C.O.D. payment, UPS may, in its sole and unlimited discretion, provide the Shipper with an indemnified C.O.D. check or money order, which is a digital image of the original payment collected by UPS at the time of Delivery and can be deposited in a bank, provided that the original check or money order has not previously been deposited or negotiated. If the indemnified check or money order turns out to be invalid for any reason including, but not limited to, insufficient funds or forgery, UPS shall not be liable upon the instrument.

### 38.7 Restrictions

C.O.D.s are accepted for amounts up to $50,000 per Package.

C.O.D. Packages with an amount to be collected in excess of $500 are not accepted for transportation via a UPS Drop Box.

Entry of a C.O.D. amount is not a declaration of value for carriage. Payment of the C.O.D. charge does not constitute payment of the declared value charge.

UPS will not accept currency in any amount for payment of C.O.D. Shipments.

### 38.8 Charges for C.O.D. Collections

An additional charge will be assessed for each C.O.D. Package tendered to UPS.

### 38.9 Remittance of C.O.D.s

Subject to the following provisions of this Section, UPS shall, on behalf of the Shipper, remit C.O.D. collections to the Shipper after the date of collection using means selected in the sole and unlimited discretion of UPS, which may include checks, money orders, electronic payments, or other means. Furthermore, UPS reserves

# UPS® Tariff/Terms and Conditions of Service – United States

the right, in its sole and unlimited discretion, to provide such services through one or more third party service providers selected by UPS.

Unauthorized C.O.D. Packages, including, but not limited to, C.O.D. Packages tendered by Shippers who are not enrolled in one of the four Enhanced C.O.D. services, may result in delays in the remittance of C.O.D. collections to the Shipper. UPS also reserves the right in its sole and unlimited discretion to return such Packages to the Shipper at the Shipper's expense.

The Shipper irrevocably authorizes UPS to apply, in its sole and unlimited discretion and without prior notice to the Shipper, any C.O.D. collections to any past due Charges owed by the Shipper and otherwise authorizes UPS for all purposes to act on the Shipper's behalf with respect to the C.O.D. service. To this end, if there are any past due Charges owed by the Shipper, the Shipper hereby (a) irrevocably assigns and transfers to UPS all of the Shipper's right, title and interest in and to each check or other negotiable instrument for payment of a C.O.D. that is received by UPS or its employee or agent, and (b) constitutes and appoints UPS as the Shipper's attorney-in-fact and authorizes UPS, in the Shipper's name, place, and stead, to endorse any such check or other negotiable instrument with the Shipper's name, to deposit the same into any UPS account, and to apply the proceeds of the same against any past due Charges owed by the Shipper. The Shipper acknowledges and agrees that such appointment of UPS as the Shipper's attorney-in-fact is coupled with an interest and is irrevocable. UPS may exercise any of its rights under this Section either directly or through any employee or agent.

The Shipper relinquishes, waives, and agrees not to assert any claim against UPS or any of its employees or agents, any Consignee, any collecting or paying bank, or any other person or entity, that may directly or indirectly arise as a result of UPS's exercise of any of its rights under this Section "Remittance of C.O.D.s." Without diminishing any of UPS's rights under the preceding sentence, the Shipper agrees that UPS and such other persons or entities shall not be liable to the Shipper or any other person or entity for any special, incidental, or consequential damages in any claim made with respect to UPS's exercise of any such rights.

The Shipper agrees that, following UPS's application of any C.O.D. collections to any past due Charges owed by the Shipper in accordance with this Section, the Shipper will continue to be fully liable for the payment of all remaining Charges owed by the Shipper (including, without limitation, (i) any Charges that are not covered by the application of the C.O.D. collections, and (ii) any Charges relating to a previously applied C.O.D. collection that is reversed by reason of the uncollectibility of the C.O.D. check or other negotiable instrument or otherwise).

Nothing in this Section shall constitute an election of remedies by UPS or any other person or entity or a waiver of any of the rights of UPS or any other person or entity under the remaining provisions of the Terms or at law or in equity.

### 39. UPS Returns® Services

Where available, UPS offers UPS Returns® Services (including UPS Authorized Return Service®, Print Return Label, Electronic Return Label, 1 UPS Pickup Attempt, 3 UPS Pickup Attempts, UPS Returns® on the Web, and UPS Returns® Exchange). 3 UPS Pickup Attempts is not available for UPS Worldwide Express Freight® Service Shipments. UPS Authorized Return Service® requests and UPS Returns® Exchange requests are contractual Package services only.

An additional accessorial charge applies to each UPS Returns® Services Package or pallet and will be assessed when the service is requested, unless the applicable Service Guide specifically provides otherwise. The applicable charges will be those set forth in the UPS Rates in effect at the time the charge is applied. After entering the UPS system, a Package or pallet returned will be charged the rate calculated from the pickup location to the destination via the service selected. The Shipper is solely responsible for controlling the generation and dissemination of labels for UPS Authorized Return Service® Packages and pallets, and will remain liable for all Charges on any Shipment tendered on Shipper's account at any time, including after termination of the contractual service.

Shipments containing certain items are prohibited from being shipped and are not accepted by UPS for UPS Returns® Services

including, but not limited to, Hazardous Materials Shipments requiring shipping papers, firearms, and Shipments with Signature Required services.

C.O.D. (Collect on Delivery) service is not available for UPS Returns® Services Packages. Third Party Billing is not available for UPS Returns® Services in the United States. Third Party Billing is available for UPS Returns® Services outside the United States.

UPS Returns® Services Shipments are subject to maximum declared values. See Section 56.1, "Maximum Declared Values."

### 40. UPS Rates

The applicable UPS Rates are determined on the basis of Shipment and Shipper characteristics, including Shipment weight and size and origin to destination distance, and are subject to change. Except as otherwise stated in the Terms, all charges, fees, or surcharges shall be those set forth in the UPS Rates in effect at the time of shipping. Packages processed for shipment or tendered to UPS on Sundays, holidays or other non-operating days may in UPS's discretion be billed at the UPS Rates in effect on the next UPS operating day.

To determine the amount of any Charges for UPS service, consult the UPS Rates in effect at the time of shipping. The effective UPS Rates are available at ups.com and upon request at the local UPS office.

Shippers are responsible for providing accurate and complete Shipment information in the UPS Shipping System used, including service selected, number, weight, and dimensions of Shipments. If any aspect of the Shipment information is incomplete or incorrect as determined by UPS in its sole and unlimited discretion, UPS may adjust Charges at any time.

If multiple Packages are tendered for transportation, at the same time or at different times, using the same shipping label and tracking number or a shipping label altered without UPS's express authorization, each of which is prohibited, UPS reserves the right to refuse service or to apply Charges to each such Package in its sole and unlimited discretion.

UPS reserves the right in its sole and unlimited discretion to use any mode of transportation whatsoever to provide the service selected by the Shipper. Regardless of the mode of transportation used, the effective UPS Rates for the service selected by the Shipper shall apply. If, however, a Shipper selects a UPS service to a destination for which only a higher level of service

# UPS® Tariff/Terms and Conditions of Service – United States

is available, UPS will substitute the next higher level of available service and will charge the corresponding rate for the substituted service.

### 40.1 Daily Rates and Retail Rates
Daily Rates apply to UPS account holders who received Daily Rates prior to July 11, 2016, to Shippers who establish a six-digit UPS account on or after July 11, 2016, or as UPS may otherwise agree in writing.

Shippers who do not receive Daily Rates will be charged Retail Rates. Retail Rates also apply to Shipments processed and paid for at The UPS Store® locations or UPS Customer Centers, except that charges for Value-Added Services and Other Charges may vary from those set forth in the Retail Rates.

Shippers who drop off at any The UPS Store® location, UPS Access Point location or a UPS Customer Center Packages that have already been processed prior to drop off will receive the rates applicable to the transaction. UPS Worldwide Express Freight® Service pallets that are processed as door-to-door pallets prior to drop off at a UPS Worldwide Express Freight® Center will receive door-to-door rates.

### 40.2 UPS® Simple Rate
UPS Simple Rate is available only for domestic Packages shipped within the U.S. 50 states with an actual weight of 50 pounds or less and a size of 1,728 cubic inches or less. The applicable rate is determined based on Package size in cubic inches and the service selected, as set forth in the applicable Service Guide. Packages that exceed 50 pounds in actual weight or 1,728 cubic inches in size may be assessed the applicable rate for the service selected in effect at the time of shipping, without UPS Simple Rate pricing or application of any discounts or reduction of any type, in UPS's sole and unlimited discretion.

UPS Simple Rate pricing is available for UPS Next Day Air Saver,® UPS 2nd Day Air,® UPS 3 Day Select,® and UPS® Ground Shipments. Separate rates for Shipments originating in or destined to Alaska and Hawaii are available for certain service levels, as set forth in the applicable Service Guide. UPS Returns® Service options for UPS Simple Rate are limited to UPS Print Return Label Service only. UPS Simple Rate is not available for use with UPS Hundredweight Service, Hazardous Materials Shipments, and Third Party or Freight Collect billed Shipments.

UPS Simple Rate Shipments must be processed through *ups.com* shipping or another UPS Automated Shipping System, where available. UPS Simple Rate may not be available through all UPS shipping systems.

The following surcharges do not apply to UPS® Simple Rate Shipments: Residential Surcharge, Delivery Area Surcharge, Delivery Area Surcharge Extended, and fuel surcharges. All other charges apply to UPS Simple Rate Shipments, including but not limited to any accessorial charge or surcharge.

No waiver, discount, or reduction of any type to UPS Simple Rate shall apply unless UPS agrees in writing to such waiver, discount, or reduction with specific written reference to UPS Simple Rate.

### 40.3 Letter Rates
Letter Rates for domestic Shipments are available only for UPS Express® Envelopes containing correspondence, urgent documents, or electronic media, with an actual weight of eight ounces or less. UPS Express® Envelopes containing items other than those listed or weighing more than eight ounces will be assessed the corresponding rate for the applicable weight. For international Shipments, UPS Express® Envelopes may be used only for single package documents of no commercial value (which may include electronic media in some countries), with an actual weight of eight (8) ounces or less. UPS Express® Envelopes containing other items, or weighing more than eight (8) ounces will be assessed the corresponding rate for the applicable weight (except as expressly set forth in Section 40.4 ("Pak Rates")).

### 40.4 Pak Rates
Pak Rates are available only for UPS Worldwide Express Plus,® UPS Worldwide Express,® and UPS Worldwide Saver® single package U.S. export shipments in UPS Express® Envelopes containing correspondence, urgent documents, or electronic media, with an actual weight of more than eight ounces but less than or equal to two pounds; or when UPS Express® Pak is selected at the time of shipping, the customs value of the Package is less than or equal to $100.00, and the weight of the Package is two pounds or less. UPS Express® Pak shipments weighing more than two pounds will be assessed the corresponding applicable UPS Rates for the Shipment.

### 40.5 UPS 10 KG Box and UPS 25 KG Box Rates
UPS 10 KG Box and UPS 25 KG Box Rates apply to UPS Worldwide Express Plus®, UPS Worldwide Express®, and UPS Worldwide Saver® single package U.S. export Shipments, using UPS 10 KG Box and 25 KG Box packaging. Shipments that exceed 10 KG and 25 KG, respectively, will be assessed the applicable UPS Rates for the actual weight and service selected.

### 40.6 Private Express Statutes
The Shipper shall comply with the requirements of the Private Express Statutes when using UPS 2nd Day Air® A.M. and UPS 2nd Day Air® services.

### 40.7 Rates for Large Packages; Large Package Surcharge
For domestic Shipments, a Package is considered a "Large Package" when its length (longest side of the package) plus girth [(2 x width) + (2 x height)] combined exceeds 130 inches, or its length exceeds 96 inches.

For international Shipments, a Package is considered a "Large Package" when its length (longest side of the package) plus girth [(2 x width) + (2 x height)] combined exceeds 130 inches.

The rate for a Large Package will be based on the greater of the dimensional weight or the actual weight, and is subject to a minimum billable rate set forth in the UPS Rates applicable to the Shipment in effect at the time of the shipping.

A Large Package Surcharge (LPS) will be applied to each Large Package, including any Package that exceeds the weight or size restrictions set forth in Section 3.1 ("Items Not Accepted for Transportation"). Each Large Package in a multiple-package Shipment may receive an LPS. LPS will not apply to UPS Authorized Return Service® UPS® Ground Packages, or to UPS Worldwide Express Freight® Service Shipments.

### 40.8 Over Maximum Limits Charge
Packages that exceed the weight or size restrictions set forth in Section 3.1 ("Items Not Accepted for Transportation") are subject to one or more of the following additional charges: Over Maximum Weight, Over Maximum Length, or Over Maximum Size. Such charges apply in addition to all other applicable Charges, including but not limited to the Large

# UPS® Tariff/Terms and Conditions of Service – United States

Package Surcharge. UPS reserves the right in its sole and unlimited discretion to return such Packages to the Shipper at Shipper's expense.

### 40.9 Additional Handling Charge

An Additional Handling charge will be assessed for any Package that requires special handling, as determined by UPS in its sole and unlimited discretion, including, but not limited to:

– Any article that is not fully encased in a corrugated cardboard shipping container, including tires;

– Any Package with an outer shipping container not made of corrugated cardboard, including but not limited to canvas, leather, metal, wood, hard plastic, soft plastic (e.g., plastic bag), or expanded polystyrene foam (e.g., Styrofoam);

– Any article that is encased in a soft-sided pack (e.g., poly bag or bubble mailer) that exceeds 18 inches along its longest side or 14 inches along its second-longest side or 6 inches in height;

– Any Package with an outer shipping container covered in shrink wrap or stretch wrap;

– Any Package bound with metal, plastic or cloth banding, or that has wheels, casters, handles, or straps (including Packages where the outer surface area is loosely wrapped or where the contents protrude outside the container surface);

– Any cylindrical-like item, including but not limited to barrels, buckets, drums, mailing tubes, or pails;

– Any Package routed through UPS's irregular package sortation process, including but not limited to Packages 1 inch or less in height;

– Any Package with its longest side exceeding 48 inches or its second-longest side exceeding 30 inches;

– Any Package with its length (longest side of the package) plus girth [(2 x width) + (2 x height)] combined exceeding 105 inches;

– Any domestic Package with an actual weight greater than 50 pounds;

– Any international Package with an actual weight greater than 55 pounds;

– Each Package in a UPS Hundredweight Service® or UPS® Ground with Freight Pricing Shipment where the average weight per Package is greater than 50 pounds and the weight for each Package is not specified in the UPS Shipping System used; and

– Each Package in a UPS® Standard or international Shipment (excluding UPS

Worldwide Express Freight® Service Shipments) where the average weight per Package is greater than 70 pounds and the weight for each Package is not specified in the UPS Shipping System used.

The rate for an Additional Handling Package will be based on the greater of the dimensional weight or the actual weight, and is subject to a minimum billable rate set forth in the UPS Rates applicable to the Shipment in effect at the time of the shipping.

### 40.10 Oversize Pallet Handling Surcharge

UPS Worldwide Express Freight® Service pallets are subject to maximum size and weight restrictions (which vary by origin and destination) as set forth at _ups.com/wwefmaxdimweight_. Pallets exceeding size or weight restrictions are not accepted for transportation without prior approval by UPS. Pallets that exceed these restrictions are subject to an Oversize Pallet Handling Surcharge.

## 41. Demand Surcharges

One or more Demand Surcharge will apply to certain Packages tendered to UPS for shipment during a Demand Period. The term Demand Surcharge includes Peak Surcharge and Peak/Demand Surcharge, and the terms are used interchangeably. Details regarding the application of Demand Surcharges and Demand Periods are set forth at _ups.com/peaksurcharges_. Demand Surcharges apply cumulatively if a Package meets more than one of the specified criteria. Demand Surcharges apply in addition to any other applicable Charges. No waiver, discount, or reduction of any type to Demand Surcharges shall apply unless UPS agrees in writing to such waiver, discount, or reduction with specific written reference to the Demand Surcharges.

## 42. Surge Fees

UPS reserves the right to impose one or more Surge Fees on Packages shipped during such specific periods as UPS may designate in its sole and unlimited discretion. Details regarding the application of Surge Fees are set forth at _ups.com/assets/resources/webcontent/en_US/surge-fee.pdf_. Such Surge Fees apply cumulatively if a Package meets more than one of the specified criteria for a Surge Fee, and Surge Fees apply in addition to any other applicable Charges, including but not limited to one or more Demand Surcharges. No waiver, discount, or reduction of any type to Surge Fees shall apply unless UPS agrees in writing to such waiver, discount, or reduction with specific written reference to Surge Fees.

## 43. Fuel Surcharges

UPS reserves the right to institute fuel surcharges on some or all Shipments without prior notice. The surcharges are subject to adjustment weekly. The surcharges may apply to any or all domestic and international transportation charges and other charges including, but not limited to, certain accessorial charges, value-added charges, surcharges and other charges. The current fuel surcharges are set forth at _ups.com/fuelsurcharge_.

Regardless of the mode of transportation used, the effective fuel surcharge for the service selected by the Shipper shall apply. The surcharges will be applied to such services and for such periods as UPS, in its sole and unlimited discretion, may determine necessary.

## 44. Manual Processing Charges

UPS reserves the right to assess a manual processing charge of $0.50 per Package or $35 per week (whichever is greater) to Shippers who ship Packages using a UPS Shipping System that applies outdated UPS Rates until such time as the Shipper upgrades the UPS Shipping System to reflect current UPS Rates.

A manual processing service charge will be assessed to each Package shipped using a UPS 3 Day Select® or UPS Ground shipping document.

## 45. Third Party Billing Service

Any Shipment billed to a Third Party (regardless of the country of origin or destination of the Shipment) is subject to a Third Party Billing Service fee, charged to the payer, set forth in the Service Guide at the time of shipping. The fee for Third Party Billing Service shall be charged for each transaction, based upon all Charges, excluding charges, duties and taxes assessed by government authorities. The Third Party Billing Service fee will not apply to UPS Returns Services or UPS Import Control Shipments.

## 46. Billing Options for Domestic Shipments

Unless otherwise agreed to in writing by UPS, Charges will be billed to the Shipper.

UPS accepts Shipments for Freight Collect billing and Third Party billing (subject to a Third Party Billing Service fee), provided the Consignee or Third Party has a valid UPS account number, an approved UPS agreement for Third Party billing/Freight Collect billing, and has agreed to accept the Charges. Regardless of the billing option

# UPS® Tariff/Terms and Conditions of Service – United States

selected, some charges including, but not limited to, address correction charges, will be billed to the Shipper. Shippers remain liable for all Charges unless and until such Charges are otherwise paid. UPS may provide UPS account holders with options designed to restrict Charges to their accounts from Freight Collect billing and Third Party billing, which may include options to restrict such billing from all Shippers, or to implement an approved list of permitted Shipper accounts, or a prohibited list of Shipper accounts. Account holders may implement such options at ups.com/vip/view?loc=en_US. UPS account holders must follow all applicable UPS procedures in connection with implementing such options.

Notwithstanding the use of any such options or any other instructions provided to UPS: (a) all UPS account holders are responsible for timely monitoring Charges to their accounts, and agree to accept and pay all Charges that are Freight Collect or Third Party billed to their accounts, including Charges on any Packages manifested before UPS has been instructed to restrict Freight Collect or Third Party billing, subject only to Section 53.1 below; and (b) by authorizing a Shipper to Freight Collect or Third Party bill to its accounts, Third Parties and Receivers are deemed to authorize all billing activity by such Shipper to the Third Party or Receiver.

## 47. Billing Options for International Shipments

The amount billed includes, but is not limited to, Charges, duties, fees, and taxes, if applicable. Unless otherwise restricted in the origin or destination country, Shippers tendering Packages using a UPS Shipping System may select the payer of Charges, duties, and taxes as Shipper, Receiver, or Third Party (subject to a Third Party Billing Service fee). UPS accepts shipments for Freight Collect or Third Party billing provided the Receiver or Third Party has a valid UPS account number, an approved UPS agreement for Third Party billing/Freight Collect billing, and has agreed to accept the Charges. Shippers remain liable for all Charges unless and until such Charges are otherwise paid. UPS may provide UPS account holders with options designed to restrict Charges to their accounts from Freight Collect billing and Third Party billing, which may include options to restrict such billing from all Shippers, or to implement an approved list of permitted

Shipper accounts, or a prohibited list of Shipper accounts. Account holders may implement such options at ups.com/vip/view?loc=en_US. UPS account holders must follow all applicable UPS procedures in connection with implementing any such options. Notwithstanding the use of any such options or any other instructions provided to UPS: (a) all UPS account holders are responsible for timely monitoring Charges to their accounts, and agree to accept and pay all Charges, including, but not limited to, duties, fees, and taxes, that are Freight Collect or Third Party billed to their accounts, including Charges on any Packages manifested before UPS has been instructed to restrict Collect or Third Party billing, subject only to Section 53.1 below; and (b) by authorizing a Shipper to Freight Collect or Third Party bill to its accounts, Third Parties and Receivers are deemed to authorize all billing activity by such Shipper to the Third Party or Receiver.

An additional Duty and Tax Forwarding Surcharge will apply if the Shipper selects a billing option in which duties and taxes are to be paid outside of the destination country.

An additional Import Collect on Delivery Fee will be assessed to the U.S. Consignee when collecting import charges at the time of delivery. Details regarding the fee are published at ups.com/rates.

UPS reserves the right in its sole and unlimited discretion to request advance payment of Charges for any Package sent to or from any international destination or origin.

For all Shipments where the Shipper is not paying the Charges, the Shipper must notify the bill payer prior to shipping, and agree to pay all Charges in the event of non-payment by the bill-to party. All Shipments must have a valid UPS billing option indicated on the UPS Shipping System entry. Regardless of the billing option selected, some charges including, but not limited to, address correction charges, will be billed to the Shipper.

## 48. Bill My Account

UPS may provide in its sole and unlimited discretion a Bill My Account service to registered Shippers to allow the Shipper to bill to its own account Charges incurred at UPS Customer Centers and participating Third-Party Retailer locations. A processing fee for using Bill My Account may apply and may vary by shipping location. When using Bill My Account, a Shipper with customized contract incentives that

may otherwise apply to the account may be limited to certain maximum incentives ("Incentive Caps"). The applicable processing fee and Incentive Caps are subject to change without prior notice and are published at ups.com/rates. Incentive Caps and processing fees in effect at the time of shipping will apply to Shipments billed using Bill My Account.

## 49. Disbursement Fee

To expedite customs clearance, UPS may make or process payments of duties and taxes on behalf of the payer as dictated by the billing option selected. An additional fee, set forth in the UPS Rates applicable to the Shipment in effect at the time of shipping, will be assessed and billed to the payer.

## 50. Currency Conversion Rate

Charges to a payer's account in a foreign currency will be converted to the payer's currency using a weekly exchange rate secured through Major Money Center Banks, plus an exchange fee, set forth in the UPS Rates applicable to the Shipment in effect at the time of shipping.

## 51. Missing/Invalid Account Number or Refusal Fee

A processing fee will be charged for a missing or invalid account number when the account number, including the Shipper's account number, is missing, the account number is not the correct account number for the bill-to party, the account number is for a Receiver or Third Party who fails to pay the Charges, or the Package is shipped to an unauthorized Consignee. In the event of non-payment by the Receiver or Third Party, the Shipper will be billed a refusal fee plus the Charges.

## 52. Shipping Charge Corrections; Audit Fee

UPS reserves the right to bill for Charges based upon the characteristics of, and services requested for, Shipments actually tendered to UPS. UPS also reserves the right to audit any Package, Shipment and/or invoice to verify service selection, dimensions, or weight, and applicability of any Charges. As part of that audit, UPS may weigh and measure any Package or Shipment tendered to UPS using any method UPS deems appropriate, including but not limited to multidimensional measuring devices. UPS may in its sole and unlimited discretion increase or adjust Charges based on the results of such

# UPS® Tariff/Terms and Conditions of Service – United States

audit. UPS reserves the right in its sole and unlimited discretion to bill for Charges based on shipping characteristics provided by the Shipper, regardless of whether UPS has audited the shipping characteristics. In the event that a Package's or Shipment's dimensions are altered during transit, UPS reserves the right to bill for Charges based on the altered dimensions.

An audit fee may be assessed for shipping charge corrections, as set forth in the effective UPS Rates.

## 53. Payment of Charges

Except where an alternative payment plan applies, UPS's payment terms require payment in full in advance.

UPS may provide in its sole and unlimited discretion alternative payment terms to certain of its Shippers. UPS, in its sole and unlimited discretion, shall decide which, if any, of the alternative payment plans described below (see Section 53.2, "Alternative Payment Plans") will be made available to the Shipper.

A Shipper that is not enrolled in any of the Alternative Payment Plans described below shall pay all Charges in advance of shipment, as required by UPS.

Notwithstanding any billing plan that is in effect or payment or billing option selected at the time of shipment, the Shipper is ultimately liable for and agrees to pay all Charges, including in the event of insolvency, bankruptcy, non-payment, refusal to pay by the Receiver or Third Party, or where the Receiver or Third Party obtains an invoice adjustment on the basis that the Charges were not authorized.

All Charges must be paid in the lawful money of the United States of America.

If a Shipper submits Shipment information to UPS through a UPS Shipping System and does not subsequently tender such Shipment to UPS, it is the Shipper's sole responsibility to request an adjustment in the event Shipper is invoiced for any such Shipments (even where Shipper is ordinarily invoiced based on a UPS package scan), as set forth below (see Section 53.1, "Invoice Adjustment"). Shippers who fail to do so will be liable for all applicable Charges.

As an accommodation to the Shipper, and in UPS's sole and unlimited discretion, UPS may render invoices, or copies of

invoices, or charge certain Packages to a Third Party or Receiver at the request of the Shipper. The Shipper remains responsible for the timely payment in full of all Charges owed by the Shipper. By requesting UPS to render invoices, or copies of invoices, or charge certain Packages to a Third Party or Receiver, the Shipper is deemed to authorize the Third Party or Receiver to act on behalf of the Shipper, and UPS may rely thereon in all respects.

UPS also may in its sole and unlimited discretion elect to render an invoice that includes amounts owed for services provided by UPS affiliates.

If Charges are paid by payment card or by an electronic payment method, the Shipper expressly authorizes UPS to assess any Charges and to obtain payment of the Charges by use of the payment card or electronic payment method. If, for any reason, any such transaction is rejected or declined, the Shipper will pay to UPS a declined transaction fee of ten dollars ($10) per incident, in addition to any late payment fees assessed by UPS and any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper. The Shipper authorizes UPS to charge the declined transaction fee to the Shipper's payment card account or electronic payment account or to collect the fee directly from the Shipper, at UPS's sole option.

For Charges paid by check or wire transfer, UPS will apply an additional fee per payment. Details regarding the fee are published at ups.com/rates.

If, for any reason, a negotiable instrument submitted to UPS as payment for Charges is returned to UPS unpaid, or an electronic request for payment is dishonored, UPS may charge the Shipper a dishonored payment fee of twenty dollars ($20) per incident, in addition to any late payment fees assessed by UPS and any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper.

UPS may provide trade credit information on its Shippers to commercial reporting agencies.

A payment processing fee equal to two percent (2%) of all invoice charges will be added to each invoice. Details regarding the fee are published at ups.com/rates.

### 53.1 Invoice Adjustment
#### – 53.1.a Invoice Adjustments (General)

Except as otherwise set forth in Section 53.1.b, requests for an invoice adjustment (e.g., adjustment of Charges based on an incorrect rate, billable weight, account number, failure to tender a Shipment, type of service, shipping charge correction, etc.) or a refund due to a duplicate payment must be received by UPS within 180 days of receiving the contested invoice, or any billing dispute is waived.

#### – 53.1.b Invoice Adjustments (Unauthorized Charges)

UPS account holders are responsible for timely monitoring Charges to their accounts and are deemed on notice of Charges once they have been billed. A UPS account holder (including a Shipper, Receiver or Third Party) that disputes Charges (whether direct, Freight Collect billed, Third Party billed or otherwise) on the basis that the Charges were not authorized (a "Fraud Dispute") must request to block further shipping and billing activity on the affected account(s) immediately upon discovery of unauthorized activity.

Any UPS account holder making a Fraud Dispute must provide proof that the Charges were not authorized by an actual or apparent agent or representative. In addition, any Fraud Dispute must be received by UPS within the following timeframe, as applicable, or the dispute is waived: (a) within the timeframe set forth in Section 53.1.a, if the Fraud Dispute is for Freight Collect or Third Party billed Charges, and the UPS account holder had blocked all Freight Collect and Third Party billed Charges on the applicable account in accordance with Sections 46 or 47, as applicable, before the packages with disputed Charges were manifested; or (b) for all other Fraud Disputes, within 30 days of receiving the contested invoice. All Fraud Disputes also must comply with the notice and other requirements set forth in Section 53.1.c.

No UPS account holder will be eligible for more than $10,000 per calendar year in refunds or other invoice adjustments (aggregated across all affiliated accounts and other related accounts for such account holder) for Fraud Disputes. The foregoing limitation will not apply, however, to Fraud Disputes for Freight Collect and Third Party billed Charges,

# UPS® Tariff/Terms and Conditions of Service – United States

where the UPS account holder had blocked all such Charges on its applicable account in accordance with Sections 46 or 47, as applicable, before the packages with unauthorized Charges were manifested.

**– 53.1.c Invoice Adjustments (Procedures For Requesting)**

Notification to UPS of a request for an invoice adjustment under Sections 53.1.a and 53.1.b must be made in writing using one of the following methods:

– Submit a request through UPS's online Billing Center at *ups.com/billing*;

– Email a request to UPS through the *ups.com* website using the "Support Category" "billing"; or

– Mail a request to United Parcel Service, P.O. Box 7247-0244, Philadelphia, PA 19170-0001.

The notification to UPS must include the date of shipment, the tracking number for each disputed charge, and the reason for the disputed charge. A partial payment against an invoice is not considered a request for an invoice adjustment or notice to UPS of a disputed charge. UPS reserves the right to refuse to issue any invoice adjustment until all outstanding Charges owing to UPS have been paid in full.

The filing of a lawsuit does not constitute notification by the filer or on behalf of any other party.

Requests for invoice adjustments cannot be made without a good faith basis for submitting the request as to each specific package and adjustment requested. If UPS determines that a requestor has submitted batch or multiple single requests for adjustments without a substantial basis, all requests of such requestor will be denied in their entirety for such time period as UPS may determine in its sole and unlimited discretion. A right or claim, of any kind, to challenge the amount invoiced is conditioned upon full and strict compliance with all requirements regarding notice set forth in this Section; otherwise, failure to comply with the notice requirements set forth in this Section constitutes agreement to pay the amount in the invoice. Full and strict compliance with this Section is required, even where it is believed that such compliance would not result in relief or would otherwise be futile.

**53.2 Alternative Payment Plans**

Where UPS elects to make an alternative payment plan available to the Shipper, UPS may render an invoice to the Shipper on a weekly (i.e., seven days) or a monthly (i.e., four or five calendar weeks) basis. A weekly invoice will include the Charges incurred in the previous week. Notwithstanding that UPS has elected to render an invoice to the Shipper on a weekly basis, an invoice may be issued only when the Shipper has incurred aggregate Charges in excess of ten dollars ($10), or when five (5) calendar weeks have elapsed from the date of issuance of the last invoice, whichever event occurs first. A monthly invoice will include the Charges incurred for the four- or five-week period for which the invoice is issued. In its sole and unlimited discretion, UPS may offer one or more of the following alternative payment plans for the payment of Charges:

**– Electronic Funds Transfer Plan (Debit EFT)**

By written agreement with UPS, the Shipper will provide UPS with the Shipper's bank account number and bank routing number to enable UPS to electronically request payment, for all Charges incurred by the Shipper, directly from the Shipper's bank, on a weekly or monthly basis. The Shipper's bank will remit the amount requested to UPS and deduct that amount from the Shipper's bank account. Payments to UPS will be shown on the Shipper's bank statements. The Shipper is responsible for payment of any fees imposed by the Shipper's bank. Additionally, the Shipper will receive a weekly or monthly invoice, as applicable, except as described above, from UPS listing the services provided for the applicable billing period. If, for any reason, an electronic request for payment is dishonored, the Shipper is responsible for making a timely payment directly to UPS. Past due balances will be subject to any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper. No late payment fee shall be assessed with respect to the Electronic Funds Transfer Plan.

**– Monthly Prepayment Plan**

By written agreement with UPS, the Shipper will make a prepayment with UPS in an amount equal to four weeks' anticipated Charges as estimated by UPS. Upon notice to the Shipper, the required prepayment amount may be changed by UPS at any time to reflect a revised estimate of four weeks' Charges. All prepayment amounts will remain on account with UPS. No interest will be paid or accrued on the prepayment amounts.

The Charges incurred for the applicable month will be totaled and billed to the Shipper on a monthly basis. Payment is due within seven (7) days after receipt of the UPS invoice. Past due balances will be subject to a late payment fee as described below in addition to any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper.

**– Weekly Prepayment Plan**

By written agreement with UPS, the Shipper will make a prepayment with UPS in an amount equal to four weeks' anticipated Charges as estimated by UPS. Upon notice to the Shipper, the required prepayment amount may be changed by UPS at any time to reflect a revised estimate of four weeks' Charges. All prepayment amounts will remain on account with UPS. No interest will be paid or accrued on the prepayment amounts.

Shipper will receive invoices on a weekly basis, except as described above. Each invoice will list the previous period's Charges incurred. Payment for all accumulated Charges will be due within seven (7) days following the Shipper's receipt of every fourth invoice; however, if prior to receiving the fourth invoice the Shipper's accumulated Charges should equal or exceed the prepayment amounts on account with UPS, then the accumulated Charges will be due within seven (7) days following the Shipper's receipt of the invoice requiring such payment. Past due balances will be subject to a late payment fee as described below, in addition to any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper.

**– Special Payment Plan**

By written agreement with UPS, the Shipper may prepay an amount equal to the anticipated Charges for a period of between ten to twenty-six weeks, as estimated by UPS. The Charges actually incurred by the Shipper will be deducted by UPS on a weekly basis from the prepayment amounts on account with UPS. Weekly invoices marked as paid will

# UPS® Tariff/Terms and Conditions of Service – United States

be forwarded to the Shipper reflecting the balance of the prepayment amount on account with UPS. When the prepayment amount on account with UPS reaches the minimum balance specified in the written agreement, the Shipper is required to make another prepayment for an additional period pursuant to the same agreement, or, if the Shipper does not do so, the Shipper must make another payment arrangement with UPS. All prepayment amounts will remain on account with UPS. No interest will be paid or accrued on the prepayment amounts. If the Charges incurred by the Shipper exceed the remaining balance of the prepayment amounts on account with UPS, the excess Charges will be due within seven (7) days following the Shipper's receipt of the invoice requiring such payment. Past due balances will be subject to a late payment fee as described below in addition to any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper. This payment plan alternative is available only to existing customers already approved for a Special Payment Plan.

**– Credit Extension Plan**

By written agreement with UPS, the Shipper may elect to pay an annual credit extension fee and thereafter receive invoices for Charges incurred by the Shipper on a monthly basis with no prepayment requirement. The invoices will be payable within seven (7) days following receipt by the Shipper. The credit extension fee is based upon the Shipper's total annual Charges, as estimated by UPS, and is subject to change annually by UPS in its sole and unlimited discretion. To be eligible for the Credit Extension Plan, the Shipper must use UPS's transportation services and the Credit Extension Plan solely for business, commercial, or agricultural purposes. A Shipper is not eligible for the Credit Extension Plan if the Shipper uses UPS's transportation services and the Credit Extension Plan for any personal, family, or household purposes. By using the Credit Extension Plan (if made available to the Shipper), the Shipper represents, warrants, certifies, and agrees that it will use UPS's transportation services and the Credit Extension Plan solely for business, commercial or agricultural purposes and not for any personal, family, or household purposes. Past due balances will be subject to a late payment fee as described below in addition to any collection costs

which may be incurred by UPS in the final collection of Charges owed by the Shipper.

**– Weekly Payment Plan**

Each week the Shipper will receive an invoice for the previous week's Charges except as described above. The invoice is due within seven (7) days of receipt. No prepayment is required under this plan.

Past due balances will be subject to a late payment fee as described below in addition to any collection costs which may be incurred by UPS in the final collection of Charges owed by the Shipper.

**– Credit Card Payment Plan**

The Shipper may elect to pay the previous week's Charges by credit card. The Shipper will receive billing detail itemized on its card statement or a weekly invoice, except as described above, from UPS listing the previous period's Charges incurred. The Shipper will provide UPS with the Shipper's credit information to enable UPS to process Charges incurred by the Shipper on a weekly basis.

Shipper acknowledges and agrees that there may be a delay of two or more days between the date that payments are received by UPS and the date that the payments are posted and credited to the Shipper's account with UPS. If a UPS remittance advice is attached to the Shipper's payment, the payment will be credited accordingly. If no remittance advice is attached to the Shipper's payment, the payment will be credited to the Shipper's account.

**53.3 Late Payment Fee**

A late payment fee will be assessed if the Shipper's payment for any Charges is not received by UPS by the invoice due date. Except as otherwise stated below, the late payment fee will equal nine point nine percent (9.9%) of the total past due balance of the Shipper's invoice (including without limitation any previously assessed but unpaid late payment fees).

In determining the late payment fee for the Monthly Prepayment Plan and the Weekly Prepayment Plan, UPS will apply the prepayment amounts on account with UPS to reduce the calculated base amount on which the late payment fee is assessed, provided that UPS will so apply the prepayment amounts to the oldest outstanding invoice first, and to each subsequent invoice thereafter, until the prepayment amounts have been fully so

applied. If an invoice past due is fully so covered by the prepayment amount, no late payment fee will apply. If an invoice past due is partially so covered by the pre-payment amount, the late payment fee will apply to the portion not so covered by the prepayment amount.

For the Special Payment Plan, a late payment fee will not be assessed if there has been a positive balance in the Shipper's prepayment account with UPS at any time during the 27-day period immediately preceding the transmittal of the current invoice to the Shipper. The late payment fee for the Special Payment Plan will be assessed on the "charges this period" of the Shipper's invoice (including without limitation any previously assessed but unpaid late payment fees) that is past due.

A late payment fee will be assessed only once on each invoice that is past due. Each late payment fee will be due and payable within seven (7) days following the Shipper's receipt of the invoice that first reflects the assessment of the late payment fee. The late payment fee is in addition to any collection costs that may be incurred by UPS in the final collection of Charges owed by the Shipper. Neither the assessment nor the payment of a late payment fee will (a) affect the Shipper's responsibility to pay all Charges owed, or (b) in any manner preclude UPS from exercising any of its rights or remedies hereunder or under applicable law or regulation.

**53.4 Lien on Shipments**

UPS shall have a general and continuing lien on any and all Shipments for which services are being provided by UPS that come into UPS's actual or constructive possession or control for monies owed to UPS with regard to the Shipment on which the lien is claimed and/or any and all prior Shipment(s).

**54. UPS Service Guarantee**

UPS guarantees on-schedule Delivery of Shipments shipped via the following services, where available, to all 50 states and Puerto Rico:

– UPS Next Day Air® Early
– UPS Next Day Air®
– UPS Next Day Air Saver®
– UPS 2nd Day Air A.M.®

# UPS® Tariff/Terms and Conditions of Service – United States

UPS guarantees on-schedule Delivery of Shipments shipped via the following services, where available, and provided that customs clearance is performed by UPS Supply Chain Solutions® brokerage offices designated by UPS for clearing these Shipments:

– UPS Worldwide Express Plus®
– UPS Worldwide Express NA1®
– UPS Worldwide Express®
– UPS Worldwide Express Freight® Service
– UPS Worldwide Saver®
– UPS Worldwide Express Saver®

In the event UPS fails to attempt Delivery by the date and time (if applicable) indicated at *ups.com/ctc*, for the applicable date, time and location of tender, or as provided when 1-800-PICK-UPS® (1-800-742-5877) is called, UPS, at its option, will either credit or refund the transportation charges for each such Shipment to the payer only, upon request, provided the conditions set forth in the UPS Service Guarantee are met. Transportation charges do not include other fees or charges that may be assessed by UPS including, but not limited to, fuel surcharges. This is the sole remedy available under the UPS Service Guarantee. UPS may, but is not required, to present the actual time of Delivery in tracking detail or proof of Delivery, and reserves the right to amend the actual time of Delivery within forty-eight (48) hours of the date of Delivery.

UPS shall not have any liability whatsoever for delayed Delivery, except as specifically provided for Shipments guaranteed under the UPS Service Guarantee. Under no circumstances shall UPS be liable for any special, incidental, or consequential damages including, but not limited to, damages arising from delayed Delivery or failure to attempt on-schedule Delivery.

UPS may cancel, suspend or modify the UPS Service Guarantee (or change the guaranteed time in transit) for any service(s), and for any period of time, as determined by UPS in its sole and unlimited discretion, and without prior notice. Details are set forth at *ups.com/serviceguarantee*.

## 54.1 Conditions

The UPS Service Guarantee is subject to the following conditions:

– UPS's guaranteed Delivery schedule has been obtained by referencing UPS's website or contacting a UPS Customer Service office. "On-time" or "on-schedule" means, subject to the terms of this UPS Service Guarantee, Delivery is attempted before or within 60 seconds of the Delivery time published in the UPS guaranteed Delivery schedule. UPS shall be deemed to have attempted "on-time" or "on-schedule" Delivery for purposes of the UPS Service Guarantee if (i) any of the exclusions to the UPS Service Guarantee applies, or (ii) any of the conditions set forth in the UPS Service Guarantee is not met.

– Each Package and Shipment is properly recorded in a UPS Shipping System.

– Each Package and Shipment bears the appropriate UPS tracking label and an address label, or a combined label generated by a UPS Automated Shipping System, showing the Consignee's correct name, deliverable address (UPS does not provide Delivery to a P.O. Box), and ZIP Code (or postal code for international Shipments).

– Each Package or pallet in a Shipment bears a UPS Saturday Delivery routing label (where required) when optional Saturday service is requested and available.

– Each Shipment is tendered to UPS during UPS's published business hours. Shipments received from or destined to certain locations may require earlier pickup times (available at the UPS website).

– UPS is notified by UPS's Interactive Voice Response system or through UPS's online Billing Center at *ups.com/billing* of a service failure within fifteen (15) calendar days of the date of scheduled Delivery or the date by which UPS has amended or corrected the actual time of Delivery in tracking detail or proof of Delivery, whichever is later, and is advised of the Consignee's name and address, date of shipment, Shipment weight, and UPS tracking number.

– For UPS Worldwide Express Freight® Service Shipments, the guarantee shall apply to a Shipment where any pallet exceeds maximum size or weight restrictions (as set forth at *ups.com/uwefmax dimweight*) only if the Shipper obtained confirmation of eligibility for the UPS Service Guarantee, prior to tender of the Shipment to UPS for service.

UPS reserves the right to refuse any request for a credit or refund when such request is either (a) made by, or (b) based on information obtained by, a party other than the payer of the Charges.

## 54.2 Exclusions

UPS may cancel, suspend or modify the UPS Service Guarantee (or change the guaranteed time in transit) for any service(s), and for any period of time, as determined by UPS in its sole and unlimited discretion, and without prior notice. Details are set forth at *ups.com/service guarantee*.

The UPS Service Guarantee does not apply to:

– UPS 2nd Day Air A.M.® Packages for Residential deliveries.

– Shipments tendered pursuant to Drop Shipments, special operating plans, or customized handling or processing arrangements, or tendered either under an account number on which Service Guarantee claims are addressed by a special agreement or where such claims have been addressed by special agreement with the payer of the Charges.

– Shipments processed using a UPS Automated Shipping System that is not located at the pickup address assigned to the UPS account number on which the Shipment was made.

– UPS Ground Returns Service Packages.

– Packages subject to a Large Package Surcharge or Additional Handling Fee, Packages that exceed maximum size or weight limits, Shipments containing any Package subject to a Large Package Surcharge, Additional Handling Fee, or that exceed maximum size or weight limits, or UPS Worldwide Express Freight® Service Shipments tendered without prior approval containing any pallet exceeding maximum size or weight restrictions (as set forth at *ups.com/ uwefmaxdimweight*).

– Shipments made using a Call Tag.

– Shipments subject to a UPS Delivery Intercept® request, Delivery Change Request, or a UPS My Choice® request.

– Shipments that are delayed due to causes beyond UPS's control including, but not limited to: the unavailability or refusal of a person to accept Delivery of the Shipment, acts of God, natural disasters,

# UPS® Tariff/Terms and Conditions of Service – United States

war risks, acts of terrorism, acts of public authorities acting with actual or apparent authority, acts or omissions of customs or similar authorities, authority of law, insufficient information provided by a customer, Hazardous Materials Packages improperly offered for transport, the application of security regulations imposed by the government, or otherwise applicable to the Shipment, riots, strikes or other labor disputes, civil unrest, disruptions in national or local air or ground transportation networks (including, but not limited to, UPS's transportation network), pandemic, epidemic or other public health conditions, disruption or failure of communication and information systems, and adverse weather conditions.

– International Shipments for which the Shipper has selected the Receiver or Third Party as the payer of any applicable duties and taxes and Delivery is delayed until payment arrangements are made.

– UPS Import Control® Shipments for which the Shipper has selected commercial invoice removal.

– UPS Ground Shipments or UPS® Standard Shipments that are picked up or scheduled to be delivered during the applicable dates set forth in the Year-End Holiday Schedule available at ups.com/holidays.

– Shipments without Timely Upload of PLD, Shipments not accompanied by a UPS Smart Label tag, or when the delivery address on any address label or combined label affixed to the Package does not match the delivery address on the UPS Smart Label tag, bar code, or PLD for the Package.

– UPS Air Services and UPS 3 Day Select Shipments of Hazardous Materials or Dangerous Goods Shipments, and all international Hazardous Materials or Dangerous Goods Shipments except UPS Standard Shipments.

## 55. Claims and Legal Actions: Individual Binding Arbitration of Claims

Time Limits and Pleading Requirements for Claims/No Right to Set Off
Claims against UPS must be made within strict time limits, including as set forth in Section 53.1 ("Invoice Adjustment") regarding invoice adjustments or billing disputes; Section 55.3 ("Time Limit for

Notice and Filing of Claims for Loss or Damage to Property") regarding claims for loss or damage to property; and pursuant to Section 54 "UPS Service Guarantee."

All claims against UPS arising out of or related to the provision of services by UPS, including, but not limited to, demands for damages, refunds, credits, and any legal or equitable relief whatsoever, shall be extinguished unless the Claimant (1) timely and completely complies with all applicable notice and claims periods set forth in the Terms and in the Service Guide, including as to claims for loss or damage to property under Section 55.3, claims under Section 54 ("UPS Service Guarantee"), claims for invoice adjustments under Section 53.1, or claims for breach of contract or any other cause of action; and (2) pleads on the face of any complaint filed in court against UPS or states in its submission of its claim in arbitration against UPS, as the case may be, satisfaction and compliance with those notice and claims periods as a contractual condition precedent to recovery. Claimants may not deduct the amounts of pending claims from any Charges owed to UPS, and the Shipper waives any and all rights, including any statutory or common law rights, to set off the amount of any claim against Charges owed to UPS.

Agreement to Arbitrate Claims
**Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration. Claimant and UPS expressly agree that the foregoing obligation to arbitrate disputes regardless of the date of accrual of such disputes includes, but is not limited to, preexisting disputes and disputes that arise from or relate to Packages shipped at the time of a previous version of these Terms. Claimant and UPS further agree that the foregoing obligation to arbitrate disputes applies to claims brought by UPS against Claimant, regardless of whether Claimant has also brought a claim against UPS.**

Arbitration is the submission of a dispute to a neutral arbitrator, instead of a judge or jury, for a final and binding decision, known as an "award." Arbitration provides for more limited discovery than in court, and is subject to limited review by courts. Each party has an opportunity to present evidence to the arbitrator in writing or through witnesses. An arbitrator can only award the same damages and relief that a court can award under the law and must honor the terms and conditions in the Terms.Claimant and UPS agree that their sole relationship is a contractual one governed by the Service Guide and Terms. Any controversy or claim arising out of or related to the provision of services by UPS shall be resolved solely based on the agreements set forth in the Service Guide and Terms.

Institutional Arbitration
The arbitration shall be conducted by the American Arbitration Association (AAA) in accordance with its Commercial Arbitration Rules or, provided that you are an individual consumer and are using UPS's services for personal (not business) use, the Consumer Arbitration Rules (collectively referred to herein as the "AAA Rules"), and judgment on the award may be entered in any court of competent jurisdiction. The AAA Rules, including instructions for how to initiate arbitration, are available at adr.org. The arbitrator shall decide all issues of the case on the basis of the applicable law, not equity. If you initiate arbitration, you must serve UPS's registered agent for service of process, Corporation Service Company, which has locations in every state. Information also can be found on the website of your local Secretary of State.

**Any arbitration under this Agreement will take place on an individual basis; class, mass, consolidated or combined actions or arbitrations or proceeding as a private attorney general are not permitted. Claimant and UPS are each waiving the right to trial by jury. Claimant and UPS are further giving up the ability to participate in a class, mass, consolidated or combined action or arbitration.**

Place of Arbitration/Number of Arbitrators/Costs of Arbitration/Governing Law/Survival
Any arbitration will take place in the county where Claimant resides and will be determined by a single arbitrator. Solely with respect to a Claimant that does not reside in the United States, the arbitration will take place in Fulton County, Georgia.

# UPS® Tariff/Terms and Conditions of Service – United States

The initial filing fee required of Claimant by the AAA Rules shall be paid by Claimant to the extent such fee does not exceed the amount of the fee required to commence a similar action in a court that otherwise would have jurisdiction. For all non-frivolous complaints, UPS will pay the amount of such fee in excess of that amount. The arbitrator will allocate the administrative costs and arbitral fees consistent with the applicable rules of the American Arbitration Association. Reasonable attorney's fees and expenses will be allocated or awarded only to the extent such allocation or award is available under applicable law.

All issues are for the arbitrator to decide, except that issues relating to the scope, application, and enforceability of the arbitration provision, issues relating to the interpretation or application of the provision guarantying access to state courts of limited jurisdiction for qualifying disputes, and issues relating to interpretation or application of the prohibition on participation in class, mass, consolidated or combined actions or arbitrations or proceedings as a private attorney general, are all issues for a court to decide. The Federal Arbitration Act governs the interpretation and enforcement of this provision. This agreement to arbitrate shall survive termination of the Terms.

The arbitration demand must plead with particularity facts that demonstrate the dispute does not qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdictions over civil disputes). Where the dispute relates to a shipment, in order to commence arbitration, the arbitration demand must provide particularized information that identifies the shipment or shipments, such as by the date(s) of shipment and UPS tracking number(s).

## Severability

Notwithstanding anything to the contrary in the AAA Rules, if any part of this arbitration provision is deemed invalid, illegal or unenforceable for any reason, this shall not affect the validity, legality or enforceability of the remainder of this arbitration provision, and the arbitrator shall have the authority to amend any provisions

deemed invalid, illegal or unenforceable to the minimum extent necessary to make the same valid, legal and enforceable while preserving the intent of the parties as expressed in these Terms.

## Desk Arbitration

For all disputes concerning an amount less than fifteen thousand dollars ($15,000.00), the parties shall submit their arguments and evidence to the arbitrator in writing and the arbitrator shall make an award based only on the documents; no hearing will be held unless the arbitrator in his or her discretion, and upon request of a party, decides it is a necessity to require an in-person hearing. For a dispute governed by the AAA Consumer Arbitration Rules where the arbitrator issues an award in favor of Claimant, and concerning an award between fifteen thousand dollars ($15,000.00) and fifty thousand dollars ($50,000.00), inclusive, UPS shall refund Claimant's filing fee under the AAA Rules following conclusion of the arbitration, provided that Claimant agrees that both parties shall submit their arguments and evidence to the arbitrator in writing and that the arbitrator shall make an award based only on the documents, without a hearing being held. Notwithstanding this provision, the parties may agree to proceed with desk arbitration at any time.

## Access to Small Claims Court

All parties shall retain the right to seek adjudication in a state court of limited jurisdiction, such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdiction over civil disputes, for individual disputes within the scope of such court's jurisdiction. If the claims asserted in any request or demand for arbitration could have been brought in such a court of limited jurisdiction, then either party may elect to require that the claims be heard in such court of limited jurisdiction, rather than in arbitration, by notifying the other party of that election in writing.

## Acknowledgements

Claimant and UPS acknowledge and agree that pursuant to these Terms:

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST CLAIMANT, UPS OR RELATED THIRD PARTIES;

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A COURT, OTHER THAN A STATE COURT OF LIMITED JURISDICTION AS DEFINED ABOVE, RESOLVE ANY DISPUTE ALLEGED AGAINST CLAIMANT, UPS OR RELATED THIRD PARTIES;

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO HAVE A COURT REVIEW ANY DECISION OR AWARD OF AN ARBITRATOR, WHETHER INTERIM OR FINAL, EXCEPT FOR APPEALS BASED ON THOSE GROUNDS FOR VACATUR EXPRESSLY SET FORTH IN SECTION 10 OF THE FEDERAL ARBITRATION ACT.

– CLAIMANT AND UPS AGREE THAT WE ARE WAIVING THE RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, JOIN AS A CLASS MEMBER, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS IN ANY CLASS, MASS, CONSOLIDATED OR COMBINED ACTION OR ARBITRATION FILED AGAINST CLAIMANT, UPS AND/OR RELATED THIRD PARTIES.

## Award

The arbitrator may award money or equitable relief in favor of only the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. Similarly, an arbitration award and any judgment confirming it apply only to that specific case; it cannot be used in any other case except to enforce the award itself. To reduce the time and expense of the arbitration, the arbitrator will not provide a statement of reasons for his or her award unless a brief explanation of the reasons is requested by one of the parties. Unless both Claimant and UPS agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative, private attorney general or class proceeding.

## Confidentiality of Arbitration

Notwithstanding anything to the contrary in the AAA Rules, UPS and Claimant agree that the filing of arbitration, the arbitration proceeding, any documents exchanged or produced during the arbitration proceeding, any briefs or other documents prepared

# UPS® Tariff/Terms and Conditions of Service – United States

for the arbitration, and the arbitral award shall all be kept fully confidential and shall not be disclosed to any other party, except to the extent necessary to enforce this arbitration provision, arbitral award or other rights of the parties, or as required by law or court order. This confidentiality provision does not foreclose the American Arbitration Association from reporting certain consumer arbitration case information as required by state law.

### 55.1 Making Claims for Loss or Damage to Property
All notices of claims for loss of or damage to property transported or accepted for transportation must include the date of shipment, the tracking number, and the nature of the loss or damage. A request for proof of Delivery or damage inspection or the filing of a lawsuit do not constitute notification of a claim. Notice of a claim for loss or damage to property must be made using one of the following methods:

– Submit online at *ups.com/us/en/support/file-a-claim.page*; or

– Call 1-800-PICK-UPS® (1-800-742-5877).

All claims for loss or damage to property transported or accepted for transportation must: (1) be in writing (or an electronic communication) and must include reference to the Source Document or pickup record number and date of shipment or copies of other documents sufficient to identify the Shipment involved, and the declared value; (2) assert the liability of UPS for alleged loss or damage; (3) make claim for payment of a specified or determinable amount of money; and (4) be accompanied by a copy of the original invoice or, if no invoice was issued, other proof, certified to in writing, as to the purchase price paid by the Consignee (where the property involved has been sold to the Consignee), actual cost or replacement cost of the property, or extent of the damage to the property.

Claims for loss or damage to property must be filed in writing and transmitted electronically at *ups.com/us/en/support/file-a-claim.page*.

No claims will be voluntarily paid unless UPS receives notice of the claims and they are filed in writing and transmitted

electronically by or on behalf of the Shipper in accordance with these provisions.

A right or claim, of any kind, for loss or damage to property is conditioned upon full and strict compliance with this Section 55.1 and Sections 55.3 through 55.6. Full and strict compliance with this Section is required, even where it is believed that such compliance would not result in relief or would otherwise be futile.

### 55.2 Acknowledgment of Claims for Loss or Damage to Property
After receiving a proper written and electronic transmission of a claim in the manner and form and with the supporting documents described in Section 55.1 ("Making Claims for Loss or Damage to Property") and Section 55.4 ("Investigation of Claims for Loss or Damage to Property") herein, UPS or its designee will acknowledge the receipt of such claim in writing or electronically to the claimant within 30 days after the date of receipt, unless such claim has already been paid or denied in writing or electronically. UPS will at the time each claim is received create a separate file and assign thereto a successive claim file number and note that number on all documents filed in support of the claim and all records and correspondence with respect to the claim, including the written acknowledgment of receipt and, if in its possession, the Source Document and delivery receipts, if any, covering the Shipment involved. At the time such claim is received, UPS will cause the date of receipt to be recorded on the face of the claim document, and the date of receipt will also appear on the acknowledgment of receipt sent to the claimant.

### 55.3 Time Limit for Notice and Filing of Claims for Loss or Damage to Property
As a condition precedent to recovery, all claims for loss or damage to property must be noticed and filed in writing and transmitted electronically with UPS within the following time limits:

– For domestic Shipments (including shipments to and from Puerto Rico), UPS must receive notice of claims within sixty days after Delivery of the Package or, in case of failure to make Delivery, within sixty days after the date of scheduled Delivery. Claims must be filed within nine months after Delivery of the Package or, in case of failure to make Delivery,

within nine months after the date of scheduled Delivery.

– For international Shipments, claims must be filed within sixty days after Delivery of the Package or pallet or, in the case of non-Delivery, within sixty days after the date of scheduled Delivery.

– Suits shall be instituted within two years after denial of any portion of the claim. Where UPS does not receive notice of claims, claims are not filed, or suits are not instituted thereon in accordance with the foregoing provisions, such claims shall be deemed waived and will not be paid.

### 55.4 Investigation of Claims for Loss or Damage to Property
– **Prompt Investigation.** Each claim for loss or damage to a Package or Shipment filed in the manner prescribed herein will be promptly and thoroughly investigated, if investigation has not already been made prior to receipt of the claim.

– **Supporting Documents.** Each claim must be supported by the following: (1) evidence of payment of the shipping and any declared value charges; and (2) either the original invoice or a photocopy, exact copy, or extract of, the original invoice, a certification of prices or costs, with trade or other discounts, allowance, or deductions of any nature whatsoever and the terms thereof, or depreciation reflected thereon. Where the property involved in a claim has not been invoiced to the Consignee shown on the bill of lading or receipt, where an invoice does not show price or cost, where the property involved has not been sold, or where the property has been transferred at bookkeeping values only, UPS will, before paying a claim, require the claimant to establish the value in the quantity shipped, transported, or involved. UPS reserves the right to request the original shipping record or Source Document.

For an asserted claim of $1,000 or more for a Package processed through a UPS Shipping System and tendered to a UPS driver or UPS Customer Center, a copy of the signed high-value shipment summary applicable to the Shipment obtained by the Shipper and signed by the UPS driver or UPS Customer Center representative at the time of tender may be required to support

# UPS® Tariff/Terms and Conditions of Service – United States

the claim. UPS reserves the right to refuse to pay any claim if, having requested such a signed high-value shipment summary, no such summary is provided.

For an asserted claim of $1,000 or more for an international UPS Returns® or a UPS Import Control® Package or pallet, the signed UPS high-value shipment summary applicable to the Shipment must be submitted in support of the claim.

By filing a claim and supporting documents to UPS, the claimant certifies that the claim, amount of claim, and supporting documents are true and correct. The submission of false information as part of the claims process will result in automatic denial of a claim. Packages for which such claims are submitted are considered prohibited articles and are subject to an additional fee.

– **Original Packaging Materials.** In the event that a claim is made for damage to a Shipment, the original packaging materials must be made available to UPS or its designee for inspection prior to reshipment. UPS reserves the right to refuse to pay any claim for damage to property if, having requested the original packaging materials, they are not made available for inspection.

– **Verification of Loss.** When an asserted claim for loss of an entire Package or pallet or an entire Shipment cannot be otherwise authenticated upon investigation, UPS will obtain from the Consignee of the Shipment involved a certified statement in writing that the property for which the claim is filed has not been received from UPS or from any other source. UPS reserves the right to require verification by the filing of a police report and providing a copy of the filed report to UPS in support of the claim.

### 55.5 Salvage
When UPS pays the actual cost, the purchase price, or the replacement cost of the property, all rights, title to, and interest in the property shall thereupon pass to UPS, and UPS reserves the right to obtain the property for salvage. Payment of a claim in such circumstances shall be contingent on UPS's receipt of the damaged property in the same condition as on the date the damage was incurred.

### 55.6 Disposition of Claims for Loss or Damage to Property
UPS or its designee, after receiving a written claim for property transported, will pay, decline, or make a firm compromise settlement offer in writing to the claimant within 120 days after UPS receives the claim; provided, however, that if the claim cannot be processed and disposed of within 120 days after receipt, UPS or its designee will at that time and at the expiration of each succeeding 60-day period while the claim remains pending, advise the claimant in writing of the status of the claim and the reason for the delay in making final disposition thereof and shall retain a copy of such notice to the claimant in its claim file.

No claim for loss or damage shall be paid unless a valid claim has been filed in accordance with terms set forth herein (in Section 55.1, "Making Claims for Loss or Damage to Property," Section 55.3, "Time Limit for Notice and Filing of Claims for Loss or Damage to Property," and Section 55.4, "Investigation of Claims for Loss or Damage to Property"). UPS reserves the right to refuse to pay any claim for loss or damage to property until all outstanding Charges owing to UPS have been paid in full. UPS reserves the right to refuse to pay any claim for loss of property if, having requested a detailed description of the property, no such description is provided.

### 55.7 Authorization for Electronic Payment
UPS or its designee will pay claims electronically to any bank account the claimant provides in connection with a claim or the claimant's use of the services described in these Terms (together with any additional or substitute bank accounts the claimant may later provide, a "Bank Account"). UPS reserves the right in its sole and unlimited discretion to pay claims via an alternate payment method.

By filing a claim, the claimant authorizes UPS or its designee to initiate electronic credit entries to the Bank Account. The claimant further authorizes UPS or its designee to: (1) verify that the Bank Account is valid by initiating non-monetary entries or micro-transactions to the Bank Account or by using a third-party provider; and (2) initiate debit or credit entries to the Bank Account to correct any errors or make

any adjustments. The claimant is solely responsible for providing accurate Bank Account information, including routing and account numbers, and agrees that we may rely on the information provided by claimant and that we are not responsible for misdirected or delayed payments that result from incorrect, incomplete, or outdated information. The claimant represents and warrants that the Bank Account is located in the United States and that the claimant is an authorized user on the Bank Account. The claimant understands that all credit and debit entries under this authorization are subject to the Nacha Rules and agrees to comply with the Nacha Rules and all applicable law.

### 56. Declared Value; Liability
UPS's liability for loss or damage to each UPS domestic Package or international Shipment, or to each pallet in a UPS Worldwide Express Freight® Service Shipment, is limited to a value of $100, except as set forth below. Unless a greater value is recorded in the declared value field of the UPS Source Document or the UPS Automated Shipping System used, the Shipper agrees that the released value of each domestic Package or international Shipment, or pallet is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation, and that UPS shall not be liable for more than $100 for each domestic Package or international Shipment or pallet.

UPS has no liability whatsoever for delayed Delivery, except as specifically provided for Shipments guaranteed under the UPS Service Guarantee.

To increase UPS's limit of liability for loss or damage above $100, the Shipper must declare a value in excess of $100 for each Package or pallet in the declared value field of the UPS Source Document or the UPS Automated Shipping System used and pay an additional charge. The Shipper cannot declare a value in excess of the maximum allowable limits set forth below. UPS shall not be liable under any circumstances for an amount in excess of the declared value of a domestic Package or international Shipment, or pallet. When a Shipper declares a value in excess of $100, it does not receive any form of insurance. Shippers desiring

# UPS® Tariff/Terms and Conditions of Service – United States

cargo insurance, all risk insurance, or another form of insurance should purchase such insurance from a third party. Cargo insurance may be available through UPS licensed affiliates UPS Capital Insurance Agency, Inc. and Parcel Pro, Inc.

The rules relating to liability established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, Poland, on October 12, 1929, that convention as amended, or the Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999), shall apply to the international carriage of any Shipment insofar as the same is governed thereby. There are no stopping places which are agreed upon at the time of tender of the Shipment, and UPS reserves the right to route the Shipment in any way UPS deems appropriate.

**56.1 Maximum Declared Values**
The maximum declared value is $50,000 per Package and $100,000 per pallet, except for the following for which the maximum declared value may not exceed:

– Subject to the limitations set forth below, certain Packages are eligible for the enhanced maximum declared value of $70,000 per Package ("Enhanced Maximum Declared Value"). A Package is eligible for Enhanced Maximum Declared Value only where the Package is a domestic Package; is tendered pursuant to the Shipper's Scheduled Pickup Service; the service level selected is a UPS Next Day Air delivery service; the Package is processed for shipment using a UPS Shipping System (declarations of value on paper Source Documents are not eligible for Enhanced Maximum Declared Value); and the Package does not contain any hazardous material or a Perishable Commodity. Except as set forth in this Section, the portion of any declaration of value above $50,000 per Package is null and void;

– $1,000 per Package for Packages shipped by a Third-Party Retailer if no high-value control log was provided to UPS on tender of the Package;

– $1,000 per Package for a Package processed for shipment prior to tender using a UPS Shipping System and tendered to

a UPS driver or UPS Customer Center, unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Package and signed by the driver or UPS Customer Center representative upon tender of the Package;

– up to $10,000 per Package for a Package shipped to a UPS Access Point® location (excluding Packages shipped to The UPS Store® locations and Packages redirected to a UPS Access Point location by UPS, the Consignee, or the Shipper);

– $500 per Package for a Package shipped via a UPS Drop Box;

– up to $1,000 per Package for a Package shipped via a Third-Party Retailer or UPS Access Point® location (including a UPS Access Point® locker) if such Package was processed for shipment using a UPS Shipping System prior to drop off at the Third-Party Retailer or UPS Access Point® location or billed using Bill My Account;

– $1,000 per Package or pallet for international Shipments containing jewelry (not including costume jewelry), or $2,500 per Package or pallet for Shipments tendered to eligible destinations set forth at *ups.com/jewelry*;

– $1,000 per Package or pallet for Shipments containing unset precious stones or industrial diamonds, or $2,500 per Package or pallet for international Shipments tendered to eligible destination set forth at *ups.com/jewelry*;

– $1,000 per Package for domestic Packages returned via UPS Print Return Label, UPS Print and Mail Return Label, Electronic Return Label, or 1 UPS Pickup Attempt Return Service (including via UPS Returns® on the Web service);

– $1,000 per Package or pallet for international Shipments returned via the following UPS Returns® Services: UPS Print Return Label, UPS Print and Mail Return Label, Electronic Return Label, 1 UPS Pickup Attempt, or 3 UPS Pickup Attempts (including via UPS Returns® on the Web), unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Package or pallet and signed by the driver or UPS Customer Center representative upon tender of the Shipment;

– $1,000 per Package or pallet for international UPS Import Control® Shipments

unless a UPS high-value shipment summary is obtained by the Shipper or person tendering the Package or pallet and signed by the driver or UPS Customer Center representative upon tender of the Shipment;

– $999 per Package for Packages shipped via Shipper Release service;

– $500 per Package for loss or damage to any Shipment containing an article that, absent a signed written agreement with UPS allowing Shipment, UPS does not otherwise accept for transportation or Shippers are prohibited from shipping (UPS has no liability without such an agreement).

Shippers cannot declare a value for UPS® Prepaid Letters.

Declaring a value in the declared value field of the UPS Source Document or UPS Automated Shipping System used does not increase UPS's limitations of liability for, and Shippers may not declare a value for, damages related to providing or failure to provide C.O.D. service, including, but not limited to: failure to collect the C.O.D. amount; failure to collect the specified form of payment; collection of an instrument in the wrong amount; failure or delay in delivering the collected instrument to the Shipper; or collection of forged, insufficient funds, or otherwise invalid instruments.

Any declared value contrary to what is allowed in the applicable Terms or Service Guide (e.g., the portion of any declaration in excess of allowed maximums) is null and void. Acceptance for carriage or receipt of payment for any Package or Shipment bearing a declared value contrary to what is allowed does not constitute a waiver of any provisions of the Terms or Service Guide limiting UPS's liability or responsibility for any such Package or Shipment. If a Shipper declares value in excess of the applicable maximum allowed or in any respect contrary to what is allowed in the applicable Terms or Service Guide, it is the Shipper's sole responsibility timely to request an adjustment as set forth in Section 53.1 ("Invoice Adjustment") to recover any Charges. Shippers who fail to do so will be liable for all invoiced Charges.

# UPS® Tariff/Terms and Conditions of Service – United States

**56.2 Liability Limits**

UPS's maximum liability for loss or damage to each UPS domestic Package or international Shipment, or to each pallet in a UPS Worldwide Express Freight® Service Shipment, shall not exceed the lesser of:

– $100, when no value in excess of $100 is declared on the Source Document or UPS Automated Shipping System used (or when a value in excess of $100 is declared, but the applicable declared value charges are not paid);

– the declared value on the Source Document or UPS Automated Shipping System used when a value in excess of $100 is declared and the applicable declared value charges paid;

– the purchase price paid by the Consignee (where the shipped property has been sold to the Consignee);

– the actual cost of the damaged or lost property;

– the replacement cost of the property at the time and place of loss or damage; or

– the cost of repairing the damaged property.

UPS's liability for Shipments containing the following commodities shall be limited as follows:

– **Checks.** UPS's liability for a Shipment containing a check or checks is limited to the cost of stopping payment on and reissuing the check(s), not to exceed $100 per Package or pallet. In no event shall UPS be liable for the face value of the check(s).

– **Phone Cards, Tickets, Gift Cards, and Similar.** UPS's liability for a Shipment containing a phone card, ticket (such as event or airline ticket), gift certificate, gift card, coupon, or other similar printed matter with an exchange value is limited to the cost (which shall not include any amount of the value attached to the card, certificate, or coupon, or similar printed matter) of replacing the physical card(s), certificate(s), or printed matter, not to exceed $100 per Package or pallet. In no event shall UPS be liable for the face value of any phone card, ticket, gift certificate, gift card, coupon, or similar printed matter.

– **Media.** UPS's liability for a Shipment containing documents, film, photographs (including negatives), slides, transparen-cies, videotapes, compact discs, laser discs, computer tapes, and media of similar nature is limited to the replace-ment cost of the media on which the content is recorded.

– **Pairs, Parts.** In the event of loss of or damage to a pair or set of articles, UPS's liability is limited to the value of that part of the pair or set which is lost or damaged, and UPS shall not be liable for the value of the whole pair or set. In the event of loss of or damage to any part of property (including any part of a machine) which, when complete for sale or use, consists of several parts, UPS shall be liable only for the value of the part lost or damaged, not to exceed the declared value of the part lost or damaged. In no event shall UPS be liable for the value of the complete item.

In the event of partial loss or damage to a pallet in UPS Worldwide Express Freight® Service, UPS shall be liable only for the value of the contents of the pallet lost or damaged, and not the value of the full pallet.

**56.3 Exclusions from Liability**

UPS shall not be liable or responsible for:

– loss or damage to articles of unusual value (as defined in these Terms);

– loss or damage to Prepaid Letters;

– loss or damage resulting from insects, moths, vermin, inherent vice, deteriora-tion, dampness of atmosphere, extreme of temperature, ordinary wear and tear, or that which occurred or arose prior to or after the course of transportation by UPS;

– loss or damage resulting from improper, inadequate or unsafe packaging, labeling, or wrapping that fails to meet UPS's published standards related thereto set forth in the Terms or at *ups.com*;

– damage to any Package or Shipment where the original packaging materials are not made available to UPS for inspection;

– loss or damage resulting from the misuse of shipping labels or UPS Shipping Systems;

– loss or damage to Perishable Commodities to the extent the loss or damage results from exposure to heat or cold or the perishable nature of the item;

– loss or damage to human remains, fetal remains, human body parts, human embryos, or components thereof;

– loss or damage to fluorescent tubes or bulbs;

– damage to the outer container, including but not limited to luggage or other containers having value that are shipped without separate protective packing;

– loss of, damage to, or irretrievability of data stored on any type of media, or of information including without limitation personal, health or financial information;

– loss or damage due to acts of God, natural disasters, war risks, acts of terrorism, nuclear damage, acts of public authorities acting with actual or apparent authority, acts or omissions of customs or similar authorities, authority of law, the application of security regulations imposed by the government or otherwise applicable to the Shipment, riots, strikes or other labor disputes, civil unrest, disruptions in national or local air or ground transportation networks (including, but not limited to, UPS's transportation network), pandemic, epidemic or other public health conditions, disruption or failure of communication and information systems, or adverse weather conditions;

– loss or damage to any Package or Ship-ment for which UPS has no scan or other record reflecting that the Package or Shipment was tendered to UPS by the Shipper; or

– loss or damage to any Shipment contain-ing articles that:

(i)   Shippers are prohibited from shipping;

(ii)  UPS does not or is not authorized to accept for transportation;

(iii) UPS states that it will not accept; or

(iv) UPS has a right to refuse or that UPS states it will accept only upon express written approval, except where the Shipper has entered into a signed written agreement with UPS expressly allowing the Shipper to tender such articles to UPS for transportation notwithstanding these Terms.

For clarity, written agreements wherein UPS or any of its affiliates has agreed to

# UPS® Tariff/Terms and Conditions of Service – United States

provide services other than transportation, for articles that Shippers are prohibited from shipping, that UPS does not or is not authorized to accept for transportation, that UPS states that it will not accept, or that UPS has a right to refuse, even if such services are incidental to or contemplate transportation, do not constitute agreement by UPS to accept such items for transportation.

UPS shall not be liable for any damages of any kind, under any theory, arising from or relating to, directly or indirectly, in whole or in part, the loss of or unauthorized access, acquisition, use, modification, disclosure, or destruction of, or damage to, personal, health, financial, or any other type of data or information, including, without limitation, Social Security number, date of birth, driver's license number, credit card number, and financial account information. Notwithstanding any other provisions to the contrary and to the fullest extent permitted by applicable law, UPS will in no event be liable to Shipper, Consignee, or any other person, for any loss, damage, or costs of any kind arising out of or related to any data loss, data exposure, misuse of data, unauthorized access to data or electronic system(s), or cybersecurity or data privacy incident, regardless of whether or not any such loss, damage, or costs are caused by, or otherwise attributable to, UPS.

UPS shall not be liable for any loss or damage arising from providing service to, or on behalf of, a person or entity that obtains such services, including the delivery of property, by trick, false pretense, or other fraudulent scheme.

UPS shall not be liable for any loss or damage arising from fraud committed against the Shipper, Consignee or UPS, including but not limited to loss or damage to Shipments that are redirected or intercepted by a third party without authorization.

UPS shall not be liable for any damages arising from UPS's inability, failure, or refusal to comply with a request to stop, return, or re-route shipment of a Package after tender to UPS.

UPS shall not be liable for any interruption of service due to causes beyond UPS's

control including, but not limited to: the unavailability or refusal of a person to accept Delivery of the Shipment, acts of God, natural disasters, war risks, acts of terrorism, acts of public authorities acting with actual or apparent authority, acts or omissions of customs or similar authorities, authority of law, insufficient information provided by a customer, Hazardous Materials Packages improperly offered for transport, the application of security regulations imposed by the government or otherwise applicable to the Shipment, riots, a government agency hold, strikes or other labor disputes, civil unrest, disruptions of any kind in national or local air or ground transportation networks (including, but not limited to, UPS's transportation network), pandemic, epidemic or other public health conditions, disruption or failure of communication and information systems, and adverse weather conditions.

UNDER NO CIRCUMSTANCES SHALL UPS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM LOSS, MISDELIVERY OF, OR DAMAGE TO PROPERTY, DELAYED DELIVERY, OR FAILURE TO ATTEMPT DELIVERY IN ACCORDANCE WITH THE UPS SERVICE GUARANTEE, WHETHER OR NOT UPS HAD KNOWLEDGE SUCH DAMAGES MIGHT BE INCURRED. UNDER NO CIRCUMSTANCES SHALL UPS BE LIABLE FOR ANY DAMAGES WHATSOEVER FOR DELAYED DELIVERY, EXCEPT AS SPECIFICALLY PROVIDED FOR SHIPMENTS MADE UNDER THE UPS SERVICE GUARANTEE.

Acceptance for carriage of any Shipment containing articles that Shippers are prohibited from shipping, that UPS does not or is not authorized to accept for transportation, that UPS states it will not accept, or that UPS has a right to refuse, does not constitute a waiver of any provisions of the Terms or Service Guide limiting UPS's liability or responsibility for any such Package or Shipment.

## 57. Data Handling

The Shipper agrees that UPS and other companies in the UPS group of companies worldwide (i) may use data provided by the Shipper for purposes that include

providing UPS's services, products, and support; handling the Shipper's payments, claims, requests, and UPS accounts; communicating with the Shipper or Consignee to provide tracking updates and information on special events, surveys, contests, offers, promotions, products, and services; providing advertising that may be tailored to the Shipper's or Consignee's interests; operating, evaluating, protecting, and improving UPS's business; facilitating the Shipper's use of UPS blogs and social media; performing data analyses; monitoring and reporting compliance issues, including identifying and protecting against illegal activity, claims, or other liabilities; exercising, establishing, and defending legal claims; and complying with UPS policies and legal obligations, and (ii) may transfer data provided by the Shipper to countries other than the country where the Shipment is tendered for service. The Shipper also agrees that UPS may share data provided by the Shipper with third parties, including service providers, affiliates, resellers, joint marketing partners, franchisees, Shipper's contacts upon the Shipper's request, government agencies, and other third parties such as shippers, consignees, or third-party payers and recipients. UPS may also disclose data provided by the Shipper in order to comply with a legal obligation, to cooperate voluntarily with law enforcement or other public or government authorities, to prevent harm or loss in connection with suspected or actual illegal activity, and in the event UPS sells or transfers all or a portion of its business or assets. UPS is not responsible for the privacy practices of any non-UPS places, sites, platforms, or services.

## 58. Incorporation of Documents; Waiver; Future Changes

All Shipments are subject to the terms and conditions contained in the Terms. The effective Service Guide, and any modifications or amendments of them, are hereby incorporated by reference in these Terms. In the event of a conflict or inconsistency between the Terms and the effective Service Guide, the Terms shall control. UPS reserves the right to unilaterally modify or amend any portion of the Service Guide or the Terms at any time without prior notice.

# UPS® Tariff/Terms and Conditions of Service – United States

The Terms, the Service Guide and the UPS Source Document for each Shipment together comprise the complete and exclusive agreement of the parties, including any of UPS's affiliates or subsidiaries, except as modified by any existing or future written agreement between the parties, and may not be contradicted, modified or supplemented by any oral agreement or by any implied-by-law covenant.

For any language in the parties' agreement that gives UPS any discretion, judgment or other right, UPS's exercise of such discretion, judgment or other right is not limited in any way whatsoever – even if the specific language does not so specify. UPS has the sole and unilateral authority to choose how to exercise its discretion, judgment or any other right and may do so for any reason it chooses, without limitation. UPS is not bound by any previous exercise of its discretion, judgment or any other right. Nor does any previous exercise constitute a determination or admission by UPS about how such discretion, judgment or right should be or should have been exercised.

The parties disavow and waive any obligations of good faith and/or fair dealing, whether implied by law or otherwise, in connection with their agreements regarding services to which these Terms apply, including but not limited to UPS's exercise of any discretion, judgment or other right, afforded by the Service Guide, the Terms or the UPS Source Document. UPS (and any of UPS's affiliates and subsidiaries) have no special, confidential, or fiduciary relationship with any Shipper or Claimant.

Any failure to enforce or apply any terms or provisions of the Service Guide or the Terms shall not constitute a waiver of that term or provision by UPS, and shall not diminish or impair UPS's right to enforce such term or provision in the future. If one or more provisions of the Terms shall be held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not be so affected or impaired, and an arbitrator shall have the authority to amend any provisions deemed invalid, illegal, or unenforceable to the minimum extent necessary to make the same valid, legal and enforceable while preserving the intent of the parties as expressed in these Terms.

UPS may engage subcontractors to perform some or all of the transportation and incidental services.

UPS contracts on its own behalf and on behalf of its servants, agents, subcontractors, and UPS Access Point locations, each of whom shall have the benefit of these Terms, including but not limited to limitations and exclusions on liability. No such party has authority to waive or vary these Terms.



[ups.com](ups.com)

© 2025 United Parcel Service of America, Inc. UPS, the UPS brandmark and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved. 2025_Tariff_June2update_R2_V2_053025

# EXHIBIT 12

# Return Receipt - The Basics



General information, eligible mail classes, compatible extra services, and images associated with Return Receipt service (PS Form 3811) and what you should expect.

🕐 Jul 9, 2023 Knowledge

## Article Number

000006076

## Customer Information

| | | |
|---|---|---|
| How is Return Receipt used? | What does a Return Receipt (Green Card) look like? | How much does a Return Receipt cost? |
| What domestic mail classes can be used with Return Receipt? | Compatible Extra Services | After Mailing an Item, Can I Request a Return Receipt? |
| Is Return Receipt Eligible for a Refund? | What is Electronic Return Receipt? | |

Feedback

## How is Return Receipt used?

*Return Receipt* provides the sender with proof of delivery (the recipient's signature along with information about the delivery address, if different, and date of and time of delivery).

- A Return Receipt may be purchased at the time of mailing. **A mailer can no longer purchase a Return Receipt After Mailing,** but can request information from the delivery record if the previously purchased Return Receipt did not arrive.
- A mailer purchasing return receipt service may choose to receive the return receipt by mail (by use of PS Form 3811) or email (by Electronic Return Receipt?).
- Proof of delivery includes the following information:
  - Date of Delivery.
  - Signature of Recipient (or Recipient's Authorized Agent).

- Information about the recipient's actual delivery address, if different.
  - If provided by email, the Return Receipt includes a link to the USPS Tracking® prepopulated with tracking/delivery information on the mail item.
- If the correct fees, postage, and form are affixed, a mailpiece with Return Receipt may be mailed from the home, office, or dropped in a Collection Box receptacle. Aviation Mail Security restrictions apply.
- PS Form 3811, *Domestic Return Receipt*, includes a barcode and Related Tracking Number for tracking of the proof of delivery as it is being sent to the mailer after delivery of the mailpiece.

Back to Top

## What does a Return Receipt (Green Card) look like?

The hardcopy PS Form 3811, *Domestic Return Receipt* (seen below), or any USPS-approved copy includes a barcode with a Tracking Number. This Tracking Number is **not** to track the mailpiece sent by the mailer. Entering this Related Tracking Number into USPS Tracking provides tracking information on the hardcopy Return Receipt itself as it is being mailed to the original mailer who requested this service.

NOTE: A Return Receipt cannot be viewed online.

**Image of the front of PS Form 3811,** *Domestic Return Receipt:*



Feedback

**Image of the back of PS Form 3811,** *Domestic Return Receipt:*



Back to Top

## How much does a Return Receipt cost?

For detailed information on fees, go to Notice 123 or "Insurance & Extra Services."

Back to Top

## What domestic mail classes can be used with Return Receipt?

Return Receipt service (PS Form 3811) is available for:

- Priority Mail Express® (Form 3811 only)
- Priority Mail®, First-Class Mail®, USPS Ground Advantage™-Commercial™, and Parcel Select (if purchased with Certified Mail, Collect on Delivery (COD), Insurance over $500, or Registered Mail®)
- USPS Marketing Mail™ (parcels only, excluding Marketing Parcels; if purchased with Bulk Insurance over $500)
- Parcel Select Lightweight (if purchased with Bulk Insurance over $500)
- Bound Printed Matter, Library Mail, Media Mail (if purchased with Collect on Delivery or Insurance over $500)

Back to Top

## The following extra services can be combined with Return Receipt service (PS Form 3811)

- Certified Mail
- Certified Mail Restricted Delivery
- Certified Mail Adult Signature Required

Feedback

- Certified Mail Adult Signature Restricted Delivery
- Restricted Delivery
- Collect on Delivery
- Collect on Delivery Restricted Delivery
- Registered Mail
- Registered Mail Restricted Delivery
- USPS Tracking
- Signature Confirmation Restricted Delivery (Form 3811 only)
- Signature Confirmation (Form 3811 only)
- Insurance (when insured for more than $500, Form 3811 only)
- Adult Signature Requested (Form 3811 only)
- Adult Signature Restricted Delivery (Form 3811 only) (Priority Mail Express and Priority Mail only

Back to Top

## After Mailing an Item, Can I Request a Return Receipt?

Mailing an item and then purchasing a Return Receipt is not an option. You can purchase a Return Receipt at the time of mailing and receive a Return Receipt with delivery information either in the mail or by email.

**If you did purchase a Return Receipt service, but have not received the Return Receipt from the item's delivery,** you can still request information from the delivery record within 90 days of the date of purchasing Return Receipt. You must visit any Post Office, station or branch, complete PS Form 3811-A, *Request for Delivery Information/Return Receipt* and produce your receipt showing that the applicable return receipt fee was paid. This must be done within 90 days of the date of purchase.

Back to Top

## Is Return Receipt Eligible for a Refund?

It may be eligible under certain conditions.

Mailers can use USPS Tracking® to check the status of the delivery record after delivery of a mailpiece with a hardcopy Return Receipt.

Return Receipt fees are refunded only if the USPS® fails to provide the recipient's signature (if not otherwise refused, unclaimed, or returned to sender). Visit www.usps.com/help or your origin Post Office™ to request a refund, not less than **30** days, or more than 60 days from the date of mailing.

If you have purchased a Return Receipt at a retail Post Office™ location and have not received the return receipt (or receive an incomplete receipt), you may request a refund or

Feedback

replacement record either:

- After 30 calendar days from date of mailing.
- Any time after you know the item has been delivered.

The applicable fee is not charged at retail if the sender can produce their receipt showing the return receipt fee was paid.

If you have purchased an electronic Return Receipt and have not received your electronic return receipt via email within 3-5 days of your request, we suggest you visit USPS.com® and check the delivery status of your item.

- If you discover that your item has been delivered, we suggest that you check your email or junk folder. Occasionally email that is not junk will be sent to the folder if it does not meet your criteria for acceptable email.
- As a final alternative, we suggest that you request your electronic Return Receipt again. To do this, enter the tracking number in USPS Tracking®, select "Return Receipt Electronic" under "Available Actions", and provide your email address.

Back to Top

Feedback

## Title

Return Receipt - The Basics

## URL Name

Return-Receipt-The-Basics

Sending Mail & Packages          Insurance & Extra Services

## Related Articles

Domestic Claims - The Basics

Mailboxes - The Basics

Missing Mail - The Basics

USPS Package Intercept® - The Basics

Certified Mail® - The Basics

## Trending Articles

Where is my package? Tracking Status Help

Missing Mail - The Basics

Delayed mail and packages?

Informed Delivery® - The Basics

Change of Address - The Basics

Feedback

# EXHIBIT 13 REDACTED IN ITS ENTIRETY